## STATE OF CONNECTICUT *v.* SEDRICK COBB
## (SC 14384)

Callahan, C. J., and Borden, Berdon, Norcott, Katz, Peters and O'Connell, Js.*

---

* The listing of justices reflects their seniority status on this court as of the date of argument.

Argued February 19—officially released December 7, 1999

*Kent Drager*, senior assistant public defender, and *Jonathan M. Levine*, with whom was *David S. Golub*, for the appellant (defendant).

*Harry Weller*, senior assistant state's attorney, with whom were *John A. Connelly*, state's attorney, and *Maureen M. Keegan*, senior assistant state's attorney, for the appellee (state).

*Opinion*

## TABLE OF CONTENTS

| | Page |
|---|---|
| I. FACTS. | 301 |
| II. SEARCH AND SEIZURE ISSUES | 306 |
| A. The December 21, 1989 Warrantless Search of the Defendant's Apartment. | 314 |
| B. The December 21, 1989 Warrant to Search the Defendant's Apartment. | 316 |

 C. The Execution of the December 21, 1989
 Search Warrant . . . . . . . . . . . . . . 322
 D. The December 22, 1989 Seizure of Certain
 Items from the Defendant's Car . . . . . . 325
 1. The December 22, 1989 Search War-
 rant for the Defendant's Car. . . . . . 326
 2. The Pretrial Ruling . . . . . . . . . . 328
 3. The Panel's Ruling During Trial. . . . 329
 4. The Defendant's Claims on Appeal . . 332
 E. The December 26, 1989 Search Warrant
 for the Defendant's Apartment . . . . . . 341
 F. The Execution of the December 26, 1989
 Search Warrant . . . . . . . . . . . . . . 345
 G. The December 26, 1989 Seizure of the
 Valve Cap and Valve Stem Remover from
 the Defendant's Car . . . . . . . . . . . . 348
III. THE DEFENDANT'S CONFESSION. . . . . . 349
IV. GUILT PHASE ISSUES . . . . . . . . . . . . 364
 A. Waiver of a Jury Trial. . . . . . . . . . . 365
 B. Motion for a Mistrial . . . . . . . . . . . 375
 C. The Factual Basis of the Verdict . . . . . 379
 D. The Sufficiency of the Evidence. . . . . . 384
 E. Murder-Kidnapping Capital Felony . . . . 386
 F. Murder-Sexual Assault Capital Felony . . 387
 G. The Two Witness Rule . . . . . . . . . . 389
 H. The Imposition of Two Death Sentences 390
V. PENALTY PHASE ISSUES . . . . . . . . . . 392
 A. The Defendant's Waiver of a Jury Trial . 393
 B. Disclosure of the Factual Basis of the Guilt
 Phase Verdicts . . . . . . . . . . . . . . . 393
 C. The Defendant's Claim that the State
 Improperly Changed Its Theory of Aggra-
 vation . . . . . . . . . . . . . . . . . . . . 397
 1. The Evidence at the Guilt Phase . . . 398
 2. The Arguments at the Guilt Phase . . 403
 3. The Evidence at the Penalty Phase. . 407
 4. The Arguments at the Penalty Phase 410

D. The State's Notice of Aggravating Factors 419
E. The Denial of Disclosure Regarding the
 Defendant's Mental Condition . . . . . . . 422
F. Articulation of the Factual Basis of the
 Panel's Verdict Regarding the Aggravating
 Factors . . . . . . . . . . . . . . . . . . . 426
G. The Panel's Treatment of the Unitary
 Aggravating Factor as Three Separate Fac-
 tors . . . . . . . . . . . . . . . . . . . . 432
H. The Definitions of "Especially Heinous"
 and "Especially Vague". . . . . . . . . . . 434
I. The Purported Inadequacy of the Panel's
 Verdict . . . . . . . . . . . . . . . . . . . 434
J. The Claimed Retroactivity of the *Ross* Def-
 inition of "Especially Cruel" . . . . . . . . 436
K. The Claimed Inapplicability of Certain
 *Ross* Language . . . . . . . . . . . . . . . 442
L. The Sufficiency of the Evidence of the
 Aggravating Factor . . . . . . . . . . . . 446
M. Articulation of the Factual Basis of the
 Panel's Verdict Regarding the Mitigating
 Factors . . . . . . . . . . . . . . . . . . . 451
N. Whether the Panel Properly Exercised Its
 Sentencing Function . . . . . . . . . . . . 452
O. The Panel's Verdict Regarding Mitigation 456
P. The Purported Use of the Defendant's
 Motion to Suppress his Confession . . . . 466
Q. The Purported Misapplication of the Con-
 cept of Mitigation . . . . . . . . . . . . . 468
R. The Purported Failure to Consider Certain
 Nonstatutory Mitigating Factors. . . . . . 469
S. The Purported Failure to Consider the
 "Catchall" Mitigating Factor . . . . . . . . 472
T. The Purported Failure to Consider Mercy
 or Appropriateness of the Death Penalty 474
U. The Purported Failure to Consider the
 Severity of the Aggravating Factor . . . . 475

V. The Purported Failure to Consider the Cumulative Impact of Mitigation . . . . . 481

W. The Purported Vagueness of § 53a-46a . . 482

X. The Purported Improper Failure to Find Mitigation. . . . . . . . . . . . . . . . . . 486

 1. Claimed Mitigating Factors Regarding the Defendant's Psychological State 489

 2. Claimed Nonstatutory Mitigating Factors . . . . . . . . . . . . . . . . . . . . . 491

Y. The Imposition of Two Separate Death Sentences. . . . . . . . . . . . . . . . . . 496

Z. Certain Constitutional Challenges. . . . . 496

AA. The Purported Arbitrary Factors Pursuant to § 53a-46b (b) (1) and (2). . . . . . 497

 1. The Sufficiency of the Evidence of Aggravation . . . . . . . . . . . . . . . 498

 2. Certain Guilt Phase Challenges . . . . 498

 3. Request for Evidentiary Hearing . . . 498

VI. PROPORTIONALITY REVIEW . . . . . . . . 500

A. The State's Claim of Lack of Proportionality Review Jurisdiction . . . . . . . . . . . 501

B. The Comparative Method of Proportionality Review . . . . . . . . . . . . . . . . . . 502

C. The Purported Speculative Basis of the Aggravant. . . . . . . . . . . . . . . . . . . 509

D. Proportionality Review Pursuant to § 53a-46b (b) (3) . . . . . . . . . . . . . . . . . . 509

BORDEN, J. The defendant, Sedrick Cobb, appeals[1] from the judgment of the trial court, after a trial to a three judge court, of conviction of two counts of capital felony in violation of General Statutes § 53a-54b (5) and

---

[1] The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b), which provides in relevant part: "The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years; (4) review of a sentence of death pursuant to section 53a-46b . . . ."

(7),[2] and one count of robbery in the third degree in violation of General Statutes § 53a-136 (a).[3] The trial court imposed two sentences of death on the capital felony counts, and a sentence of five years incarceration on the robbery count. The defendant raises a total of forty-five challenges to the judgment of conviction and to the death sentences. We affirm the judgment in all respects.

The defendant was charged in an information with: (1) two counts of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A) and (B);[4]

---

[2] General Statutes § 53a-54b provides: "Capital felony. A person is guilty of a capital felony who is convicted of any of the following: (1) Murder of a member of the Division of State Police within the Department of Public Safety or of any local police department, a chief inspector or inspector in the Division of Criminal Justice, a sheriff or deputy sheriff, a constable who performs criminal law enforcement duties, a special policeman appointed under section 29-18, an official of the Department of Correction or a person providing services on behalf of said department when such employee or person is acting within the scope of his employment or duties in a correctional institution or facility and the actor is confined in such institution or facility while such victim was acting within the scope of his duties; (2) murder committed by a defendant who is hired to commit the same for pecuniary gain or murder committed by one who is hired by the defendant to commit the same for pecuniary gain; (3) murder committed by one who has previously been convicted of intentional murder or of murder committed in the course of commission of a felony; (4) murder committed by one who was, at the time of commission of the murder, under sentence of life imprisonment; (5) murder by a kidnapper of a kidnapped person during the course of the kidnapping or before such person is able to return or be returned to safety; (6) the illegal sale, for economic gain, of cocaine, heroin or methadone to a person who dies as a direct result of the use by him of such cocaine, heroin or methadone; (7) murder committed in the course of the commission of sexual assault in the first degree; (8) murder of two or more persons at the same time or in the course of a single transaction; or (9) murder of a person under sixteen years of age."

We recognize that, for purposes of this appeal, the statutes applicable to the defendant's trial were the 1989 revision of the General Statutes. For the sake of uniformity and clarity, however, except where otherwise indicated, references in this opinion are to the statutes as they currently are codified.

[3] General Statutes § 53a-136 (a) provides: "A person is guilty of robbery in the third degree when he commits robbery as defined in section 53a-133."

[4] General Statutes § 53a-92 provides: "Kidnapping in the first degree: Class A felony. (a) A person is guilty of kidnapping in the first degree when he

(2) robbery in the third degree in violation of § 53a-136 (a); see footnote 3 of this opinion; (3) sexual assault in the first degree in violation of General Statutes § 53a-70 (a);[5] (4) murder in violation of General Statutes § 53a-54a;[6] and (5) two counts of capital felony in violation

abducts another person and: (1) His intent is to compel a third person (A) to pay or deliver money or property as ransom or (B) to engage in other particular conduct or to refrain from engaging in particular conduct; or (2) he restrains the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually; or (B) accomplish or advance the commission of a felony; or (C) terrorize him or a third person; or (D) interfere with the performance of a government function.

"(b) Kidnapping in the first degree is a class A felony."

[5] General Statutes § 53a-70 provides: "Sexual assault in the first degree: Class B felony: Nonsuspendable sentences. (a) A person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person, or (2) engages in sexual intercourse with another person and such person is under thirteen years of age and the actor is more than two years older than such person, or (3) commits sexual assault in the second degree as provided in section 53a-71 and in the commission of such offense is aided by two or more other persons actually present.

"(b) Sexual assault in the first degree is a class B felony for which one year of the sentence imposed may not be suspended or reduced by the court or, if the victim of the offense is under ten years of age, for which ten years of the sentence imposed may not be suspended or reduced by the court."

[6] General Statutes § 53a-54a provides: "Murder. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime.

"(b) Evidence that the defendant suffered from a mental disease, mental defect or other mental abnormality is admissible, in a prosecution under subsection (a) of this section, on the question of whether the defendant

of § 53a-54b (5) and (7). See footnote 2 of this opinion. After the trial court, *Heiman, J.*, found probable cause to try the defendant on the murder and capital felony counts, the state filed a notice of aggravating factors alleging that the capital felonies were committed in an especially heinous, cruel or depraved manner, as provided in General Statutes (Rev. to 1989) § 53a-46a (h) (4).[7] The defendant waived a jury trial and elected to be tried by a three judge court, as provided by General Statutes § 53a-45.[8] Pursuant to § 53a-45, the deputy chief

acted with intent to cause the death of another person.

"(c) Murder is punishable as a class A felony in accordance with subdivision (2) of section 53a-35a unless it is a capital felony or murder under section 53a-54d."

[7] General Statutes (Rev. to 1989) § 53a-46a (h) provides: "If no mitigating factor is present, the court shall impose the sentence of death on the defendant if the jury or, if there is no jury, the court finds by a special verdict as provided in subsection (e) that (1) the defendant committed the offense during the commission or attempted commission of, or during the immediate flight from the commission or attempted commission of, a felony and he had previously been convicted of the same felony; or (2) the defendant committed the offense after having been convicted of two or more state offenses or two or more federal offenses or of one or more state offenses and one or more federal offenses for each of which a penalty of more than one year imprisonment may be imposed, which offenses were committed on different occasions and which involved the infliction of serious bodily injury upon another person; or (3) the defendant committed the offense and in such commission knowingly created a grave risk of death to another person in addition to the victim of the offense; or (4) the defendant committed the offense in an especially heinous, cruel or depraved manner; or (5) the defendant procured the commission of the offense by payment, or promise of payment, of anything of pecuniary value; or (6) the defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value."

Public Acts 1995, No. 95-19 amended § 53a-46a by making substantive revisions to and redesignations of certain subsections of this statute. Hereafter, references in this opinion to § 53a-46a are to the 1989 revision.

[8] General Statutes § 53a-45 provides: "Murder: Penalty; waiver of jury trial; finding of lesser degree. (a) Murder is punishable as a class A felony in accordance with subdivision (2) of section 53a-35a unless it is a capital felony or murder under section 53a-54d.

"(b) If a person indicted for murder or held to answer for murder after a hearing conducted in accordance with the provisions of section 54-46a waives his right to a jury trial and elects to be tried by a court, the court shall

court administrator, *Hennessy, J.*, appointed a three judge panel consisting of *Kulawiz, Barnett* and *Langenbach, Js.* (panel), to hear the case.

The defendant filed three motions to suppress: (1) certain evidence gathered as a result of two searches of the defendant's automobile; (2) certain evidence gathered as a result of three searches of the defendant's residence; and (3) an oral confession made by the defendant. After an evidentiary hearing, the court, *Pellegrino, J.*, denied the defendant's motions.

The trial then was held before the panel, which rendered a verdict finding the defendant guilty on all counts. Thereafter, pursuant to General Statutes (Rev. to 1989) § 53a-46a (b) (3),[9] the defendant, with the

be composed of three judges designated by the Chief Court Administrator or his designee, who shall name one such judge to preside over the trial. Such judges, or a majority of them, shall have the power to decide all questions of law and fact arising upon the trial and render judgment accordingly.

"(c) The court or jury before which any person indicted for murder or held to answer for murder after a hearing conducted in accordance with the provisions of section 54-46a is tried may find such person guilty of homicide in a lesser degree than that charged."

[9] General Statutes (Rev. to 1989) § 53a-46a provides in relevant part: "Hearing on imposition of death penalty. Aggravating and mitigating factors. (a) A person shall be subjected to the penalty of death for a capital felony only if a hearing is held in accordance with the provisions of this section.

"(b) For the purpose of determining the sentence to be imposed when a defendant is convicted of or pleads guilty to a capital felony, the judge or judges who presided at the trial or before whom the guilty plea was entered shall conduct a separate hearing to determine the existence of any mitigating factor concerning the defendant's character, background and history, or the nature and circumstances of the crime, including any mitigating factor set forth in subsection (g), and any aggravating factor set forth in subsection (h). Such hearing shall not be held if the state stipulates that none of the aggravating factors set forth in subsection (h) of this section exists or that one or more mitigating factors exist. Such hearing shall be conducted (1) before the jury which determined the defendant's guilt, or (2) before a jury impaneled for the purpose of such hearing if (A) the defendant was convicted upon a plea of guilty; (B) the defendant was convicted after a trial before three judges as provided in subsection (b) of section 53a-45; or (C) if the jury which determined the defendant's guilt has been discharged by the court for good cause or, (3) before the court, on motion of the defendant and with the approval of the court and the consent of the state. . . ."

approval of the court and the consent of the state, elected to have the penalty phase hearing held before the panel rather than a jury. The panel rendered a special verdict finding that both capital felonies had been committed in an especially cruel and heinous manner. The panel did not find, however, that the crimes had been committed in an especially depraved manner. In addition, the panel found that there had been no mitigating factors. The panel further determined that the counts charging kidnapping, sexual assault and murder were lesser included offenses of the capital felonies. Accordingly, the panel imposed two separate death sentences, one for each of the capital felony convictions, and a five year sentence for the robbery conviction. This appeal followed.

## I

## THE FACTS

The panel reasonably could have found the following facts. On December 15, 1989, the defendant was in the parking lot of the Bradlees' shopping center in Waterbury. After Bonita Casertano parked her car in the lot and entered the shopping center, the defendant deflated one of her car tires with a valve stem remover. When she returned to her car, the defendant approached her, pointed to her deflated tire, and offered to change it for her. A friend of Casertano passed by, however, and offered to assist Casertano, at which time the defendant left the area.

On December 16, 1989, at approximately noon, the defendant was again in the Bradlees' shopping center parking lot. Susan Romaniello had parked her car and entered the shopping center. Thereafter, the defendant deflated one of her car tires with a valve stem remover. When she returned to her car, the defendant approached her, told her that her tire was flat, and offered to change it for her. She declined his offer,

however, because she lived nearby and her father was able to come to her aid. When her father did so, he noticed that the valve cap was missing from the deflated tire.

On the evening of December 16, 1989, the victim in this case, Julia Ashe, drove her two door car to the Naugatuck Valley Mall in Waterbury, where she bought some items from Lerner's department store (Lerner's) and from Record Town. She then drove 2.4 miles to the Bradlees' shopping center and parked her car in the parking lot. The defendant was also in the parking lot, and had in his possession a valve stem remover and a roll of fiberglass reinforced tape. After the victim had left her car and entered the shopping center, the defendant deflated one of her car tires with his valve stem remover. When she returned to her car, the defendant approached her and offered to change the tire. She accepted his offer, and the defendant removed the deflated tire and replaced it with a donut spare tire from the trunk of the victim's automobile. While the defendant was changing the tire, Richard Sprague walked by and saw the defendant so engaged. At some point, the defendant told the victim that his car was disabled and requested a ride. The victim agreed to give him a ride to a gas station. The victim and the defendant then both entered her car with the victim in the driver's seat and the defendant in the front passenger seat. After they left the parking lot, the defendant forced the victim to drive approximately 0.8 of one mile until they reached a secluded wooded area off Harper's Ferry Road in Waterbury, near a dam that abutted a pond.

The defendant directed the victim to park there, and he then directed her to get into the backseat, where he knew that she would not be able to leave the two door car. He then went through her pocketbook and shopping bags, and took approximately $300, including two $50 bills. The victim's fiance, John DeSantis, had given

her the money in a Watertown Federal Credit Union envelope after having cashed her paycheck for her at the credit union the day before. The defendant also took personal papers belonging to the victim. Thereafter, he entered the rear passenger area, pulled the victim's pants down to her knees, inserted his finger into her anus, and forcibly had vaginal intercourse with her. Afterward, he put one of her gloves in her mouth, and covered her mouth and nose with several layers of the tape. He also taped her hands together and her feet together, and carried her to the dam. There he pushed her off the wall of the dam onto a concrete apron approximately twenty-three feet below that extended from the bottom of the dam. The temperature at that time was approximately eighteen or nineteen degrees fahrenheit. The water at the base of the dam, where it covered the concrete apron, was approximately one foot deep.

The victim survived the fall and located some metal wire mesh, which is used to reinforce concrete, protruding from the ice near the apron. Using the sharp edges of the wire mesh, she was able to remove the bindings from her hands, cutting herself in the process. She also managed to undo the bindings from her feet, removing her right sneaker in the process. She unsuccessfully attempted to remove the gag from her mouth. While attempting to do so, she used sufficient force to cause her to gouge her face with her fingernails and to break a fingernail. When she had removed some of her bindings, the victim attempted to crawl out of the water onto the abutting rocky shore.

Meanwhile, however, in order to make sure that the victim was dead, the defendant was watching her from the top of the dam. Realizing that she had survived the fall and was crawling toward the shore, the defendant made his way down to the victim and forced her, face

down, back into the shallow water at the base of the dam, strangling or drowning her, or both.[10]

The defendant then returned to the victim's car, where he opened the trunk with her car keys, and took out a Jean Country store bag containing a new pair of blue jeans and a Lerner's bag. He next threw the car keys into the trunk, closed it, took both bags with him, and walked back to his car, which was in the Bradlees' parking lot. The defendant then drove onto Interstate 84, back to the area adjoining the dam and the pond. There he parked on the shoulder of the highway, and climbed over a guardrail and through a hole in a fence to a point where he was able to look down and see the victim's lifeless body. He then drove home.

At that time, the defendant was living in an apartment, located at 85 Aetna Street in Naugatuck, with a friend, George Fonte, from whom he rented a room for $300 per month. At some point during the early morning hours of December 17, 1989, the defendant made a payment on his rent by leaving $250 of the cash that he had stolen from the victim, including the two $50 bills, on the kitchen table. Later that same morning, the defendant went to the Jean Country store at the Naugatuck mall where, giving a false name and address, he returned the victim's jeans, which she had purchased at 6:40 p.m. the previous day, for a cash refund in the amount of $19.90.

---

[10] The evidence regarding whether the defendant returned to the bottom of the dam and killed the victim was in conflict. According to the defendant's confession, which we discuss in detail in part III of this opinion, he never went to the bottom of the dam. After throwing her off the top of the dam, he returned to his car, and then drove back to the scene where, from the side of the highway near the pond, he observed her motionless body and concluded that she was dead. The panel was not required, however, to credit that precise scenario. Instead, we conclude that the panel reasonably could have found that the victim survived the fall and spent some time desperately trying to save her own life before the defendant made his way to the bottom of the dam and killed her.

The victim's body and car were not discovered until December 25, 1989. When discovered, her body was lying face down, her hands were spread apart, and her feet, also spread apart, were protruding from the ice onto the shoreline. Her head and most of her body were encased in ice beyond the waterline. There was evidence indicating, moreover, that before her death her hands and ankles had been bound with tape. Her right foot was unshod, and her right sneaker was missing. Her pants were unbuttoned and totally unzipped, and her underwear was exposed. Beneath the layers of tape around her mouth and nose there was a glove stuffed into her mouth. There were numerous premortem abrasions and contusions on her face, wrists and arms. There were no injuries of significance to the back of her body. There was a hemorrhage of the soft tissue between the vagina and the rectum, consistent with penetration of the rectum. The defendant's sperm was in her vagina.[11] The cause of death was asphyxia.[12]

The victim's pocketbook was in her car, but there was no money in it. Although when she had left to go shopping her car had four regular tires on it, when it was found there was a donut spare tire where the left front tire had been, and in the trunk were the left front tire, a single glove and the keys to the car. The valve stem of the removed tire was loose, but when it was tightened the tire retained air, and was still full of air at the time of trial approximately seventeen months later. Additional facts will be stated as appropriate to the various claims of the defendant.

---

[11] Although the victim and DeSantis had intercourse three days before her disappearance, both the intact state of the sperm and blood tests excluded him as the source of the sperm. Furthermore, although the defendant is not a secretor, the panel reasonably could have found, on the basis of blood tests and the defendant's oral confession, that the defendant had deposited the sperm in the victim's vagina.

[12] Asphyxia is synonymous with asphyxiation and is defined as the "impaired exchange of oxygen and carbon dioxide, usually on a ventilatory, not circulatory, basis." T. Stedman, Medical Dictionary (24th Ed. 1982).

The defendant's claims on appeal fall into five discrete categories challenging: (1) the pretrial rulings by Judge Pellegrino, and a subsequent ruling during the trial by the panel, on the motions to suppress the evidence gathered in the various searches; (2) the pretrial ruling by Judge Pellegrino on the motion to suppress the defendant's oral confession; (3) various aspects of the guilt phase of the proceedings; (4) various aspects of the penalty phase of the proceedings; and (5) the proportionality of the death sentences, which we review pursuant to General Statutes (Rev. to 1989) § 53a-46b (b) (3).[13] We consider each category in turn.

## II

### SEARCH AND SEIZURE ISSUES

Judge Pellegrino held an extensive evidentiary hearing on the defendant's motions to suppress, at which

[13] General Statutes (Rev. to 1989) § 53a-46b provides: "Review of death sentence. (a) Any sentence of death imposed in accordance with the provisions of section 53a-46a shall be reviewed by the supreme court pursuant to its rules. In addition to its authority to correct errors at trial, the supreme court shall either affirm the sentence of death or vacate said sentence and remand for imposition of a sentence in accordance with subdivision (1) of section 53a-35a.

"(b) The supreme court shall affirm the sentence of death unless it determines that: (1) The sentence was the product of passion, prejudice or any other arbitrary factor; (2) the evidence fails to support the finding of an aggravating circumstance specified in subsection (h) of section 53a-46a; or (3) the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

"(c) The sentence review shall be in addition to direct appeal and if taken, the review and appeal shall be consolidated for consideration. The court shall then render its decision on the legal errors claimed and the validity of the sentence."

Proportionality review pursuant to subdivision (3) of § 53a-46b (b) has been repealed, effective April 12, 1995, by Public Acts 1995, No. 95-16, § 3 (b). Hereafter, references in this opinion to § 53a-46b are to the 1989 revision. See *State* v. *Webb*, 238 Conn. 389, 491 n.71, 680 A.2d 147 (1996) (proportionality review mandatory for all capital felony cases pending at time of repeal).

the defendant did not testify, and issued a lengthy and detailed memorandum of decision on the motions. Although the defendant presents challenges to the trial court's conclusions in nonchronological order, it is useful to consider his challenges chronologically.[14] It is also necessary to provide certain factual background, as specifically found by the court in its memorandum of decision and as disclosed by the record, of the search and seizure processes in which the various law enforcement agencies engaged during the course of their investigation into the disappearance and death of the victim. That factual background is as follows.

In June, 1989, the defendant was arrested in connection with an incident involving an attempted sexual assault, an assault and an unlawful restraint that had occurred in Naugatuck. At the time of the critical events in the present case, that matter was pending in the Superior Court in Waterbury, and the defendant was represented on those charges by a privately retained attorney, David Labriola.

On December 20, 1989, five days before the discovery of the victim's body, Detective Joseph Froehlich, of

_____

[14] We note that in presenting these claims, the defendant has not offered separate and independent analyses of them under the state constitution. See State v. Geisler, 222 Conn. 672, 684–85, 610 A.2d 1225 (1992). In some instances, he relies on both federal and state constitutional doctrines and authorities that do not differ from each other in any significant respect. See, e.g., part II A of this opinion (standard for determining validity of consensual search); part II C of this opinion (particularity of warrant requirement). In another instance, he relies on state constitutional authority that we determine it is not necessary to address. See part II D 4, footnote 29 of this opinion. In sum, therefore, all of the defendant's search and seizure claims rest either on federal constitutional doctrines and authorities alone, or on state constitutional doctrines and authorities that simply mirror his federal claims. We, therefore, analyze the defendant's claims as he has presented them, namely, as governed by federal constitutional principles, without a separate and independent state constitutional basis. See State v. Dyson, 238 Conn. 784, 794, 680 A.2d 1306 (1996) ("[b]ecause the defendant has failed to provide any independent analysis under the state constitution, we limit our analysis to the federal constitution").

the Connecticut state police, seized and searched the defendant's 1979 Mazda car pursuant to a warrant connected to the defendant's involvement in a sexual assault, burglary and robbery that had occurred on December 15, 1989, in Oxford. The warrant authorized the police to search for and seize, among other things, articles of clothing worn by the perpetrator of the Oxford crimes, certain items taken during that robbery, and forensic evidence such as fingerprints. After finishing the search for evidence at the state police barracks in Southbury, the state police performed an inventory search of the defendant's car. The inventory disclosed, among other items, the following: a plastic bag, with the name "Lerner New York" on it, containing a woman's red belt and a pair of earrings, with Lerner's price tags attached; a plastic bag, with the name "Record Town" on it, containing a cassette tape entitled "Relaxation"; and a valve stem cap from an automobile tire. The defendant does not challenge on appeal either this warrant or the inventory process.

In the early evening of December 20, 1989, Trooper James Monroe, Detective John Buterla and Sergeant John Mucherino, of the Connecticut state police, went to the defendant's apartment in Naugatuck to execute an arrest warrant for the arrest of the defendant in connection with the Oxford crimes committed on December 15, 1989. Officer Robert Hughes, of the Naugatuck police department, accompanied the state police to assist them with the arrest. At that time, Hughes also was investigating a sexual assault that had occurred in Naugatuck on December 13, 1989. The defendant was at his apartment, and he was placed under arrest. The defendant was asked if he would be willing to speak with the police about the Oxford incident. He agreed and, after having been given the *Miranda* warnings,[15]

---

[15] *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

he voluntarily spoke with the police about that incident. The defendant also was asked for consent to search his apartment. He consented to the search and willingly signed two separate consent forms, one for the state police and one for the Naugatuck police, which also advised him of his right not to have his home searched without a warrant. Neither the execution of that warrant nor the consensual search of his apartment at that time yielded any evidence that is relevant to the present case. The factual circumstances surrounding that consent, however, are relevant to certain of the defendant's claims regarding subsequent searches and to his claim regarding his confession.

The defendant then was taken to the Southbury state police barracks, where he was booked and again asked if he would agree to discuss the Oxford crimes. He agreed to do so, and again was given the *Miranda* warnings. The defendant then willingly gave a written statement regarding the Oxford crimes. He was calm and cooperative. After giving this statement, the defendant consented to speak with the Naugatuck police, who were waiting at the barracks, about the Naugatuck crime committed on December 13, 1989. The defendant again was given the *Miranda* warnings, and he gave the police a written statement concerning his involvement in that incident. He continued to manifest a calm demeanor at that time.

Meanwhile, the Watertown and Waterbury police departments were investigating the victim's disappearance on December 16, 1989. On the morning of December 21, 1989, Mucherino shared information about the Oxford crimes with Detective Robert Scannell, of the Watertown police department, and told Scannell that the defendant had been arrested. Scannell had been told by DeSantis that on the night of her disappearance, the victim had intended to shop at Lerner's and Music Land in the Naugatuck Valley Mall. After Scannell had

learned the details of the Oxford crimes from Mucherino, he requested the state police to ask the defendant if he had been at that mall on December 16, 1989.

At the time of Scannell's request, Detective Sean Byrne, of the Connecticut state police, was transporting the defendant in a police cruiser from the Southbury barracks to the Superior Court in Derby, for arraignment on the Oxford crimes. Mucherino contacted Byrne by radio and requested that Byrne ask the defendant if he had been at the mall on December 16, 1989. Byrne, after reading the defendant the *Miranda* warnings, asked him if he had been at the Naugatuck Valley Mall on December 16, and the defendant answered in the affirmative. This information was transmitted to Scannell.

The defendant was arraigned at geographical area number five of the Superior Court in Derby at approximately noon on December 21, 1989. At that arraignment, the presiding judge, *Sequino, J.*, advised the defendant, along with others then being arraigned, of their rights. That advice included the following: He had "the right to remain silent"; anything he said "can and will be used against" him; if he "consider[ed] answering questions that may be posed to [him] by anyone including a police officer, [he had] the right to consult with an attorney before being questioned"; he had "the right to have an attorney present while being questioned and . . . the right to stop answering questions at any time [he] chose"; he had "the right to be represented by an attorney"; and if he could not "afford an attorney and [he, qualified], the court [would] appoint a public defender to represent [him] without cost to [him]." The court appointed Public Defender Mary Hazelkamp to represent the defendant on the Oxford charges.

At approximately 1 p.m., Detective Neil O'Leary and Lieutenant Robert Deely, of the Waterbury police

department, having been informed that the defendant had been at the Naugatuck Valley Mall on December 16, 1989, went to the court in Derby to speak with the defendant. The defendant was in the lockup. They identified themselves as police officers investigating the disappearance of the victim, the defendant agreed to speak with them, and he again was given the *Miranda* warnings. He freely agreed to cooperate with the police officers and, although denying any knowledge of the victim, discussed an incident that had occurred at the mall on December 16. He stated that in the parking lot he had found a Lerner's shopping bag, which he had put in his car, and a receipt, which he had put in his pocket and later left in a box next to his bed in his bedroom at his apartment. According to the defendant, the bag contained a pair of earrings, a cassette tape and the receipt. During this interview, O'Leary contacted Byrne, who told him that a Lerner's bag and its contents had been inventoried as being in the defendant's car on December 20, 1989. The defendant told O'Leary and Deely that they could go to his apartment and get the receipt. They were unwilling to do so, however, without a written consent to search. The defendant agreed to sign a consent form. Because they did not have a consent form with them, they went back to Waterbury, secured a consent to search form, and returned to Derby at approximately 4 p.m. They presented the form to the defendant, at which time Deely advised him of his right not to have his apartment searched without a warrant. The defendant stated that he knew his rights, and that "[t]he judge just read them to me." The defendant then signed the consent to search form.

In this form, the defendant acknowledged that he had been advised of his right not to have a search made of his apartment without a search warrant, and that he had a right to refuse to consent to the search. He also

specifically authorized "[Lieutenant Deely and Detective O'Leary] . . . members of the Waterbury Police Department," to search his "premises" located at 85 Aetna Street in Naugatuck "for the receipts [he] took out of a Lerner's shopping bag, and put in [his] bedroom in a box." The form also authorized them "to take from the above mentioned premise . . . any letters, papers, material, or other property which they may desire for their official investigation." The defendant also acknowledged that "[t]his written permission is being given to the above named officers voluntarily and without threats or promises of any kind after having been advised of [his] constitutional rights which [he] hereby waived]."

O'Leary and Deely went to the defendant's apartment, and when they looked into the box next to his bed, as he had described it to them, they first saw a green and white Watertown Federal Credit Union envelope. They immediately thought that the envelope might be evidence in the present case because DeSantis had told them that the victim belonged to the Watertown Federal Credit Union, and that he had cashed her paycheck and had given her the money in a credit union envelope. Instead of proceeding further on the basis of the consent to search, however, the officers called State's Attorney John Connelly, who advised them to seek a search warrant to seize the credit union envelope.[16]

As a result, O'Leary and Deely prepared and secured a search warrant for the seizure of the credit union envelope and other items that they thought might be located in the defendant's apartment. They executed

---

[16] During this search, O'Leary and Deely also spoke with Fonte, with whom the defendant shared the apartment. Fonte voluntarily turned over to them the remaining $220 of the $250, including the two $50 bills, which the defendant had left on the kitchen table on the morning of December 17, 1989. The defendant does not challenge in any way how O'Leary and Deely acquired possession of this money.

the warrant at approximately 9 p.m. on December 21, 1989, and, pursuant thereto, they seized the credit union envelope. The envelope contained a Chess King receipt dated December 14, 1989, in the amount of $25,[17] a K-Mart receipt dated December 1, 1989, for a VHS movie and some waterbed conditioner, and another K-Mart receipt dated December 9, 1989, for a saw and some paint.[18] They also seized a newspaper, which was located under the covers of the defendant's bed, open to a news story about the disappearance of the victim.

The next day, December 22, 1989, Deely and Scannell secured a search warrant for the defendant's car, which was still being held by the state police. Pursuant thereto, they sought to seize, and did seize, a woman's red belt, a pair of woman's purple and gold clip-on earrings attached to a plastic display card labeled "Cafe," a cassette tape entitled "Relaxation," a Lerner's bag, and a Record Town bag. This warrant and the seizure incident to it were the subject both of a pretrial ruling of Judge Pellegrino, and of a subsequent ruling of the panel during the trial, which we discuss in more detail in part II D of this opinion.

The victim's car and body were discovered on December 25, 1989. As a result, Deely and O'Leary sought another warrant to seize, among other things, a plastic valve cap, a metal valve cap, and a valve stem remover, from the defendant's car. This warrant was signed and executed on December 26, 1989, yielding the two valve

---

[17] At trial, this receipt was identified as a receipt for a sweater that the victim had purchased for her father at Chess King on December 14, 1989.

[18] The next day, December 22, 1989, O'Leary and Deely showed the envelope and the K-Mart receipts to DeSantis. He identified the envelope as identical to the one that he had given to the victim containing her paycheck proceeds. He also confirmed that the victim had been shopping at K-Mart on the days in question, and that she had purchased the movie, waterbed conditioner, saw and paint, all of which he still had and he then turned over to O'Leary and Deely.

caps. On·the same day, they sought and secured a warrant to search the defendant's apartment for, among other items, the victim's driver's license, credit cards and personal papers. This search yielded a Stop and Shop photograph envelope containing, among other items, the victim's social security card, her bank charge card, and two Sears receipts dated December 14, 1989, and signed by the victim.[19]

A

The December 21, 1989 Warrantless Search
of the Defendant's Apartment

Judge Pellegrino ruled that the defendant voluntarily had consented to the warrantless search of his apartment by O'Leary and Deely on December 21, 1989. That search revealed the presence of the Watertown Federal Credit Union envelope, which served as a partial basis for the subsequent warrant for the further search of the defendant's apartment and the seizure of the envelope. The defendant claims that the court improperly determined that his consent to this search was voluntary. We disagree.

"A search . . . is not unreasonable under . . . the fourth amendment to the constitution of the United States . . . if a person with authority to do so has freely consented . . . . *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 248, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973); *Dotson* v. *Warden*, 175 Conn. 614, 618, 402 A.2d 790 (1978). . . . *State* v. *Reagan*, 209 Conn. 1, 7, 546 A.2d 839 (1988). Whether there was valid consent to a search is a factual question that will not be lightly overturned on appeal. *United States* v. *Sanchez-Jaramillo*, 637 F.2d 1094, 1098 (7th Cir.), cert. denied, 449 U.S. 862, 101 S. Ct. 166, 66 L. Ed. 2d 79 (1980)." (Internal quotation

---

[19] At trial, these receipts were identified as receipts for items that the victim had purchased on her Sears Roebuck and Company credit card at the Naugatuck Valley Mall.

marks omitted.) *State* v. *Zarick*, 227 Conn. 207, 226, 630 A.2d 565, cert. denied, 510 U.S. 1025, 114 S. Ct. 637, 126 L. Ed. 2d 595 (1993). The state has the burden to establish the voluntariness of the consent, and the trial court's finding in that regard "will not be upset by this court unless clearly erroneous." *State* v. *Reddick*, 189 Conn. 461, 469, 456 A.2d 1191 (1983).

The trial court's finding is amply supported by the evidence. The defendant agreed to speak with O'Leary and Deely in the Derby courthouse after they had informed him that they were police officers investigating the disappearance of the victim, and after they had advised him of his *Miranda* rights. He voluntarily disclosed to them that he had put a receipt in a box in his bedroom, and he specifically told them that they could go to his apartment and retrieve it. They advised him of his right not to have his apartment searched without a warrant, and he stated that he understood his rights. There was a hiatus of several hours while they obtained a formal consent to search form. He then signed the form in which he also acknowledged that he could refuse to have his apartment searched without a warrant, that they could seize, not only the receipt in question, but any other items that they deemed pertinent to their investigation, and that he was giving them permission to search without threats or promises of any kind. In signing the form, he also specifically waived his constitutional right not to have his premises searched without a warrant. As the trial court specifically noted, there was no evidence whatsoever of any coercion. In addition, on the prior day the defendant voluntarily had consented to a search of his apartment in connection with his arrest for the Oxford crimes, and he had executed a consent to search form at that time.

The defendant argues that "by being informed that the police could get a warrant, [he] was given the signal that not to consent would be futile. This brings the case

within the rule of *Dotson* v. *Warden*, [supra, 175 Conn. 621], where this court stated that the intimation that a warrant will automatically issue is as inherently coercive as the announcement of an invalid warrant." (Internal quotation marks omitted.) The trial court did not find, and the evidence does not demonstrate, however, that O'Leary and Deely told or intimated to the defendant that if he did not consent, a warrant automatically would issue for the search of his apartment. Indeed, the record is to the contrary. O'Leary testified, without contradiction by the defendant, that he had advised the defendant that without a warrant they could not search his apartment unless he consented, and that a warrant could issue if "a judge felt there was probable cause to do so." Moreover, it was the defendant who volunteered the information about the receipt, and who told the officers that they were free to go to his apartment to retrieve it, and it was they who insisted, nonetheless, on having him sign a consent form.

B

The December 21, 1989 Warrant to Search
the Defendant's Apartment

The court ruled that the search warrant for the defendant's apartment issued on December 21, 1989, was valid. This search yielded, among other things, the credit union envelope, the Chess King receipt for the sweater that the victim had purchased for her father on December 14, 1989, and the newspaper under the defendant's bedcovers open to a story concerning the victim's disappearance, all of which eventually were introduced into evidence. The defendant claims that this warrant was invalid because the affidavit underlying it did not establish probable cause. This claim is without merit.

Under the fourth amendment to the United States constitution, "[p]robable cause to search exists if: (1)

there is probable cause to believe that the particular items sought to be seized are connected with criminal activity or will assist in a particular apprehension or conviction . . . *and* (2) there is probable cause to believe that the items sought to be seized will be found in the place to be searched. . . . *State* v. *Vincent,* 229 Conn. 164, 171, 640 A.2d 94 (1994).

"The standard of review of an issuing judge's determination that probable cause existed to issue a search warrant is to consider the information before the issuing judge at the time of the issuance of the warrant, together with the reasonable inferences drawn from such information, in the light most favorable to the issuing judge's determination of probable cause. . . . In determining whether probable cause exists to conduct a search, a totality of the circumstances test is used. *Illinois* v. *Gates,* 462 U.S. 213, 233, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983); *State* v. *Johnson,* [219 Conn. 557, 562, 594 A.2d 933 (1991)]; *State* v. *Barton,* 219 Conn. 529, 545, 594 A.2d 917 (1991). [P]robable cause is a fluid concept— turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules. *Illinois* v. *Gates,* supra, 232. In determining the existence of probable cause to search, the magistrate should make a practical, commonsense decision whether, given all of the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place. Id., 238; *State* v. *Johnson,* supra, 563. In making this determination [of probable cause], the magistrate is entitled to draw reasonable inferences from the facts presented. When a magistrate has determined that the warrant affidavit presents sufficient objective indicia of reliability to justify a search and has issued a warrant, a court reviewing that warrant at a subsequent suppression hearing should defer to the reasonable inferences drawn by the magistrate.

. . . *State* v. *Zarick,* [supra, 227 Conn. 222–23].''
(Emphasis in original; internal quotation marks omit-
ted.) *State* v. *Sivri,* 231 Conn. 115, 141–42, 646 A.2d
169 (1994).

The application for the search warrant sought permis-
sion to search the defendant's apartment and to seize
a green and white Watertown Federal Credit Union
envelope, a Music Land plastic bag, receipts, a woman's
red coat, white sneakers and blue jeans, and a ''black
velcro wallet with crisscross design.'' The supporting
affidavit of O'Leary and Deely dated December 21, 1989,
disclosed the following facts. The victim, age twenty-
two, was reported missing by DeSantis to the Water-
town police department at approximately 2 a.m on
December 17, 1989. He had last seen her when she
left their residence in Oakville to go shopping at the
Naugatuck Valley Mall on the evening of December 16,
1989. When she left, she had been wearing, among other
items, blue jeans, a red winter coat and sneakers, and
was carrying a black velcro wallet with a crisscross
design. The victim had told DeSantis that she was going
shopping at Lerner's and Music Land at the mall, and
would be home at approximately 10:30 p.m. She neither
arrived home at the expected time, nor had she called.
According to DeSantis, this was completely out of char-
acter for her, because in the five years that they had
been together she had never even been one hour late
coming home. Further, she was seen by Douglas
Hughes, a friend of both DeSantis and the victim, inside
the mall carrying packages, at approximately 7:30 p.m.

The affidavit further stated that the victim's friends
and her employer were of the opinion that her disap-
pearance involved foul play. The affidavit also stated
that the defendant, who lived at 85 Aetna Street in
Naugatuck, had been arrested on the previous day and
charged with robbery in the first degree and sexual

assault in the first degree in connection with an incident that had occurred in Oxford on December 15, 1989.

In addition, the affidavit disclosed that the victim did all of her banking at the Watertown Federal Credit Union, and that on December 21, 1989, the defendant had been interviewed by O'Leary and Deely in connection with the victim's disappearance. After being advised of and waiving his constitutional rights, he had told them that, on the evening of December 16, 1989, he had been shopping at Caldor's department store, and when he returned to his car in the Caldor's lot it would not start. He walked across the street to the Naugatuck Valley Mall, and, in that parking lot at approximately 10 p.m., after leaving the mall, he found a plastic shopping bag with the name "Lerner's" on it. According to the defendant, inside the bag were a pair of earrings, a cassette tape and a receipt. He took the receipt out of the bag and put it in his jacket pocket, and walked back to his car. He put the bag into his car, which still would not start. He then blacked out for several hours, woke up at approximately 2 a.m., started his car and went home.

When asked why he took the receipt, the defendant stated that he did not know why. When asked where the receipt was at that time, the defendant stated that he had put it in a cardboard box in his bedroom, and that the affiants could get it. The defendant also stated that his roommate would be home after 5 p.m. and would let them in because the defendant did not have his keys with him. After being advised that in order for O'Leary and Deely to enter his apartment they would need either a search warrant or a written consent to search signed by him, the defendant stated that he had nothing to hide, and that if they wanted to enter the apartment he would give them his consent. They then secured a consent to search form, which the defendant signed.

The affidavit further disclosed that, pursuant to the consent to search, O'Leary went to the defendant's apartment at approximately 5:30 p.m. on December 21, 1989. In the defendant's bedroom was the cardboard box described by the defendant, and inside the box in plain view were a green and white Watertown Federal Credit Union envelope and a plastic Music Land bag. O'Leary and Deely stated that they recalled that the victim was a member of that credit union. Furthermore, DeSantis had told them that the victim would have had a Watertown Federal Credit Union envelope in her possession because he had cashed her paycheck at the credit union on December 14, 1989, and had given her just such an envelope containing several hundred dollars. In addition, DeSantis had told them that the victim had intended to go shopping at Music Land. O'Leary and Deely also determined from an official of the credit union that the defendant was not a member of it. Finally, the officers had spoken to Mucherino, who told them that when the defendant was arrested on December 20, 1989, his car had been seized and inside it was a Lerner's bag.

These facts gave ample support for the issuing judge's determination that there was probable cause to search the defendant's apartment. Although the whereabouts of the victim was then unknown and her body had not yet been discovered, there was sufficient evidence for probable cause to believe that she had been the victim of criminal activity. She had been missing for approximately five days, after having gone shopping in the Christmas holiday period, and had neither returned home when expected that evening nor called to say where she was. She had not been seen since 7:30 that evening, when she had been seen at the mall. Such a disappearance was totally out of character for her. Thus, there was probable cause to believe that the items sought were "connected with criminal activity . . . ."

(Internal quotation marks omitted.) *State* v. *Vincent,* supra, 229 Conn. 171. These facts were sufficient for the issuing judge to infer that the items sought were connected to criminal activity because the victim, rather than having left the area voluntarily, had "disappeared as a result of [such] activity." *State* v. *Sivri,* supra, 231 Conn. 144.

Furthermore, there was sufficient evidence to connect both the defendant and his apartment to the criminal activity regarding the disappearance of the victim, and thus, ample evidence for probable cause to believe that the items sought would be found in the defendant's apartment. The victim was going to shop at Lerner's and Music Land at the mall, and was seen at the mall at approximately 7:30 p.m. The defendant admitted that he had been at the mall at approximately the same time. The defendant admitted that he had found and taken possession of a Lerner's bag containing a pair of earrings, a cassette tape and a receipt, and such a bag had been found during the inventory search of his car. The consensual search of the defendant's apartment had disclosed the credit union envelope, and the victim had been in possession of just such an envelope, which contained several hundred dollars, when she had embarked on her shopping trip. Moreover, the defendant was not a member of the credit union. The consensual search also had disclosed the presence of a Music Land bag. Furthermore, the defendant had been arrested and charged with first degree robbery and first degree sexual assault for a criminal incident committed on the very day before the victim's disappearance. The totality of these facts, and the reasonable inferences that could be drawn from them by the issuing judge, were sufficient to establish probable cause to believe that, in addition to the credit union envelope and Music Land bag that already had been found in the defendant's

apartment, the other items sought also would be found there. Id., 142.

## C

### The Execution of the December 21, 1989 Search Warrant

In executing the December 21, 1989 warrant, the police seized the credit union envelope and its contents, which included the Chess King receipt.[20] The trial court declined to suppress the receipt, ruling that: (1) the receipt was "part and parcel" of the credit union envelope; and (2) the warrant had authorized the seizure of "receipts."

The defendant claims that the Chess King receipt should have been suppressed on the ground that "the warrant did not authorize the seizure of [this receipt] . . . because at the time [it was] seized the police lacked the [requisite] probable cause that [it was] in any way connected to criminal activity or to [the victim's] disappearance." More specifically, he argues that: (1) if the authorization in the warrant to seize receipts included any or all receipts, the warrant would necessarily be "an unconstitutional general warrant"; and (2) the authorization to seize the envelope did not authorize the police to seize anything in it, except for the cash that the affidavit established had been in the envelope. Therefore, the defendant maintains, the police could not establish probable cause with regard to any other contents of the envelope. We disagree.

---

[20] In executing this warrant, the police also seized the K-Mart receipts. Those receipts, however, were not introduced into evidence. Although on appeal the defendant challenges the seizure of all of the receipts seized, we confine our review to the Chess King receipt because that was the only receipt introduced into evidence against the defendant.

Furthermore, the police also seized the newspaper article open to the story about the victim's disappearance, which subsequently was introduced into evidence against the defendant. In this appeal, the defendant does not challenge the seizure of that item.

"The description of items to be seized in a warrant need only be as specific as the circumstances and the nature of the activity under investigation permit." *State* v. *Zarick*, supra, 227 Conn. 225. In construing the terms of a warrant, the circumstances and nature of the activity under investigation dictate a practical margin of flexibility. *United States* v. *Lowry*, 675 F.2d 593, 595 (4th Cir. 1982). This principle, which applies in the law of the execution of warrants, is consistent with the concomitant principle, which applies in the law of the validity of warrants, that probable cause is to be determined based on the totality of the circumstances, viewed in a common sense and practical manner. *State* v. *Sivri*, supra, 231 Conn. 142. Furthermore, when police search for an item, they are entitled to search any container that logically could hold the item sought. *United States* v. *Gomez-Soto*, 723 F.2d 649, 655 (9th Cir.), cert. denied, 466 U.S. 977, 104 S. Ct. 2360, 80 L. Ed. 2d 831 (1984). In addition, the police do not exceed the scope of a warrant when they provide the issuing magistrate with the most particular description of the item sought that they reasonably can provide, and then seize only those items that fall generally within that description. See *United States* v. *Emmons*, 24 F.3d 1210, 1216 (10th Cir. 1994) (" '[w]hen the circumstances of the crime make an exact description of the fruits and instrumentalities a virtual impossibility, the searching officer can only be expected to describe the generic class of items he is seeking' "); *United States* v. *Harris*, 903 F.2d 770, 775 (10th Cir. 1990) (same). These principles, as applied to the facts of the execution of this warrant, compel the conclusion that the police acted well within permissible bounds in seizing the Chess King receipt found in the credit union envelope.

The affidavit disclosed that the defendant had placed, in a box in his bedroom, a receipt of unknown origin

that he had taken from a Lerner's bag that he purportedly had found in the mall parking lot on the night of the victim's disappearance. Further, when the police, with the defendant's consent, looked in the box for that receipt, they discovered the credit union envelope, at which point they ceased their consensual search and secured the warrant.

The warrant authorized the seizure of both the envelope and receipts. The envelope itself was named in the warrant as a target of the search, and was also a logical container of a receipt, in the sense that a paper receipt reasonably could be thought to be inside an envelope. The envelope was part of the evidence connecting the defendant to the disappearance of the victim, and the defendant himself had stated that he had obtained the receipt from a Lerner's bag he had found in the mall parking lot. Moreover, this reference further connected the defendant to the victim's disappearance because she had disappeared after leaving to go shopping at Lerner's, among other places, at the mall. Thus, the envelope, the Lerner's bag and the receipt, all combined to connect the defendant to the victim's disappearance. Therefore, when the police seized the credit union envelope, they were entitled to search inside it to determine whether it contained, and then to seize therefrom, any receipt found therein.[21]

Consequently, we reject the defendant's contention that the police were required to establish separate probable cause to seize anything, other than cash, that they found in the credit union envelope. The police were authorized to seize any receipt that could have disclosed a potential connection between the victim and the

---

[21] This conclusion renders it unnecessary to consider the state's claim that the Chess King receipt was not suppressible because, irrespective of the warrant, the police were authorized to seize it pursuant to the broad scope of the defendant's consent to search given to O'Leary and Deely prior to the issuance of the warrant.

defendant. Because they had provided the issuing judge with the best description, based on the defendant's own statement, that they had, namely, receipts, and they seized only what was within that description, the seizure of the receipt was proper.

We also reject the defendant's contention that this interpretation of the scope of the warrant renders it an unconstitutional general warrant. Given that the defendant did not specify the origin of the receipt that he had taken out of the Lerner's bag purportedly found in the mall parking lot, and given that the victim was known to have been on a shopping trip at the mall prior to her disappearance, that reference was as specific as the circumstances and the nature of the activity under investigation permitted. See *State* v. *Zarick,* supra, 227 Conn. 225.

D

The December 22, 1989 Seizure of Certain
Items from the Defendant's Car

Pursuant to a search warrant issued for the defendant's car dated December 22, 1989, the police seized the following items: a Lerner's bag containing a red belt and a pair of earrings, which the victim had purchased at Lerner's on December 16, 1989; and a Record Town bag containing a cassette tape entitled "Relaxation," which the victim had purchased at Record Town on December 16.[22] The defendant claims that these items, as well as certain other evidence that was discovered as a result of the seizure of these items, should have been suppressed. We disagree.

---

[22] In addition, when this search was conducted, both James McDonald, of the Waterbury police department forensic laboratory, and Scannell, observed in plain view a valve cap and valve stem remover in a tray between the driver's side door and the front seat. At that time, however, those items did not appear to have significance to the investigation into the victim's disappearance.

This claim of the defendant, and the state's responses to it, require some additional background. The defendant's claim arises out of the ruling of Judge Pellegrino on the defendant's initial pretrial challenge to the warrant for the search of his car on December 22, 1989, and a subsequent related ruling by the panel, that arose when certain facts that had not been disclosed at the suppression hearing became known during the trial. Therefore, a full understanding of the claim, and of its proper disposition, requires discussion of the warrant, of the ruling of the trial court denying suppression, and of the panel's subsequent ruling.

1

### The December 22, 1989 Search Warrant for the Defendant's Car

On the evening of December 22, 1989, the Waterbury police secured a search warrant for the defendant's car, which was still located at the state police barracks in Southbury. That warrant authorized the search of the car, and the seizure therefrom, of the following items, among others: a woman's red belt; a pair of woman's purple and gold clip-on earrings attached to a plastic display card labeled "Cafe"; an audio cassette tape entitled "Relaxation"; a Lerner's bag; and a Record Town bag.

The supporting affidavit submitted by Scannell and Deely contained the following information. The first six paragraphs repeated some of the same statements that had been contained in the supporting affidavit for the December 21, 1989 search warrant for the defendant's apartment. In summary, these paragraphs repeated the following facts: the victim had been missing since the evening of December 16, 1989; she had failed to return home at the expected hour and failed to call, which was totally out of character for her; the victim had told

DeSantis that she was going shopping at Lerner's and Music Land, at the mall, where she had been seen at 7:30 p.m. by Douglas Hughes; her friends and employer were of the opinion that she had been the victim of foul play; and the defendant had been arrested on December 20, 1989, for the December 15, 1989 robbery and sexual assault in Oxford.

The affidavit also contained the following information, which theretofore had not been reflected in any previous warrant application. The defendant had been identified by the victim of the Oxford crimes as the man who had entered her home, sexually assaulted her, and "held a gun to her head while playing Russian Roulette." Also, on December 20, 1989, the state police, in connection with the arrest of the defendant for the Oxford crimes, had executed a search warrant of the defendant's car at the Southbury barracks, and in connection with that search had inventoried among the contents of the car the following items, which were in state police custody at Southbury: (1) a gray plastic Lerner's bag containing a woman's red belt with a Lerner price tag and a pair of woman's purple and gold clip-on earrings attached to a plastic display card bearing the word "Cafe"; and (2) a white plastic Record Town bag containing an audio cassette tape entitled "Relaxation."

The affidavit further stated that, on December 21, 1989, the Waterbury and Watertown police departments had executed a search warrant for the defendant's apartment, and had seized store receipts from stores located at the mall that were connected to purchases made by the victim on December 14 and 16, 1989. In this connection, paragraph ten of the affidavit, which later became the subject of the panel's ruling during trial, stated as follows: "Through subsequent investigation and checking of the day's receipts for 12-16-89 at the Lerner Shop, located at the [Naugatuck] Valley Mall,

it was learned that [the victim], on 12-16-89 purchased at said Lerner's, one red Lerner's belt, and one pair of womans, purple and gold clip-on type earrings."

The affidavit also stated that the audio cassette tape entitled "Relaxation" had been identified by DeSantis as the type of cassette that the victim had intended to purchase for him as a Christmas present. Finally, the affidavit stated that, as of December 22, 1989, the date of the affidavit, neither the victim nor her car, which she had been driving on December 16, 1989, had been located.

2

The Pretrial Ruling

The defendant's pretrial challenge to the December 22, 1989 warrant was confined to the claim that certain information contained in the affidavit, namely, that the victim of the Oxford crimes had identified him as the perpetrator of those crimes, was false. Thus, the defendant challenged the validity of the warrant under the doctrine of *Franks* v. *Delaware*, 438 U.S. 154, 171–72, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978), that, where a supporting affidavit contains false information included by the affiant either knowingly or recklessly, and the remaining information in the affidavit is insufficient to establish probable cause, the warrant is invalid. See also *State* v. *Delmonaco*, 194 Conn. 331, 335, 481 A.2d 40, cert. denied, 469 U.S. 1036, 105 S. Ct. 511, 83 L. Ed. 2d 401 (1984). Judge Pellegrino rejected this challenge ruling that the information was not false, and was not made with either intent to mislead or with reckless disregard for the truth, and that, even if the challenged information were excised, the warrant nonetheless established probable cause. See id. The defendant does not challenge that ruling in this appeal.

### 3

### The Panel's Ruling During Trial

During the trial, testimony revealed that, on the morning of December 22, 1989, before the search warrant was secured by the Waterbury police that evening, certain items that were referred to in the warrant affidavit had been removed from the defendant's car. Specifically, Mucherino removed the Lerner's bag and its contents, namely, the belt and earrings, and the Record Town bag and its contents, namely, the "Relaxation" cassette tape, from the car, took them to the Waterbury police department, and gave them to O'Leary. Detective Tania Stenberg, of the Waterbury police department, subsequently brought the belt and earrings, with the coded price tags attached, to Lerner's. At Lerner's, Stenberg compared the numbers on the price tags of the belt and earrings to all of Lerner's December 16, 1989 sales slips, as a result of which she was able to obtain copies of the charge receipts and of the cash register receipt for the purchase of these items. Thereafter, O'Leary returned the items that had been removed from the car to Mucherino, who put them back in the car. Subsequently, the warrant affidavit was prepared, and the warrant was secured that evening. Pursuant to the execution of the warrant, the bags and their contents again were seized. This prewarrant activity by Stenberg was not described as such in the warrant affidavit.[23] It was referred to, however, in paragraph

[23] Although the defendant, in a footnote in his reply brief, claims that this course of conduct "was later hidden by the state from both the [issuing] magistrate . . . and the judge (as well as the defense) at the suppression hearing," the defendant makes no independent claim based on the fact that the warrant affidavit did not specifically disclose what the "subsequent investigation" referred to in paragraph ten consisted of. When O'Leary was questioned about this at the trial, he testified that he did not disclose it at the suppression hearing because he was not asked about it. The defendant did not pursue the propriety of O'Leary's conduct further. In any event, the defendant was given a full opportunity to address the consequences of the prewarrant conduct by the panel's consideration of it at the trial.

ten of the subsequently prepared warrant affidavit, as indicated previously.

Stenberg testified at trial that on the morning of December 22, 1989, she had taken the belt and earrings to Lerner's at the mall. Using the numbers on the price tags, she located, among the store's receipts for December 16, 1989, the transaction involving their purchase, as a result of which she located the charge receipts for the items. Those receipts contained the victim's signature and indicated that the cashier was Lisa Nickles.

Prior to Stenberg's testimony, there had been no disclosure of the fact that, prior to the issuance of the warrant, the police had removed these items from the car, used them for investigatory purposes, and then referred to the fruits of that investigation in the warrant affidavit. Following that disclosure, the defendant requested the panel to reconsider the court's pretrial suppression ruling. The panel granted the defendant's request for reconsideration, and ruled that the pre-warrant removal by the state police of the items on the morning of December 22, 1989, was an illegal seizure. Specifically, the panel ruled that the removal of the properly inventoried "items from the automobile inventoried for the use as possible evidence absent exigent circumstances [was] unauthorized and should not have been done without a warrant. . . . The individual police officer must not be allowed so much latitude that inventoried searches are turned into a purposeful and general means of discovering evidence of the crime. Further, we find that the inevitable discovery exception is not applicable to this factual situation . . . ." Accordingly, the panel suppressed the Lerner's bag, the belt, the earrings, the Record Town bag and the tape entitled "Relaxation."[24]

---

[24] It is not clear why the panel, even on its rationale, extended its suppression ruling beyond the Lerner's items to the Record Town bag and the tape. Those latter items, although removed from and then returned to the car

The panel also ruled, however, that the warrant affidavit established probable cause to search the defendant's car.[25] Accordingly, the panel declined to suppress the following material that the defendant also sought to have suppressed: (1) a valve cap and valve stem remover that also were in the defendant's car, which were not seized pursuant to the December 22, 1989 warrant, but were seized pursuant to a subsequent search warrant issued on December 26, 1989;[26] and (2) the Lerner's charge and cash register receipts connecting the Lerner's bag to the victim's purchases on December 16, 1989.

The defendant claims on appeal that the panel should have suppressed the valve cap, the valve stem remover, and the Lerner's charge and register receipts. These claims were presented to the panel, and rejected by it. The defendant also claims, for the first time on appeal, that the panel should have stricken Stenberg's trial testimony,[27] and that it should not have permitted the subsequent trial testimony of Nickles, who had known the

prior to the issuance of the warrant, did not play any role, insofar as the record discloses, in Stenberg's prewarrant activity.

[25] Upon the defendant's request for clarification of this determination, the panel stated that, in so ruling, it included in its consideration paragraph ten of the affidavit. It also stated, however, that the affidavit contained "further" information establishing probable cause. We need not consider the propriety of the panel's inclusion of paragraph ten, however, because of our conclusion, explained in part II D 4 of this opinion, that, as a matter of law, the affidavit, shorn of any of the purportedly illegally obtained information, nonetheless established probable cause.

[26] The defendant claims that the seizure of these items on December 26, 1989, was tainted by the prior illegality on December 22, 1989. We discuss in part II E of this opinion the defendant's claims regarding the December 26 warrant.

[27] In this regard, the defendant acknowledges that, at trial, he did not request that the panel strike Stenberg's testimony. Nonetheless, he seeks to prevail under State v. Golding, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), the plain error doctrine, and what he terms "the special capital reviewability rule." Because we conclude, as we explain in part II D 4 of this opinion, that the panel should not have suppressed any of the items that it did suppress, we need not address the defendant's claims under any of these doctrines.

victim from grammar school, that on December 16, 1989, the victim had purchased two items for $1.99 and $5.[28]

### 4

### The Defendant's Claims on Appeal

On appeal, the defendant claims that "[a]fter having found [the] initial seizure of the Lerner's bag and the Record Town bag from the defendant's car on the morning of [December 22, 1989] to be illegal in violation of constitutional search and seizure guarantees, the three judge panel erred in not applying properly the exclusionary rule to all of the evidence derived from the illegal search and seizure." More specifically, the defendant claims that all of the evidence in question is the fruit of the poisonous tree and, therefore, is suppressible. See *Wong Sun* v. *United States*, 371 U.S. 471, 484–85, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963); *State* v. *Ostroski*, 201 Conn. 534, 545, 518 A.2d 915 (1986). The state responds that, assuming but not conceding that the panel was correct in ruling that the prewarrant removal of the items from the car was unconstitutional: (1) nonetheless, under the independent source doctrine the warrant was valid and the consequent seizure of the Lerner's material was also valid; and (2) that material inevitably would have been seized irrespective of any prior illegality. We agree with the state.[29]

---

[28] The panel, however, refused to permit Nickles to identify the particular two items that the victim had purchased. In this regard, the defendant did not claim at trial that Nickles should not have been permitted to testify at all. Nonetheless, he claims that he should prevail on the same bases presented in connection with Stenberg's testimony. See footnote 27 of this opinion. For the same reasons to which we refer in footnote 27, we need not address the questions of reviewability of Nickles' testimony.

[29] Alternatively, the state contends that, despite the panel's ruling to the contrary, there was nothing illegal about the prewarrant removal and use of the items. Our conclusion, however, that the independent source doctrine and the inevitable seizure doctrine apply, renders it unnecessary to consider the state's contention that the panel was incorrect in ruling that the prewarrant removal of the items from the car was illegal. It also is unnecessary, therefore, to consider the defendant's response to that contention, namely,

"It is well recognized that the exclusionary rule has no application [where] the [g]overnment learned of the evidence from an independent source. . . . *Segura* v. *United States*, 468 U.S. 796, 805, 104 S. Ct. 3380, 82 L. Ed. 2d 599 (1984); see *Wong Sun* v. *United States*, supra, 371 U.S. 485; *Silverthorne Lumber Co.* v. *United States*, 251 U.S. 385, 392, 40 S. Ct. 182, 64 L. Ed. 319 (1920). Independent source, in the exclusionary rule context, means that the tainted evidence was obtained, in fact, by a search untainted by illegal police activity. *Murray* v. *United States*, 487 U.S. 533, 539, 108 S. Ct. 2529, 101 L. Ed. 2d 472 (1988). *State* v. *Vivo*, 241 Conn. 665, 672–73, 697 A.2d 1130 (1997). The doctrine is based on the premise that the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse*, position that they would have been in if no police error or misconduct had occurred. . . . In the case of a search conducted pursuant to a search warrant, [t]he two elements that must be satisfied to allow admission [under the independent source doctrine] are: (1) the warrant must be supported by probable cause derived from sources independent of the illegal entry; and (2) the decision to seek the warrant may not be prompted by information gleaned from the illegal conduct. *United States* v. *Johnson*, 994 F.2d 980, 987 [(2d Cir.), cert. denied, 510 U.S. 959, 114 S. Ct. 418, 126 L. Ed. 2d 364 (1993)]; *Murray* v. *United States*, supra, [542]. . . . *State* v. *Vivo*, supra, 672–73." (Emphasis in original; internal quotation marks omitted.) *State* v. *Joyce*, 243 Conn. 282, 289–90, 705 A.2d 181 (1997), cert. denied, 523 U.S. 1077, 118 S. Ct. 1523, 140 L. Ed. 2d 674 (1998).

that the panel's ruling was correct, under our independent state constitutional limitation on warrantless searches, as expressed in such decisions as *State* v. *Joyce*, 229 Conn. 10, 639 A.2d 1007 (1994), and *State* v. *Miller*, 227 Conn. 363, 630 A.2d 1315 (1993).

Even if we were to assume, without deciding, that the removal of the Lerner's bag and its contents from the car, and the use of those contents by Stenberg as described previously, were illegal, nonetheless, we conclude that both elements of the independent source doctrine were met by the warrant and the circumstances of its issuance in the present case.

As the state accurately points out, not all of the information contained in paragraph ten of the warrant affidavit must be excised because only certain parts of that information was tainted. Specifically, irrespective of that paragraph, the affidavit contained the following information to establish probable cause that the victim was shopping at Lerner's on December 16, 1989. DeSantis had told the police that on the evening of December 16, the victim was going shopping at Lerner's and at Music Land, both of which were identified as being located at the mall. In addition, Douglas Hughes saw her shopping at the mall at approximately 7:30 p.m. on December 16. Thus, the only information properly excisable from the affidavit, as the fruit of the purported illegality, was that portion of paragraph ten that established that the victim actually had purchased a belt and a pair of gold and purple clip-on earrings at Lerner's. We therefore consider the affidavit shorn only of that information.

The affidavit provided, therefore, the following information. The victim had disappeared on the evening of December 16, 1989, and neither she nor her car, which she had been driving that evening, had been seen since. Although she was supposed to be home by approximately 10:30 p.m., she had failed to return, and had failed to call. These failures were totally out of character for her. Further, she had told DeSantis that she was going shopping at Lerner's and Music Land at the mall, where she was seen with packages in her arms by Douglas Hughes at approximately 7:30 p.m. Her friends and

employer held the opinion that she had been the victim of foul play. In addition, the defendant had been arrested on December 20, 1989, for the December 15, 1989 sexual assault of a woman in Oxford, who had identified him as the man who had entered her home, sexually assaulted her and played Russian Roulette with a gun held to her head. Also, the December 20 search of the defendant's car, which was still being held at the Southbury state police barracks, disclosed that in the car were: a Lerner's bag containing a woman's red belt with a Lerner's price tag attached; gold clip-on earrings that appeared to have been purchased recently; and a Record Town[30] bag containing a cassette tape entitled "Relaxation," which DeSantis had identified as the type of cassette that she intended to purchase for him for Christmas. This information was more than sufficient to establish probable cause to search the defendant's car for evidence regarding the victim's disappearance.

Further, the record conclusively establishes that the decision to seek the warrant was not prompted by the information gleaned from the illegal conduct. Although the determination of whether the decision to seek the warrant for the search of the defendant's car was improper, if it was prompted by such information, would ordinarily present a question of fact for the trial court; *Murray* v. *United States*, supra, 487 U.S. 543; the circumstances of the present case are such that only one rational inference can be drawn, namely, that the decision to seek the warrant would have been the same irrespective of the prewarrant discovery of the small amount of tainted information.

In addition to the untainted information contained in the warrant affidavit that we already have described at

---

[30] The fact that a Record Town bag, rather than a Music Land bag, was found in the defendant's car does not vitiate the significance, for probable cause purposes, of the Record Town bag. Certainly, it is a permissible inference that the victim may have found at one music store what she stated she would be shopping for at another music store.

length, the police also knew the following facts. The defendant had admitted being at the parking lot of the mall on December 16, 1989, where he said he had found a Lerner's bag containing a pair of earrings, a cassette tape and a receipt. In his apartment there had been found, as a result of the consensual and warrant searches on December 21, 1989, a credit union envelope that also potentially tied the defendant to the victim's disappearance. The police knew that DeSantis had given the victim money in just such an envelope, that the defendant did not belong to the credit union, and that the defendant had not returned to his apartment until some time early in the morning of December 17, 1989, when he left $250 on the kitchen table of his apartment for a rent payment to Fonte. In addition, the envelope contained K-Mart receipts that matched items purchased by the victim on December 1 and 9, 1989. Finally, the police knew that the defendant had kept, under his bedcovers, a newspaper open to a story about the disappearance of the victim.

Given all of this information—both that contained in the warrant affidavit and the information also known to the police but not contained in the affidavit—and given that the defendant's car already was impounded at the state police barracks in connection with a different but recent sexual assault and robbery, it is wholly implausible—indeed, it is inconceivable—that the police would *not* have sought a search warrant for his car, irrespective of the additional information purportedly gained in an illegal manner. Thus, the only rational conclusion that any fact finder could draw from this record is that the decision to seek the warrant was not prompted by the purportedly tainted information.

Alternatively, we agree with the state that, even if the independent source doctrine did not apply so as to permit the introduction into evidence of the challenged evidence, the evidence, nonetheless, properly was

admissible because the items seized from the defendant's car on December 22, 1989, inevitably would have been seized. Thus, under an "inevitable seizure" variation of the inevitable discovery doctrine, all of the evidence seized by the police from the defendant's car on December 22, as well as all of the evidence derived therefrom, such as the charge receipts and Nickles' testimony, was admissible, the ruling of the panel to the contrary notwithstanding.

Both the United States Supreme Court and this court have explained the relationship between the independent source doctrine and the inevitable discovery doctrine. "[The] 'inevitable discovery' doctrine . . . assumes the validity of the independent source doctrine as applied to evidence initially acquired unlawfully. . . . The inevitable discovery doctrine, with its distinct requirements, is in reality an extrapolation from the independent source doctrine: *Since* the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered." (Emphasis in original.) *Murray* v. *United States*, supra, 487 U.S. 539. Both doctrines rest on the same premise: " 'the interest of society in deterring unlawful police conduct and the public interest in having [fact finders] receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse*, position that they would have been in if no police error or misconduct had occurred.' " (Emphasis in original.) *State* v. *Vivo*, supra, 241 Conn. 672, quoting *Nix* v. *Williams*, 467 U.S. 431, 443, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984). Thus, "if the [state] can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police, there is no rational basis to keep that evidence from the jury in order to ensure the fairness of the trial proceedings." *Nix* v. *Williams*, supra, 447.

"Independent source, in the exclusionary rule context, means that the tainted evidence was obtained, 'in fact,' by a search untainted by illegal police activity. *Murray* v. *United States*, [supra, 487 U.S. 539]. Inevitable discovery in that same context means that the evidence was illegally obtained, but would have been discovered legally had the legal means to do so not been aborted because of the illegal seizure." *State* v. *Vivo*, supra, 241 Conn. 672–73.

"Both the independent source rule and the inevitable discovery rule rest on assumptions that if the law enforcement agencies involved had eschewed the illegal activity, they nevertheless would have procured the evidence at issue. But the independent source rule applies only upon proof that *in actual fact* the officers did not obtain the challenged evidence as a result of the primary illegality; the inevitable discovery exception assumes that the evidence was in fact obtained as a consequence of the primary illegality but is invoked by proof that—hypothetically—if the officers had not engaged in the primary illegality, they would nevertheless although in a different manner have obtained the challenged evidence. . . . 1 C. McCormick, Evidence (4th Ed. 1992) § 180, p. 739; see *Murray* v. *United States*, supra, 487 U.S. 540." (Emphasis in original; internal quotation marks omitted.) *State* v. *Vivo*, supra, 241 Conn. 673 n.5.

We have stated that "[t]o qualify for admissibility the state must demonstrate that the lawful means which made discovery inevitable were possessed by the police and were being actively pursued *prior* to the occurrence of the constitutional violation." (Emphasis in original.) *State* v. *Badgett*, 200 Conn. 412, 433, 512 A.2d 160, cert. denied, 479 U.S. 940, 107 S. Ct. 423, 93 L. Ed. 2d 373 (1986). Although it is not altogether clear, under currently prevailing inevitable discovery jurisprudence, that these are rigid requirements for the application of

the doctrine; compare, e.g., 5 W. LaFave, Search and Seizure (3d Ed. 1996) § 11.4 (a), pp. 249–50 ("[c]ircumstances justifying application of the 'inevitable discovery' rule *are most likely to be present* if these investigative procedures were already in progress prior to the discovery via illegal means, as in *Nix* v. *Williams*, [supra, 467 U.S. 431] or where the circumstances are such that, pursuant to some standardized procedures or established routine a certain evidence-revealing event would definitely have occurred later" [emphasis added]); we conclude that, even applying the *Badgett* standard, the circumstances of the present case justify the application of the inevitable discovery doctrine. In doing so, moreover, we recognize that whether the doctrine applies ordinarily is, at least in the first instance, a question of fact for the trial court. *State* v. *Badgett*, supra, 433–34. In the present case, however, on the basis of the undisputed historical facts established by the record, no other rational conclusion could be drawn.

Certainly, prior to the issuance of the warrant during the evening of December 22, 1989, the police investigation into the disappearance of the victim had focused on the defendant, and that investigation was being pursued actively. As of December 21, 1989, the police possessed the following information. The defendant had been arrested and charged with the Oxford sexual assault that occurred on December 15, 1989, the day before the victim's disappearance. The victim was last seen at approximately 7:30 p.m. on December 16, 1989, shopping at the mall, where she had gone specifically intending to shop at Lerner's and Music Land. The defendant had admitted being at the mall at approximately 8 p.m. on December 16, the day of the victim's disappearance, and finding a Lerner's bag containing a pair of earrings, a cassette tape, and a receipt that, he stated, he had brought back to his apartment. The cassette tape matched the type that the victim had

intended to purchase as a Christmas present for DeSantis. The two searches of the defendant's apartment on that date—one consensual and the other pursuant to a warrant—had disclosed a Record Town bag, a newspaper article under his bedcovers open to the story about the victim, and the credit union envelope and its contents. The police knew that the victim did her banking at the credit union, that she had been in possession of just such an envelope containing several hundred dollars in cash, and that the defendant was not a member of the credit union. Moreover, Fonte had told the police on December 21, that the defendant had not come home until early in the morning of December 17, 1989, when he left $250 on the kitchen table. Furthermore, on December 22, 1989, the police also had learned from DeSantis that the K-Mart receipts found in the credit union envelope were for the same items that the victim had purchased at K-Mart. In addition, from the day that the defendant's car was seized, on December 20, 1989, it had been impounded by the state police and the defendant had been incarcerated. In the defendant's car were a Lerner's bag, a woman's belt, a pair of earrings, the cassette tape, a valve cap and a valve stem remover. Thus, as the state points out, the contents of the car would have remained unchanged.

Therefore, once the victim's car and body were discovered on December 25, 1989, and the examination of the car disclosed the spare tire on the front and the regular tire in the trunk with the valve stem having been tampered with, the ultimate seizure of the Lerner's bag and its contents was inevitable. It follows that the police next would have sought and secured another warrant, as they actually did on December 26, 1989, to search the defendant's car for the valve cap and valve stem remover, which the police knew were in it as a result of Waterbury police officer James McDonald's and Scannell's plain view during the December 22, 1989

search of the car. See footnote 22 of this opinion. In addition, that search inevitably would have yielded the Lerner's bag and its contents, which would have been in plain view and which the police knew from the prior inventory were already in the car. The extremely inculpatory significance of the bag and its contents at that time immediately would have been apparent to the police. Thus, the police inevitably would have seized the bag and its contents, and those items in turn inevitably would have yielded the Lerner's receipts and Nickles' testimony. Therefore, "the lawful means which made discovery inevitable were possessed by the police and were being actively pursued *prior* to the occurrence of the constitutional violation," consequently the evidence was admissible. (Emphasis in original.) *State* v. *Badgett*, supra, 200 Conn. 433.

E

### The December 26, 1989 Search Warrant for the Defendant's Apartment

The trial court rejected the defendant's claim that the December 26, 1989 search warrant for the defendant's apartment lacked probable cause. This warrant sought "[p]ackaging type tape, [Connecticut] drivers license of [the victim], credit cards of [the victim, and] personal papers of [the victim]." The search pursuant to the warrant yielded, among other items, the victim's social security card and her Citicorp banking card, and two Sears receipts, both dated December 14, 1989, and signed by her, for the amounts of $26.49 and $9.15.[31]

---

[31] The defendant also claims that the police exceeded the scope of the warrant by seizing a receipt from the Yankee Trader store that, according to the defendant, infected both the guilt and penalty phases of the trial by permitting the state to argue that he had purchased the tape as part of his plan to kidnap and restrain the victim. As the state accurately points out, however, although such a receipt was seized, it was not introduced into evidence, and the only source in the evidence of the defendant's purchase of the tape at Yankee Trader was his confession, the admissibility of which we discuss in part III of this opinion. Furthermore, there is nothing in the record to suggest that the state relied upon the receipt, rather than the

The defendant raises two challenges to this ruling of the trial court. First, the defendant claims that the warrant was invalid because Deely and O'Leary, in making their oaths for the supporting affidavit, did not sign the affidavit, and the issuing judge, *Byrne, J.*, did not sign the jurat of the supporting affidavit. Instead, Deely and O'Leary signed, and Judge Byrne signed the jurat of, an attached affidavit form for dispensing with the requirement of delivery of a copy of the search warrant to the person named as the owner or occupant of the premises to be searched. Second, the defendant claims that the warrant lacked probable cause. We reject both contentions.

The first contention borders on the frivolous. At the suppression hearing, the state affirmatively elicited testimony from O'Leary explaining the mistake in the location of the signatures.[32] Thereafter, in oral argument before Judge Pellegrino, the defendant, whose trial counsel intentionally had omitted any such claim from his brief, through the same trial counsel specifically

defendant's confession and the actual tape that was removed from the victim's body, to identify the manufacturer of the tape. The record is to the contrary. The defendant stated in his confession that he had bought the tape at the Yankee Trader, and a representative of Tara Tape, Inc., testified that, based upon a series of scientific tests to the tape sample, it was his opinion that the tape had been manufactured by Tara Tape, Inc. Thus, it is immaterial whether the police properly seized the Yankee Trader receipt.

[32] O'Leary testified that on December 26, 1989, he and Deely presented two search warrants to Judge Byrne at his chambers in the Waterbury courthouse: one for the defendant's car, and the second, the warrant in question here, for the defendant's apartment. O'Leary testified further that, although he and Deely swore to the truth of all of the statements in the affidavit before Judge Byrne and that Judge Byrne administered the oath to them, they and Judge Byrne mistakenly affixed their signatures to the bottom of the fourth page of the search warrant material, which was the affidavit requesting dispensation of the requirement of delivery of a copy of the warrant to the property owner, rather than the bottom of the third page, which was the supporting affidavit. O'Leary also testified that neither he nor Deely ever asked Judge Byrne to dispense with the requirement of delivery.

waived any claim based on the mistaken location of the signatures.[33] We conclude that this claim was waived in the trial court and, therefore, furnishes no basis for appellate review.[34]

---

[33] During oral argument on the motions to suppress, the court inquired: "You make no claim that it was signed in the wrong place?" The defendant's counsel responded: "No, Your Honor. I researched that and I know the state briefed it, I didn't, but based upon—for the court's information, *State* v. *Anonymous* [(*1973-6*), 30 Conn. Sup. 211, 309 A.2d 135 (1973)], and *State* v. *Montagna*, [35 Conn. Sup. 225, 405 A.2d 93 (1979)]. It seems clear to me that that's a technical defect that doesn't undermin[e] the validity of the warrant based upon the testimony that was put forth here. So I'm not raising—I'm not making a claim that on account of the fact that it was signed on the wrong page, that the warrant was, therefore, defective."

[34] The defendant claims that we should review this claim because it discloses plain error, and because of what he terms a "special capital reviewability rule." We decline to do so.

First, the plain error doctrine, which is now codified at Practice Book § 60-5, provides in relevant part: "The court may reverse or modify the decision of the trial court if it determines that the factual findings are clearly erroneous in view of the evidence and pleadings in the whole record, or that the decision is otherwise erroneous in law. . . . The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . ." This is not, however, a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. See, e.g., *Connecticut National Bank* v. *Giacomi*, 242 Conn. 17, 39, 699 A.2d 101 (1997) (plain error for trial court to fail to apply applicable statute); *Westport Taxi Service, Inc.* v. *Westport Transit District*, 235 Conn. 1, 37, 664 A.2d 719 (1995) (plain error for trial court to rely on improper statute); *State* v. *Preyer*, 198 Conn. 190, 198–99, 502 A.2d 858 (1985) (plain error where trial court misinformed jury about availability of affirmative defense). Thus, we do not apply the plain error doctrine in order to review a ruling that is not even arguably incorrect in the first place. This scrivener's error can hardly constitute plain error because the warrant was valid notwithstanding the mistaken location of the signatures. *State* v. *Rosario*, 238 Conn. 380, 386, 680 A.2d 237 (1996) (scrivener's error does not invalidate otherwise valid search warrant); *State* v. *Colon*, 230 Conn. 24, 36, 644 A.2d 877 (1994) (omission of or defect in jurat does not affect validity of warrant issued upon probable cause when proven by extrinsic evidence that supporting affidavit properly sworn to). In addition, we have on occasion employed our supervisory power, in both capital and noncapital cases, to review unpreserved claims.

Further, we know of no authority for a "special capital reviewability rule."

The defendant's claim of lack of probable cause is based on two contentions. The defendant argues that: (1) the application for the warrant contains what he characterizes as the "tainted fruit of the illegal [December 22, 1989] seizure of the Lerner's bag and its contents from [the] defendant's car," and if that material is excised, the supporting affidavit lacks probable cause; and (2) the application for the warrant "failed to establish probable cause to justify a *third* search of [the] defendant's [apartment] by the Waterbury police (and the fifth overall search of [the] defendant's residence) within a five to six day period, during the entirety of which [the] defendant was incarcerated . . . ." (Emphasis in original.) Neither of these contentions is persuasive.

We already have determined that neither the Lerner's bag, the Record Town bag, and their contents, nor the evidence to which they led, should have been suppressed because of (1) the independent source doctrine, and (2) the inevitable discovery doctrine. The independent source doctrine applies when "the tainted evidence was obtained, 'in fact,' by a search untainted by illegal police activity." *State* v. *Vivo*, supra, 241 Conn. 672. The "independent source rule applies only upon proof that *in actual fact* the officers did not obtain the challenged

---

Under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), the plain error doctrine, and our supervisory power, there is authority capacious enough to rectify any constitutional or nonconstitutional trial court errors that affect the outcome of a criminal case, capital or otherwise, and that, under those doctrines, require the reversal of the judgment. In addition, with respect to constitutional claims, we have stated that we will scrupulously and independently examine the record to ensure that the constitutional fact-finding of the trial court is adequately supported, and that this same standard of review applies to a finding of an aggravating factor in a capital case. *State* v. *Webb*, 238 Conn. 389, 482–83, 680 A.2d 147 (1996). When and if these doctrines prove inadequate to remedy an injustice in a capital case, we will consider whether to supplement them. Suffice it to say that this record, in which experienced trial counsel explicitly waived a plainly meritless claim, does not present such a case.

evidence as a result of the primary illegality . . . ." (Emphasis in original; internal quotation marks omitted.) Id., 673 n.5. Thus, our conclusion that the challenged evidence of the Lerner's bag and its evidentiary fruits was admissible under the independent source doctrine also requires the conclusion that there was no taint flowing from it that infected the issuance of the subsequently issued warrant to search the defendant's apartment. In other words, if, as we have concluded by our application of the independent source doctrine, the police did not obtain the information about the victim's purchases of the belt and earrings as a result of the "primary illegality," namely, the prewarrant seizure of the belt and earrings, there was no illegality to taint the subsequent warrant. There is, therefore, no justification for excising the purportedly tainted information from the warrant affidavit.

Regarding his second contention, the defendant offers neither authority nor reason, and we know of none, that requires the state, in applying for a search warrant for premises that it previously has searched, to offer independent justification for its failure to seize, in those prior searches, the evidence that it now seeks to discover. So long as the subsequent search warrant affidavit establishes probable cause, the fact that the premises to be searched had been searched previously does not undermine that probable cause. Because the defendant makes no other claim with respect to the validity of this search or the adequacy of the supporting affidavit, we decline to discuss this claim further.

F

The Execution of the December 26, 1989
Search Warrant

The December 26, 1989 search warrant authorized the seizure of, among other items, "[p]ackaging type tape . . . ." In executing this warrant, the police seized,

in addition to the Stop and Shop photograph envelope, three receipts, namely, a Yankee Trader receipt and two Sears receipts, which were in plain view on a desk in the defendant's bedroom. The defendant claims that these receipts were outside of the scope of the December 26, 1989 warrant in that they "were not plainly connected to the victim," and that the court therefore improperly denied his motion to suppress these items[35] and "the evidence derived therefrom." We disagree.

As we stated with regard to the seizure of the Chess King receipt pursuant to the December 21, 1989 warrant; see part II C of this opinion; "[t]he description of items to be seized in a warrant need only be as specific as the circumstances and the nature of the activity under investigation permit." *State* v. *Zarick*, supra, 227 Conn. 225. Moreover, when the items that were seized "were discovered during a lawful search authorized by a valid warrant [and when] they were discovered, it was immediately apparent to the officer that they constituted incriminating evidence . . . the seizure [is] authorized by the 'plain-view' doctrine."[36] *Horton* v. *California*,

---

[35] As noted by the defendant, although the trial court did not expressly address the admissibility of these receipts in its memorandum of decision, the court implicitly ruled that these items properly were seized by denying the defendant's motion to suppress the items seized during the execution of the December 26, 1989 warrant.

[36] In *State* v. *Hamilton*, 214 Conn. 692, 698, 573 A.2d 1197, vacated and remanded, 498 U.S. 933, 111 S. Ct. 334, 112 L. Ed. 2d 299 (1990), following what we regarded as the then prevailing United States Supreme Court precedent, we stated: "A plain view seizure is reasonable under the fourth amendment if the police: (1) were lawfully on the premises and engaged in a lawful activity; (2) discovered the evidence inadvertently; and (3) have probable cause to believe there is a reasonable relationship between the evidence seized and the criminal behavior under investigation." Two months after *Hamilton* was decided, however, the United States Supreme Court expressly revisited the "inadvertence" element of the plain view doctrine and held that, "even though inadvertence is a characteristic of most legitimate 'plain-view' seizures, it is not a necessary condition." *Horton* v. *California*, 496 U.S. 128, 130, 110 S. Ct. 2301, 110 L. Ed. 2d 112 (1990). Subsequently, based on *Horton*, a petition for a writ of certiorari was granted in *Hamilton*, and the judgment was vacated and remanded for consideration. Thereafter, the appeal in *Hamilton* was withdrawn.

496 U.S. 128, 142, 110 S. Ct. 2301, 110 L. Ed. 2d 112 (1990). "The police meet the 'immediately apparent' requirement if, on discovery, they have probable cause to associate the property in plain view with criminal activity without further investigation. *Arizona* v. *Hicks*, [480 U.S. 321, 324–27, 107 S. Ct. 1149, 94 L. Ed. 2d 347 (1987)]; *White* v. *State*, 729 S.W.2d 737, 740–41 (Tex. Crim. App. 1987)." *State* v. *Reddick*, 207 Conn. 323, 335, 541 A.2d 1209 (1988). In other words, "objects not named in the warrant, but found within an officer's plain view, may be seized if the . . . officers had a reasonable basis for believing that the seized evidence was reasonably related to the offense which formed the basis for the search warrant. *Chambers* v. *State*, 508 S.W.2d 348, 353 (Tex. Crim. App. [1974]) . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Onofrio*, 179 Conn. 23, 40–41, 425 A.2d 560 (1979). "This doctrine is based upon the premise that the police need not ignore incriminating evidence in plain view while they are operating within the parameters of a valid search warrant or are otherwise entitled to be in a position to view the items seized." (Internal quotation marks omitted.) *State* v. *Hamilton*, 214 Conn. 692, 698, 573 A.2d 1197, vacated and remanded, 498 U.S. 933, 111 S. Ct. 334, 112 L. Ed. 2d 299 (1990).

The victim's body was discovered on December 25, 1989. As the detectives executing the December 26, 1989 warrant were aware, and as was indicated in the warrant's supporting affidavit, the victim's body was discovered with "packaging like tape around the arms, legs and also around her face." During the suppression hearing, O'Leary testified that he had seized the Yankee Trader receipt [37] and the Sears receipts from the desk because he thought that the packaging tape "could have

---

[37] The fact that the Yankee Trader receipt was dated December 2, 1989, further supports the reasonableness of the inference that the receipt could have been connected to the death of the victim.

been purchased at either of those stores." In light of the fact that the officers were lawfully in the defendant's apartment; see part II E of this opinion; and were aware that the victim's body, which had been discovered only the day before, had been bound with packaging tape, we conclude that the officers had probable cause to associate the receipts from Sears and the Yankee Trader; see footnote 31 of this opinion; which were in plain view on the defendant's desk, with the criminal activity that formed the basis for their investigation.

G

The December 26, 1989 Seizure of the Valve Cap and Valve Stem Remover from the Defendant's Car

The defendant's final search and seizure claim is that the panel should have suppressed the valve caps and valve stem remover that the police seized from the defendant's car pursuant to the December 26, 1989 search warrant for the car. Although the panel had suppressed the Lerner's bag and Record Town bag, and their respective contents, based on its view that they illegally had been seized before the issuance of the December 22, 1989 warrant for the search of the defendant's car, the panel declined to suppress the valve caps and valve stem remover.

This claim, and its resolution, mirror the defendant's claim regarding the search of his apartment pursuant to the December 26, 1989 search warrant for those premises. The basis of the defendant's claim for suppression of these items, like his claims regarding the items seized from his apartment, is that they were the "tainted fruit of the initial illegal seizure of the bags from the car." Because we have determined that the bags, and the evidence to which they led, were obtained independently of any prior purported illegality, however, the admissibility of the valve caps and valve stem

remover could not have been tainted by the seizure of the bags.

## III

## THE DEFENDANT'S CONFESSION

The defendant claims that Judge Pellegrino should have suppressed an oral confession that he gave to O'Leary and Deely on December 27, 1989, because it was obtained in violation of this court's ruling in *State v. Stoddard*, 206 Conn. 157, 537 A.2d 446 (1988), which we discuss later in part III of this opinion. The defendant also claims, accordingly, that any evidence to which his confession led the police also should have been suppressed. The state contends that: (1) *Stoddard* should be reversed; and (2) alternatively, the defendant is not entitled to any relief under *Stoddard*. We decline to reverse *Stoddard* because of considerations of stare decisis, and because its reasoning is as sound now as when it was decided. We also conclude, however, that *Stoddard* does not avail the defendant of suppression of his confession.

The record discloses the following facts. On December 27, 1989, the defendant was brought to geographical area number four of the Superior Court in Waterbury, to be arrested and arraigned in connection with the December 13, 1989 Naugatuck sexual assault. At that time, Public Defender Hazelkamp already was representing the defendant in the Derby geographical area courthouse, and attorney Labriola already was representing him in Waterbury in connection with the June, 1989 Naugatuck charges. It is undisputed, however, that, although Hazelkamp represented him on the Oxford charges pending in the Derby courthouse, neither she nor any other public defender represented him in connection with the December 13, 1989 Naugatuck charges for which he had been brought to Waterbury for arrest and arraignment, because for such purposes

the two public defender's offices operated independently of each other—the office of the public defender is not considered to be one law firm.[38]

At approximately 9 a.m., on December 27, 1989, O'Leary and Deely went to the Waterbury courthouse to speak with the defendant, who they knew was being brought in to be arrested in connection with the December 13, 1989 sexual assault in Naugatuck. Shortly after 9 a.m., as the defendant was being brought into the lockup area by the sheriff's department, O'Leary greeted the defendant and asked him if he remembered them. The defendant said that he did, and O'Leary asked him whether he would speak with them. The defendant agreed to speak with the officers, and was escorted by the sheriff to the bail commissioner's office. The officers and the defendant, who were the only individuals in the office, sat down at a table. Deely read the *Miranda* warnings to the defendant, and the defendant read the *Miranda* warnings aloud from Deely's *Miranda* card. O'Leary asked the defendant if he wanted a lawyer. He stated that he did not want a lawyer. When O'Leary asked the defendant again whether he wanted a lawyer, the defendant replied that "I want to get this off my chest." O'Leary then reread him the *Miranda* warnings, and the defendant stated that he understood his rights. O'Leary then asked him again if he wanted to talk with them, and the defendant again stated that "I want to get this off my chest." The defendant then made an oral confession, which took approximately one-half hour.

The defendant's statement included the following information. On the night of December 16, 1989, he went to the Bradlees' shopping center, and saw the victim park her car and go inside. He then walked over

---

[38] While this appeal was pending, it was remanded for a trial court determination on this specific issue, and the defendant does not challenge the trial court's determination that "the public defender system is not a single unitary firm . . . ."

to the car and let the air out of a front tire. He waited for her to return to the car. When she returned, he asked her if she wanted him to change her flat tire. She agreed, and he replaced the tire with her spare tire. He then told her that his car was stuck, and asked her for a ride to a gas station. She agreed, and they entered her car. She was driving and he was in front with her. As they were leaving the parking lot, he grabbed her by the shoulders and directed her to a dirt road near the parking lot. She drove down the dirt road, and when she had parked he told her to get into the backseat and lie on the floor. It was a two door car and he knew that she would not be able to leave it from the backseat. He then went through her pocketbook, and took money and other personal papers and belongings out of it. The defendant next got into the backseat with the victim, and pulled her pants and underwear down to her knees. He put his finger into her anus, and then had vaginal intercourse with her against her will. He stated that he ejaculated into a napkin, not inside her. He stated further that because he realized that she had seen his face, he taped her hands and took one of her gloves, put it in her mouth, and taped her mouth shut, using some tape that he had bought at the Yankee Trader store when purchasing a tarpaulin for his father's boat.

The defendant next removed the victim from her car. She was still alive. He took her over to a wall near a body of water, and pushed her off the wall into the body of water. He then returned to her car and opened the trunk because he remembered that, when he was changing the tire, he had seen a Jean Country shopping bag in the trunk. He took that bag out of the trunk, and inside that bag was a pair of blue jeans and a Lerner's bag. He took the two bags out of the trunk, locked the car, and walked back to his car at the Bradlees' parking lot. He next drove in his car onto Interstate 84, and stopped his car on the side of the highway near the

body of water. He then walked from his car to the body of water, saw that the victim was in the water and was not moving, and knew that she was dead. He then returned to his car and drove home. At approximately 10 a.m. the next morning, he went to Jean Country and returned the jeans for cash.

On the basis of the information contained in the defendant's confession, O'Leary contacted Sergeant Edward Pekrul, of the Waterbury police department, at approximately 10 a.m. on December 27, 1989. After speaking with O'Leary, Pekrul went to investigate the area adjacent to the dam off of Interstate 84. After parking on the shoulder of the highway, Pekrul observed two sets of footprints near the guardrail—one set that appeared to be leading toward the dam, and another set that was leading away from the dam. No other footprints were found in the area of the guardrail. The footprints, including a footprint going over the guardrail, covered the twenty-five feet from the highway guardrail to a fence between the highway and the dam. The fence had a hole in it, and the footprints continued past the hole, for a total of approximately ten to fifteen feet of footprints going from the inside of the fence toward the dam. It is possible to view the location where the victim's body was found from the spot where the footprints ended. Although there was a distance of another 150 to 200 feet between the fence and the dam, no other specific footprints could be discerned because, by this time, the area had been heavily trampled by persons looking for and removing the victim's body.

On the evening of December 26, 1989, however, the day *before* the defendant's confession to O'Leary and Deely, Assistant Public Defender Barbara Sorrentino, of the Waterbury judicial district office, was told by an investigator from the office of the chief public defender to be on the lookout for the defendant because he was a suspect in a capital felony case. At that time, the

defendant had not been charged with the crimes involved in the present case, and neither Sorrentino nor any other public defender in the Waterbury judicial district represented him on any charges whatsoever. Furthermore, although she did not know the precise date on which the defendant would be brought into a Waterbury courthouse, she had overheard two sheriffs state that the defendant probably would be brought in on December 27, 1989. Either that evening or the next morning, Sorrentino contacted Assistant Public Defender Michael Isko, who worked primarily at the Waterbury geographical area courthouse, to advise him of the defendant's imminent arrival in Waterbury.

When Isko arrived at the geographical area courthouse prior to 9 a.m. on December 27, 1989, he went downstairs into the lockup area and informed Sheriff Michael Connelly that he wanted to speak with the person who was a suspect in a murder case who was to arrive that morning, presumably the defendant. Connelly told Isko that he would have to check with Lieutenant Philip Calo, who was the sheriff in charge of the lockup area. Isko then talked with Calo, who assured Isko that he would advise him when the defendant had arrived. Meanwhile, prior to 9 a.m., Sorrentino went to the courthouse to meet with Isko so that she could accompany him when they spoke with the defendant. Isko was busy with other matters, and when he became free sometime after 9 a.m., Sorrentino and Isko went downstairs to the lockup area, where they discovered that the defendant was in conference with O'Leary and Deely. As soon as they discovered this, they entered the bail commissioner's office. As they entered, the defendant had completed giving his oral confession, and O'Leary and Deely were about to obtain a written confession from him. Sorrentino and Isko, however, immediately told O'Leary and Deely that they were public defenders, ordered O'Leary and Deely to stop ques-

tioning the defendant, and asked them to leave. O'Leary and Deely did so.

In *State* v. *Stoddard*, supra, 206 Conn. 157–58, we held that the due process clause of article first, § 8, of the Connecticut constitution[39] requires the police "to inform a suspect whom they are holding for custodial interrogation of timely efforts by counsel to render pertinent legal assistance." In that case, the defendant had been arrested at approximately 1:15 p.m. on April 19, 1984, and, after being duly advised of and waiving his *Miranda* rights, he was questioned by the police in a detective bureau interrogation room at the police station at various times between approximately 2 p.m. of that day, and 3 p.m. on the next day, April 20. Id., 160–62. At that time, after again waiving his *Miranda* rights, the defendant signed a written confession, which ultimately was admitted against him at trial. Id., 162. In the meantime, however, within fifteen minutes of the defendant's arrest, his girlfriend had contacted an attorney whose partner had represented the defendant on prior charges. Between 1:30 p.m. on April 19, and the morning of April 20, the attorney made four telephone calls to the police station, identifying himself as the defendant's attorney and requesting to speak with him. Id., 161–62. In response to each call, however, the attorney was told

[39] The constitution of Connecticut, article first, § 8, provides: "In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel; to be informed of the nature and cause of the accusation; to be confronted by the witnesses against him; to have compulsory process to obtain witnesses in his behalf; to be released on bail upon sufficient security, except in capital offenses, where the proof is evident or the presumption great; and in all prosecutions by indictment or information, to a speedy, public trial by an impartial jury. No person shall be compelled to give evidence against himself, nor be deprived of life, liberty or property without due process of law, nor shall excessive bail be required nor excessive fines imposed. No person shall be held to answer for any crime, punishable by death or life imprisonment, unless on a presentment or an indictment of a grand jury, except in the armed forces, or in the militia when in actual service in time of war or public danger."

by the police department's information desk that the defendant was not there. As a result, the defendant did not know of the attorney's efforts to reach him, and the attorney did not go to the police station to do so. Id.

On these facts, we concluded "that a suspect must be informed promptly of timely efforts by counsel to render pertinent legal assistance. Armed with that information, the suspect must be permitted to choose whether he wishes to speak with counsel, in which event interrogation must cease, or whether he will forgo assistance of counsel, in which event counsel need not be afforded access to the suspect. The police may not preclude the suspect from exercising the choice to which he is constitutionally entitled by responding in less than forthright fashion to the efforts by counsel to contact the suspect. The police, because they are responsible for the suspect's isolation, have a duty to act reasonably, diligently and promptly to provide counsel with accurate information and to apprise the suspect of the efforts by counsel." Id., 166–67. We also stated that, "[w]ithin the parameters we have outlined, this duty requires only that the police act as a neutral conduit for the pertinent and timely requests by counsel to meet with a custodial suspect." Id., 167. Furthermore, we held that "the prior existence of an attorney-client relationship is not relevant to the duty itself." Id., 172. Instead, "[t]he existence, or lack thereof, of an attorney-client nexus relates to the question of waiver . . . ." Id.

With respect to the question of waiver, however, we declined to impose a per se rule of suppression in the event of a violation of this duty of disclosure. Instead, we held that "[t]he decision to speak or to stand mute is a personal right of the suspect," which is to made "exclusively [by] him" on the basis of full knowledge of all of the relevant circumstances. Id., 174. Based upon "the totality of the circumstances . . . [t]he critical question is whether the information not conveyed

by the police would likely have changed the defendant's appraisal and understanding of the circumstances. . . . Of particular, but not exclusive, relevance are such facts and circumstances as the relationship of the suspect to the attorney, the nature of counsel's request, the extent to which the police had reasonable notice of counsel's request and the conduct of the suspect." (Citations omitted.) Id., 175. Thus, we stated that the state has the "burden of proving by a preponderance of the evidence that the efforts of counsel, if properly communicated, would not have altered the defendant's" decision to speak with the police. Id., 176–77. This burden, moreover, is to be evaluated "[u]nder the totality of the circumstances . . . ." Id., 176.

Even if we were to assume, without deciding, that there was a *Stoddard* violation under the facts of the present case,[40] we conclude nonetheless that, even if the effort of Sorrentino and Isko to contact the defendant properly had been communicated to him, the defendant would not have altered his decision to speak with O'Leary and Deely and to confess. We therefore conclude that, the assumed *Stoddard* violation notwithstanding, the defendant's waiver of his rights was valid.

We first consider our scope of review on this issue of waiver. The trial court ruled that *Stoddard* did not

[40] In this regard, the state contends that *Stoddard* does not apply to this case because: (1) the defendant was not in police custody at the time of the interrogation; (2) the defendant was not " 'isolated' in a manner that triggers the concerns expressed in *Stoddard*"; and (3) under the then prevailing statutory scheme; compare General Statutes (Rev. to 1983) § 51-296 (a) with General Statutes § 51-296 (c); the public defenders had no authority to represent the defendant until so designated by the trial court and, therefore, this was not a case of police interference in an attorney-client relationship. For purposes of this claim of the defendant, however, we assume, without deciding, that: (1) the custody of the defendant by the sheriff's department was a sufficient surrogate for police custody; (2) the fact that the defendant was in custody for purposes of requiring the *Miranda* warnings was sufficient to trigger the application of *Stoddard*; and (3) the public defenders had sufficient authority to contact the defendant so as to trigger the duty established by *Stoddard*.

require the suppression of the defendant's confession because, among other reasons, even if the defendant had been told of Sorrentino's and Isko's effort to talk with him, "there is a reasonable likelihood that the defendant would have still voluntarily spoken with the police officers." The defendant maintains that, although the underlying historical facts are subject to the normal deferential scope of review of factual determinations, the conclusion regarding whether the defendant nevertheless would have spoken with the police officers is a legal conclusion subject to a plenary scope of appellate review. The state does not contest this point. We agree with the defendant that our scope of review over this issue is plenary and that, therefore, it is our obligation to consider the totality of the circumstances as disclosed by the record as a whole, including the relevant historical facts found by the trial court, and to determine from that record the critical question, namely, whether the pertinent information not communicated to the defendant would have altered his decision to speak with the police when he did.[41]

First, we believe that this question is most accurately characterized, not as either a question of fact or as a question of law, but as a hybrid mixed question of fact and law. Although throughout the law there are various mixed questions that call for differing scopes of appellate review and, therefore, applying the label does not necessarily yield the answer; compare, e.g., *Copas* v. *Commissioner of Correction*, 234 Conn. 139, 152–53, 662 A.2d 718 (1995) (mixed question of law and fact yields plenary scope of review); with *Plastic Tooling Aids Laboratory, Inc.* v. *Commissioner of Revenue Services*, 213 Conn. 365, 369, 567 A.2d 1218 (1990) (mixed

---

[41] In so concluding, however, we reject the defendant's contention that we must be convinced beyond a reasonable doubt that the defendant would have nevertheless spoken with the police. As *Stoddard* itself makes clear, the degree of persuasion is "by a preponderance of the evidence . . . ." *State* v. *Stoddard*, supra, 206 Conn. 176.

question of law and fact yields deferential scope of review); the question of whether to give such mixed determination by a trial court deferential or plenary review is really a question of judicial policy. *Miller* v. *Fenton*, 474 U.S. 104, 114, 106 S. Ct. 445, 88 L. Ed. 2d 405 (1985) (when "the issue falls somewhere between a pristine legal standard and a simple historical fact, the fact/law distinction at times has turned on a determination that, as a matter of the sound administration of justice, one judicial actor is better positioned than another to decide the issue in question"). Affording a deferential scope of review to such a question means, in effect, that if two trial courts were to reach different but reasonable conclusions on essentially the same evidence, we would be constrained to sustain both. The importance of the question of waiver presented by a *Stoddard* violation argues against permitting the kind of inconsistency that such deference would produce.

Second, this waiver determination is qualitatively different from the kind of factual determinations to which we normally give deference. The inquiry here is not what happened, based on the evidence presented and the permissible inferences drawn therefrom. The inquiry here is what *would or would not have happened* if something that did *not* happen *had happened*. We are as qualified as the trial court to evaluate the record and to make that hypothetical determination.

Third, this determination is much like the ultimate determination of whether a defendant knowingly and voluntarily waived his *Miranda* rights. Indeed, the question of whether, notwithstanding a *Stoddard* violation, the defendant would nonetheless have spoken with the police, is simply part of the *Miranda* voluntariness calculus. *State* v. *Stoddard*, supra, 206 Conn. 173. In making the appellate determination of whether there was a valid *Miranda* waiver, although we defer to the trial court's findings on subsidiary factual questions, we do

not give that deference on "the ultimate legal finding of voluntariness . . . ." (Citations omitted.) *State* v. *Whitaker*, 215 Conn. 739, 753, 578 A.2d 1031 (1990); *Arizona* v. *Fulminante*, 499 U.S. 279, 303, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991); *Miller* v. *Fenton*, supra, 474 U.S. 112. On that determination, "[t]he sole issue for us to decide is whether, judging the record as a whole . . . the state has proved waiver by the preponderance of the evidence." (Citation omitted.) *State* v. *Whitaker*, supra, 753.

Fourth, in *Stoddard* itself we employed, albeit without discussion, a plenary scope of review. After articulating the standards for a waiver of a *Stoddard* violation, we concluded that "[t]he record in this case, taken as a whole, reveals at least a reasonable likelihood that the defendant would have invoked his right to counsel had the police fulfilled their duty to inform." *State* v. *Stoddard*, supra, 206 Conn. 176. Because of the unrestricted contents of the attorney's aborted communications, and because the attorney was a member of a firm that previously had represented the defendant, we concluded that "[u]nder the totality of the circumstances, the state has not met its burden of proving by a preponderance of the evidence that the efforts of counsel, if properly communicated, would not have altered the defendant's appraisal and understanding of the circumstances." Id., 176–77. Accordingly, without leaving the question open to further trial court determination, we ruled that "the trial court erred in denying the defendant's motion to suppress." Id., 177.

Applying this plenary scope of review to the entire record in the present case, we conclude that the state has met its burden. The state has demonstrated, by a preponderance of the evidence, that, even if the effort of the public defenders to talk with the defendant properly had been communicated to him, it is reasonably likely that the defendant would nevertheless have decided to

speak with O'Leary and Deely, and to have confessed to them.

First, the defendant's conduct; see id., 175; not only at the time of his confession, but during the preceding week, strongly indicated that he would have cooperated with O'Leary and Deely notwithstanding the information that he was not given. During the week preceding his confession, when asked about both crimes regarding which he formally had been charged and regarding crimes of which he was merely a suspect, the defendant exhibited an extraordinary willingness to cooperate with the police. On December 20, 1989, when he was arrested at his apartment for the Oxford crimes, he agreed to and did speak with the police about those crimes. He also signed two separate consents to search his apartment, one in connection with the Oxford crimes, and the other in connection with the December 13, 1989 Naugatuck crimes for which he then was only under investigation. Thereafter, at the Southbury barracks, he again willingly gave a written statement regarding the Oxford crimes to the state police, and also willingly gave a written statement regarding the Naugatuck crimes to the Naugatuck police. Moreover, this entire course of cooperation had been preceded by numerous *Miranda* warnings, by his repeated waiver of the rights referred to therein, and by full advice regarding his right not to have his apartment searched without a warrant.

The next day, December 21, 1989, while being transported to the court in Derby for arraignment on the Oxford crimes, the defendant, again after having been given the *Miranda* warnings, freely responded to Byrne's inquiry regarding whether he had been at the Naugatuck mall on December 16, 1989. That afternoon, O'Leary and Deely met with him at the court in Derby and told him that they were police officers investigating the disappearance of the victim in the present case.

After having been fully and elaborately advised by the court at his arraignment, and after again having been advised of his *Miranda* rights by O'Leary and Deely, and having waived them, he freely agreed to cooperate with the two police officers and freely discussed with them his version of how he had come into possession of the Lerner's bag and the receipt at the mall parking lot. He then gave them both oral and written consent to search his apartment, again after having been fully advised that he need not do so.

Furthermore, all of this cooperation took place while the defendant was represented by counsel, albeit not necessarily on the specific matter on which he was cooperating. Since June, he had been represented by Labriola, whom he privately had retained to represent him on the prior Naugatuck charges, for which he had been charged and which charge was pending in court. Since his arraignment on December 21, 1989, in Derby, he was represented on the Oxford charges by Hazelkamp. Not once during this entire course of cooperation with the police on the very serious charges of sexual assault and related crimes, and on O'Leary's and Deely's investigation of the victim's disappearance, for which the defendant knew he was responsible, did the defendant seek to consult either his privately retained or publicly appointed attorney to advise him regarding whether to cooperate. Instead, despite his knowledge of his own guilt, and despite the knowledge that he had counsel, he repeatedly waived his right to counsel and spoke with the police when they asked if he would do so, and repeatedly waived his right not to have his apartment searched without a warrant. Thus, the defendant's conduct during the week before confessing to O'Leary and Deely indicates an unmistakable willingness to forgo any reliance on counsel, and to cooperate with the police regarding both those crimes for which he had been charged and those crimes for which he

was under investigation. Moreover, all of this coopera-
tion was given when the defendant knew, or must have
known, that his cooperation would inculpate him, not
only in the other crimes for which he was cooperating,
but in the present matter.

Of further importance in this respect is his willing-
ness, on December 21, 1989, to permit O'Leary and
Deely to search his apartment for the receipt that he
claimed to have found in the mall parking lot. His writ-
ten consent to search covered, not only that receipt,
but anything else that "they may desire for their official
investigation." The defendant knew that the reference
to the "official investigation" was to the disappearance
of the victim, whom the defendant had murdered just
five days earlier. The defendant also knew, or must have
known, that their search would be likely to uncover, not
only the receipt, for which he had supplied an exculpa-
tory explanation, but the credit union envelope and the
newspaper article, which would be much more difficult
to explain and which would necessarily lead to more
inculpatory material regarding the victim's murder.

In addition, when O'Leary and Deely met with the
defendant in the bail commissioner's office on the morn-
ing of December 27, 1989, he knew that O'Leary and
Deely were still investigating the disappearance of the
victim whom he had sexually assaulted and murdered
just eleven days earlier. Nonetheless, he agreed to talk
to them. He was read his *Miranda* rights twice, and
read them aloud himself once from the card. He
acknowledged that he understood his rights. He was
asked twice if he wanted a lawyer, and twice he refused.
These refusals, moreover, came when the defendant
was at the courthouse to be arrested and arraigned
on the charges arising out of the December 13, 1989
Naugatuck incident. Thus, the conclusion is inevitable
that he knew that, just as had occurred in the Derby
court on the Oxford crimes, he would soon have a public

defender appointed on those charges. Nevertheless, he twice stated that he wanted to get the matter "off [his] chest." Thus, in this encounter with O'Leary and Deely, the defendant continued the course of eschewing any reliance on counsel and of cooperation with the police that had characterized his behavior for the prior week. In addition, he indicated that another factor was impelling him to continue that course of conduct: a desire to relieve his conscience by confessing.

Second, unlike the situation in *Stoddard*, in which the defendant had a prior attorney-client relationship with the partner of the attorney who was attempting to contact him, in the present case the defendant had no such relationship with either Sorrentino or Isko, or with any public defender in their office. They were not his attorneys, and were not associated with anyone who had been his attorney. Indeed, he had never even met or heard of either of them. They were *strangers to him*. Thus, "the relationship of the suspect to the attorney"; id., 175; does not suggest that the defendant would have acted differently than he did, because there was no such relationship.

Third, *Stoddard* is also factually distinguishable because of the extraordinary preconfession history in the present case of cooperation with the police, despite the fact that the defendant throughout had counsel available to him, and despite the high probability, of which the defendant must have been aware, that his cooperation would inculpate him. Moreover, in the present case there is a strong suggestion in the record that, when O'Leary and Deely asked the defendant to speak with them, the defendant wanted to clear his conscience. There was no such history or suggestion in *Stoddard*.

The defendant contends that, because when Sorrentino and Isko entered the bail commissioner's office he

ceased his cooperation, the state cannot establish that, armed with the proper information, he would have acted differently earlier, when O'Leary and Deely asked to speak with him. The proof, however, is not in that pudding. There is nothing in the record to suggest that he was given any choice in the matter after the arrival of Sorrentino and Isko. Indeed, the record is to the contrary. When Sorrentino and Isko entered the office, they immediately ordered O'Leary and Deely to stop questioning the defendant and to leave.[42] O'Leary and Deely promptly complied.

The defendant attaches significance to the fact that he *did not*, at that point, tell Sorrentino and Isko to leave, ask for permission to complete his written confession, or accept O'Leary's and Deely's invitation to speak with them later, to which they testified. Those facts, however, which are statements of what the defendant *did not do*, do not undermine our conclusion, which is drawn from the record of what the defendant *did do*, both in the previous week and in the previous one-half hour, and from the absence of any prior relationship between the defendant and Sorrentino and Isko.

The state's burden is to establish, on the basis of the totality of the circumstances, that the defendant would not have acted differently had he been given the proper information. Our conclusion is drawn from the totality of the circumstances, and those circumstances convince us that the state has met its burden.

## IV

## GUILT PHASE ISSUES

The defendant presents eight claims involving the guilt phase of the trial. He claims that: (1) his waiver

---

[42] Indeed, Sorrentino testified that she immediately had identified herself as the defendant's attorney, an identification that plainly was inaccurate.

of a jury trial and his election of a three judge panel were not knowing, intelligent and voluntary; (2) the panel should have granted his motion for a mistrial because it improperly had read Judge Pellegrino's memorandum of decision on the defendant's motions to suppress; (3) the panel improperly denied his motion that it articulate the specific factual basis for its verdict; (4) there was insufficient evidence to prove beyond a reasonable doubt the temporal concurrence between his killing of, and his intent to kill, the victim; (5) § 53a-54b (5) applies only if there has been a kidnapping for ransom; (6) there was insufficient evidence to prove beyond a reasonable doubt that he murdered the victim in the course of the commission of a sexual assault in the first degree; (7) the panel did not comply with the two witness rule; and (8) the panel improperly failed to merge his two capital felony convictions for one victim prior to the penalty phase hearing. None of these contentions is persuasive.

A

Waiver of a Jury Trial

The defendant first contends that his waiver of his right to a jury trial and election of a three judge panel were not knowing, intelligent and voluntary. More specifically, he argues that the canvass by Judge Byrne was flawed in several respects. First, the defendant claims that the trial court misinformed him about how the chief court administrator selects the panel members. Second, the defendant asserts that it was improper for the trial court not to canvass him about "his understanding of how jurors would be picked and his role therein and his ability to question prospective jurors about their attitude toward racial issues and toward the death penalty . . . ." Third, he argues that he "was not advised about the likelihood that the three judge

panel would become aware of inadmissible and prejudicial information about [the] defendant which a jury would never hear." We disagree.[43]

The following undisputed facts bear on the defendant's claim. When the defendant initially was put to plea on all seven counts of the information, he pleaded not guilty and elected a jury trial. Thereafter, however, during a pretrial hearing, the defendant withdrew his jury trial election, elected a trial before a three judge panel, and waived his right to a jury trial.

At that hearing, the defendant was represented by Gerard A. Smyth and Alan D. McWhirter, of the office of the chief public defender. Both were experienced criminal defense attorneys.[44] They continued to represent the defendant throughout the trial.

The defendant's attorneys informed the court that, because the state had communicated to them that it intended to withdraw its request to have the defendant examined by a psychiatrist, they both had spoken to the defendant about "whether or not [he would elect] to be tried by a three judge panel or by a jury." McWhirter stated that "[a]fter considerable discussion and deliberation, I believe that we've reached the decision that we would make the request—[the defendant] will make the request that the trial be made in front of a three judge panel as opposed to a jury at this time." Smyth concurred with this description of events. McWhirter explained to the court that they also had discussed with the defendant "the question of what

_____

[43] The defendant concedes that this claim was not properly preserved. He seeks to prevail, however, pursuant to State v. Golding, 213 Conn. 233, 567 A.2d 823 (1989). Although the defendant's claim merits review under the first two requirements of Golding; see id., 239; it fails to satisfy the third requirement because the record establishes that the defendant was not deprived of his right to a jury trial. Id., 240.

[44] Indeed, Smyth subsequently was appointed as the state's chief public defender, a position that he still holds.

would happen if, in fact, a three judge panel return[ed] a verdict of guilty on a capital felony crime . . . ." He added that in his discussions with the defendant, he had explained to the defendant that, pursuant to § 53a-46a (b),[45] "if a three judge panel would return a guilty verdict on capital felony . . . the next stage would be to empanel a jury to decide the penalty phase unless, number one, the defendant were to request that the three judge panel that heard the facts remain to decide the penalty phase; number two, that the state's attorney did not have an objection to that process; and, number [three], that the court consented to it." McWhirter further explained to the court that he had spoken to the state, and the state had indicated that if the defendant elected to have the panel for the penalty phase, the state would not object. The state confirmed that it would not object if the defendant elected the panel for the penalty phase. The trial court then questioned the defendant personally regarding his election to determine whether his choice was made "freely and voluntarily, knowingly, and with a full understanding of the consequences of what [he was] doing."

The court explained to the defendant that he had the right to a jury trial before twelve jurors, that no one could force him to change his election of a jury trial, and that he was entitled to have the matter tried to a three judge panel if he so elected. The court explained each of these rights separately, and, at the end of each explanation, asked the defendant if he understood that particular right. The defendant answered in the affirmative each time.

The court then explained how the three judge panel would be assembled for the trial. Judge Byrne explained that he personally would not be a member of the panel,

[45] See footnote 9 of this opinion for the text of General Statutes (Rev. to 1989) § 53a-46a (b).

that the presiding criminal judge would request that the chief court administrator appoint a panel, that it was the chief court administrator who would appoint the panel members, that the panel members would be appointed "by lot," and that the panel probably would be composed of judges sitting in Waterbury. Again, the court explained each part of the procedure for the appointment of the panel members and, at the end of each explanation, asked the defendant if he understood the process. Each time the defendant answered, "Yes."

The trial court then asked the defendant a number of personal questions and received the following information from him. The defendant was twenty-nine years old, a high school graduate, and employed at the time he was arrested. Since graduation from high school, the defendant had "spent some time in the service and after was a truck driver." In particular, the defendant had spent five years in the United States Army, during which he worked as a transportation specialist, and had left the army with the rank of E-4. While in the army, the defendant had been stationed at a "couple" of duty stations, and participated in special training. The trial court asked, "And you were honorably discharged from that service?" The defendant responded, "No. No, I wasn't." The defendant also stated that he had been incarcerated for sixteen months, and that he was not "under the influence of alcohol, drugs or medication of any kind."

Again, the trial court asked the defendant if he understood that he had the right to a jury trial, and the defendant responded that he did. The trial court then asked: "This is what I gather you want to do today, waive your right to a jury trial and have it done by a three judge panel?" The defendant answered: "That's correct, Your Honor."

The court then advised the defendant that "in a jury trial, of course, the verdict must be unanimous, all

twelve would have to agree on the verdict," and that "when you have three judges, it's a majority. So it would only have to be two out of three in order for a verdict to be rendered . . . ." The court asked if the defendant understood, and he responded that he did. The court asked the defendant if he was being forced into making his election, and he said no. When the court asked him if anyone was "threatening" him to make his election, the defendant responded, "No. I do it of my own free will."

The court also confirmed that the defendant had discussed his election with his attorneys and, without soliciting the particulars of the defendant's conversations with his attorneys, the court asked if the defendant felt that he was "fully and adequately" apprised of the consequences of his election. The court also asked the defendant if his attorneys had told him anything different from what the court had told him, and the defendant responded that they had not. The trial court then explained to the defendant that "the case of this type is split into two phases. The part of determining guilt or innocence, and depending on that verdict, if the verdict of the three judge panel is guilty, then we go to what we call the penalty phase." The court also explained to the defendant that in order for the three judge panel to preside over the penalty phase, the panel must agree to do so. The court continued that "if the three judge panel comes to the conclusion that you are guilty of the crimes charged, then they could disqualify themselves and then you would have to go on to a jury trial . . . ." At this juncture, the defendant posed a question to the court: "They could disqualify themselves, Your honor?" The court answered, "They could say that, we don't want to participate in the penalty phase. You also have to have the agreement of the three judge panel in order for the three judge panel to participate in the penalty phase, if that's how far it goes;

do you understand that?" Before the defendant could answer, Smyth stated: "We've explained that in greater detail, Your Honor. I think the court can proceed." The defendant then stated that he understood the procedure. Nonetheless, despite these statements by the defendant's attorney and by the defendant himself, the court twice more explained to the defendant that the panel could decline to participate in the penalty phase, and asked if the defendant understood. Both times, the defendant answered in the affirmative.

The court then asked the defendant if he had any questions that he wanted to ask of the court, if he understood all the questions that the court had asked, and if he understood that once he made the election it could not be changed. The defendant declined to ask any questions, and indicated that he understood the court's questions and the consequences of his election. For the last time the trial court asked the defendant, "you are doing this freely and voluntarily, are you not, sir?" In response, the defendant stated, "Yes. This is in my best interest, Your Honor."

The trial court then asked several questions of the defendant's attorneys. First, the court asked the attorneys whether they agreed with the defendant's answers. The attorneys responded in the affirmative. The court then asked Smyth, "do you feel that [the defendant's] waiver is freely and voluntarily accomplished and he knows what he is doing and the consequences of that?" Smyth responded, "I am personally satisfied that that is the case, Your Honor." McWhirter concurred. The court also asked the defendant's attorneys whether they knew of any reason why the court should not accept the defendant's waiver, and both attorneys replied that they did not. The court finally directed the same question to the state. The state responded that it knew of no reason. The trial court then specifically found that

the defendant had waived his right to a jury trial "knowingly, intelligently and voluntarily" and, accordingly, accepted the defendant's waiver.

In addition, on May 28, 1991, immediately before the presentation of evidence, the defendant was put to plea on the state's substitute information. In the course of those proceedings, he personally reiterated his election to be tried "[b]y judges," rather than by a jury, and Smyth reminded the panel that, "[j]ust for the record, there was a previous election and a finding by Judge Byrne."

"The principles that govern waiver of a right to a jury trial are not in dispute. The right to a jury trial in a criminal case is among those constitutional rights which are related to the procedure for the determination of guilt or innocence. The standard for an effective waiver of such a right is that it must be knowing and intelligent, as well as voluntary. *Schneckloth* v. *Bustamonte*, [supra, 412 U.S. 237]; *Patton* v. *United States*, 281 U.S. 276, 312, 50 S. Ct. 253, 74 L. Ed. 854 (1930). . . . Relying on the standard articulated in *Johnson* v. *Zerbst*, 304 U.S. 458, 464, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938), we have adopted the definition of a valid waiver of a constitutional right as the intentional relinquishment or abandonment of a known right. . . . *State* v. *Reed*, 174 Conn. 287, 293, 386 A.2d 243 (1978). This strict standard precludes a court from presuming a waiver of the right to a trial by jury from a silent record. . . . [S]ee *Boykin* v. *Alabama*, 395 U.S. 238, 243, 89 S. Ct. 1709, 23 L. Ed. 2d 274 (1969). In determining whether this strict standard has been met, a court must inquire into the totality of the circumstances of each case. . . . [S]ee *Adams* v. *United States ex rel. McCann*, 317 U.S. 269, 278, 63 S. Ct. 236, 87 L. Ed. 268 (1942). When such a claim is first raised on appeal, our focus is on compliance with these constitutional requirements rather than on observance of analogous procedural rules prescribed

by statute or by the Practice Book." (Citations omitted; internal quotation marks omitted.) *State* v. *Williams*, 205 Conn. 456, 460–61, 534 A.2d 230 (1987).

The record affirmatively and unequivocally establishes that the defendant's waiver of his right to a trial by a jury was voluntary, knowing and intelligent. First, "there is no evidence to suggest that the defendant was not of ordinary intelligence or educational background." Id., 463. In fact, the record establishes that the twenty-nine year old defendant was a high school graduate, had received training in the military, and had been employed at the time of his arrest.

Moreover, "[t]he defendant was not a novice in the criminal justice system . . . . See, e.g., *State* v. *Reid*, 204 Kan. 418, 421, 463 P.2d 1020 (1970). Nor can it fairly be said that the record presents a picture of a defendant bewildered by court processes strange and unfamiliar to him . . . . See *Smith* v. *O'Grady*, 312 U.S. 329, 334, 61 S. Ct. 572, 85 L. Ed. 859 (1941)." (Internal quotation marks omitted.) *State* v. *Shockley*, 188 Conn. 697, 708, 453 A.2d 441 (1982). The record also reflects that the defendant had been advised of his right to a jury trial in relation with another sexual assault charge. At the time of the canvass in the present case, he was under arrest for, and previously had been arraigned and put to plea, for both the Naugatuck and Oxford crimes. The record also demonstrates that the defendant remained alert and attentive during the court's questioning, and even asked a question from the court when he was unsure of the meaning of the panel's potential disqualification. The defendant did not respond with a generic yes or no to every question; rather, the defendant actively participated in the canvassing. For example, the trial court asked, "And you were honorably discharged from the service?" The defendant candidly answered, "No. No, I wasn't." In addition, he stated that his choice was "of my own free will," and that it was "in my best

interest . . . ." These examples, and the record as a whole, show that the defendant was neither intimidated nor confused by the process.

The record also reflects that the defendant was represented by counsel experienced in cases of this nature, who were present and actively participated in the canvass. Although the presence of counsel does not by itself mean "that the defendant's interests and rights are protected . . . [t]he fact of counsel being present and having advised the defendant is a factor to be considered in determining the question of the need for or sufficiency of any admonition given by the court. *Neller* v. *State*, 79 N.M. 528, 534, 445 P.2d 949 (1968); see *Henderson* v. *Morgan*, 426 U.S. 637, 647, 96 S. Ct. 2253, 49 L. Ed. 2d 108 (1976)." (Internal quotation marks omitted.) *State* v. *Shockley*, supra, 188 Conn. 708. Indeed, it would be to blink at the reality disclosed by this record to conclude other than that the defendant's decision to have his fate determined by a panel of judges, rather than by a jury, was a tactical decision entered into by the defendant after consultation with and advice from experienced and capable defense counsel.

Finally, the court repeatedly asked the defendant and his attorneys whether his election was voluntary and knowing, and whether there was any reason to suggest that it was not. The defendant and his attorneys repeatedly assured the court that it was voluntary and that there were no such reasons. The record clearly establishes that the defendant made his choice voluntarily, knowingly, intelligently, and after full consultation with experienced counsel.

We reject the defendant's contention that he is entitled to a new trial because the trial court improperly described the panel's selection process. The defendant's specific claim is that the trial court erroneously

informed the defendant that the panel members would be chosen by the chief court administrator by lot. The chief court administrator has the discretion to choose the panel members pursuant to § 53a-45 (b). See footnote 8 of this opinion. Although we agree with the defendant that § 53a-45 (b) does not direct the chief court administrator to choose the panel members by lot, there is no basis in this record, taken as a whole, to conclude that the trial court's conveyance of this misinformation was of any moment in the defendant's decision to waive his right to a jury trial. The trial court's description of the process of the selection of the panel as a whole was meant to, and did, convey one significant fact to the defendant, namely, that he would have no part in the selection of the panel members. Informing the defendant that the chief court administrator had the discretion to appoint the panel members, without mentioning the particular method of the exercise of that discretion, would not have conveyed any significantly different information to the defendant.

The defendant's second argument, namely, that the trial court improperly failed to advise him that he could participate to a certain degree in the selection of the jury, is also unpersuasive. In canvassing the defendant, it was not the function of the court to provide an analysis of the strategic advantages and disadvantages to him of a jury trial, as opposed to a trial to a panel of judges. That is the function of the defendant's counsel, not the court. Indeed, in this case, the defendant's counsel encouraged the trial court to stop its questioning, by stating that "[w]e've explained that in greater detail, Your Honor. I think the court can proceed." The presentation of facts and information relating to strategic decision making was properly left to the defendant's counsel. Moreover, the court did inform the defendant that, unlike a jury verdict that would have to be unanimous, the panel could convict him by a two to one vote.

We also reject the defendant's final argument in this respect, namely, that he "was not advised about the likelihood that the three judge panel would become aware of inadmissible and prejudicial information about [the] defendant which a jury would never hear." This claim refers to the defendant's contention, which we discuss in part IV B of this opinion, that the panel improperly read the memorandum of decision of Judge Pellegrino on the defendant's motion to suppress. This claim is without merit.

First, as we explain in part IV B of this opinion, there was nothing improper in the fact that the panel read the memorandum of decision. Second, generally in a trial to a court, the court will have to hear evidence before ruling on admissibility. That is the kind of concern inherent in the choice of fact finder that is the province of counsel, not the court, to discuss with the defendant. It is not part of the required canvass of a defendant who elects to waive his constitutional right to a jury trial.

B

Motion for a Mistrial

The defendant also claims that the panel improperly denied his motion for a mistrial, which was based on his claim that it improperly had read the memorandum of decision by Judge Pellegrino on the defendant's motions to suppress certain evidence. Specifically, the defendant asserts that the suppression hearing was held before Judge Pellegrino in order to insulate the panel from hearing irrelevant and prejudicial evidence that might have been admitted for the purposes of suppression, but that otherwise would have been inadmissible at the trial. Thus, the defendant argues that, because the panel members exposed themselves to such irrelevant and highly prejudicial evidence, the panel, as fact finders, "taint[ed] themselves." We disagree.

The following are the relevant facts. When it was discovered during the trial that the police had removed certain items from the defendant's car, and used these items before securing the December 22, 1989 warrant for the search of the defendant's car, the defendant indicated that he intended to renew his motion to suppress the evidence that was obtained from his car. See part II D of this opinion. In response, the state indicated that it believed that the legal issue had been resolved in Judge Pellegrino's memorandum of decision. Judge Barnett, one of the panel members, then handed the state a copy of the memorandum of decision, and asked if the state could confirm that it covered the defendant's claim. After reviewing the memorandum of decision, the state acknowledged that the fact that the police had removed items from the defendant's car prior to the execution of the warrant had not been made known to Judge Pellegrino. The state also argued, however, that the items that were removed were legally in the custody of the state police as a result of the prior inventory search of the car. The panel did not rule immediately on the legal issue raised by the new evidence, and the examination of witnesses continued.

After a recess, on the same day, the defendant moved for a mistrial. The basis of the defendant's motion was that if one or more of the panel members had read the first ten pages of Judge Pellegrino's memorandum of decision, they would have learned irrelevant and highly prejudicial evidence that otherwise would not have been known to them. It was the defendant's claim that due process required that he be tried based on facts adduced at his trial, not on the facts that were found during the suppression hearing.

The panel denied the defendant's motion. Judge Kulawiz stated on behalf of the panel that all members of the panel had read Judge Pellegrino's decision. She also stated: "I do not believe there was any prohibition

from any one of us as judges from hearing the preliminary motions in this case. Certainly any determinations of fact that were made by another judge are not to be considered by us in this trial. We are basing any decisions that we make solely and entirely upon any testimony, any determination of credibility. That's being made by us in this courtroom and not by anyone outside this courtroom, including Judge Pellegrino. His ultimate decision concerning suppression of the evidence is something that we certainly would have to be aware of in order to try this case."

The denial of a motion for a mistrial will be reversed only upon a showing of an abuse of discretion. *State* v. *Correa*, 241 Conn. 322, 348–53, 696 A.2d 944 (1997). We conclude that the panel did not abuse its discretion in denying the defendant's motion.

First, contrary to the defendant's claim, the record does not establish that the suppression motions were heard by Judge Pellegrino in order to insulate the panel from any evidence that might not have been admissible at the trial on the merits.[46] There is nothing in this record to suggest any such reason for the assignment of Judge Pellegrino, rather than the panel, to hear the motions. Second, the panel would not have been disqualified from hearing the defendant's suppression motions in the first place. Practice Book § 41-7, formerly

---

[46] In his main brief in this case, the defendant claimed that the "hearing on these motions had purposely been heard before a different judge so as to prevent the three judge panel from learning of the irrelevant and prejudicial information disclosed therein." The state challenged the accuracy of this statement in its brief. In response, the defendant modified his position, and stated in his reply brief that "it is a clear inference from the record that the reason that Judge Pellegrino heard the defendant's suppression motions even after the three judge panel had been appointed was so that the prejudicial information about the defendant that would be disclosed during that hearing . . . would not be heard by the panel . . . ." There is no support in the record for either of the defendant's contentions.

§ 813,[47] provides in relevant part: "All motions which require an evidentiary hearing shall be heard by the judicial authority to whom the case has been assigned for trial, unless otherwise provided by rule or statute, or otherwise ordered by the presiding judge." There was no such rule, statute or order in the present case. Third, we have held that where a trial court states that it can and will ignore certain improper evidence, "[t]here is no reason to believe [it] could not do so, or that a reasonable person would have cause to question [its] ability to do so." *State v. Santangelo*, 205 Conn. 578, 602, 534 A.2d 1175 (1987). Fourth, when the defendant moved to renew his suppression motions, he claimed that the evidence adduced at trial had not been made available to Judge Pellegrino. In order to examine the merits of this claim, the panel was required to compare Judge Pellegrino's findings to the trial evidence. We cannot imagine how such an examination could have been carried out without a careful reading of Judge Pellegrino's decision. Fifth, there is very little factual detail in the memorandum of decision regarding the defendant's alleged involvement in the other incidents that could have prejudiced the panel as a fact finder. In addition, the panel heard the defendant's confession, which was corroborated by physical evidence obtained

---

[47] Practice Book § 41-7, formerly § 813, provides: "A motion made before trial shall be determined prior to trial, unless the judicial authority orders that the ruling be deferred until during the trial of the general issue or until after the verdict. Unless the judicial authority otherwise permits, all pretrial motions pending at the time for the hearing of any pretrial motion shall be heard at the same time. The judicial authority may order the filing of briefs prior to, at, or following such hearing. Where factual issues are involved in determining a motion, the judicial authority shall state its essential findings on the record. A verbatim record shall be made of all proceedings at a hearing on a pretrial motion, including such findings of fact and conclusions of law as are made orally. All motions which require an evidentiary hearing shall be heard by the judicial authority to whom the case has been assigned for trial, unless otherwise provided by rule or statute, or otherwise ordered by the presiding judge."

through the autopsy of the victim's body and other evidence.

## C

### The Factual Basis of the Verdict

The defendant next contends that he is entitled to a new trial because the panel did not properly "state the factual basis underlying the decisions on the legal issues" resolved by its verdict as was required by Practice Book, 1991, § 4059 (now § 64-1).[48] The defendant's precise claim is that, although the panel orally announced its verdict, which then was transcribed and filed with the clerk, this court should remand the case to the panel or order a new trial because the verdict failed to address, with particularity, the factual issues relating to the cause of the victim's death.[49] We disagree.

This claim arises out of the testimony of Edward T. McDonough, the deputy chief medical examiner for the state, who performed the autopsy on the victim's body. McDonough testified that, based on his anatomical findings, the cause of death was asphyxia, which he attributed to one or a combination of three underlying

[48] Practice Book, 1991, § 4059 (now § 64-1), provided: "Except in small claims actions and as provided in Sec. 4060, when rendering judgments in trials to the court and in criminal cases, in ruling upon motions to dismiss under Sec. 814 and motions to suppress under Sec. 820, the court shall, either orally or in writing, state its decision on the issues in the case and, if there are factual issues, the factual basis of its decision. The court shall include in its decision its conclusion as to each claim of law raised by the parties. If oral, the decision shall be recorded by a court reporter and, if there is an appeal, the trial judge shall order the decision transcribed and the transcript of the decision shall be signed by the trial judge and filed in the trial court within ten days of the filing of the appeal. If written, the decision shall be stated in a memorandum of decision, which shall be filed with the clerk."

[49] The defendant also claims that the verdict failed to specify facts "to resolve the question of the timing or sequence of events upon which the concurrence of [the] defendant's action and intent depends." This claim is closely related to the defendant's next claim, which we address in part IV D of this opinion.

mechanisms: airway occlusion, resulting from the gag in her mouth; neck compression, or manual strangulation; and drowning. He could not be more specific with regard to any of these three mechanisms.

In its verdict, the panel found the defendant guilty of murder, and the two counts of capital felony that relied on that finding of guilt.[50] The defendant then filed a motion for a finding of fact, in which he requested the panel to "articulate for the record the factual basis for its decision, wherein the defendant was found guilty of murder . . . and capital felony . . . ." The defendant asserted in his motion that such a finding was "required by Practice Book § 4059." In oral argument in support of this motion, the defendant clarified that he was asking the panel to articulate whether it found that the victim "died as a result of a facial gag or died as a result of drowning or died as a result of strangulation." The panel denied the defendant's motion.

The defendant claims that the panel's denial was improper, and requests that we remand this case to the panel for further articulation. The defendant further contends that, in the event that the panel is unable to reconstruct the factual basis of its decision, there should be a new trial. The defendant's arguments are unavailing, both procedurally and substantively.

The defendant characterizes the panel's denial of his motion as a failure to comply with § 4059, which he

---

[50] Specifically, as to those three counts the panel stated: "As to count five, we find the defendant guilty of murder in that the defendant, with the intent to cause the death of [the victim], did cause her death by asphyxia.

"As to count six, we find the defendant guilty of capital felony in that the defendant committed murder of [the victim], a person whom he had kidnapped, during the course of the kidnapping and before she was able to return or be returned to safety.

"As to count seven, we find the defendant guilty of capital felony in that the defendant did commit murder in the course of the commission of the sexual assault in the first degree of [the victim], which murder we find was closely related in time and place to said sexual assault."

claims provides an independent ground for "de novo or plenary review," and potential reversal of the verdict and a new trial. Section 4059, however, cannot be read in a vacuum. It must be read together with Practice Book, 1991, § 4051 (now § 66-5),[51] and Practice Book, 1991, § 4054 (now § 66-7).[52] Thus, in general terms, § 4059 established the instances in which the trial court was required "either orally or in writing, [to] state its decision on the issues in the case and, if there are factual

[51] Practice Book, 1991, § 4051 (now § 66-5), provided: "A motion for rectification or articulation shall be filed in triplicate with the chief clerk of the supreme court and forwarded by such clerk to the trial judge. The trial judge shall file the ruling on the motion with the chief clerk of the supreme court.

"Any motion seeking corrections in the transcript or the trial court record which depend on proof of matters not of record or seeking an articulation or further articulation of the decision of the trial court shall be determined by the judge of the trial court whence the appeal is taken or the reservation is made. The trial court may make such corrections or additions as are necessary for the proper presentation of the preliminary statement of issues or for the proper presentation of questions reserved; or the trial court may approve a stipulation of counsel that such a correction or addition be made, provided the motion or stipulation is presented before the appeal is ready to be assigned for hearing and only by leave of the supreme court thereafter. The action of the trial judge as regards such a correction or addition may be reviewed by the supreme court under Sec. 4054. Nothing herein is intended to affect the existing practice with respect to opening and correcting judgments and the records on which they are based.

"Corrections made before the record is printed shall be included in it. If the record has been printed, the chief justice may direct the chief clerk of the supreme court to prepare a supplemental printed record, to be printed and distributed in the same way as the original printed record, but in the absence of such a direction the chief clerk of the supreme court shall furnish the justices of the supreme court typewritten copies."

[52] Practice Book, 1991, § 4054 (now § 66-7), provided: "Any party aggrieved by the action of the trial judge as regards rectification of the appeal or articulation under Sec. 4051 may make a written motion for review to the supreme court, to be filed with the chief clerk of the supreme court, and the supreme court may, upon such a motion, direct any action it deems proper. If the motion depends upon a transcript of evidence or proceedings taken by a court reporter, the procedure set forth in Sec. 4053 shall be followed. Corrections which the supreme court makes or orders made pursuant hereto shall be included in the printed record or a supplemental record in the same way in which, under Sec. 4051, corrections made by the trial judge are included."

issues, the factual basis of its decision . . . [and] its conclusion as to each claim of law raised by the parties. . . ." Those instances were "in criminal cases, in ruling upon motions to dismiss under Sec. 814 and motions to suppress under Sec. 820 . . . ." See footnote 48 of this opinion. In the event that a party deemed a court's memorandum of decision, filed pursuant to § 4059, factually to be inadequate, § 4051 provided the mechanism by which that party could have remedied the perceived inadequacy by filing a "motion for rectification or articulation." If dissatisfied with the results of the motion for articulation, the aggrieved party could have sought appellate review, as well as an order for articulation, by filing a motion for review in this court pursuant to § 4054.

Therefore, a claimed failure to make adequate findings under § 4059 did not, by itself, provide a basis for reversal of a verdict that is otherwise valid. See *State* v. *Holloway*, 22 Conn. App. 265, 273, 577 A.2d 1064, cert. denied, 215 Conn. 819, 576 A.2d 547 (1990) (ruling of trial court on defendant's motion for articulation pursuant to § 4051 does not ordinarily provide basis of claim on appeal).[53] Moreover, despite the pendency of this appeal for approximately eight years, the defendant has never sought review of the panel's ruling. Thus, the defendant's claim that he is entitled to appellate relief based on what he claims to be the panel's inadequately articulated verdict is procedurally flawed.

[53] Our current rules of appellate practice reflect the same principle. Practice Book § 66-5 provides in relevant part: "The sole remedy of any party desiring the court having appellate jurisdiction to review the trial court's decision on the motion [for articulation] filed pursuant to this section or any other correction or addition ordered by the trial court during the pendency of the appeal shall be by motion for review under Section 66-7. . . ." See *State* v. *Crespo*, 246 Conn. 665, 669, 718 A.2d 925 (1998), cert. denied, 525 U.S. 1125, 119 S. Ct. 911, 142 L. Ed. 2d 909 (1999) (denial by trial court of motion for articulation not reviewable on appeal; sole remedy is motion for review).

Moreover, substantively, in its verdict the panel stated all that it was required to state. The general purpose of these rules of practice and their interplay is to ensure that there is a trial court record that is adequate for an informed appellate review of the various claims presented by the parties. *Barnes* v. *Barnes*, 190 Conn. 491, 493–94, 460 A.2d 1302 (1983). One specific purpose of a motion for articulation of the factual basis of a trial court's decision is to clarify an "ambiguity or incompleteness in the legal reasoning of the trial court in reaching its decision." *State* v. *Wilson*, 199 Conn. 417, 434, 507 A.2d 1367 (1986). Further articulation of a panel's criminal verdict is unnecessary where the verdict adequately states its factual basis, and where the record is adequate for informed appellate review of the verdict. In the present case, the panel adequately stated the factual basis for its verdict, and the record is adequate for purposes of an informed appellate review.

On the murder count, the information and bill of particulars charged that the defendant had murdered the victim in that, with the intent to cause her death, he had done so by asphyxia. The panel stated in its verdict that the defendant, "with [the] intent to cause the death of [the victim], did cause her death by asphyxia." Thus, it found that the defendant had engaged in the specific criminal conduct proscribed by the particular statute involved, as specified in the information and bill of particulars. No more was required of the panel. There is nothing in either the language or the purpose of § 4059 that required the judicial panel to state the specific mechanism by which the defendant killed the victim. This is particularly true in the present case, where (1) there was no real dispute regarding the fact that the defendant had killed the victim, (2) based on the evidence, the asphyxia could have resulted from any one or a combination of all three mechanisms specified by the medical examiner,

and (3) the medical examiner could not isolate any of the three mechanisms as the sole mechanism underlying the asphyxia. Furthermore, the panel's refusal to make its findings more specific has not impaired our ability to review the panel's verdict with respect to the murder count and, accordingly, the capital felony counts that rely on that conviction. There is no ambiguity or incompleteness in the verdict, and the record presented to us raises no difficulties in determining whether any element found by the panel is supported by the evidence.[54]

## D

## The Sufficiency of the Evidence

The defendant next claims that there was insufficient evidence to prove beyond a reasonable doubt that there was a temporal concurrence between the defendant's intent to kill and his conduct that resulted in the victim's death. We disagree.

Generally, criminal intent and the acts that meet the elements of a crime must temporally concur. W. LaFave & A. Scott, Criminal Law (1972) § 34, p. 237. "With crimes which require both some act or omission and mental fault, no crime is committed unless the mental fault concurs with the act or omission, in the sense that the mental state actuates the act or omission." Id. It is axiomatic that "to render any act criminal, the *intention* with which it is done, must be so; or, in other words, the *will* must concur with the act." (Emphasis in original.) *Myers* v. *State*, 1 Conn. 502, 505 (1816); see also *State* v. *Miller*, 186 Conn. 654, 666, 443

---

[54] It is true that, in unusual cases we have, sua sponte, remanded criminal cases to the trial court for further articulation of its verdict. See, e.g., *State* v. *Patterson*, 227 Conn. 448, 454–55, 629 A.2d 1133 (1993); *State* v. *Cobbs*, 198 Conn. 638, 643–44, 504 A.2d 513 (1986). Suffice it to say that none of the considerations that prompted our sua sponte remand in those cases applies in the present case.

A.2d 906 (1982) (specific intent and criminal act must be contemporaneous). Our murder statute embodies this notion of contemporaneity. One is guilty of murder "when, with intent to cause the death of another person, he causes the death of such person . . . ." General Statutes § 53a-54a (a). The defendant was found guilty of murder under this statute.

In reviewing the verdict to determine whether it was supported by the evidence, we employ a two part test. "First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [fact finder] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Traficonda*, 223 Conn. 273, 278, 612 A.2d 45 (1992). "In order to be convicted of murder, the defendant must have possessed the specific intent to cause the death of the victim. General Statutes § 53a-54a. To act intentionally, the defendant must have had the conscious objective to cause the death of the victim. General Statutes § 53a-3 (11); *State* v. *Raguseo*, 225 Conn. 114, 120, 622 A.2d 519 (1993). Generally, intent can be proved only by circumstantial evidence. . . . Intent may be, and usually is, inferred from conduct. . . . An intent to cause death may be inferred from circumstantial evidence such as the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading to and immediately following the death." (Internal quotation marks omitted.) *State* v. *Greenfield*, 228 Conn. 62, 76–77, 634 A.2d 879 (1993).

There was sufficient evidence to prove beyond a reasonable doubt that when the defendant engaged in the homicidal conduct, he did so with the intent to kill the victim. The defendant stated in his confession that, after

sexually assaulting the victim, he bound and gagged her because she had seen his face. Because, however, she obviously had seen his face when he initiated his ruse in the Bradlees' parking lot and he already had the tape and valve stem remover, the panel could have inferred that his intent to kill had been formed at that earlier time, and was maintained throughout his subsequent homicidal conduct. After covering the victim's mouth and nose with tape, the defendant then restrained the victim's hands and feet with tape, and while she was still alive carried her out of the car and subsequently threw her off the dam into the freezing water below. As we explain in part V C of this opinion, there also was evidence from which the panel reasonably could have concluded that the defendant later made his way down to the victim and effectuated his homicidal intent by strangling her, drowning her, or both. Thus, irrespective of whether the cause of the victim's death was one or a combination of any of the three underlying causes of the victim's asphyxia, there was sufficient evidence from which the panel could have inferred that, at the time the defendant killed the victim, he had the intent to do so.

E

Murder-Kidnapping Capital Felony

The defendant's next claim is that he cannot be guilty of capital felony pursuant to § 53a-54b (5), namely, murder committed in the course of the commission of a kidnapping or before the kidnapped person is able to return or be returned to safety, because that statute applies only where the kidnapping was for the purpose of collecting a ransom. This claim is controlled by our recent decision in *State* v. *King*, 249 Conn. 645, 687, 735 A.2d 267 (1999), in which we rejected an identical argument.

## F

### Murder-Sexual Assault Capital Felony

Next, the defendant claims that he could not have been found guilty of the capital felony of murder in the course of the commission of a sexual assault because the evidence did not establish that he murdered the victim in the course of committing sexual assault in the first degree. We disagree.

Under § 53a-54b (7), "[a] person is guilty of a capital felony who is convicted of . . . (7) murder committed *in the course of the commission* of sexual assault in the first degree . . . ." (Emphasis added.) As used in § 53a-54b (7), the phrase "in the course of the commission of sexual assault in the first degree" includes within its ambit the killing of the victim during or shortly after the sexual assault motivated by a desire to avoid detection.[55] See *Wooldridge* v. *State*, 653 S.W.2d 811, 816 (Tex. Crim. App. 1983) ("[w]e see no material difference between [a perpetrator who kills the rape victim after commission of the rape] and the armed bank robber who shoots his victim as he flees, in order to eliminate the only witness to his crime").

"This court does not interpret statutes in a vacuum, nor does it refuse to consider matters of known historical fact. . . . And although criminal statutes are strictly construed, it is equally fundamental that the rule of strict construction does not require an interpretation which frustrates an evident legislative intent. *State* v.

---

[55] We need not determine in the present case whether the phrase, "in the course of the commission of sexual assault in the first degree," as used in § 53a-54b (7), also includes a temporal inclusion after the sexual assault, irrespective of the motive for the killing. See, e.g., *State* v. *Gomez*, 225 Conn. 347, 352, 622 A.2d 1014 (1993) ("in the course of," in context of felony murder statute; General Statutes § 53a-54c; includes "the period immediately before or after the actual commission of the crime"); *State* v. *Usry*, 205 Conn. 298, 315–16, 533 A.2d 212 (1987) (suggesting that statutory phrase includes killing of victim in flight from or immediately after sexual assault).

*Belton,* 190 Conn. 496, 505–506, 461 A.2d 973 (1983); *State* v. *Roque,* 190 Conn. 143, 151, 460 A.2d 26 (1983); *State* v. *Sober,* 166 Conn. 81, 91, 347 A.2d 61 (1974)." (Citations omitted; internal quotation marks omitted.) *State* v. *Ellis,* 197 Conn. 436, 445, 497 A.2d 974 (1985), on appeal after remand sub nom. *State* v. *Paradise,* 213 Conn. 388, 567 A.2d 1221 (1990). The legislative history of § 53a-54b (7) strongly indicates the legislative intent that the statute apply to the reasonably contemporaneous killing of the victim after commission of sexual assault in the first degree so that the victim could not become a witness against the perpetrator.[56]

The evidence in the present case was sufficient to prove beyond a reasonable doubt that the defendant murdered the victim after sexually assaulting her in

---

[56] "Mr. President, I rise in support of this Bill. A little over a year ago there was one of these rape murders in my district. I met with the family of the victim. I know how strongly they feel in favor of this Bill. I was presented a year ago with a petition signed by 4600 residents in my district saying that something should be done. I believe that in the crime of rape murder this is the best we could pass to make it a capital offense. In the crime of rape, it is far too easy for the perpetrator, if he feels [that] the victim will go to the police, to kill the victim because thereby the witness is lost. In the particular case in my district that apparently was exactly what happened. The victim was told, don't you go to the police and the victim said, but I will and the man killed her. Mr. President, I believe the passage of this Bill will provide protection. I'm not saying that there will be no more rape murders, what I'm saying Mr. President, is that I believe it will discourage that crime.

"It will exact what I believe is a fair punishment from the perpetrator for having destroyed the victim by the crime of rape to then carry out and then take even that very life of the victim, I believe warrants, I believe demands the very punishment, the most extreme punishment which we can carry out and I support this Bill. I hope those here will all support it so that truly this crime which certainly ranks among those which are presently among the seven offenses which are capital crimes in Connecticut, certainly if we are to have those crimes as offenses, this also should be included." 23 S. Proc., Pt. 8, 1980 Sess., pp. 2348–49, remarks of Senator Richard Cunningham; see also id., p. 2347, remarks of Senator Salvatore C. DiPiano ("I believe that the penalty of death should be affixed to a rape murder when you take into consideration what the victim of that atrocious crime had to go through; the suffering, usually the bizarre manner in which that crime is committed").

order to prevent her from becoming a witness against him. Both his conduct before and after he sexually assaulted her, and his subsequent confession, were sufficient to establish that the defendant murdered the victim in the course of the commission of sexual assault in the first degree.

## G

### The Two Witness Rule

The defendant also claims that his convictions cannot be sustained because the panel did not specifically satisfy the statutory requirements of General Statutes § 54-83,[57] the so-called two witness rule. This claim is without merit.

The defendant concedes that this claim was not preserved in the trial court, and seeks to prevail under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989), or under the plain error doctrine.

An unpreserved claim of error based on the failure of a court to instruct the jury on the two witness rule in a case eligible for the death penalty is not an error of constitutional dimension. *State* v. *Day*, 233 Conn. 813, 848, 661 A.2d 539 (1995). The defendant, therefore, cannot prevail under the *Golding* doctrine. Id., 849.

Furthermore, the "defendant cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is both so clear and so harmful that a failure to reverse the judgment would result in manifest injustice." Id. "Moreover, because the claim raised here is nonconstitutional, the defendant must demonstrate that the trial court's improper action likely affected the result of his trial." Id., 850. The defendant cannot meet this burden.

---

[57] General Statutes § 54-83 provides: "No person may be convicted of any crime punishable by death without the testimony of at least two witnesses, or that which is equivalent thereto."

The evidence in the present case satisfied the two witness rule. The defendant confessed to the robbery, the sexual assault, the kidnapping, and the murder of the victim, and each element of those crimes was corroborated by independent circumstantial evidence. See *State* v. *Ross*, 230 Conn. 183, 219, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995).

## H

### The Imposition of Two Death Sentences

The panel imposed two separate death sentences: one on the sixth count of the information, on which the defendant had been found guilty of capital felony in violation of § 53a-54b (5), "murder by a kidnapper of a kidnapped person during the course of the kidnapping or before such person is able to return or be returned to safety"; and the other on the seventh count of the information, on which the defendant had been found guilty of capital felony in violation of § 53a-54b (7), "murder committed in the course of the commission of sexual assault in the first degree . . . ." The defendant claims that "his constitutional protection against double jeopardy was violated by the . . . panel's failure to merge [his] two capital felony convictions for one victim into one capital felony conviction *prior to the penalty hearing.*"[58] (Emphasis added.) We disagree.

The defendant's challenge is based on the third of the three "separate functions" of the double jeopardy prohibition, namely, the protection "against multiple punishments for the same offense [in a single trial]." (Internal quotation marks omitted.) *State* v. *Hill*, 237

---

[58] The defendant concedes that this claim was not raised in the trial court, and he seeks to prevail pursuant to *State* v. *Golding*, supra, 213 Conn. 233. He cannot do so, however, because, as we explain in part IV H of this opinion, double jeopardy principles are not violated by the two sentences.

Conn. 81, 99, 675 A.2d 866 (1996). This challenge fails, both for practical and analytical reasons.

As a practical matter, because the defendant can be executed only once, the threat of multiple punishments is illusory. Unless and until the sentence of death is actually carried out, it is not "consummated" for double jeopardy purposes. *Louisiana ex rel. Francis* v. *Resweber*, 329 U.S. 459, 463, 67 S. Ct. 374, 91 L. Ed. 422 (1947). Thus, as the state accurately points out, "for a defendant sentenced to death for several capital crimes, there is no such thing as a 'multiple punishment.' "

As an analytical matter, the defendant argues that pursuant to *State* v. *Chicano*, 216 Conn. 699, 584 A.2d 425 (1990), cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991) (double jeopardy violation where defendant convicted of and sentenced for both felony murder and manslaughter of single victim; remedy is to combine manslaughter conviction with felony murder conviction, subject, however, to resuscitation of manslaughter conviction if felony murder conviction later invalidated), when a defendant has been found guilty of "alternative ways of committing the same offense . . . the separate verdicts on the alternative forms of the offense must be merged into a single conviction *for purposes of conviction and sentencing*." (Emphasis added.) This analysis is flawed.

Even if we were to assume, without deciding, that the doctrine employed in *Chicano* applies to multiple violations of the capital felony statute, the defendant misapplies it to the present case. The defendant argues that the panel was required to combine the two separate guilty verdicts *before* entering the penalty phase of the proceedings. Thus, under the defendant's rubric, the panel would be required, before hearing the penalty phase, to select one of the two particular capital felony violations as the only surviving violation.

Furthermore, in that penalty hearing, one of the principal factors would be whether there were aggravating or mitigating factors involved in "the nature and circumstances *of the crime* . . . ." (Emphasis added.) General Statutes (Rev. to 1989) § 53a-46a (b) and (d). Thus, presumably the panel would be confined to determining whether those factors applied only to the surviving capital felony violation, and not to the violation that was combined therein. Then, if either the underlying conviction of that offense, or the imposition of the death penalty for it, subsequently was reversed for any reason, there would be no other capital felony conviction upon which a death penalty could operate. Moreover, even a resuscitation scheme, as in *Chicano*, would not be feasible because there would be no record of whether any aggravating or mitigating factors had been established with respect to that violation. Double jeopardy principles do not require that the state be put to such a one-sided choice, and the defendant has offered no authority suggesting such a requirement. See *State* v. *Hill*, supra, 237 Conn. 102 (double jeopardy does not require that defendant "be immunized from criminal liability for one or the other of the two crimes merely because he happened to be in simultaneous possession of the two different types of narcotics").

## V

## PENALTY PHASE ISSUES

The defendant raises twenty-seven claims challenging various aspects of the penalty phase of the trial, including the imposition of the two death penalties. We reject each claim.[59]

---

[59] Some of these claims rest on constitutional principles. In none, however, has the defendant offered a separate and independent state constitutional analysis. Where, therefore, we address the defendant's constitutional claims, we confine our analysis to federal constitutional doctrines and authorities. *State* v. *Dyson*, 238 Conn. 784, 794, 680 A.2d 1306 (1996); see footnote 14 of this opinion.

## A

### The Defendant's Waiver of a Jury Trial

The defendant "contends that the minimal canvass of [his] purported waiver of [his] right to a jury at the penalty phase was insufficient to show a constitutionally valid waiver." We decline to afford appellate review of this claim.

The defendant concedes that this claim was not raised in the trial court. He therefore seeks to prevail pursuant to *State* v. *Golding*, supra, 213 Conn. 233. His claim of a constitutional right to a jury trial at the penalty phase of a capital felony, however, is simply an attempt to apply a constitutional label to a nonconstitutional right. There is no constitutional right to a jury trial in the sentencing phase of a capital case. *Walton* v. *Arizona*, 497 U.S. 639, 647, 110 S. Ct. 3047, 111 L. Ed. 2d 511 (1990); *Clemons* v. *Mississippi*, 494 U.S. 738, 745, 110 S. Ct. 1441, 108 L. Ed. 2d 725 (1990); *Spaziano* v. *Florida*, 468 U.S. 447, 459, 104 S. Ct. 3154, 82 L. Ed. 2d 340 (1984). Therefore, the defendant has not met the second prong of *Golding*, namely, that his claim be of truly constitutional dimension. *State* v. *Golding*, supra, 238–39.[60]

## B

### Disclosure of the Factual Basis of the Guilt Phase Verdicts

The defendant next claims that he was deprived of due process of law because the panel declined, prior to the penalty phase hearing, to disclose the factual

---

[60] The defendant also seeks to prevail under the plain error doctrine, and under the purported "special capital reviewability rule." As we indicated in footnote 34 of this opinion in response to similar claims, there can be no plain error based on a claim without substantive merit. Furthermore, everything that we stated in footnote 34, regarding the defendant's assertion of a special capital reviewability rule, applies to this claim as well.

basis of its prior findings of guilt on the two capital felony offenses. More specifically, he claims that the panel's failure to answer "the critical factual questions concerning the manner and timing of [the victim's] death, deprived [the] defendant of due process and a fair penalty hearing because [the] defendant did not have sufficient information about what he had actually been found guilty of to be able to defend against the state's amorphous and ever-changing theory of aggravation." We reject this claim.

Prior to the commencement of the penalty phase, the defendant moved that the panel "articulate for the record the factual basis for its decision, wherein the defendant was found guilty of murder, in violation of § 53a-54a . . . and capital felony, in violation of § 53a-54b (5) and (7)." The defendant asserted that the "factual basis of the court's decision is material to the issue of whether or not an aggravating factor exists." The panel denied this motion.

This claim reduces to the contention that the panel was required to make a finding regarding precisely by what specific cause and specifically when the victim died: by asphyxia resulting from the occlusion of her breathing passages caused by the gag taped into her mouth, before the defendant threw her off the dam; by asphyxia resulting from strangulation, after he threw her off the dam; or by asphyxia resulting from drowning, after he threw her off the dam. The defendant asserts that, without such a finding, he was unconstitutionally hindered in presenting a defense against the state's claim of an aggravating factor.[61] We disagree.

---

[61] In the trial court, the defendant also asserted that this information was required by Practice Book, 1991, § 4059. We already have determined, in part IV C of this opinion, that the panel's verdict satisfied the requirements set forth by that provision. On appeal, moreover, except by a passing and parenthetical reference to § 4059, the defendant confines his analysis to the requirements of due process. Accordingly, we do as well.

The medical examiner stated that based on his anatomical findings, the cause of death was asphyxia, which could have been caused by any one or a combination of three underlying mechanisms: airway occlusion from the gag in her mouth; manual strangulation; and drowning. He could not be more precise than that. The defendant does not claim that this evidence is legally insufficient in any way.

Had the defendant chosen to have his guilt or innocence determined by a jury, rather than the panel, the jury's verdict of guilty would not have been any more specific than was the panel's. We know of no principle of due process that would have required the jury to state with particularity which factor or combination of factors caused the victim's death, or at what specific time. Thus, the defendant then would have been required to enter the penalty phase with no more information in this regard than he had in the present case. Similarly, we know of no principle of due process, and the defendant has offered none, that, in the guilt phase of a capital case, imposes greater requirements of specificity of the verdict on a panel of judges than on a jury.

Furthermore, the United States Supreme Court has stated, in the context of a death penalty case, that due process of law generally does not require the state to disclose the evidence that it intends to introduce against the defendant, and that even where the prosecutor had told the defendant that he did not intend to introduce certain evidence, it did not offend due process for him to change his mind on the day of trial. *Gray* v. *Netherland*, 518 U.S. 152, 167–68, 116 S. Ct. 2074, 135 L. Ed. 2d 457 (1996). Thus, although a "defendant's right to notice of the charges against which he must defend is well established . . . a defendant's claim that he has a right to notice of the *evidence* that the state plans to use to prove the charges stands on quite a different footing. We have said that 'the Due Process Clause has

little to say regarding the amount of discovery which the parties must be afforded.' " (Citations omitted; emphasis in original.) Id., quoting *Wardius* v. *Oregon*, 412 U.S. 470, 474, 93 S. Ct. 2208, 37 L. Ed. 2d 82 (1973). Similarly, due process does not require a sentencing panel, prior to the commencement of the sentencing hearing, to make particular findings of fact regarding the cause and time of the victim's death.

The defendant's reliance on *Gardner* v. *Florida*, 430 U.S. 349, 97 S. Ct. 1197, 51 L. Ed. 2d 393 (1977), and *Lankford* v. *Idaho*, 500 U.S. 110, 111 S. Ct. 1723, 114 L. Ed. 2d 173 (1991), is unavailing. In *Gardner*, the trial court, in imposing a death sentence, specifically noted that its sentence was based, in part, on factual information contained in a confidential presentence report, which had not been disclosed to the defendant. The United States Supreme Court reversed the death sentence concluding that the defendant had not been given the opportunity through the adversary process to contest the accuracy and materiality of that factual information. *Gardner* v. *Florida*, supra, 356. That principle does not apply where, as in the present case, all of the evidence on which the panel based its decision was presented through the adversary process. See General Statutes (Rev. to 1989) § 53a-46a (c) (in penalty hearing, "the court shall disclose to the defendant or his counsel all material contained in any presentence report which may have been prepared").

In *Lankford*, both the guilt and the penalty phases had been conducted on the express understanding between the state and the defendant that the state would not seek the death penalty. Under Idaho law, however, the sentencing judge was not bound by the state's decision not to seek the death penalty. *Lankford* v. *Idaho*, supra, 500 U.S. 119; compare General Statutes (Rev. to 1989) § 53a-46a (b) (no death penalty hearing if state stipulates that no aggravating factor exists or that mitigating

factor exists). At the sentencing hearing, the parties argued only the merits of consecutive as opposed to concurrent sentences of incarceration. Nonetheless, the court imposed the death penalty, without giving the defendant a hearing at which death as an available penalty was at issue. *Lankford* v. *Idaho*, supra, 119–20. Under those circumstances, the United States Supreme Court reversed the death sentence because, although the sentencing judge had not relied on secret information, as in *Gardner*, "his silence following the State's response to the presentencing order had the practical effect of concealing from the parties the principal issue to be decided at the hearing. Notice of issues to be resolved by the adversary process is a fundamental characteristic of fair procedure. Without such notice, the Court is denied the benefit of the adversary process." Id., 127. In the present case, the defendant had full notice of the issue to be decided in the penalty phase, and full opportunity to contest it through the adversary process.

C

The Defendant's Claim that the State Improperly
Changed Its Theory of Aggravation

We next consider the defendant's claim that the panel improperly permitted "the state to change its theory of the case regarding aggravation during its closing argument and in a manner inconsistent with the state's theory of the case during the guilt phase of the trial."[62] The defendant maintains that, during the guilt phase, "it was the state's theory . . . that [the] defendant intentionally caused the death of [the victim] by pushing her off the top of the dam." The defendant also contends, however, that in the state's final argument at the

---

[62] The disposition of this claim bears on the analysis of certain other claims of the defendant. We therefore consider it out of the order in which the defendant has presented it.

close of the penalty hearing, it was permitted "to put forth a theory of the case different from the theory presented during the guilt phase," namely, that after pushing her off the dam, the defendant "went back down and pushed her back in the water." Thus, the defendant argues, "the state was allowed to advance a theory of the case in the penalty phase which was not advanced by the state during the guilt phase and, indeed, was a theory which was clearly inconsistent with what had to have been found by the . . . panel at the guilt phase." This, the defendant asserts, violated due process of law. We disagree.

In order properly to analyze this claim, it is necessary to review in some detail the state's presentation of the evidence, both at the guilt phase and at the penalty phase, and the arguments of the parties presented to the panel at the conclusion of the guilt phase and the penalty phase, regarding the charge of intentional murder. This review leads us to conclude, contrary to the contention of the defendant, that, although the state may have shifted some of the emphasis of its argument from that presented at the guilt phase to that presented at the penalty phase, this shift in emphasis, where it did occur, was not improper, did not prejudice the defendant, and did not violate his due process rights.

1

The Evidence at the Guilt Phase

At the guilt phase, the state had the burden to establish that the defendant had committed either or both of the two forms of capital felony charged: (1) murder by a kidnapper of a kidnapped person during the course of the kidnapping or before the kidnapped person could return or be returned to safety in violation of § 53a-54b (5); and (2) murder committed in the course of the commission of a sexual assault in the first degree in

violation of § 53a-54b (7).[63] Each capital felony required the state to prove an intentional murder in violation of § 53a-54a (a), which provides: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ." Thus, for each capital felony, in addition to the elements of kidnapping and sexual assault, respectively,[64] the

[63] In count five of the substitute information, the intentional murder count, the state had alleged: "THE [defendant] did commit the crime of MURDER in violation of Connecticut General Statutes Section 53a-54a (a) in that on or about the 16th day of December 1989, in the evening hours, at or near Reidville Drive, Waterbury, Connecticut, the [defendant] with the intent to cause the death of another person, to wit; [the victim]; caused the death of [the victim] by asphyxia." In its bill of particulars, the state alleged as to count five: "With the intent to cause the death of another person, to wit; [the victim]; the defendant caused her death by asphyxia."

In count six of the information, the murder-kidnapping capital felony count, the state had alleged: "THE [defendant] did commit the crime of CAPITAL FELONY in violation of Connecticut General Statutes Section 53a-54b (5) in that on or about the 16th day of December 1989, in the evening hours, at or near Reidville Drive, Waterbury, Connecticut, the said [defendant] did commit MURDER of a kidnapped person, to wit; [the victim]; during the course of the kidnapping and before [the victim] was able to return to safety." In its bill of particulars, the state alleged as to count six: "The defendant did commit murder of a kidnapped person, to wit; [the victim]; during the course of the kidnapping and before [the victim] was able to return to safety . . . ."

In count seven of the information, the sexual assault-murder capital felony count, the state had alleged: "THE [defendant] did commit the crime of CAPITAL FELONY in violation of Connecticut General Statutes Section 53a-54b (7) in that on or about the 16th day of December 1989, at or near Reidville Drive, Waterbury, Connecticut, the [defendant] did commit MURDER in the course of the commission of SEXUAL ASSAULT IN THE FIRST DEGREE of [the victim]." In its bill of particulars, the state alleged as to count seven: "The defendant did commit murder in the course of the commission of the sexual assault in the first degree of [the victim]."

[64] This claim of the defendant focuses solely on what he claims to be the state's change of theory regarding whether the *murder* of the victim was accomplished in an aggravating manner. His claim does not involve the additional elements of either kidnapping or sexual assault. Furthermore, this claim does not rely on any denial that he in fact caused the victim's death. That was never part of his theory of defense, either at the guilt phase or at the penalty phase.

The defendant's theory of defense at the guilt phase, insofar as it implicates this claim, was that the state had not proven beyond a reasonable doubt

state had the burden to prove "(1) intent, (2) causation and (3) death by killing as opposed to death by accident or suicide." (Internal quotation marks omitted.) *State* v. *Rasmussen*, 225 Conn. 55, 74, 621 A.2d 728 (1993).

During the guilt phase, the state introduced the defendant's oral confession, in which he outlined the ruse by which he, armed with the tape, intentionally deflated the victim's tire so that, upon her return from shopping, he could persuade her to allow him into her car. According to this confession, the defendant then forced her to drive to the scene of the homicide where, after robbing and sexually assaulting her, he gagged and bound her, and then, realizing that she had seen his face, took her over to the wall of the dam and pushed her off the wall into the water below. Also according to this confession, the defendant then returned to his car and drove onto Interstate 84 where, from the shoulder of the highway, he looked down into the water, saw her motionless body, and concluded that she was dead. Thus, according to the defendant's confession, (1) his homicidal intent was not formed until after he had robbed and sexually assaulted her, and (2) he had no further physical contact with her after pushing her off the dam.

The panel was entitled, however, as is any fact finder, to credit those parts of the confession that it found credible, and to draw reasonable inferences therefrom, and to discount those parts that it found not credible. Thus, there was, in fact, sufficient evidence, based in

that the defendant killed the victim with the requisite homicidal intent, as opposed to some lesser culpable state of mind. The defendant's theory of defense at the penalty phase was that the state had not proven the aggravating factor alleged; and that he had proven one or more of the mitigating factors that he had alleged, none of which involved any doubt about his having killed the victim. Therefore, we analyze this claim as it was litigated in the trial court, and argued and briefed in this court, namely, on the basis that the defendant in fact caused the death of the victim.

part on the confession and in part on other evidence, that pointed to a more elaborate scenario. On the basis of this evidence, the panel reasonably could have determined that: (1) the defendant had formed his homicidal intent by the time he first encountered the victim; (2) after gagging her and binding both her hands and feet and after pushing her off the dam, he realized that she had removed her bonds and was crawling up the shore; and (3) in order to effectuate his intent, he then made his way down to the victim and killed her by strangulation, drowning, or both; and (4) he *then* returned to his car, drove onto Interstate 84, and, from a vantage point affording a view of the dam, observed her lifeless body. This evidence, and the inferences that it permitted, may be fairly summarized as follows.

First, there was sufficient evidence to justify the inference that the defendant possessed a homicidal intent before he encountered this specific victim. He went to the Bradlees' parking lot armed with both the tape and the valve stem remover, intent on preying on a companionless woman by deflating her tire and then offering to help her, just as he unsuccessfully had done with Casertano and Romaniello, and as he successfully did with the victim. He knew precisely where he would bring his victim, as he directed the victim in this case to the area of the killing. Moreover, the manner in which he used the tape on the victim after sexually assaulting her, coupled with his statement that he had decided to bind and gag her and throw her off the dam because she had seen his face, permitted the inference that, despite his self-serving statement to the contrary, he entered into his scheme knowing that his victim, who predictably would have seen his face, would eventually have to be killed.

Next, the defendant's confession permitted the inference that, at some point after throwing the victim off the dam, the defendant looked down to determine

whether she was dead. Common sense, supported the inference, moreover, that the defendant, eager to satisfy himself that the victim was dead, looked down from the top of the dam *immediately* after throwing her into the water. In other words, the panel could have inferred that it was unlikely that the defendant would have risked waiting to satisfy himself that she was dead for the amount of time that it would have taken him to walk almost one mile back to his car, get back onto the highway, and drive to a vantage point from where he could observe her body.

Finally, there was overwhelming circumstantial evidence that the victim was alive despite having been thrown off the dam and that, after reaching the bottom of the dam, she struggled to remove her bonds—successfully with respect to her feet and hands, and unsuccessfully with respect to her face and mouth. When her body was found, it was face down in the ice of the pond, facing away from the concrete apron of the dam. Her arms were separated at her sides, not taped together. Shredded and frayed remnants of the tape were on her right wrist, but there was no tape on her left wrist. Her feet, also not taped together, were on a rock on the shore. Her left foot was shod with a sneaker and sock, and had tape around it. Her right foot was unshod, with neither sneaker nor sock, and had no tape around it. Her mouth was covered with the gag fashioned from her glove and the defendant's tape, but the glove was in the front part of her mouth between her teeth, and the gag, which did not involve the neck, did not entirely cover her nose. The tape was of a type that would be very difficult to break.

The autopsy slides and testimony indicated numerous premortem injuries. There were abrasions or scrapes on her wrists and on all of the knuckles of her left hand, and she had a freshly broken fingernail. Her jeans had

dirt on the knees and the front, and there were contusions, or bruises, on her knees and shins. The autopsy also disclosed evidence consistent with death by strangulation,[65] drowning,[66] or both.

All of this evidence, taken together, permitted the reasonable inference that the defendant had killed the victim, not by pushing her off the dam and leaving her there to die, but by strangling or drowning her, or both, after making his way down to her. The location of the body when found, the position of her arms and legs, the type and presence of tape on her wrists and ankle, the condition of her clothing, the types and location of the injuries to her body, the other autopsy findings, and the footprints, permitted that reasonable chain of inferences.

2

The Arguments at the Guilt Phase

At the conclusion of the state's case, the defendant moved for a judgment of acquittal on all of the counts. With respect to the murder count, the gist of the defendant's argument was that the state had not proven that the defendant had the intent to kill the victim. Based on his view of the evidence, the defendant argued that the panel "could only reasonably conclude that [the victim] died as a result of the gag around her mouth, and that being the case, the causing of death was not necessarily intentional." Thus, in the defendant's view, the evidence supported a guilty verdict only on the lesser included offenses of manslaughter in the first or second degree.[67] The state responded that it had proven

---

[65] Hemorrhages of the victim's neck were indicative of manual strangulation.

[66] Evidence of hyperinflation of the victim's lungs, which nearly met at the midline, was indicative of drowning.

[67] The defendant argued: "With regard to count five wherein [the defendant] stands accused of murder, the defense would submit that the evidence presented by the state is insufficient or would present an insufficient basis upon which the court could conclude beyond a reasonable doubt that the

the defendant's intent. Although it only briefly referred to the defendant's confession, its argument in response to the defendant's contentions makes clear that it relied heavily on the confession to rebut those contentions.[68] The panel denied the defendant's motion.

Thereafter, the defendant rested without presenting any evidence, and the parties presented final arguments.

element of intent to cause the death of [the victim] has been established. We base that argument primarily upon the testimony of the medical examiner. The medical examiner . . . McDonough, testified that the cause of death was asphyxia resulting from the gag around the mouth and/or neck compression. I would submit that neck compression was eliminated on cross-examination as a cause of death . . . ."

The defendant also argued that McDonough had not testified to drowning as a cause of the asphyxia with the requisite "reasonable degree of medical certainty," and that, therefore, "the court cannot conclude, based on the testimony, that the cause of death was drowning," because such a conclusion would be speculative.

Finally, the defendant argued that the only cause of death by asphyxia supported by the evidence was "asphyxia by mechanical airway occlusion and neck compression." Thus, according to the defendant, "the court could only reasonably conclude that [the victim] died as a result of the gag around her mouth, and that being the case, the causing of death was not necessarily intentional.

"I would submit that based upon the evidence, it would support, at best, a finding of guilty to manslaughter in either the first or second degree, but not a finding of guilty to murder."

[68] Thus, the state argued: "[A]s to the question of intent, Your Honor, what else could one's intent be when . . . a man of [the defendant's] physical demeanor and stature—binds and gags a ninety-six pound woman, puts a gag in her mouth, and you saw the tape. The glove was stuck in her mouth, just not laid on top, but stuck in her mouth, her arms and legs bound together. She's carried to the top of a dam, the dam that you see in the state's photograph, in the middle of winter, and, as he says, pushed her off the dam. What else could one's intent be? She's bound, she's gagged . . . .

"[W]e tell the jury to apply common sense. And common sense is when you do what [the defendant] did to that young woman and left her in that condition at the bottom of the dam, what else could one's intent be? And he himself indicates he went back to see if she was dead. Don't forget he has to walk all the way back to Bradlees', get in his car, get up on [Interstate] 84, get out of the car, walk to the area of the dam. He observes her there. And I believe the quote was, 'When I saw her laying at the bottom of the dam, I knew she was dead.' So what else could one's intent be? I mean, to say it's reckless conduct boggles the mind."

With respect to the murder count, the state again focused on what it perceived, from the prior argument, the defendant's claim to be, namely, that there was no proof of his intent to kill, and, again, the state relied primarily on the defendant's confession to rebut that contention.[69] The gist of the defendant's argument was that, because the state had not established the specific cause of the victim's death, the state had failed to establish that the defendant had the requisite intent to kill, and that, therefore, the defendant could be convicted only of manslaughter.[70] In rebuttal, the state argued,

[69] The state argued: "As to count five of the information . . . intentional murder. And [defense counsel] yesterday in his motion for judgment of acquittal, indicated that . . . what the court should find is that this was not an intentional act, that [the defendant] did not intend to cause the death of [the victim]. At most, it was a reckless act, by putting the gag in her mouth and taping her with that reinforced packing tape around her head. Perhaps, at best, it was reckless.

"I think the important thing to show [the defendant's] intent is his statement. . . . The court will have the testimony of Detective O'Leary. But my recollection was that [the defendant] told Detective O'Leary that after sexually assaulting her in the backseat of the car, and he vividly described that sexual assault, my recollection was then he taped her up. [The defendant] told Detective O'Leary, I was going to leave her there at first, but I realized she saw my face. Then he went on to say how he brought her to the edge of the dam and pushed her off. The key phrase there, of course, is, I realized she saw my face.

"So when he brought her to the edge of the dam, he did indeed intend to kill her. The reason he intended to kill her, the reason he wanted her dead was because he realized she saw his face. I mean, it's ludicrous to say that he was going to remedy the fact that she saw his face by pushing her off the dam, and perhaps by pushing her off the dam in such a condition, she'd get amnesia or wouldn't remember who the man was. The intent there was to kill. The intent was to kill because [the victim] could identify [the defendant]. I realized she saw my face."

[70] The defendant argued: "There has been no evidence presented to this court to demonstrate how [the victim] died. Yes . . . McDonough testified that the cause of death was asphyxiation. He also said he could not tell you what caused that asphyxiation. He could not tell you whether it was manual strangulation. He could not tell you whether she was asphyxiated by the gag and the glove that was placed in her mouth. Nor could he tell you whether or not she died as a result of drowning. All of his medical expertise, all of his training, all of his life's work cannot provide this court with an answer to that question.

based on *both* the circumstantial evidence and on the defendant's confession, that it had proven an intent to kill.[71] Thereafter, the panel rendered its verdict finding

"In fact . . . McDonough cannot tell this court or even offer an opinion as to whether [the victim] was alive when she entered the water. When he was specifically asked that question, he said, I cannot tell you. . . .

"I think that there are many questions that are left to be answered and many questions that cannot be answered. One of them is whether [the victim] was alive when she went over the dam to the water.

"[McDonough] has said she could have died from the asphyxiation from the gag. There is no evidence that's been presented to this court to say she was alive. And if [the victim] was alive or was not alive. If she was not alive when she went over the dam, then I will submit to this court that the charge of intentional murder is not the crime of which [the defendant] may be found guilty. . . .

"I don't believe there's been any evidence presented, nor can there be a logical, reasonable inference drawn by this court that [the victim] was intentionally killed by having a gag placed over her mouth. And if, in fact, that was not an act that was intended to cause her death, then it is not murder.

"It would indeed, however, perhaps be under circumstances evincing an extreme indifference to human life, someone recklessly engaging in conduct which created a grave risk of death to another person, indeed thereby caused such person's death."

In sum, the defendant argued "that the state of Connecticut must prove that [the victim] was alive when she went over the dam. If the state cannot convince this court of that beyond all reasonable doubt, then I don't believe that this court can return with a verdict of intentional murder."

[71] The state argued: "[T]o say that [the defendant] did not intend to cause the death of [the victim], which we must prove, with intent to cause the death, he caused the death, to say the evidence doesn't bear that out is mind boggling.

"Whether or not [the victim] was alive or dead before she hit the bottom of the dam, look at the photographs. Look at the injuries to her body, to her face, the bruises, the contusions, the scraping marks on her wrists, the tape, the bindings were broken. She lost her sneaker. My God, those are all premortem, prior to death, those injuries. My God, was she alive or dead? Look at the photographs. Her knees were scraped, bruises on her knees, the bruise on her forehead, the bruises around where the gag was. I mean, if you look at them, it looks like what she tried to do is pull the gag off. She broke the bindings. The bindings are shattered both on her legs and on her foot—I mean, the legs and her hands. My God, was she alive or dead?

"How was this murder committed? It was committed by [the defendant] binding and gagging that ninety-six pound, five foot one [inch] girl, sticking a glove down her throat, putting that reinforced tape around her head, her arms and her feet, carrying her to the edge of a dam. You have the picture of the dam there. And pushing her off.

the defendant guilty of having committed two capital felonies.

### 3

### The Evidence at the Penalty Phase

At the penalty phase, it was the state's burden to prove beyond a reasonable doubt, pursuant to its notice of an aggravating factor, that the defendant committed either or both of the capital felonies "in an especially heinous, cruel, or depraved manner." In support of that burden, the state reintroduced all of the evidence, outlined in detail previously, that it had introduced at the guilt phase. See part V C 1 of this opinion. It did not, however, rest on that submission. The state also introduced the following additional evidence.

A map of the area of the dam was introduced that gave a specific distance of 23.3 feet from the top of the dam to the concrete apron below. Further, there was testimony from Melvin Goldstein, a meteorologist, that the temperature in the general area on December 16, 1989, was approximately eighteen or nineteen degrees fahrenheit between 8 p.m. and 11 p.m., and that from December 16, the temperature did not rise above freezing until December 31, 1989. Goldstein also testified that, although six inches of snow had fallen before ending at approximately midnight on December 16, from that date until December 25, 1989, only traces of snow had fallen. In addition, Goldstein testified that on December 16, the moon had been between the full phase

---

"Why? Because she saw his face. A reckless act. It boggles the mind. And what does he do after the act? I mean reckless? It was a terrible thing he did.

"Now he's got the Jean Country bag. Does he go back and help her out? Does he try to help her? Does he give her aid? What does he do? He gets in his car and he goes to the other side of the dam up on [Interstate] 84, gets out of the car, parks the car on [Interstate] 84 and calmly walks through the snow. He's now on the other side of the dam. Goes through a hole in the fence and views the body. I saw she was in the water. She wasn't moving. I knew she was dead."

and the first quarter phase, and thus, there had been no moon in the sky prior to 10 p.m.

Further, the state introduced a videotape that had been made of the recovery of the body of the victim on the evening of December 25, 1989. This videotape showed, with more specificity than previously had been elicited, the location of the body in the ice of the pond in relation to the dam, and the surrounding area. It also showed the steep and rocky terrain leading from the dam down to the pond, and the dirt on the victim's clothes, regarding which there had been similar testimony in the guilt phase. This videotape further showed that the body had been brought up to the top of the area lying on its back on a rescue sled, so that the dirt on the jeans could not have come from the recovery operation.

The state also introduced the testimony of Joseph G. Tartaglia, a Watertown police department scuba diver, who, with a scuba diving team, had searched the pond on December 26, 1989. Through his testimony, and another map of the scene, as well as certain photographs and a videotape of his dives, the following evidence was introduced that had not been introduced in the guilt phase. There was a roll of metal wire mesh with sharp ends protruding from the ice. On the wire mesh were pieces of the same type of tape with which the victim had been bound. In addition, there were pieces of the tape trailing from the base of the dam to where the body had been found. Tartaglia also described finding the victim's other sneaker approximately twenty to thirty feet away from where the victim's body had been found, encased in the ice at the bottom of the dam. In addition, Tartaglia testified to the depth of the water that covered the cement apron, namely, approximately one foot.

The state also recalled Officer McDonald, the director of the Waterbury forensic laboratory. McDonald reiterated much of the testimony that had been introduced at the guilt phase, including the condition and location of the victim's body when it was found, the positions of her arms and legs, the condition of her bonds and the location and condition of the wire mesh. His earlier testimony regarding the defendant's possession of the valve stem remover was reintroduced by the state.

Further, the state recalled McDonough, who reiterated much of his earlier testimony regarding the condition of the victim's body and the wounds found on it. He again testified to the precise height and weight of the victim. He also reintroduced sixteen of the twenty-seven autopsy slides that had been introduced at the guilt phase. Using those sixteen slides, he reiterated much of what he had testified to in the guilt phase, describing the fibers on the victim's wrists and legs, the condition of her clothes, the numerous premortem injuries on the various parts of her body, the dirt on the knees of her jeans, and the abrasions and contusions on her knees. He also gave his opinion, which he had not been asked to give at the guilt phase, that: (1) the injuries on the victim's wrists had been caused by sharp metal prongs of the wire mesh such as the kind that had been found in the ice at the bottom of the dam; and (2) certain abrasions on the victim's face were consistent with having been caused by the victim's fingernails. Finally, through McDonough the state reintroduced, among other items, the tape and glove by which the defendant had gagged the victim.

In addition, the state introduced the testimony of Anthony Marchionne, a process engineer employed by Tara Tape, Inc., which manufactured the tape used by the defendant. He described in some detail the specific composition of the tape. He also testified in effect that the tape did not lose tensile strength by being immersed

in ice water, and that it tended to gain tensile strength by being wrapped over itself, as had been done in the present case. Finally, the state reintroduced the guilt phase testimony of Sergeant Pekrul regarding the footprints that he had found.

## 4

## The Arguments at the Penalty Phase

The state argued that the defendant had intended to inflict extreme pain or torture beyond that necessary to inflict death. It argued that the penalty phase evidence showed that, after the defendant pushed the physically small victim off the dam on the dark and moonless night of December 16, 1989, he watched her struggle for her life at the bottom of the dam. Then, according to the state, after she successfully had removed the tape from her hands and feet by using the metal wire mesh, and was climbing back up the rocky shore, the defendant went to the bottom of the dam and forced her back into the water.[72] The defendant's argument at

---

[72] The state argued: "The aggravating nature of this crime is found in the facts themselves, in the physical evidence that the state has produced in the penalty phase hearing. . . . [W]hen you apply the law to the facts of this case, clearly it shows that this murder was committed in an especially heinous, cruel or depraved manner. . . .

"And we know that tape was with [the defendant] all the time because there was no indication that the tape, that fiber tape was in [the victim's] car. And in his statement to Detective O'Leary, [the defendant] indicated he brought the tape with him. . . . She was alive, and he pushed her off. . . .

"[T]he state must show that it was the intentional infliction of extreme pain or torture above and beyond that necessarily underlying the killing. You can argue that because that's the definition. And what [the defense is] going to argue is [the defendant] didn't have the intent to inflict extreme pain upon [the victim].

"As I argue to juries every time I stand in front of them, you don't leave your common sense out at the courthouse steps. You bring your common sense with you. And the question is what else could have been his intent?

"Here's a girl who is five foot one [inch], ninety-six pounds, in the middle of winter. [Goldstein] here testified it was nineteen degrees . . . . It had just snowed. The water was frozen, the pond was frozen. He brings her to the top of the dam, a dam with a drop of some twenty-four feet, bound and gagged, helpless and pushes her off the top of the dam. What did he think

was going to happen to this girl? He had to know pushing someone alive off the top of the dam is going to inflict extreme pain. What did he think was going to happen? She was going to bounce back up? There was a trampoline at the bottom of the dam? She was going to land in the water and float downstream and somebody was going to rescue her? What else could be the intent, but to inflict pain, extreme pain above and beyond that necessary for the killing? Because if he just wanted to kill her, surely he had the opportunity.

"He could have strangled her to death. I mean, that wouldn't be beyond him. He already stuck the glove down her throat. He had raped her. He said he had to kill her because she saw his face.

"So this killing went above and beyond the infliction of pain that was necessary to take [the victim's] life. And did she suffer? Did she suffer extreme pain? . . .

"[T]he evidence in this case speaks for itself. There is the dam. The engineer testified from the top of the dam to the bottom, to the ice, it's [23.7] feet. Twenty-four foot drop. We all have been on top of a diving board and looked down. Can you imagine what was going through that girl's mind? This is a dark, isolated, wooded area. It's not only freezing cold, there was no moon. It was dark. Bound and gagged he pushes her off the top of the dam.

"[The victim] didn't die when she went over the dam. For some reason she survived. And she survived for a long period of time. Clearly the evidence in this case shows that [the victim] did not die instantaneously when she hit the bottom of the dam. And the evidence shows just the opposite, as she struggled for her life.

"At the base of the dam the divers found tape, the same tape that she was bound and gagged with. They found tape at the bottom of the dam, at the base. They found tape and red fibers on the metal or iron screen that we have as an exhibit. They found her sneaker. It's interesting because you can look at that sneaker, the back of it. You'll see there is a rip in it. And that rip is constant with the other types of rips in her clothing. Look at her pants. If you look at her pants, you see the rips at the bottom of the legs below the knees, the tears both front and back. Look at her red coat. It's torn at the bottom. This woman was struggling for her life.

"By the marks on her wrist that were under the tape, as . . . McDonough testified, those marks were consistent with her trying to break the bindings on the iron or on the metal screening. I think if you look at the rips and tears in the cloth and on the coat, that would be consistent with her being some way in the area of that metal screening trying to fight for her life.

"We know she broke the bindings on her wrist. We know the bindings on her ankles were broken. My God, you could imagine what she had to go through to break those bindings.

"We heard from . . . Marchionne from Tara Tape telling us about the strength of the tape and how the tape can be broken or can't be broken. There was that filament, twenty-three fibers of fiberglass, one inch tape. And that tape wasn't wrapped once. It was wrapped numerous times.

"So we know [the victim] lived. And I would say from the evidence one can infer she lived for a long time as she struggled for her life at the bottom of the dam. And again you got to think not only of the fact that—but the conditions at the time.

"Here's a girl who went out Christmas shopping. And she ends up at the bottom of that ice cold dam. And she didn't go through the ice because the water at the bottom is only eight inches thick. The ice was eight inches. And I believe there was a little water underneath. Even if it wasn't icy, she wouldn't have gone into the water. And you look at the tapes. You see the tapes. The divers were there. How deep the water was. Remember the diver told us there was an apron there. The apron, I think, went out about fifteen feet. And the water above the apron was only a foot deep. And if anything, would indicate the suffering of [the victim], the intentional infliction of pain upon [the victim] by [the defendant], the hatefully, shocking, evil manner in which the murder was committed, grossly bad.

"I think the key evidence, if nothing else, is . . . the gag. Don't forget what . . . Donough testified to. This is not just a piece of tape around [the victim's] mouth. Her own glove was stuffed in her throat. The glove was not laying flat across her lips. [McDonough] testified at the guilt phase. And we asked that testimony be incorporated as part of the penalty phase. [McDonough] testified that the glove was down her throat between her teeth. Can you imagine? I mean, if that in itself isn't extreme pain—again common sense. We all have things stuck in our throat or something in our mouth. The glove from her hand is stuck in her throat and then wraps it around with paper tape. And look at this gag. That tape is only one inch wide orange tape. This gag is maybe two and one-half, three inches. Look how many times he wrapped it around.

"And what did [the victim] do? She broke the bindings from her hand. She broke the bindings from her legs, slipped her foot out because it appears she slipped her foot out, took her sock off. She couldn't get the gag off her mouth. And she tried and she tried because look at the autopsy pictures, the marks around her lips. There are scratch marks consistent with trying to pull that off. And she couldn't pull it off because one of the reasons it was so thick and so tightly bound and her hair—[the victim's] hair was stuck in that. Talk about pain. Did you ever pull a band-aid off your arm and the hair sticks?

"Look at the gag. To do that to another human being and to say in some way it is not depraved, in some way is not heinous, in some way is not cruel is beyond imagination.

"You know, there is one thing—Well, before I say that, let me say one more thing about the injuries on [the victim]. When you look at the slides and hear the testimony of . . . McDonough, first of all, the bruises on her face. I don't know how those bruises got there. There is a heck of a lot of bruises. And if you look at the bruises on her face, one could argue that her face was bruised when he pushed her off the dam, hit that big rock there. That's one explanation. But if you look at the bruises on her face,

they are really not a pattern bruise. She has bruises on the side of her head. She has bruises on the front of her head. She has bruises on her nose. I don't know how all those bruises got there. [The defendant] says he threw her in the backseat of the car. He taped her. I mean, it's just kind of unbelievable to me how you could tape a person the way he did. That poor girl had to be struggling, had to be fighting. [The defendant] is a big man, but still, to be bound—just raped and then bound and gagged.

"I think one could infer that some of those injuries on her face, the inference can be drawn that they were inflicted by [the defendant]. How else could they get there? Because again it's not the pattern. [McDonough] didn't say it was a pattern where if you scraped your face on the side of a rock.

"Also, her nose is bloody. The photograph showing her nose bleeding. There was injuries to her nose. So clearly these are all premortem injuries.

"And finally—Again I don't want you to interpret my brevity as lack of confidence in the case because indeed we feel we have proved the aggravating factors beyond a reasonable doubt. I was out at the dam on that cold Christmas Day. And from that day when I first saw [the victim's] body in the pond to today, to this morning, one thing has baffled me. And that's the position of [the victim's] feet on the rocks. If you look at this [photograph] . . . and the videotapes, clearly in the testimony of . . . McDonald and Officer [Liam] Pesce, clearly [the victim] was laying face down in that pond under the ice. The ice froze over her, but her feet were up on the rocks. And the diver, Officer Tartaglia, said that those rocks were at least a foot from the top of the rocks to the beginning of the water. And we know from Officer Tartaglia about the flow of the water there, that there was a flow, but that was some ninety-seven feet away on the other side of the dam. And Officer Tartaglia testified that the current didn't affect him in his swimming or diving until he got right next to the water, that the water around where [the victim's] body was found was very calm, still, I believe, was his testimony.

"The question is, how did [the victim's] feet get in that position? And as I say, I don't know the answer. And I don't believe we found the answer from many of the people who testified in this case, but I think a clear inference could be drawn, based not only on the position of her feet, but on the condition of her clothing, on the pants—[the victim] did not go Christmas shopping with her jeans in this condition—And the condition I mean is the dirt.

"[McDonough] testified that the heaviest concentration of dirt was on the knee area and the thigh area. And there are also bruises on her knees underneath the pants. And this type of dirt, I think one could infer, would not come from just lying in water. And don't forget the bottom of the dam was ice and snow. There was no dirt there, no indication that there was dirt there. There are only two places that the dirt could have came from. One is between [the defendant's] car and the top of the dam. There is dirt there. We have seen the pictures. We have the maps, how far it was. He says he carried [the victim] to the top of the dam. I think by the condition

of the clothing, the dirt, the tears, one can infer that he didn't carry her, but he had to drag her, that he dragged [the victim] to the top of that dam. That's where the dirt came from. I think that's one inference that can be drawn from the evidence.

"The other inference that can be drawn from the evidence, and there is evidence about the location of [the victim's] body and how did her feet get where they are? Because don't forget—I don't think there is any evidence that her body would have washed up. I mean, this is not like a beach area. There was all rocks. And these rocks are high. There is a foot drop between where her feet were and the way she's laying face down. She's facing back into the pond. It's not as if she got up at the bank and fell forward from exhaustion or just the gag had got to her and she suffocated. She would have fallen onto the bank or she would have fallen backwards, but her feet are up on those rocks. And I think the inference that can be drawn—It's baffled me why her feet are in that position, and I thought about this hard and long from the first day, that Christmas Day I saw the body at the dam. The inference that can be drawn, and I think it's a logical inference, is that [the victim] not only broke her bindings, but that she got out of the water. If you look at the sketch here, you can see and you look at the pictures. The ice would have ended at that time on the 16th because there was new ice. The ice was over her, but right where her body was evidently there was no ice because the ice is frozen on top of her. I think the inference can be drawn that [the victim] got onto the shore. She made it out of the water off the dam and was climbing back up the bank. And I think you can draw that inference again from the clothing, the dirt. You have to explain this dirt on the pants, on her knees. She didn't get that from the bottom of the dam. She made it to the shore. And if you look at where the body is located, it's really the first natural area because of the way the rocks are very high in through here. It's really the first natural passageway back up the bank. I think the inference can be drawn that [the defendant], when he pushed her off the top of the dam, he didn't leave right away. He had to hear her down at the bottom of the dam moving around, fighting for her life, trying to break the bindings. He knew she wasn't dead when he pushed her off because he does tell the police that ultimately he went back to check on her. He went up to Reidville Drive to see if she was still alive. And then he said, I saw she wasn't moving. I knew she was dead.

"[The defendant] was very interested. He wanted to make sure [the victim] died, and why? Because she saw his face. That's why he said he killed her to Detective O'Leary. He pushes her off the top of the dam. I believe he stood there and watched [the victim] struggle for her life. He saw [the victim] make it to the side of the ground going up. I believe [the victim] probably got out of that water because of the position her feet were in and was walking up the bank. I think the inference can be drawn from the position of the body that [the defendant] went back down and pushed her back in the water. How else does a body get in that position? . . .

"I think that is one inference. You may not want to draw that inference,

the penalty phase, insofar as it relates to this claim,[73] was that "if the court were to adopt [the state's] theory as to the way [the victim] died . . . it would be inconsistent with the court's finding at the guilt phase of this trial."

With this background in mind, we return to the defendant's claim, namely, that the state improperly was permitted, in the penalty phase, to advance a theory of the case that it had not advanced in the guilt phase and that was, moreover, inconsistent with the factual findings of the panel at the guilt phase. More specifically, the defendant claims that "[d]uring the guilt phase, the state argued, and the trial court presumably so found, that [the] defendant acted with the intent to kill when he threw [the victim] off the top of the dam *and that this was how she was killed*. This was the only theory of the application of intentional killing force presented to the . . . panel during the guilt phase. This remained

but I think if you look at the position of the body, the location of the feet, the dirt on the clothes—I mean that dirt on that clothing did not come from the bottom of the dam. And look at the coat. The coat, too, has the dirt on it. And the coat is ripped and tattered.

"So clearly the evidence produced in the penalty portion of this case sets this murder apart. And as the Supreme Court said, you must—or the fact finder must—the evidence sets this murder apart from all those other murders in which the penalty of death is not applicable.

"And I know it's not easy. It's not an easy task for me. It's not an easy task for me to stand here. And I know for the court it's not an easy task to do. But the law is on the books. The law is enforceable. And all the state asks for, as we ask every jury, is to apply the facts in this case to the law. That's all we ask. And if you do that, I am confident that you'll find that the state has proved one, if not all, of the aggravating factors beyond a reasonable doubt. Thank you."

[73] The defendant also argued that the evidence failed to establish beyond a reasonable doubt that: (1) extreme pain or extreme torture was actually inflicted on the victim; and (2) the defendant intended to inflict them on the victim. In addition, the defendant argued that there was a reasonable doubt about the presence of the aggravating factor alleged by the state. These arguments, however, do not bear on the present claim. We consider them under a different appellate claim of the defendant. See part V L of this opinion.

the state's theory until its final argument in the penalty phase."[74] (Emphasis added.)

This claim of the defendant rests on two premises. The first premise is that, at the guilt phase, the state's "theory of the case" was confined to the factual scenario that the defendant's only homicidal conduct in effectuating his intent to kill the victim was throwing her off the dam, and that she did not survive the fall. The

---

[74] The defendant further argued: "During this [penalty phase] argument, however, the state realized that it wanted to draw a distinction between [the] defendant acting with the intent to kill and his supposedly acting with the intent to cause additional, excess suffering. Thus, the state changed its theory at the last minute and argued that [the] *defendant intended to cause suffering, but not to kill*, when he threw [the victim] off the dam. According to this changed theory, then, the intentional killing force had to have been applied later so, even though there is absolutely no evidence to support it (and it is flatly contradicted by [Detective] O'Leary's description of [the] defendant's oral statement on which the state so heavily relies), the state had then to claim that the defendant himself went down to the bottom of the dam and killed [the victim] by pushing her into the water for a *second* time. Of course, as noted previously, the . . . panel could not have found this to be true during the guilt phase and could not find it to be true at the penalty phase without violating fundamental due process and the rule of [*Cole* v. *Arkansas*, 333 U.S. 196, 208, 68 S. Ct. 514, 92 L. Ed. 644 (1948)], because it would require that they change their guilt phase findings about how [the victim] died and about when [the] defendant had acted with intent to kill [the victim]. Once the state had committed itself (as it had during the [guilt] phase) to its theory as to how and when the victim was killed, it was a violation of fundamental due process for the state to be allowed to change this theory at the very end of the penalty phase." (Emphasis altered.)

Although we address the core of the defendant's argument in the text of this opinion, there are two aspects of this argument that we address here, namely, the contentions that: (1) at the penalty phase the state argued that the defendant intended to cause suffering *but not death*; and (2) the state's reliance on the defendant's confession precludes its argument that the defendant killed the victim at the bottom of the dam. As to the first, it is clear that, contrary to the defendant's assertion, the state at the penalty phase argued that, *in addition to his intent to kill,* and not in substitution for it, the defendant intended to cause the victim to suffer. Indeed, that was part of the state's burden of proof on the aggravating factor. As to the second, neither the state in introducing the confession and in arguing on the basis of it, nor the panel in considering it, was required to take all of its details at face value, especially considering the wealth of circumstantial evidence suggesting that parts of it plainly were falsely self-serving.

second premise is that the panel, by its verdict at the guilt phase, implicitly found the defendant guilty of killing the victim according to this scenario. Thus, in the defendant's view of this trial record, at the guilt phase the state sought to prove only, and the panel found only, that the defendant intended to kill the victim by throwing her off the dam, and that he did in fact kill her by throwing her off the dam. These premises, and this view of the record, are fundamentally flawed.

First, the state's case in the guilt phase was bounded only by the information and the bill of particulars. See *State* v. *Bergin*, 214 Conn. 657, 674–75, 574 A.2d 164 (1990). Those charging documents alleged that the defendant murdered the victim by intentionally causing her death by asphyxia. They did not require the state to prove (1) any particular underlying mechanism for the asphyxia, (2) any particular time at which the defendant first formed that intent, or (3) any particular factual scenario by which the elements of the offense charged would be established. We know of no authority or reason, and the defendant has offered none, that the state narrows the boundaries by which it may prove the allegations in the charging documents by arguing for a particular set of inferences at final argument, or that such an argument necessarily precludes the fact finder from drawing broader inferences that reasonably are supported by the evidence.

Second, the state's final argument in the guilt phase reasonably cannot be understood as having been intended to narrow those boundaries. Although, in its initial argument, the state relied principally on the defendant's confession, that argument is most reasonably understood as premised on the implicit argument that the defendant's *intent to kill* was established by his own confession, even without consideration of all of the other circumstantial evidence. It is also clear, moreover, that at that point the state was anticipating

that the defendant would argue, as he had immediately before in moving for a judgment of acquittal, that the state had not proven his intent to kill. Thus, although the state did not explicitly preface its opening final argument regarding his intent to kill with this premise, the argument that the defendant's intent to kill was established by his own confession permeates the state's presentation. This theory became explicit, moreover, when in rebuttal the state extensively referred to the circumstantial evidence establishing that the victim had survived the fall and struggled to save her own life. Even without such argument, that circumstantial evidence was sufficient for a set of inferences that the defendant killed the victim, not by throwing her off the dam, but by his further homicidal conduct at the bottom of the dam.

Third, the evidence at the guilt phase overwhelmingly established that the victim had survived the fall and struggled at the bottom of the dam to save her own life. We need not recount that evidence. Indeed, it is difficult, if not impossible, to conceive that, on the state of the evidence presented, any rational fact finder could have found that she died as a result of having been thrown off the dam, without further homicidal conduct having taken place at the bottom of the dam.

Fourth, the panel's obligation was to consider all of the evidence and to determine whether the state had proven its case as alleged in the charging documents. Although it certainly was obligated to consider the arguments of the parties, it knew that those arguments were not evidence. See *State* v. *Glenn*, 194 Conn. 483, 496–97, 481 A.2d 741 (1984). The evidence consisted of what had been presented to the panel, and the panel's function was to draw reasonable inferences from that evidence, and to determine whether the state had proven its case beyond a reasonable doubt. See *State* v. *Bruno*, 236 Conn. 514, 538–39, 673 A.2d 1117 (1996). There is

absolutely no basis for the defendant's assertion that the panel, by its verdict, adopted a theory of murder that was premised on or limited to the factual assertion that the victim died as a result of having been pushed off the top of the dam. Such a finding would have been contrary to all of the undisputed circumstantial and physical evidence presented.

The defendant's reliance on *Cole* v. *Arkansas*, 333 U.S. 196, 68 S. Ct. 514, 92 L. Ed. 644 (1948), is misplaced. In that case, the defendants had been charged and convicted in the trial court of violating a specific section of the Arkansas statutes. On appeal, however, the state Supreme Court affirmed their convictions on the basis of a different section of the statutes, under which they had never been charged. The United States Supreme Court reversed that decision stating: "No principle of procedural due process is more clearly established than that notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge, if desired, are among the constitutional rights of every accused in a criminal proceeding in all courts, state or federal." Id., 201. In the present case, there is simply no basis in the record for a viable claim that the defendant's conviction at the guilt phase and the imposition of the death penalties at the penalty phase violated his due process right to notice of the charges against him and the opportunity to be heard concerning those charges.

D

The State's Notice of Aggravating Factors

The defendant claims that the panel denied him a fair penalty hearing by denying his motion for a bill of particulars regarding the state's notice of aggravating factors. Specifically, he contends that the panel should have ordered the state to specify the "specific acts, language or behavior" that constituted the "especially cruel" or "especially heinous" manner in which he had

committed the crimes.[75] (Internal quotation marks omitted.) We disagree.

In January, 1991, approximately four months before the guilt phase hearing began, the state filed its notice of aggravating factors stating that "the aggravating factors which the state alleges to exist and which the state intends to offer proof at any hearing on imposition of the death penalty which may be held . . . are that pursuant to [General Statutes §] 53a-46a (h) (4): the defendant committed the offense in an especially heinous, cruel, or depraved manner." In June, 1991, after the panel rendered its verdict on the guilt phase, but before the beginning of the penalty phase, the defendant moved for a bill of particulars, requiring the state to specify "[b]y what specific actual acts, language or behavior does the state allege that the defendant committed the offense in an 'especially cruel'. . . [or] 'especially heinous' manner?" The panel denied this motion.

"When the state's pleadings have informed the defendant of the charge against him with sufficient precision to enable him to prepare his defense and to avoid prejudicial surprise, and were definite enough to enable him to plead his acquittal or conviction in bar of any future prosecution for the same offense, they have performed their constitutional duty. . . . State v. Spigarolo, 210 Conn. 359, 381, 556 A.2d 112, cert. denied, 493 U.S. 933, 110 S. Ct. 322, 107 L. Ed. 2d 312 (1989); see State v. Morrill, 197 Conn. 507, 551, 498 A.2d 76 (1985); State v. Vincent, 194 Conn. 198, 205, 479 A.2d 237 (1984); State v. Killenger, 193 Conn. 48, 55, 475 A.2d 276 (1984); State v. Roque, [supra, 190 Conn. 154].

"[T]he denial of a motion for a bill of particulars is within the sound discretion of the trial court and will

---

[75] The defendant also sought a specification regarding the "especially depraved" manner of commission of the offenses, and he renews that claim on appeal. Because the panel did not find this aggravating factor proven, however, we decline to consider this aspect of the defendant's claim.

be overturned only upon a clear showing of prejudice to the defendant. . . . *State* v. *Spigarolo*, supra, [210 Conn. 385]; *State* v. *Laracuente*, [205 Conn. 515, 519, 534 A.2d 882 (1987), cert. denied, 485 U.S. 1036, 108 S. Ct. 1598, 99 L. Ed. 2d 913 (1988)]. A defendant can gain nothing from [the claim that the pleadings are insufficient] without showing that he was in fact prejudiced in his defense on the merits and that substantial injustice was done to him because of the language of the information. *State* v. *Rafanello*, 151 Conn. 453, 457, 199 A.2d 13 (1964) . . . . *State* v. *Spigarolo*, supra, 382." (Internal quotation marks omitted.) *State* v. *Kyles*, 221 Conn. 643, 652–53, 607 A.2d 355 (1992). The panel did not abuse its discretion in denying the defendant's motion.

The defendant's specific claim is "that he was clearly harmed by the lack of the requested bill of particulars, as shown by the state being allowed to change in its theory of the case at the time of its closing argument, which the state would not have been allowed to do had the requested bill of particulars been ordered." Thus, the defendant's claim rests on the same flawed premises that we previously have rejected. See part V C of this opinion. We already have concluded that the defendant's claim that the state improperly was permitted to change its theory of the case from the guilt phase to the penalty phase is without merit. On the same reasoning, there is no basis in this record to conclude that, had the panel ordered the state to file a bill of particulars, the state would have been required to confine itself to the unlikely factual scenario that the defendant intentionally killed the victim by pushing her off the dam, without any further homicidal conduct at the bottom of the dam.

Finally, as a practical matter, this record clearly indicates full prepenalty hearing disclosure to the defendant

of all pertinent material. Concurrently with the denial of the defendant's bill of particulars, the panel granted most of the defendant's discovery motion and, except in one respect, which we discuss in part V E of this opinion, the defendant does not challenge the scope of that ruling. Further, in response to the defendant's request in his motion for disclosure of "[a]ny and all . . . evidence . . . intended for use by the prosecuting authority to establish the existence of an aggravating factor or to rebut the existence of a mitigating factor," the state responded, "Will be made available to defense counsel, at their convenience," at the state's attorney's office. We presume that counsel availed themselves of this open file disclosure.

E

The Denial of Disclosure Regarding the
Defendant's Mental Condition

The defendant next claims that the panel improperly denied that portion of his prepenalty phase motion for disclosure that sought "the substance of any communications by [psychiatrist] Ezra Griffith to the state's attorney or his representative concerning his review of the reports of mental examinations of the defendant disclosed to the state in accordance with" Practice Book, 1991, § 759 (now § 40-18).[76] This claim is without merit.

[76] Practice Book, 1991, § 759 (now § 40-18), provided: "If a defendant intends to introduce expert testimony relating to a mental disease or defect, or another condition bearing upon the issue of whether he had the mental state required for the offense charged, he shall, within the time provided for the filing of pretrial motions or at such later time as the judicial authority may direct, notify the prosecuting authority in writing of such intention and file a copy of such notice with the clerk. He shall also furnish the prosecuting authority with copies of reports of physical or mental examinations of the defendant made in connection with the offense charged, within five days after receipt thereof. The judicial authority may for cause shown allow late filing of the notice or grant additional time to the parties to prepare for trial or make such other order as may be appropriate."

The following facts and procedural history are relevant to this claim. On January 15, 1991, prior to the guilt phase, the defendant filed a notice pursuant to Practice Book, 1991, § 756 et seq. (now § 40-15 et seq.), on "disclosure by the defendant," that he intended to rely on a defense of mental disease or defect. The state, on January 17, 1991, moved to have the defendant examined by a psychiatrist, but that motion was never acted upon. On April 4, 1991, prior to the beginning of the guilt phase, the state indicated on the record that it had transmitted to Griffith certain reports of one psychiatrist and two psychologists who had examined the defendant. After indicating that it had discussed the reports with Griffith, the state withdrew its motion for a psychiatric examination. The defendant thereupon, at the same proceeding, changed his election from a jury trial to a court trial and, on May 28, 1991, the guilt phase began. The defendant did not raise a defense of mental disease or defect.

After the guilt phase and before the penalty phase, the defendant filed the motion for disclosure involved in this claim. The state asserted, and it is not disputed, that: (1) Griffith had not examined the defendant; (2) although the state had discussions with Griffith solely regarding the insanity defense,[77] the state had decided not to have the defendant examined, based on the state's attorney's review of the reports submitted to Griffith and on the state's attorney's conversations with Griffith; and (3) there was no written report by Griffith to the state. The state also claimed that the conversations with Griffith were "the work product of our office." The state's attorney asserted further that there was "nothing that I can recall that would be considered exculpatory in those conversations" with Griffith. In an

[77] Thus, the state had not consulted with Griffith regarding either aggravation or mitigation for purposes of the penalty phase. Indeed, at the time of that consultation, the guilt phase had not even begun.

ensuing colloquy with Judge Barnett, the state's attorney stated, "I will tell you the sum and substance." In response, the defendant's counsel stated, "I don't think you should. That may or become—" Judge Barnett then stated, "No." Thereafter, after reserving decision on this aspect of the defendant's discovery motion, the panel denied it without comment.

The defendant contends that "the state should not be allowed to evade disclosure requirements by accepting a substantive report orally, without obtaining a written report that surely would have had to be turned over. Once the state below offered to turn over at least the sum and substance of the report, it is hard to see how the . . . panel could reach the determination to deny the no longer opposed motion for disclosure." Recognizing, however, that the record does not contain any suggestion of the content of Griffith's conversations with the state, the defendant argues that we should remand the case and "order the disclosure to take place and then allow the parties to seek the appropriate remedy or remedies thereafter depending on the substance of the disclosure." We are not persuaded.

First, we disagree with the defendant's reading of the trial record. It is clear to us that the state's offer to disclose the "sum and substance" of its conversations with Griffith was made to the panel, and not to the defendant, and that the defendant understood it accordingly.[78] Indeed, if it were otherwise, it would be hard to account for the defendant's response that "I don't think you should." Thus, it is not accurate to assert, as the defendant does, that the motion was no longer opposed.

---

[78] This interpretation would be consistent with the obligation of the state to submit to the court, for an in camera review, any material claimed by the defendant to be exculpatory, and to leave to the court the ultimate decision of whether, and to what extent, the material should be disclosed. See Practice Book § 40-42 (formerly § 787).

Furthermore, even if the state's offer were to be construed as intended to satisfy the panel that the conversation contained nothing exculpatory; see footnote 78 of this opinion; the defendant's response was to eschew that course as well. The defendant's request and response, therefore, can only be understood as resting on an assertion of entitlement to the content of the conversation under the rules of criminal discovery. We know of no authority in those rules, however, and the defendant has offered none, that requires the state either to secure a written report from, or to divulge its conversation with, a psychiatrist whom it has orally consulted, but who has not examined the defendant, pursuant to an order of the court, for purposes of a possible mental disease or defect defense. Compare Practice Book, 1991, § 760 (now § 40-19).[79] Indeed, it was not until 1995, four years after the trial in this case, that Practice Book, 1995, § 760A (now § 40-20),[80] was added to provide a mechanism to secure such a report from a psychiatrist who *had* performed such an examination pursuant to such an order, but who had not supplied a report. Thus, there is no basis for the defendant's assertion that the state was permitted "to evade disclosure requirements by accepting a substantive

[79] Practice Book, 1991, § 760 (now § 40-19), provided: "In an appropriate case the judicial authority may, upon motion of the prosecuting authority, order the defendant to submit to a psychiatric examination by a psychiatrist designated for this purpose in the order of the court. No statement made by the defendant in the course of any examination provided for by Sec. 757, whether the examination shall be with or without the consent of the defendant, shall be admitted in evidence against the defendant on the issue of guilt in any criminal proceeding. A copy of the report of the psychiatric examination shall be furnished to the defendant within a reasonable time after the examination."

[80] Practice Book, 1995, § 760A (now § 40-20), which became effective October 1, 1995, provided: "If any expert fails to submit any written report of the result of any physical or mental examination conducted pursuant to Sec. 757 the judicial authority, upon request of the party who engaged the expert, may issue an appropriate subpoena or order pursuant to Sec. 733 or may direct that the expert's deposition be taken pursuant to Sec. 789."

report orally, without obtaining a written report that surely would have had to be turned over."[81]

In addition, as the state points out, the defendant has not established that he could not have obtained Griffith's opinion, assuming that Griffith had formed one, directly from him and used it in the penalty phase. We "do not assume that psychiatric professionals will act as hired guns on behalf of their respective 'employers.'" *State* v. *Ross*, supra, 230 Conn. 272 n.41.

Thus, we see no justification for remanding the case at this time for further fact-finding on this question. The defendant offered extensive psychological testimony in mitigation at the penalty phase, and it is purely speculative that Griffith would have added anything to that testimony. We do not ordinarily remand for further fact-finding based on nothing but speculation, and we see no reason to do so in the present case.

F

Articulation of the Factual Basis of the Panel's
Verdict Regarding the Aggravating Factors

The defendant's next claim is that the panel's special verdict at the penalty phase did not comply with the requirements of Practice Book, 1991, § 4059; see footnote 48 of this opinion; because it failed to state the factual basis underlying its decision on the aggravating factors. In addition to his reliance on § 4059, the defendant maintains that we should, "both as a matter of constitutional capital jurisprudence, and as a matter of [our] supervisory authority over the procedures of the

---

[81] The defendant's reliance on *State* v. *Ross*, supra, 230 Conn. 266–73, therefore, is misplaced. In that case, we held that the trial court improperly had excluded, at the penalty phase, a letter and a report by a psychiatrist who, pursuant to a court order, had examined the defendant for the state for purposes of the insanity defense. Id., 272–73. Unlike the present case, therefore, the evidence in *Ross* was known, and was the product of the rules of criminal discovery.

trial court," require the court's verdict on the penalty phase to "contain a detailed and complete statement of the court's findings of fact and legal conclusions with regard to aggravating factors . . . ."[82] The defendant argues that, without such a statement, we cannot provide meaningful appellate review of the trial court's sentencing decision.[83] We are not persuaded.

The relevant facts and procedural history are as follows. In its orally delivered verdict, which subsequently was transcribed and signed, the panel stated: "Special verdict: In accordance with § 53a-46a (e), the court sets forth findings as to the existence of aggravating factors.

"One: The state has proven beyond a reasonable doubt that the murder of [the victim] was committed in an especially cruel manner in that [the defendant] intentionally inflicted extreme pain and torture on [the victim] above and beyond that which would necessarily accompany the underlying killing.

"Two: The state has proven beyond a reasonable doubt that the killing of [the victim] was committed by [the defendant] in an especially heinous manner in that it was hatefully and shockingly evil and grossly bad . . . .

"Accordingly, as to counts six and seven of the information, this court imposes the sentence of death."

Thereafter, on August 19, 1991, the defendant, specifically relying on Practice Book § 4059 "for purposes of the appeal," moved that the panel "articulate . . . [t]he factual basis upon which the court concluded that each

---

[82] The defendant makes a similar but independent claim regarding the panel's verdict on mitigating factors. We address that claim separately. See part V M of this opinion. Thus, in part V F of this opinion, we consider only the panel's verdict, and the defendant's claims, regarding the aggravating factor.

[83] As a remedy, the defendant suggests that we remand the case to the panel for a more explicit articulation and, if the panel cannot at a later date provide one, we must order a new penalty hearing.

count of capital felony was committed in an 'especially cruel' manner," and "[t]he factual basis upon which the court concluded that each count of capital felony was committed in an 'especially heinous' manner." The panel denied this motion on September 24, 1991. The defendant did not move for appellate review of the panel's ruling on this motion.

Insofar as the defendant's claim rests on § 4059, it suffers from the same procedural and substantive flaws as did his similar claim regarding the panel's verdict at the guilt phase. See part IV C of this opinion. Procedurally, the purported failure of the panel adequately to state the factual basis of its verdict does not provide an independent basis for appellate reversal of the judgment, and the defendant has failed to avail himself of the appropriate procedural mechanism of seeking review of the panel's ruling.

Substantively, the panel stated all that § 4059 required of it. The state's notice of aggravating factors alleged that "the defendant committed the offense in an especially heinous, cruel, or depraved manner." Prior to the penalty phase, the panel had announced that it would apply the definition of "especially cruel" that this court adopted in State v. Breton, 212 Conn. 258, 270, 562 A.2d 1060 (1989) (Breton I), namely, "the intentional infliction of extreme pain or torture above and beyond that necessarily accompanying the underlying killing," and that it would apply the definition of "heinous," namely, "hatefully or shocking evil, grossly bad," which the panel determined had been approved by the United States Supreme Court in Lewis v. Jeffers, 497 U.S. 764, 769–70, 110 S. Ct. 3092, 111 L. Ed. 2d 606 (1990).[84] The

---

[84] The panel also announced the definition of "depraved" that it would apply, namely, "when the perpetrator relishes the murder evidencing debasement or perversion or shows an indifference to the suffering of the victim and evidences a sense of pleasure in the killing," which the panel determined had been approved in Walton v. Arizona, supra, 497 U.S. 646, and Lewis v. Jeffers, supra, 497 U.S. 777. As we indicated previously, however, the

panel stated that the murder had been "committed in an especially cruel manner in that [the defendant] intentionally inflicted extreme pain and torture on [the victim] above and beyond that which would necessarily accompany the underlying killing," and that it had been committed in an especially heinous manner in that "it was hatefully and shockingly evil and grossly bad." Thus, it found that the defendant had committed the murder in the manners proscribed by the notice of aggravating factors, as interpreted by the case law that the panel had stated it would apply. No more was required of the panel by § 4059. As we stated in rejecting the defendant's similar claim regarding the guilt phase verdict, there is nothing in either the language or the purpose of § 4059 that required the panel to state the factual basis of its penalty phase verdict with any more specificity. Further, the panel's refusal to make its verdict more specific has not impaired our ability to review it because we can examine the evidence on which the panel reasonably may have relied. The verdict is neither ambiguous nor incomplete, and the record is more than adequate to determine whether it is supported by the evidence.

The defendant argues that the panel's definition of "heinous" was incorrect, and that we cannot discern if the panel considered that incorrect definition as part of the facts and circumstances of the case in determining whether the aggravating factor was proven. Therefore, he contends, we must reverse the panel's special verdict and order a new penalty hearing. We agree that the definition employed by the panel for the term "heinous" was incorrect. We also conclude, however, that this error was harmless beyond a reasonable doubt.

In *Ross*, we held that the language "especially heinous, cruel or depraved" contained in § 53a-46a (h) (4),

---

panel did not find this aspect of the alleged aggravating factors proven beyond a reasonable doubt.

does not embody three different elements. Rather, it constitutes "a unitary aggravating factor that focuses on the infliction of extreme pain or psychological or physical torture on the victim . . . ." *State* v. *Ross*, supra, 230 Conn. 261. Thus, we further held that, in order for that aggravating factor to be established, "the focus must be on whether the state has proved, beyond a reasonable doubt, that the defendant engaged in intentional conduct that inflicted extreme physical or psychological pain or torture on each of his victims above and beyond that necessarily accompanying the underlying killing. Evidence of the defendant's callousness or indifference to his victims' suffering would substantiate such a finding, but it would not suffice without some showing of the infliction of extreme pain, suffering or torture on the victims." Id., 262. We reiterated these holdings in *State* v. *Webb*, 238 Conn. 389, 478, 680 A.2d 147 (1996).

The present case was tried in 1991, three years before our decision in *Ross*. Therefore, the panel did not have the benefit of our interpretation of "heinous" as used in § 53a-46a (h) (4). Accordingly, the panel adopted a definition of "heinous" that had been approved as constitutional by the United States Supreme Court in *Lewis* v. *Jeffers*, supra, 497 U.S. 773–80, but that is broader than the definition that this court subsequently adopted in *Ross*.

We conclude, however, that this flaw in the panel's special verdict was harmless beyond a reasonable doubt. See *State* v. *Webb*, supra, 238 Conn. 479–83. The special verdict makes clear that the panel found that the defendant's conduct had been *both* especially cruel, as that term was properly defined, and especially heinous, as that term was improperly defined. As the state correctly contends, the defendant does not identify any

evidence, argument or inference offered solely on the concept of heinousness and not on the element of cruelty. Under these circumstances, therefore, any error in employing the definition of "heinous" was harmless. Id., 482–83.

The defendant also argues that, based on "constitutional capital jurisprudence" and on our supervisory authority over the criminal justice system, detailed factual findings and legal conclusions regarding the aggravating factors should be required. The underpinning of this claim is his assertion that such findings are necessary for meaningful appellate review.

There is no dispute over the proposition that, "to provide a check against having a death sentence imposed under the influence of passion or prejudice, or in a random and arbitrary manner, there must be an opportunity for meaningful appellate review." *State* v. *Ross*, supra, 230 Conn. 232. As we have decided, our death penalty statutory scheme fully satisfies that requirement. Id., 238. The defendant offers no authority, and we know of none, that requires a sentencing court to issue a detailed factual statement justifying its imposition of a sentence of death that is otherwise valid under the statutory scheme. The constitutional requirement is that "the record on appeal disclose to the reviewing court the considerations which motivated the death sentence . . . ." *Gardner* v. *Florida*, supra, 430 U.S. 361. The panel's special verdict, stating its factual findings, viewed in conjunction with the complete evidentiary record of the penalty phase hearing, discloses to this court the considerations that supported the death sentence, and provides an ample basis for our meaningful appellate review of that sentence. We decline cate-

gorically to impose any more exacting requirement under our supervisory power.[85]

## G

### The Panel's Treatment of the Unitary Aggravating Factor as Three Separate Factors

The defendant claims that a new penalty hearing is required because the panel treated the unitary aggravating factor, namely, that the defendant committed the murder "in an especially heinous, cruel or depraved manner," as if it were three separate aggravating factors, rather than a formulation constituting one unitary factor. We agree that the panel treated the three adjectives—heinous, cruel and depraved—separately. We disagree, however, that this impaired the panel's verdict in any way.

In *Breton I*, supra, 212 Conn. 271, we defined "especially cruel" as meaning "at least . . . that the defendant intentionally inflicted extreme pain or torture upon the victim, above and beyond the pain necessarily accompanying the victim's death." Subsequently, in *State* v. *Ross*, supra, 230 Conn. 260–61, we held that "especially heinous, cruel or depraved" constituted a unitary factor, rather than three separate factors, and that its meaning was that articulated in *Breton I* as

---

[85] We note, however, that if in a given case the defendant contends that, because of the nature of the evidence, effective appellate review of a sentence of death requires a more specific articulation by the panel of judges regarding the particular bases for its determinations on the aggravating and mitigating factors, he may move for such an articulation and, if he remains unsatisfied, move for appellate review pursuant to Practice Book § 66-5. Furthermore, even in the absence of such a motion for review, if we determine that such an articulation would be necessary or significantly helpful to appropriate appellate review of the sentence, we remain free to remand for an articulation sua sponte. See, e.g., *State* v. *Patterson*, 227 Conn. 448, 454–55, 629 A.2d 1133 (1993); *State* v. *Cobbs*, 198 Conn. 638, 640–44, 504 A.2d 513 (1986). In the present case, however, the defendant did not move for review, and we are persuaded that a sua sponte remand would be neither necessary nor helpful to our review of the sentence.

the meaning of "cruel," including, however, mental or psychological suffering by the victim. Thereafter, in *State* v. *Breton*, 235 Conn. 206, 219–25, 663 A.2d 1026 (1995) (*Breton II*), we affirmed the imposition of the death penalty reached through the application of the *Breton I* definition, without any reference in the information or the jury's instructions to "cruel or depraved." Thus, as the state aptly points out, these three cases establish that: (1) the application of the *Breton I* and *Ross* definition of "cruel" may stand alone as an aggravating factor; and (2) where the sentencer applies that definition to the evidence, it has evaluated the entirety of the unitary factor.

The present case was tried after our decision in *Breton I*, but before our decision in *Ross*. Thus, as stated previously, the panel did not have the benefit of our decision in *Ross* that the three terms had one unitary meaning, rather than three separate meanings. Nonetheless, the panel applied the *Breton I* definition of "cruel." Under these circumstances, therefore, the fact that the panel also applied two other inapplicable definitions to the same evidence did not undermine the validity of its application of the proper definition.

The defendant contends, nonetheless, that the panel's use of the inapplicable definitions of "heinous" and "depraved" misled it into considering irrelevant factors, namely, "such things as 'relishing' and 'evil,' " and also misled the panel "as to what were the true facts and circumstances of the case" regarding "the mitigating nature of the nonstatutory mitigating factors . . . ." There is no basis in the record for this contention. The defendant points out no evidence in the record, and we can find none, that could be considered as relevant to the inapplicable definitions but irrelevant to the applicable definition. There is no indication that the panel was misled about the facts and circumstances of the case insofar as they bore on the question of mitigation.

## H

### The Definitions of "Especially Heinous" and "Especially Depraved"

The defendant next contends that the definitions of "especially heinous" and "especially depraved" employed by the panel were unconstitutionally vague and were contrary to the meaning of those terms under our law. In light of our conclusions stated in part V G of this opinion, however, this contention is unpersuasive. The panel's proper application of the definition of "cruel" rendered irrelevant any purported infirmities inherent in its use of the definitions of "heinous" and "depraved."

## I

### The Purported Inadequacy of the Panel's Verdict

The defendant next claims that the panel failed to find that the capital offenses of which the defendant was convicted were committed in an aggravated manner. The defendant contends that the panel's penalty verdict is flawed because: (1) under § 53a-46 (h) (4), the death penalty may be imposed only if the defendant committed the *offense* in an especially heinous, cruel or depraved manner; (2) the defendant was convicted of, not simple murders, but a murder committed as part of a kidnapping and a murder in the course of the commission of first degree sexual assault; and (3) the panel's verdict found only that the *murder* was committed in an especially cruel manner, and not that the *capital offenses* were committed in such a manner. This claim borders on the frivolous.

In order to understand this claim, it is necessary to review the two sets of verdicts in this case—the verdict at the guilt phase, and the verdict at the penalty phase. At the guilt phase, the panel found: (1) on the murder count, the defendant "guilty of murder" by intentionally

causing the death of the victim by asphyxia; (2) on the first capital felony count, the defendant "guilty of capital felony" by committing the murder of the victim, "a person whom he had kidnapped, during the course of the kidnapping and before she was able to return or be returned to safety"; and (3) on the second capital felony count, the defendant "guilty of capital felony" by committing murder "in the course of the commission of the sexual assault in the first degree of [the victim], which . . . was closely related in time and place to said sexual assault." Thereafter, at the penalty phase, the panel found that the state had proven beyond a reasonable doubt "that *the murder* of [the victim] was committed in an especially cruel manner in that [the defendant] intentionally inflicted extreme pain and torture on [the victim] above and beyond that which would necessarily accompany the underlying killing." (Emphasis added.)

The defendant contends that when the panel, in its penalty phase verdict, used the word "murder," rather than, for example, "capital offense," "murder in the course of a kidnapping," "or murder in the course of a first degree sexual assault," the panel "did not make the finding(s) necessary to support a valid death sentence." It is clear from this record, however, that when the panel referred to the "murder," it intended that reference to incorporate its earlier verdict at the guilt phase that the defendant had committed the murder (1) in the course of the kidnapping of the victim, and (2) in the course of the first degree sexual assault of the victim. It is inconceivable, furthermore, that anyone in the courtroom when the penalty verdict was delivered did not understand this intention.[86] Indeed, the whole point of the penalty hearing was to determine

---

[86] The defendant's trial counsel could not have misunderstood the import of the verdict, or certainly they would have argued that the verdict was invalid.

whether the two forms of murder constituting the capital offenses of which the defendant already had been found guilty, were accompanied by the aggravating factor alleged or by any mitigating factor. Moreover, the panel's verdict appropriately tracked the language of this court, in *Breton I* and *Breton II*, in defining "cruel." Thus, the fact that, in rendering its penalty phase verdict, the panel did not repeat in full its earlier linguistic formulation rendered at the guilt phase, did not in any way invalidate its penalty verdict.

J

### The Claimed Retroactivity of the *Ross* Definition of "Especially Cruel"

In *State* v. *Ross*, supra, 230 Conn. 260–62, decided in July, 1994, we held that the unitary factor of "especially heinous, depraved or cruel" included the infliction of psychological, as well as physical, pain or torture on the victim. The defendant claims that this purported "expanded construction of [cruel], which was not in effect at the time of his crime (December, 1989), cannot be retroactively applied to him without violating the fundamental due process right to notice and the ex post facto principle as that principle is applicable through due process to judicial constructions of statutes which expand the meaning thereof." This claim is without merit.

The purported "expanded construction" of the statutory aggravating factor in question does not involve either a retroactive application to the defendant's conduct of a standard of criminal liability in violation of the due process requirement of fair notice, or a new judicial construction of a statute in violation of the ex post facto clause.[87] First, our case law makes clear that

---

[87] The constitution of the United States, article one, § 9, provides in relevant part: "No bill of Attainder or ex post facto Law shall be passed. . . ."

The constitution of the United States, article one, § 10, provides in relevant part: "No State shall enter into any Treaty, Alliance, or Confederation; grant Letters of Marque and Reprisal; coin Money; emit Bills of Credit; make any

our decision in *Ross* involved nothing more than the traditional and conventional judicial process of construing a statutory term according to its reasonably foreseeable meaning, which necessarily would apply to conduct occurring at any time while the statute was in effect.

In *Breton I*, supra, 212 Conn. 271, decided in July, 1989, we held that "especially cruel" meant "at least . . . that the defendant intentionally inflicted extreme pain or torture upon the victim, above and beyond the pain necessarily accompanying the victim's death." We referred to this definition as "an acceptable core construction of § 53a-46a (h) (4)." Id., 270. In adopting that construction, however, we did not specifically address whether the " 'extreme pain or torture' that is at the core of 'especially cruel' include[s] the infliction of psychological anguish as well as physical pain." *State* v. *Ross*, supra, 230 Conn. 260.

In *Ross*, however, we reached this issue and held that the unitary factor of "especially heinous, depraved or cruel" included the infliction of psychological, as well as physical, pain or torture on the victim. Id., 260–62. Although that was the first time that the court was called upon explicitly to decide whether the pain or torture that lay at the core of the notion of cruelty included psychological pain or torture, our decision cannot rationally be seen as departing from the defendant's reasonable expectations regarding the capital sentencing statutory scheme, because *"Breton [I]* did not exclude mental anguish from actionable 'extreme pain or torture' . . . ." Id., 260.

Thing but gold and silver Coin a Tender in Payment of Debts; pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligations of Contracts, or grant any Title of Nobility. . . ." See *Marks* v. *United States*, 430 U.S. 188, 191–93, 97 S. Ct. 990, 51 L. Ed. 2d 260 (1977) (ex post facto clause applicable to states).

The specific inclusion of the infliction of psychological pain or torture within the meaning of cruelty hardly was unforeseeable. Dictionaries generally have included the infliction of mental suffering within the associated meanings. See Webster's Third New International Dictionary (1966) ("cruelty" includes "acts that cause mental suffering or fear"). Indeed, in *Breton I*, supra, 212 Conn. 270 n.12, we quoted the following dictionary definition: " 'Cruelty' is defined as the 'intentional and malicious infliction of physical or mental suffering upon living creatures . . . or . . . the wanton, malicious, and unnecessary infliction of pain upon the body . . . .' Black's Law Dictionary (5th Ed. 1979)." Moreover, in *State* v. *Ross*, supra, 230 Conn. 264–65, we applied that definition to the defendant's homicidal conduct, which had occurred in 1983 and 1984. Thereafter, in *State* v. *Webb*, supra, 238 Conn. 484–88, we applied the *Ross* definition to the defendant's conduct in killing his victim in August, 1989. It would be anomalous to conclude that the statutory interpretation we arrived at in *Ross* in July, 1994, could be applied to Ross' conduct, which had occurred in 1983 and 1984, and to Webb's conduct, which had occurred in August, 1989, but not to the conduct of the defendant in the present case, which occurred in December, 1989.

Second, the defendant's contention improperly conflates three distinct legal doctrines: (1) the due process vagueness doctrine; (2) the eighth amendment vagueness doctrine; and (3) the ex post facto principle. None of these is violated by the application of the *Ross* interpretation to the sentencing decision in the present case.

The due process vagueness doctrine rests on the principle of fair notice to a criminal defendant that his contemplated conduct would be criminal. This doctrine involves "either the notion of fair notice of what *conduct* is prohibited or the concept of guarding against the risk

of arbitrary enforcement of the law by police officers, judges or juries." (Emphasis in original.) Id., 531–32. Thus, although there are instances in which this principle has been extended to include cases in which the penalty itself provided by a statute "may be impermissibly vague"; id., 532 n.87; the due process vagueness doctrine ordinarily applies to the substantive elements of the crime charged; see, e.g., *State* v. *Indrisano*, 228 Conn. 795, 802–20, 640 A.2d 986 (1994); because the statutory language, taken together with its judicial gloss, must " 'give the person of ordinary intelligence a reasonable opportunity *to know what is prohibited, so that he may act accordingly'* "; (emphasis added) id., 802; and must be sufficiently clear so as to avoid arbitrary enforcement by the police, judges and juries. Both purposes of the due process vagueness doctrine, therefore, are rooted in the notion that the conduct that the law defines as criminal—i.e., the substantive elements of the crime charged—be defined with reasonable clarity. It must be reasonably clear to the defendant, so that he may guide his conduct accordingly, and it must be reasonably clear to the police, judges and juries, so that they may not apply the law arbitrarily.

Accordingly, the application of the due process vagueness principle to the judicial construction of a criminal statute may give rise to a constitutional violation when that construction is not reasonably foreseeable and involves the substantive elements of the crime. "When a[n] . . . *unforeseeable* state-court construction of a criminal statute is applied retroactively to subject a person to criminal liability *for past conduct,* the effect is to deprive him of due process of law in the sense of fair warning *that his contemplated conduct constitutes a crime. Bouie* v. *Columbia,* 378 U.S. 347, 354–55, 84 S. Ct. 1697, 12 L. Ed. 2d 894 (1964); see *Douglas* v. *Buder,* 412 U.S. 430, 432, 93 S. Ct. 2199, 37 L. Ed. 2d 52 (1973)." (Emphasis added; internal quotation

marks omitted.) *State* v. *McGann*, 199 Conn. 163, 177, 506 A.2d 109 (1986).

Thus, the due process vagueness principle simply does not apply to the sentencing factor of cruelty as defined in *Ross*, because that factor does not implicate the determination of whether the defendant's contemplated conduct constituted a crime. Indeed, in adopting the "core construction" of "cruel" in *Breton I*, we specifically did "not rest upon due process notions of fair notice. See *State* v. *Schriver*, 207 Conn. 456, 463, 542 A.2d 686 (1988); *State* v. *Pickering*, 180 Conn. 54, 65, 428 A.2d 322 (1980). Rather, our construction aim[ed] to comply with the eighth amendment by distinguishing the few cases in which the death penalty is imposed from the many in which it is not. *Furman* v. *Georgia*, 408 U.S. 238, 313, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972) (White, J., concurring)." *Breton I*, supra, 212 Conn. 271 n.13.

In *Breton I*, we further explicated the difference between the two vagueness doctrines. " 'Objections to vagueness under the Due Process Clause rest on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk. . . . Claims of vagueness directed at aggravating circumstances defined in capital punishment statutes are analyzed under the Eighth Amendment and characteristically assert that the challenged provision fails adequately to inform juries what they must find to impose the death penalty and as a result leaves them and appellate courts with the kind of open-ended discretion . . . held invalid in *Furman* v. *Georgia*, [supra, 408 U.S. 238] . . . .' *Maynard* v. *Cartwright*, 486 U.S. 356, 361–62, 108 S. Ct. 1853, 100 L. Ed. 2d 372 (1988). As in *Maynard,* the more stringent eighth amendment principles control this case, except to the extent that due process principles further

enlighten our analysis." *Breton I,* supra, 212 Conn. 264 n.6.

Properly understood, therefore, vagueness analysis in the context of this claim of the defendant involves the application of the eighth amendment, not the due process clause. The purpose of the eighth amendment vagueness doctrine, unlike the due process vagueness doctrine, is to channel the capital sentencing decision sufficiently so as to ensure that the decision is not made arbitrarily and capriciously. Id., 264. The unitary sentencing factor involved in the present case passes constitutional muster. *State* v. *Ross,* supra, 230 Conn. 261.

Moreover, the application of that factor to the defendant's conduct does not violate the ex post facto clause. In the context of death penalty jurisprudence, the United States Supreme Court has stated: "It is settled, by decisions of this Court so well known that their citation may be dispensed with, that any statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as ex post facto." (Internal quotation marks omitted.) *Dobbert* v. *Florida,* 432 U.S. 282, 292, 97 S. Ct. 2290, 53 L. Ed. 2d 344 (1977). "It is axiomatic that for a law to be ex post facto it must be more onerous than the prior law." Id., 294. The mere existence of a death penalty statute on the books at the time of the defendant's conduct, even though that statutory scheme was later held unconstitutional, insulated it from ex post facto attack. Id., 297–98. The "existence of the statute served as an 'operative fact' to warn the petitioner of the penalty which [the state] would seek to impose on him if he were convicted of first degree murder. This was sufficient compliance

with the ex post facto provision of the United States Constitution." Id., 298. A fortiori, in the present case, the entirely foreseeable interpretation of the sentencing concept of cruelty did not violate the ex post facto clause.

## K
### The Claimed Inapplicability of Certain *Ross* Language

The defendant next claims that, to the extent that certain language in *Ross* substituted a general intent for a specific intent requirement in the application of the aggravating factor of cruelty, "such change cannot be retroactively applied to [the] defendant and, in addition, such change renders the . . . aggravating factor unconstitutionally vague."[88] We conclude that our decision in *Ross* had no such effect, and we therefore disagree that our decision in *Ross* invalidated the panel's verdict.

In order to understand this claim, it is necessary to review certain parts of our decisions in *Breton I* and *Ross*. In *Breton I*, we gave the core definition of "cruel" as follows: "[T]hat meaning must include the intentional infliction of extreme pain or torture above and beyond that necessarily accompanying the underlying killing." *Breton I*, supra, 212 Conn. 270. We reiterated that "the legislature, in enacting § 53a-46a (h) (4), meant to impose the death penalty at least in those cases in which the trier has found that the defendant intentionally inflicted extreme pain or torture upon the victim, above and beyond the pain necessarily accompanying the victim's death." Id., 271.

---

[88] The defendant raises this claim "in anticipation that the state will claim that the [challenged] language from *Ross* is applicable to [the] defendant in determining the sufficiency of the state's evidence of aggravation." In his next claim, the defendant challenges the sufficiency of that evidence. We consider the two claims, although connected with each other, in the sequence in which the defendant has presented them.

Thereafter, in *Ross* the defendant argued "that 'extreme pain or torture' cannot be psychological." *State* v. *Ross*, supra, 230 Conn. 260. We disagreed, stating that "[a] defendant cannot intentionally engage in conduct that inflicts extreme psychological trauma and then claim that his victims' mental distress was unintended or unforeseeable." Id. We then considered whether there was sufficient evidence to support the jury's finding of the aggravating factor. In doing so, we used the following language, which the defendant challenges in the present case: "[W]e hold, therefore, that the focus must be on whether the state has proved, beyond a reasonable doubt, *that the defendant engaged in intentional conduct that inflicted* extreme physical or psychological pain or torture on each of his victims above and beyond that necessarily accompanying the underlying killing. *Evidence of the defendant's callousness or indifference to his victims' suffering would substantiate such a finding,* but it would not suffice without some showing of the infliction of extreme pain, suffering or torture on the victims." (Emphasis added.) Id., 262. The defendant's specific contention is that the italicized language improperly enlarged the *Breton I* definition of "cruel" in two ways: (1) the first set of italicized words shifted the focus from the intent to inflict pain or torture to the intent to engage in conduct that in fact inflicted pain or torture; and (2) the second set of italicized words added a new and unforeseeable state of mind that would suffice for the aggravating factor, namely, callousness or indifference to the victim's pain, as opposed to the intent to inflict such pain.

The defendant's contention rests on a misreading of both *Breton I* and *Ross*. Contrary to the defendant's contention, in *Breton I* we did not purport to give a comprehensive and all encompassing definition of "cruel." That is evident both from the procedural posture of the appeal in *Breton I*, and from the opinion

itself. Procedurally, that case came to this court on an expedited appeal, pursuant to General Statutes § 52-265a,[89] from the trial court's dismissal, prior to the sentencing hearing, of the state's filing of its notice of the aggravating factor. *Breton I*, supra, 212 Conn. 259. Thus, at that point there was not a full factual record on which to evaluate any claim regarding the application of the aggravating factor. It is therefore very unlikely that we would have undertaken to define, once and for all, the absolute outer limits of the definition of "cruel" as used in the capital sentencing scheme.

The opinion, moreover, makes that limitation on our undertaking quite clear. In order to save the statute from any constitutional infirmity based on the eighth amendment vagueness doctrine, we gave it what we characterized as a "core construction." Id., 270. Our language in doing so was replete with the understanding that this core construction did not purport to cover all future cases, without further elaboration. For example, we stated that: the meaning of cruel *"must include the intentional infliction of extreme pain or torture"*; (emphasis added) id., 270; this was "an *acceptable core construction*"; (emphasis added) id.; "the parties may disagree over how *broadly* the term 'especially cruel' may be construed"; (emphasis in original) id.; we were "assigning to it a *limited* core construction"; (emphasis in original) id., 270–71; and our construction of the term rested on our perception that the legislature "meant to impose the death penalty *at least* in those cases in which the trier has found that the defendant intentionally inflicted extreme pain or torture upon the victim, above and beyond the pain necessarily accompanying

---

[89] General Statutes § 52-265a (a) provides in relevant part: "[A]ny party to an action who is aggrieved by an order or decision of the Superior Court in an action which involves a matter of substantial public interest and in which delay may work a substantial injustice, may appeal under this section from the order or decision to the Supreme Court . . . ."

the victim's death." (Emphasis added.) Id., 271. Having done so, we then remanded the case to the trial court for a sentencing hearing. Id., 272.

Therefore, in *Ross*, we did not, contrary to the defendant's contention, make a change from what we had held in *Breton I*, and certainly, therefore, did not retroactively apply any new construction to the defendant's detriment in the present case. Rather, in *Ross* we considered two questions that simply had not been presented to us in *Breton I*: (1) whether the pain and torture referred to as part of the meaning of "cruel" included psychological, as opposed to physical, pain or torture; *State* v. *Ross*, supra, 230 Conn. 260; and (2) whether, as part of the requisite state of mind for the concept of cruelty, evidence of the defendant's callousness or indifference to his victim's suffering would suffice. Id., 262.

With respect to the first question, we held in the affirmative. With respect to the second, we also held in the affirmative, but with the specific limitation that "it would not suffice without some showing of the infliction of extreme pain, suffering or torture on the victims." Id. It was immediately preceding that point in the opinion that we used the language that the defendant challenges here. That language, like any other, must be read in context. Doing so, and reading *Breton I* and *Ross* together, we conclude that, properly understood, they hold that, with respect to the requisite state of mind and consequences thereof, either of the following will suffice for the aggravating factor in question: (1) the defendant intended to, and in fact did, inflict extreme physical or psychological pain, suffering or torture on the victim; or (2) the defendant was callous or indifferent to the extreme physical or psychological pain, suffering or torture that his intentional conduct in fact inflicted on the victim.

In light of this discussion, the defendant's claim evaporates. To the extent that the defendant claims that our language in *Ross* constituted an impermissible act of judicial retroactivity, what we stated in part V J of this opinion applies here. The construction of "cruel" that we articulated in *Ross* was not unforeseeable, and did not involve the elements of the crime charged.[90] To the extent that the defendant claims that our construction in *Ross* constituted a violation of the eighth amendment vagueness doctrine and, therefore, cannot be applied to him, *Ross* itself forecloses the claim. *State* v. *Ross*, supra, 230 Conn. 261.

## L
### The Sufficiency of the Evidence of the Aggravating Factor

The defendant next claims that there was insufficient evidence to support the panel's finding that he committed the capital offenses in an especially cruel manner, *"based on the state's theory thereof."* (Emphasis added.) The defendant also claims that due process and his right to have his penalty determined by the panel who heard the case "prevents this court from substituting some separate theory of aggravation *other than that advanced by the state and found by the sentencer below."* (Emphasis added.) We disagree that there was any evidentiary insufficiency.

This claim rests specifically on the premises that: (1) "during the guilt phase, it was the state's theory that [the] defendant intentionally caused the death of [the victim] by pushing her off the top of the dam"; (2) this was "the theory . . . of aggravation presented by the

---

[90] Compare *State* v. *McGann*, supra, 199 Conn. 177, where we held that "[a] construction of the statute that treats the defendant as hired simply because he assumed the responsibility of fulfilling an obligation of the person he had recommended and because he would gain financially by doing so is *not* readily apparent or reasonably foreseeable." (Emphasis added.)

state *and relied upon by the . . . panel*" (emphasis added); and (3) the language in *Ross* that we discussed in part V K of this opinion may play no part in the legal standard by which the sufficiency of the evidence is to be evaluated. From these three closely related premises, and from these premises alone, the defendant argues that there was insufficient evidence for the panel to have found "that the victim *actually suffered* extreme pain or torture beyond that necessarily accompanying the capital offense(s), and . . . that [the] defendant *intentionally inflicted* extreme pain or torture on the victim beyond that necessarily accompanying the capital offense(s)"; (emphasis in original); because "the evidence fails to prove beyond a reasonable doubt that [the victim] was conscious after she was thrown from the dam."

The fundamental flaw in the defendant's contention is that the premises underlying it are unsound. We already have rejected the defendant's claims that the state was confined to a theory of aggravation focusing solely on his conduct in throwing the victim off the top of the dam, and that the panel necessarily rested its special verdict on the basis of such an assertion. See part V C of this opinion. We also have rejected the defendant's challenge to the language in *Ross*. See part V K of this opinion. Moreover, we already have outlined the overwhelming evidence that the victim survived having been thrown from the top of the dam by the defendant. See part V C of this opinion. Thus, as stated, the defendant's evidentiary sufficiency claim is without merit.

Nonetheless, we undertake to summarize the evidence that, considered under the *appropriate* legal standard, supports the panel's special verdict that the defendant committed the capital offenses in an especially heinous, cruel or depraved manner. To reiterate: in order to have established this aggravating factor, the state must have proven, beyond a reasonable doubt,

that the defendant intended to, and in fact did, inflict extreme physical or psychological pain, suffering or torture on the victim, or that he was callous or indifferent to the extreme physical or psychological pain, suffering or torture that his intentional conduct in fact inflicted on the victim. *State* v. *Ross,* supra, 230 Conn. 162; *Breton I,* supra, 212 Conn. 270–71. There was more than ample evidence to support the panel's special verdict.

As we have indicated, the evidence supports the following factual scenario. The defendant first encountered the victim in the parking lot where, armed with a valve stem remover and fiberglass reinforced wrapping tape, he engaged in the ruse by which he gained entry into her car. At that time, he intended *both* to assault her sexually, and to kill her so that she could not later identify him. The defendant then forced the victim to drive to the dark and secluded place near the dam and pond, where he forcibly penetrated her anus with his finger and then forcibly penetrated her vaginally with his penis. He next gagged her by putting her glove into her mouth and wrapping the tape tightly and repeatedly around her mouth and head, and bound her wrists and ankles with the tape. The defendant then carried her over to the top of the dam, and threw her off the top of the dam to the concrete apron approximately twenty-three feet below. It was a moonless night, and the temperature was very cold, approximately nineteen degrees fahrenheit. The victim was clad only in jeans and a coat.

The victim survived this fall, however, and, at the bottom of the dam, engaged in a heroic effort to save her own life. By scraping her wrists repeatedly against the sharp prongs of the wire mesh that protruded from the ice, she was able to remove the tape from her wrists, wounding her wrists in the process. This was a time consuming process, accompanied by enormous effort

on her part because of the high tensile strength of the tape. Having freed up her wrists, she then managed to remove the tape from her ankles, and in the process also removed her right sneaker. The tape around her mouth and head was so tightly wrapped, however, that she could not remove it. She tried so desperately to remove it that she gouged her own face and broke a fingernail in her unsuccessful effort. The victim then, with her back to the water, began to crawl back up the rocky shore of the pond.

Meanwhile, the defendant, in order to ensure that his intent to kill had been effectuated, watched from the top of the dam as the victim engaged in her desperate struggle for life. Realizing that the victim was still alive and was likely to escape, he made his way down the steep and rocky slope. When he reached her, he forced her back into the water face down, and strangled or drowned her, or both.

The defendant then returned to the victim's car, stole items from it, and walked back to his car, which was parked in the Bradlees' lot. He *then* drove on to Interstate 84 and parked his car, climbed over the guardrail and through a hole in the fence, from where he could look down and view the victim's now lifeless body. Satisfied that she was dead, he drove home.

The evidence supports the determination that the victim experienced extreme psychological and physical pain and suffering throughout this entire episode. The panel reasonably could have found that, beginning with the forced drive from the parking lot and continuing up until the moment of her death, the victim was in terror, and that the terror was accompanied by extreme physical pain and suffering. One need not elaborate on her likely state of mind, and on the extreme physical pain that she suffered, while she: was forced to drive

in the dark to a secluded place; was forced to enter the backseat of her car from which she could not escape; was forced to endure two forcible sexual assaults, one sufficiently forcible to cause a hemorrhage; was gagged and had her wrists and ankles bound; was carried in the dark and freezing night and thrown twenty-three feet off the dam to a concrete apron and icy pond below, suffering numerous bodily injuries in the process; and desperately struggled to live by wounding herself repeatedly in removing the bonds from her hands and feet and in attempting to remove them from her face. Finally, thinking that she had succeeded in saving her own life as she crawled back up the rocky shore, she saw her assailant return to her and felt him force her back into the water, and strangle or drown her.

The evidence also supports the determination that, in engaging in this entire course of homicidal conduct, the defendant had the requisite states of mind. The panel reasonably could have determined that the defendant intended to inflict on the victim the extreme physical and psychological pain and suffering that she in fact endured. It is axiomatic that the fact finder may infer intent from the natural consequences of one's voluntary conduct. See *State* v. *Crespo*, 246 Conn. 665, 674, 718 A.2d 925 (1998), cert. denied, 525 U.S. 1125, 119 S. Ct. 911, 142 L. Ed. 2d 909 (1999). The panel also reasonably could have determined that the defendant's entire course of conduct was intentional, and that, particularly as he watched the victim crawl up on to the rocks from the icy water, then made his way down to her and completed his homicidal scheme by forcing her back into the water and strangling or drowning her, the defendant was callous and indifferent to the extreme physical and psychological pain and suffering that he was in fact inflicting on her.

M

## Articulation of the Factual Basis of the Panel's Verdict Regarding the Mitigating Factors

The defendant's next claim is that the panel's special verdict rejecting his claimed mitigating factors was flawed because it did not comply with Practice Book § 4059, in that it did not state the factual basis underlying that verdict. The defendant also claims that we should require, "both as a matter of constitutional capital jurisprudence and under [our] supervisory authority over such proceedings, that when the death penalty is imposed by . . . a [panel] . . . after a penalty hearing conducted to the court, the court's verdict at the penalty phase must state in detail the court's factual findings and legal conclusions with regard to its verdict on statutory mitigating factors and all nonstatutory mitigating factors." We reject this claim.

At the end of the penalty phase hearing, the panel rendered its special verdict. With regard to the claimed mitigating factors, the panel stated: "With respect to the mitigating factors set forth in § 53a-46a (g), we find that the defendant has not proven by a fair preponderance of the evidence that at the time of the murder of [the victim], the defendant['s] . . . mental capacity was significantly impaired, nor his ability to conform his conduct to the requirements of law was significantly impaired.

"Further, we find that the defendant has not proven by a fair preponderance of the evidence that the defendant was under the influence of emotional disturbance at the time of the offense, or that he suffered or suffers from a mental disorder.

"We have considered all of the defendant's list of proposed mitigating factors submitted on August 5,

1991, and all evidence that was presented to us in mitigation.

"Considering all of the facts and circumstances of this case, we do not find the defendant has proven by a fair preponderance of the evidence any factor that can be considered as mitigating."

Thereafter, the defendant moved[91] that the panel articulate "[a]s to each mitigating factor [claimed by the defendant], the court's finding, in accordance with § 53a-46a (d), as to whether the particular factor concerning the defendant's character, background or history, or the nature and circumstances of the crime, has been established by the evidence." The defendant claimed, as the basis for this motion, "that the court is required by Practice Book § 4059 to state the factual basis of its decision for purposes of the appeal." The panel denied the motion, and the defendant did not seek appellate review of that denial.

This claim is a mirror image of the defendant's claims regarding: (1) the factual basis of the panel's verdict on the guilt phase of the trial; see part IV C of this opinion; and (2) the factual basis of the panel's special verdict on the aggravating factor; see part V F of this opinion. For all of the reasons, both procedural and substantive, that we previously stated in those parts of this opinion, we reject this claim as well.

N

Whether the Panel Properly Exercised
Its Sentencing Function

The defendant next claims "that the penalty phase verdict fails to show [that] the . . . panel actually exer-

---

[91] This motion was part of the same motion, referred to in part V F of this opinion, by which the defendant requested the panel to articulate the factual bases of its verdict that the capital felonies were committed in an "especially cruel" and in an "especially heinous" manner. Paragraphs one and two of the motion addressed the aggravating factors, and paragraph three addressed the mitigating factors.

cised sentencing judgment and actually determined that death was the appropriate sentence rather than merely applying the apparent statutory formula." More specifically, the defendant argues that, constitutionally, the verdict must show that "the panel understood that a death verdict is not the product of a mechanical application of the statute, but a reflection of the [sentencer's] normative judgment that death is the fitting and appropriate punishment." (Internal quotation marks omitted.) Thus, the defendant contends, the panel's verdict rejecting the claimed mitigating factors did not adequately reflect the panel members' "unanimous agreement . . . that they [were] convinced that the death penalty [was] fitting and appropriate." (Internal quotation marks omitted.) We disagree.

In rendering its special verdict, the panel found, first, that the state had proven the aggravating factor beyond a reasonable doubt. It then found that the defendant had not proven by a preponderance of the evidence any of the statutory or nonstatutory mitigating factors. The panel then stated: "Accordingly, as to counts six and seven of the information, this court imposes the sentence of death."

The defendant does not claim that the panel did not follow the statutory provisions in rendering its verdict. To the contrary, he claims in effect that the panel's verdict was constitutionally flawed *because* the panel followed the statute. Thus, he contends that the imposition of the death sentence pursuant to the provisions of the statute was "constitutionally inadequate" because the statute required the panel, in addition to making the findings regarding aggravating and mitigating factors specified by the statute and imposing the death penalty if the aggravating factor were proven and no mitigating factor were proven, to make an *additional* finding, namely, that the death penalty was fitting and appropriate. We agree with the state that, in making

this claim, "the defendant is resurrecting the argument that a death sentence based on a statutory formula is unconstitutional." We also agree that we already have rejected this claim in *State* v. *Ross*, supra, 230 Conn. 240–41, in which we relied on the decision of the United States Supreme Court in *Blystone* v. *Pennsylvania*, 494 U.S. 299, 110 S. Ct. 1078, 108 L. Ed. 2d 255 (1990).

"The United States Supreme Court has stated that the capital sentencer must make a reasoned moral and individualized determination based on the defendant's background, character and crime that death is the appropriate punishment. *Penry* v. *Lynaugh*, [492 U.S. 302, 319, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989)]; *Caldwell* v. *Mississippi*, [472 U.S. 320, 330–32, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985)]; see also *Saffle* v. *Parks*, [494 U.S. 484, 492–93, 110 S. Ct. 1257, 108 L. Ed. 2d 415 (1990)]; *California* v. *Brown*, [479 U.S. 538, 541, 543, 107 S. Ct. 837, 93 L. Ed. 2d 934 (1987)]. Our death penalty statutes fulfill this requirement.

"Under § 53a-46a (b), the capital sentencer is either a jury or the court. The sentencer determines whether the defendant, who has been convicted of a capital felony, should receive the punishment of death by making findings regarding the existence of any aggravating or mitigating factors. General Statutes § 53a-46a (e). The requirement that the sentencer's determination be made by setting forth its findings regarding aggravating and mitigating factors merely guides the sentencer's discretion to achieve a more focused and rational response. *Boyde* v. *California*, [494 U.S. 370, 377, 110 S. Ct. 1190, 108 L. Ed. 2d 316 (1990)]; *Blystone* v. *Pennsylvania*, supra, 494 U.S. 304–305.

"The sentencer makes the required moral and individualized determination, under our statute, because it must consider a nonexclusive list of mitigating factors as well as a catchall category consisting of any other

'mitigating factor concerning the defendant's character, background and history, or the nature and circumstances of the crime.' General Statutes § 53a-46a (b); and see [General Statutes] § 53a-46a (f). The catchall category of mitigating factors includes those factors 'which, in fairness and mercy, may be considered as tending either to extenuate or reduce the degree of [the defendant's] culpability or blame for the offense or to otherwise constitute a basis for a sentence less than death.' General Statutes § 53a-46a (d). The ability to consider an unrestricted set of mitigating factors satisfies federal constitutional requirements for a moral and individualized decision. *Blystone* v. *Pennsylvania*, supra, 494 U.S. 305.

"Furthermore, it is evident that the capital sentencer, either a jury or the court, in making its determination regarding the existence of aggravating and mitigating factors during the separate sentencing hearing is aware that its 'task [is] the serious one of determining whether a specific human being should die at the hands of the State.' *Caldwell* v. *Mississippi*, supra, 472 U.S. 329. Finally, the death sentence is mandatorily imposed only after the capital sentencer has determined unanimously that at least one aggravating factor exists and no mitigating factors exist, and has come to this unanimous determination by engaging in a full, individualized consideration as to whether death is the appropriate penalty for each defendant. *Blystone* v. *Pennsylvania*, supra, 494 U.S. 303–305.

"We conclude, therefore, that our capital sentencing statutes, on their face, give the capital sentencer, either a jury or the court, the proper amount of guided discretion to make the appropriate determination regarding the individual defendant with regard to the defendant's specific crime. Because the statutes are not impermissibly mandatory, they comply with the eighth and the

fourteenth amendments to the United States constitution." *State* v. *Ross*, supra, 230 Conn. 240–41.

## O
### The Panel's Verdict Regarding Mitigation

The defendant filed a proposed list of fifteen mitigating factors. The first two were statutory mitigating factors provided by General Statutes (Rev. to 1989) § 53a-46a (g).[92] The other thirteen were nonstatutory mitigating factors,[93] as permitted by General Statutes (Rev. to 1989) § 53a-46a (d).[94]

[92] The statutory mitigating factors contained in General Statutes (Rev. to 1989) § 53a-46a (g), were as follows: "That at the time of the offense (1) [the defendant] was under the age of eighteen or (2) his mental capacity was significantly impaired or his ability to conform his conduct to the requirements of law was significantly impaired but not so impaired in either case as to constitute a defense to prosecution or (3) he was under unusual and substantial duress, although not such duress as to constitute a defense to prosecution or (4) he was criminally liable under sections 53a-8, 53a-9 and 53a-10 for the offense, which was committed by another, but his participation in such offense was relatively minor, although not so minor as to constitute a defense to prosecution or (5) he could not reasonably have foreseen that his conduct in the course of commission of the offense of which he was convicted would cause, or would create a grave risk of causing, death to another person."

[93] The thirteen nonstatutory mitigating factors were as follows: "3. The defendant committed the offense under the influence of an emotional disturbance. 4. The defendant suffers from a mental disorder, i.e., Mixed Personality Disorder. 5. The defendant is the father of a four year old son. 6. The defendant served his country as a member of the United States Army. 7. The defendant has a history of steady and reliable employment. 8. The defendant graduated from high school and was a contributing member of his class. 9. The defendant has been adversely affected by problems of racial identity. 10. The defendant has a family that cares about him and that will provide him with emotional support while incarcerated. 11. The defendant has many positive qualities that are recognized by others. 12. The defendant confessed to the crime. 13. The defendant has adjusted well to incarceration and is adaptable to life imprisonment. 14. Based upon all the mitigating evidence, life imprisonment without the possibility of release is the appropriate sentence in this case. 15. Mercy."

[94] General Statutes (Rev. to 1989) § 53a-46a (d) provides: "In determining whether a mitigating factor exists concerning the defendant's character, background or history, or the nature and circumstances of the crime, pursuant to subsection (b) of this section, the jury or, if there is no jury, the court

In its special verdict, the panel first made explicit findings rejecting the statutory mitigating factors.[95] It then specifically addressed and rejected the claimed nonstatutory mitigating factors. The panel stated: "Further, we find that the defendant has not proven by a fair preponderance of the evidence that the defendant was under the influence of emotional disturbance at the time of the offense, or that he suffered or suffers from a mental disorder.

"We have considered all of the defendant's list of proposed mitigating factors submitted on August 5, 1991, and all evidence that was presented to us in mitigation.

"Considering all of the facts and circumstances of this case, we do not find the defendant has proven by a fair preponderance of the evidence any factor that can be considered as mitigating."

The defendant claims that the panel, in the part of its special verdict rejecting the nonstatutory mitigating factors, improperly "required [the] defendant not only to prove the factual basis of claimed nonstatutory mitigating factors, but also to prove that they were mitigating in nature." The defendant contends that whether

shall first determine whether a particular factor concerning the defendant's character, background or history, or the nature and circumstances of the crime, has been established by the evidence, and shall determine further whether that factor is mitigating in nature, considering all the facts and circumstances of the case. Mitigating factors are such as do not constitute a defense or excuse for the capital felony of which the defendant has been convicted, but which, in fairness and mercy, may be considered as tending either to extenuate or reduce the degree of his culpability or blame for the offense or to otherwise constitute a basis for a sentence less than death."

[95] In this regard, the panel stated: "With respect to the mitigating factors set forth in § 53a-46a (g), we find that the defendant has not proven by a fair preponderance of the evidence that at the time of the murder of [the victim], the [defendant's] . . . mental capacity was significantly impaired, nor his ability to conform his conduct to the requirements of law was significantly impaired."

"a fact or set of facts is mitigating in nature is a matter of judgment, not of fact, and thus not susceptible of proof." Thus, the defendant argues, requiring a capital felony defendant "to prove by a *quantitative* standard, i.e., by a preponderance of evidence, that a certain set of facts are mitigating in nature" could lead the sentencer to impose the death penalty "without that sentencer ever engaging in what is constitutionally required, that is, the exercise of his or her independent moral judgment as to whether a certain set of facts is mitigating or not and thus as [to] whether the death penalty is appropriate or not." (Emphasis in original.)

The defendant also contends that "if a preponderance burden is placed on the mitigating judgment, then, contrary to this court's decision in [*State* v. *Ross*, supra, 230 Conn. 253–54 n.33], equipoise on that judgment by the capital sentencer in a particular case will result in an automatic death sentence, by default. This is constitutionally unacceptable." Consequently, the defendant argues, we "should clarify that the capital defendant's burden of proof regarding mitigating factors applies to *factual* determinations *only* and *not to* the mitigating *judgment* that must be made by the sentencers with regard to nonstatutory mitigating factors. The court should then declare that the . . . panel here erred and order a new penalty hearing." (Emphasis in original.) We are not persuaded. We conclude, contrary to the defendant's claim, that the defendant's burden of persuasion on a nonstatutory mitigating factor, namely, by a preponderance of the evidence, extends not only to the underlying factual basis of the factor, but also to the determination that the factor is mitigating in nature.

It is important to note what the defendant does not claim. He does not claim that there is anything either unconstitutional or statutorily improper about requiring

him to prove the underlying factual basis of any nonstatutory mitigating factor by a preponderance of the evidence. His claim, rather, is that the sentencer's consideration of such a factor must be bifurcated: the defendant must establish the underlying factual basis by a preponderance of the evidence; the *mitigating nature* of any such factor, however, may *not* be subject to *any* identifiable burden of persuasion because, in his view, it is solely a matter of judgment about the appropriateness of the death penalty. Thus, with respect to the mitigating nature of any nonstatutory mitigating factor, the defendant contends, the sentencer is simply to apply its reasoned moral judgment, without consideration of any burden of persuasion.

We first note our agreement with the defendant's understanding of the panel's special verdict. With respect to any claimed nonstatutory mitigating factor, the panel determined either that the defendant: (1) had not established its underlying factual basis; or (2) had not established that it was mitigating in nature. For example, in determining that the defendant had not proven by a preponderance of the evidence that he suffered from a mental disorder, the panel necessarily found that he had not established the underlying factual basis of that assertion. In rejecting the claimed mitigating factor that the defendant was the father of a four year old boy, however, which factually was not disputed, the panel implicitly determined that this fact was not mitigating in nature.

We reject the defendant's contention that the purported impropriety in the panel's verdict is constitutional in nature.[96] It is well established that there is no

---

[96] In this connection, we also note, as the defendant concedes, that this claim was not made in the trial court and, therefore, he cannot prevail on it on appeal because of its nonconstitutional nature. *State* v. *Golding*, supra, 213 Conn. 240–41. In the exercise of our supervisory power, however, we accept the invitation of both the defendant and the state to rule on the merits of the defendant's claim in order to clarify the nature of the defendant's burden of persuasion on nonstatutory mitigating factors.

constitutional impediment to imposing the burden on a defendant to prove the existence of a mitigating factor by a preponderance of the evidence. *Walton* v. *Arizona*, supra, 497 U.S. 649–52; *State* v. *Ross*, supra, 230 Conn. 241. Contrary to the suggestion of the defendant, there is nothing in that jurisprudence to indicate that the same burden of persuasion does not apply with regard to establishing both the underlying factual basis of a mitigating factor and its mitigating nature. Therefore, the fact that the defendant was required to establish, not only the factual basis of any claimed mitigating factor, but also that it was mitigating in nature, raises no colorable constitutional claim.

Having concluded that there is no constitutional basis for the defendant's claim, we therefore turn to the only other arguable basis for the claim, namely, the statute. We conclude that the panel's special verdict regarding the nonstatutory mitigating factors complied with § 53a-46a.

The defendant's claim presents a question of statutory interpretation. "The process of statutory interpretation involves a reasoned search for the intention of the legislature. *Frillici* v. *Westport*, 231 Conn. 418, 431, 650 A.2d 557 (1994). In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of this case, including the question of whether the language actually does apply. In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Internal quotation marks omitted.) *United Illuminating Co.* v. *New Haven*, 240 Conn. 422, 431, 692 A.2d 742 (1997).

The language of § 53a-46a strongly supports the conclusion that, in determining whether the defendant has established a nonstatutory mitigating factor, his burden of persuasion is not confined to establishing the underlying factual basis of the factor, but applies *equally* to his burden of persuading the sentencer of the mitigating nature of the factor. General Statutes (Rev. to 1989) § 53a-46a (b) provides in relevant part: "For the purpose of determining the sentence to be imposed when a defendant is convicted of or pleads guilty to a capital felony, the judge or judges who presided at the trial or before whom the guilty plea was entered shall conduct a separate hearing to determine the existence of any mitigating factor concerning the defendant's character, background and history, or the nature and circumstances of the crime, including any mitigating factor set forth in subsection (g) . . . ."[97] General Statutes (Rev. to 1989) § 53a-46a (c) then provides: "The burden of establishing any mitigating factor shall be on the defendant."[98] Thus, the language of § 53a-46a (b) indicates that it applies to mitigating factors in general. There is nothing in the language of § 53a-46a (c) to suggest a bifurcation of the burden of persuasion between the underlying factual basis and the mitigating nature of any such mitigating factor.

Indeed, the language of the very next subsection of the statute also strongly suggests that the burden of persuasion applies both to the underlying factual basis and to the mitigating nature of the mitigating factor. Section 53a-46a (d) specifically provides for a two step process of determining whether such a factor has been

[97] Section 53a-46a (g) sets forth the so-called statutory mitigating factors. See footnote 92 of this opinion.

[98] As stated previously, we have held that this burden of persuasion is by a preponderance of the evidence. *State* v. *Ross*, supra, 230 Conn. 241; *State* v. *Daniels*, 207 Conn. 374, 385, 542 A.2d 306, following remand, 209 Conn. 225, 550 A.2d 885 (1988), cert. denied, 489 U.S. 1069, 109 S. Ct. 1349, 103 L. Ed. 2d 817 (1989).

established. "*In determining whether a mitigating factor exists* concerning the defendant's character, background or history, or the nature and circumstances of the crime, pursuant to subsection (b) of this section, [the sentencer, whether the court or the jury] shall *first determine* whether a particular factor concerning the defendant's character, background or history, or the nature and circumstances of the crime, *has been established by the evidence,* and *shall determine further* whether that factor *is mitigating in nature,* considering all the facts and circumstances of the case. Mitigating factors are such as do not constitute a defense or excuse for the capital felony of which the defendant has been convicted, but which, in fairness and mercy, may be considered as tending either to extenuate or reduce the degree of his culpability or blame for the offense or to otherwise constitute a basis for a sentence less than death." (Emphasis added.) General Statutes (Rev. to 1989) § 53a-46a (d). The requirements that the sentencer "first determine" whether a mitigating factor "has been established by the evidence," and then "determine further" whether that factor "is mitigating in nature," refer back to the burden of persuasion specified in subsection (c) of § 53a-46a. Thus, there is nothing in any of this language to indicate a legislative intention to bifurcate the defendant's burden of persuasion between these two parts of the sentencer's determination.

In addition, as the state correctly argues, in determining whether a set of facts is mitigating in nature, the sentencer is to view those facts through the lens of "fairness and mercy . . . ." General Statutes (Rev. to 1989) § 53a-46a (d). At that point, however, the defendant already has been convicted of a capital felony that the sentencer has determined was accompanied by an aggravating factor. Thus, it is consistent with that scenario for the legislature to impose on the defendant the

burden of persuasion regarding, not only the underlying factual basis of the claimed nonstatutory mitigating factor, but its mitigating nature as well. Furthermore, the language of General Statutes (Rev. to 1989) § 53a-46a (e) provides that "[t]he jury or, if there is no jury, the court shall return a special verdict setting forth its findings *as to the existence of any aggravating or mitigating* factor." (Emphasis added.) This language demonstrates that "the existence" of a mitigating factor is determined according to the burden of persuasion specified in subsection (c) of § 53a-46a.

The genealogy of the statutory provisions regarding the proof of a mitigating factor also indicates the legislative intent that the burden of persuasion applies to both elements of mitigation. Before 1985, General Statutes (Rev. to 1983) § 53a-46a (c) provided only that: "The burden of establishing any mitigating factor shall be on the defendant." At that time, there was no statutory provision specifying the nature of a mitigating factor, or the steps which the sentencer should take in determining the existence of such a factor. We held, however, that although the statute did not specify the precise measure of that burden of persuasion, "[a]nalogous principles of criminal law persuade us that . . . the defendant [was required] to establish the existence of a mitigating factor by a preponderance of the evidence." *State* v. *Daniels*, 207 Conn. 374, 385, 542 A.2d 306, following remand, 209 Conn. 225, 550 A.2d 885 (1988), cert. denied, 489 U.S. 1069, 109 S. Ct. 1349, 103 L. Ed. 2d 817 (1989).

In 1985, by Public Acts 1985, No. 85-366, § 1, the legislature enacted what is now § 53a-46a (d). That provision specified, among other things, the two step process regarding the existence of a mitigating factor, namely, that the fact finder determine whether a particular factor "has been established by the evidence," and next, "whether that factor is mitigating in nature . . . ."

Moreover, Public Acts 1985, No. 85-366 defined the nature of a mitigating factor, namely, that it is "such as do[es] not constitute a defense or excuse for the capital felony of which the defendant has been convicted, but which, in fairness and mercy, may be considered as tending either to extenuate or reduce the degree of his culpability or blame for the offense or to otherwise constitute a basis for a sentence less than death." The fact that the legislature inserted this definition of a mitigating factor, for which it already had placed the burden of persuasion on the defendant, without specifying that a different burden applied to establishing either the factual predicate of a factor or that it is mitigating in nature, further supports our conclusion that the burden of persuasion applies to both parts of the factor.

The legislative history of our death penalty statutes also buttresses this interpretation. If there had been a legislative intention to impose a bifurcated burden of persuasion, despite the clear legislative language indicating no such bifurcation, we would expect to see such an intention expressed in the legislative history. We have examined fully the relevant legislative history, and find no such indication. See 28 S. Proc., Pt. 10, 1985 Sess., pp. 3470–75; 28 H.R. Proc., Pt. 17, 1985 Sess., pp. 6111–17; Conn. Joint Standing Committee Hearings, Judiciary, Pt. 5, 1985 Sess., pp. 1386, 1408–23, 1446, 1471–72, 1476–86, 1491, 1493–94, 1500–12.

Finally, our precedents support the conclusion that the statutorily defined burden of persuasion applies to both elements of mitigation. In *State* v. *Daniels*, supra, 207 Conn. 385, we held that the defendant's burden of persuasion on a mitigating factor was the preponderance of the evidence. While acknowledging that the then newly enacted § 53a-46a (d) provided "a useful definition of mitigating factors"; id., 386 n.10; we did not suggest that there was any bifurcation of that burden.

Thereafter, in *Breton II*, we read § 53a-46a (d), consistently with its clear language, to require the defendant to "convince the jury not only of the facts underlying an alleged nonstatutory mitigating factor, but also that the factor 'is mitigating in nature, considering all the facts and circumstances of the case,' such that 'in fairness and mercy, [it] may be considered as tending either to extenuate or reduce the degree of his culpability or blame for the offense or to otherwise constitute a basis for a sentence less than death.' General Statutes § 53a-46a (d)." *Breton II*, supra, 235 Conn. 229; see also *State* v. *Ross*, supra, 230 Conn. 255 (defendant has " 'burden of showing why he should receive leniency' ").

It is true, as the defendant suggests, that the question of whether a nonstatutory mitigating factor, if established factually, is mitigating in nature involves the exercise of the reasoned moral judgment of the sentencer. That does not mean, however, as the defendant also suggests, that a burden of persuasion may play no useful role in that exercise of judgment. One of the functions of a burden of persuasion is to indicate the degree of certitude that the fact finder must have in order to find in favor of the party with the burden. *Addington* v. *Texas*, 441 U.S. 418, 423, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979). Thus, rather than leave the sentencer bewildered regarding the degree of certitude that it must have in order to find a mitigating factor, the statute gives the sentencer guidance.

It is also true, as the defendant contends, that in *State* v. *Webb*, supra, 238 Conn. 506, we concluded that in performing our appellate responsibility of proportionality review under § 53a-46b (b) (3), "we must perform proportionality review under the statute irrespective of any allocation of [a burden of persuasion], examining the appropriate relevant material and arriving at our best judgment, based on that material and the applicable legal principles." We are not convinced, however,

that § 53a-46a and § 53a-46b require us to disregard the burden of persuasion. First, the proportionality review statute is silent with respect to the allocation of a burden of persuasion; id., 505; whereas the mitigation statute clearly places such a burden on the defendant. Second, the appellate task of proportionality review is more like determining a question of law than making a finding of fact. The determination of whether a mitigating factor has been established, however, although also a matter of judgment, is ultimately a question of fact, "which is the traditional function to which burdens of persuasion are applicable." Id., 507.

P

The Purported Use of the Defendant's Motion
to Suppress his Confession

The defendant next claims that the death sentence improperly was imposed because the panel impermissibly used against him the fact that he had moved to suppress his confession.[99] Specifically, the defendant contends that the panel improperly took into consideration "the filing of motions to suppress by his trial counsel, purportedly to rebut [the] defendant's claim of mitigation based on his confession to the police and his cooperation with the police." This claim is without merit.

This claim rests solely on the following factual premise. *Prior* to the penalty hearing, the defendant moved to dismiss the penalty hearing and to sentence him to life imprisonment without the possibility of release, on the following two closely related grounds, both based

---

[99] Neither this claim, nor those claims considered in subparts Q through AA of part V of this opinion, were raised in the trial court. Although the defendant argues that these claims merit review under the *Golding* doctrine; *State* v. *Golding*, supra, 213 Conn. 239–40; we choose to review these claims pursuant to our supervisory power, and thus, except where otherwise specified, we express no opinion as to whether they are reviewable under the first two *Golding* requirements.

on the state's evidence during the guilt phase: "(1) . . . the court could not reasonably fail to find that a mitigating factor exists; [and] (2) [i]t would be a proper exercise of [its] discretion for the court to dismiss the penalty hearing on the basis of evidence presented by the state during the course of the trial." In support of this motion, the defendant argued that, among other things, he "assisted the police in their investigation of the crime and confessed to the crime."

Thereafter, one member of the panel, Judge Barnett, engaged in a colloquy with the defendant's counsel in which Judge Barnett questioned the strength of that argument by pointing out that the defendant also had moved to suppress his confession. The defendant's counsel countered by contending that (1) it was the defendant's counsel's decision to move to suppress, for which the defendant should not be penalized, (2) by cooperating and confessing, and by not presenting a defense in the guilt phase, the defendant "did the functional equivalent of pleading guilty," and (3) "the court also can conclude that confessing is an indication of remorse . . . and it is an indication of repentance; and I submit that on the basis of that life without possibility of release is the appropriate sentence in this case [and] not a sentence of death." Immediately thereafter, the state argued against the defendant's motion. The court initially reserved decision on the motion, and subsequently denied it without comment. During the penalty phase itself, including the panel's imposition of the death penalty, the fact of the defendant's motion to suppress the confession was not discussed on the record by any member of the panel.

The short answer to the defendant's claim is that this record does not support his assertion that in imposing the death penalty, the panel considered and held against him, in connection with his proposed mitigant of his confession, the fact that he had moved to suppress the

confession. The colloquy engaged in by one of three panel members with the defendant's counsel, during argument on the defendant's motion prior to the penalty hearing, is an inadequate basis for such an assertion. We need not consider, therefore, the defendant's legal contention that it was improper for the panel to have considered and held against the defendant the fact that he had moved to suppress his confession because there is no indication that it did so.

## Q
### The Purported Misapplication of the Concept of Mitigation

The defendant claims that the panel "either misapplied or misunderstood the concept of mitigation." More specifically, the defendant argues in his brief that when the panel stated, "we do not find [that] the defendant has proven by a fair preponderance of the evidence any factor that *can be considered as* mitigating"; (emphasis in original); this "statement by the . . . panel does not say that the panel had determined that what [the] defendant had proven was not mitigating, rather the statement says that whatever [the] defendant had proven could not even be *considered* as mitigating." (Emphasis in original.) This argument rests on an utter misreading of the panel's special verdict.

The panel stated more than what the defendant selectively has quoted. After specifically finding that the defendant had not proven the factual basis of two of his claimed nonstatutory mitigating factors, namely, that he was under the influence of emotional disturbance and that he suffered from a mental disorder, the panel stated: "We have considered all of the defendant's list of proposed mitigating factors submitted on August 5, 1991, and all evidence that was presented to us in mitigation.

"Considering all of the facts and circumstances of this case, we do not find the defendant has proven by a fair preponderance of the evidence any factor that can be considered as mitigating."

It is clear from this special verdict that, contrary to the defendant's contention, the panel understood and properly applied the concept of mitigation as provided by § 53a-46a (d). The panel considered all of the defendant's claimed mitigating factors, and all of the evidence presented in mitigation. With respect to each factor, the panel first determined whether it was established by the evidence, and then whether it was mitigating in nature. The only plausible reading of the special verdict is that, as to each, the panel decided either that its factual basis had not been established or that, given the establishment of its factual basis, it was not mitigating in nature.

### R
### The Purported Failure to Consider Certain Nonstatutory Mitigating Factors

The defendant next claims that the panel failed to consider what he claims to be a nonstatutory mitigating factor, namely, a "moderate impairment" of his mental capacity and of his capacity to conform to the requirements of the law. We reject this claim.

The state agrees with the defendant, as do we, that if the defendant proves the *statutory* mitigating factor that "his mental capacity was significantly impaired or his ability to conform his conduct to the requirements of law was significantly impaired but not so impaired in either case as to constitute a defense to prosecution"; General Statutes (Rev. to 1989) § 53a-46a (g) (2); he must be sentenced to life without the possibility of release. The state also agrees with the defendant, as do we, that if a defendant fails to prove a significant impairment, the sentencer may consider any lesser

degree of impairment as a nonstatutory mitigating factor. As we read the record, however, contrary to the defendant's reading, the panel did exactly what the defendant claims it failed to do.

The defendant, in his list of proposed mitigating factors, listed four factors that involved his mental state— two statutory, and two nonstatutory. The two statutory factors were: "1. At the time of the offense, the defendant's mental capacity was *significantly* impaired"; and "2. At the time of the offense, the defendant's ability to conform his conduct to the requirements of the law was *significantly* impaired." (Emphasis added.) See General Statutes (Rev. to 1989) § 53a-46a (g) (2). The two nonstatutory factors were: "3. The defendant committed the offense under the influence of an emotional disturbance"; and "4. The defendant suffers from a mental disorder, i.e., Mixed Personality Disorder." These two nonstatutory mental impairment mitigating factors can be read only as the functional equivalent of what the defendant now characterizes as a "moderate," rather than a "significant," impairment of his mental capacity.

The panel, in its special verdict, specifically addressed and rejected the factual basis of each of the four mental impairment factors, finding that the defendant had not established by a preponderance of the evidence either that (1) his mental capacity or his ability to conform his conduct to the requirements of the law was significantly impaired, or (2) he was under the influence of emotional disturbance or suffered from a mental disorder. The panel then stated that after having "considered all of the defendant's list of proposed mitigating factors . . . all evidence that was presented to [it] in mitigation . . . [and] all of the facts and circumstances of this case, [it did] not find the defendant [had] proven by a fair preponderance of the evidence any factor that can be considered as mitigating."

The defendant did not claim that the panel had not considered anything that was relevant to mitigation. Moreover, the defendant did not at any time argue to the panel that in considering whether the statutory mental impairment mitigating factors that he had proposed had been established, the panel was required by law to consider some lesser level of mental impairment *other than* the two proposed mental impairment mitigating factors that he had listed immediately after his two proposed statutory mental state mitigating factors.

It is clear from this trial record, therefore, that the defendant considered that his two nonstatutory mental state mitigating factors constituted a lesser degree of mental impairment than were stated in his two statutory mental state mitigating factors, and that he urged the panel to find that those two nonstatutory factors existed. It is also clear that the panel considered those two nonstatutory factors, and all of the evidence relevant to the defendant's claimed mental impairment, and found that the defendant had not established the necessary underlying factual bases. Thus, the panel considered and found that the defendant had not established by a preponderance of the evidence that he suffered from a lesser degree of mental impairment than was required by the statutory mitigating factor. Having reached that factual determination, the panel was not required to go further.

The defendant's reliance on *Hitchcock* v. *Dugger*, 481 U.S. 393, 107 S. Ct. 1821, 95 L. Ed. 2d 347 (1987), is unavailing. In that case, the United States Supreme Court reversed the death penalty because the trial court had refused to permit the advisory jury, and had itself as the sentencer refused, to consider "evidence of nonstatutory mitigating circumstances, and . . . the proceedings therefore did not comport with the requirements of *Skipper* v. *South Carolina*, 476 U.S. 1 [106 S. Ct. 1669, 90 L. Ed. 2d 1] (1986), *Eddings* v.

*Oklahoma,* 455 U.S. 104 [102 S. Ct. 869, 71 L. Ed. 2d 1] (1982), and *Lockett* v. *Ohio,* 438 U.S. 586 [98 S. Ct. 2954, 57 L. Ed. 2d 973] (1978) (plurality opinion)." *Hitchcock* v. *Dugger,* supra, 398–99. Those cases require that a capital felony defendant be "permitted to present any and all relevant mitigating evidence that is available." *Skipper* v. *South Carolina,* supra, 8. In the present case, the defendant was not precluded from presenting any nonstatutory mitigating evidence, and the panel did not refuse to consider any such evidence. On the contrary, the panel considered all of the defendant's claimed nonstatutory mitigants and whether the defendant had established a lesser degree of mental impairment than required under the statutory mitigants. Moreover, the panel specifically noted that it had considered *all* of the evidence regarding mitigation and *all* of the facts and circumstances of the case.

S

### The Purported Failure to Consider the "Catchall" Mitigating Factor

The defendant's next claim is that the special verdict is flawed because the panel did not consider "whether the defense's proffered mitigating information contained any mitigating factor other than those specifically claimed by the defense and/or whether there was anything in the case other than what was contained in the defense's proffer of mitigating information." (Emphasis added.) Specifically, the defendant contends that the panel did not consider the so-called "catchall" mitigating factor "consisting of any other 'mitigating factor concerning the defendant's character, background and history, or the nature and circumstances of the crime.' General Statutes § 53a-46a (b); and see [General Statutes] § 53a-46a (f)." *State* v. *Ross,* supra, 230 Conn. 240. We disagree.

"The catchall category of mitigating factors includes those factors which, in fairness and mercy, may be

considered as tending either to extenuate or reduce the degree of [the defendant's] culpability or blame for the offense or to otherwise constitute a basis for a sentence less than death. General Statutes § 53a-46a (d). The ability to consider an unrestricted set of mitigating factors satisfies federal constitutional requirements for a moral and individualized decision. *Blystone* v. *Pennsylvania*, supra, 494 U.S. 305." (Internal quotation marks omitted.) *State* v. *Ross*, supra, 230 Conn. 240.

The record unequivocally establishes that the defendant requested the panel to consider, and that the panel did consider, the catchall category of mitigants. The defendant's proposed list of mitigating factors requested "the court to deliberate as to the existence of each of the following mitigating factors, *as well as any other mitigating factor suggested by the evidence concerning the background, character or history of the defendant or the nature and circumstances of the offense* . . . ." (Emphasis added.) This introduction was followed by a list of fifteen factors, the last two of which were: "14. Based upon all the mitigating evidence, life imprisonment without the possibility of release is the appropriate sentence in this case. 15. Mercy." The defendant then orally argued to the panel that number fourteen meant that the panel was "not limited to the mitigating factors proposed on the defendant's list. Anything suggested by the evidence can be a mitigating factor, if you so determine." The defendant also contended to the panel that it could base the finding of a mitigating factor on "the totality of the evidence presented concerning [the defendant's] background . . . ."

As noted, the panel, in rendering its special verdict, stated that it had "considered all of the defendant's list of proposed mitigating factors submitted on August 5, 1991 . . . ." This consideration necessarily included "any other mitigating factor suggested by the evidence

concerning the background, character or history of the defendant or the nature and circumstances of the offense," which is the catchall category. It also necessarily included numbers fourteen and fifteen, which in their generality reasonably can be viewed only as the equivalent of the catchall category. Finally, the panel stated that it had considered *"all evidence that was presented to us in mitigation."* (Emphasis added.) Thus, the panel did not consider itself to be confined to the fifteen specified mitigants in a way that excluded its consideration of the catchall category. To the contrary, the panel considered the catchall category, as presented through the defendant's list of proposed mitigants, and as presented through all the "evidence that was presented . . . in mitigation."

T

## The Purported Failure to Consider Mercy or Appropriateness of the Death Penalty

The defendant claims that his death sentence is flawed because the panel's "penalty verdict fails to show, as required, that the . . . panel considered the application of mercy or the inappropriateness of the death sentence as separate, independent mitigating factors." Recognizing, as he must, that his own list of proposed mitigating factors included both mercy and the inappropriateness of the death penalty; see part V S of this opinion; and that the panel specifically rejected all of the listed factors, the defendant argues that because "mercy and the inappropriateness of the death penalty are matters which are subject to the exercise of sentencing *judgment*, not the exercise of quantitative *proof* . . . neither of these factors is subject to being proven or not proven." (Emphasis in original.) Therefore, the defendant contends, the "panel's assertion that [the] defendant had not proven 'any factor' by a preponderance of the evidence means that the . . . panel did not consider either mercy or the inappropriateness of

the death sentence as independent mitigating factors
. . . ." We reject this claim.

This claim rests on the same flawed premise that underlay the defendant's previous claim that whether a set of facts is mitigating in nature is a matter of judgment, not of fact, and is therefore not susceptible of proof by any burden of persuasion. We rejected that premise before; see part V O of this opinion; and we do so here for the same reasons. Therefore, we conclude that the panel did consider, under the applicable and appropriate statutory burden of persuasion, the defendant's claims that mercy or the inappropriateness of the death penalty should preclude a sentence of death in the present case.[100]

## U
### The Purported Failure to Consider the Severity of the Aggravating Factor

The defendant's next challenge to the panel's special verdict is that it failed "to show that the . . . panel considered as a mitigating factor whether the aggravating factor found was insufficient to warrant the death penalty." More specifically, the defendant argues that "the capital sentencers must be able to articulate their determination that death is not appropriate for a specific individual, even where no other mitigation exists, based on the determination by the sentencers in that specific case that the aggravating factor found is not sufficient to warrant or justify the death penalty. The sentencer can only do this by concluding that death is inappropriate in that case and for that defendant and then report this conclusion through the finding of a

[100] Consequently, it is not necessary to consider the state's claim that, under our statutory sentencing scheme, although the sentencer must view the various mitigating factors through a lens of "fairness and mercy"; General Statutes (Rev. to 1989) § 53a-46a (d); mercy and the appropriateness of the death penalty do not constitute separate mitigating factors.

mitigating factor on that basis." Thus, the defendant's contention is that the sentencer, having found a statutorily defined aggravating factor, must then make an *additional* finding, namely, that the aggravating factor found warrants the death penalty. According to the defendant, if that finding is not or cannot be made, the sentencer is required to find that a mitigating factor exists, namely, that the aggravating factor found is not sufficient to warrant the death penalty in the particular case. Because the panel did not make such an additional finding in the present case, the defendant contends that its special verdict imposing the death penalty was flawed and must be reversed. We disagree.

As a matter of the meaning of our statutory capital sentencing scheme, the defendant's contention is simply incorrect. "In General Statutes §§ 53a-46a through 53a-46c, the legislature has established a three-tiered pyramid, in which each tier narrows the class of defendants that may be found eligible for the death penalty. At the first tier above the base of the pyramid, our statute separates capital felony homicides from other homicides, and authorizes bifurcated death penalty hearings only for those who have been found guilty of or have pleaded guilty to a capital felony. General Statutes § 53a-46a (b). At the second tier, the statute further limits the death penalty by requiring the sentencer to find, beyond a reasonable doubt, the existence of at least one statutorily delineated aggravating factor. General Statutes § 53a-46a (b), (e), (f) and (h); *State* v. *Daniels*, [supra, 207 Conn. 384]. At the third and final tier, our statute separates, from all cases in which a penalty of death may be imposed, those cases in which it shall be imposed; *Zant* v. *Stephens*, [462 U.S. 862, 871, 103 S. Ct. 2733, 77 L. Ed. 2d 235 (1983)]; by requiring a sentencer to find, by a preponderance of the evidence, whether a mitigating factor exists. General Statutes § 53a-46a (e). In making this determination, the capital

sentencer must consider the existence of each of the mitigating factors listed in the statute at § 53a-46a (g) and of any other mitigating factor concerning the defendant's character, background and history, or the nature and circumstances of the crime. General Statutes § 53a-46a (b). *If the sentencer fails to find the existence of a mitigating factor, after having found the existence of an aggravating factor, the court must sentence the defendant to death.* General Statutes § 53a-46a (f). Otherwise, the court must impose a sentence of life imprisonment without possibility of release." (Emphasis added; internal quotation marks omitted.) *State* v. *Ross*, supra, 230 Conn. 236–38.

"In their overall configuration, our death penalty statutes facially satisfy the constitutional requirements of the eighth and fourteenth amendments to the United States constitution. The multitiered pyramid meets the prerequisite of consistency and reliability by guiding the capital sentencer's discretion with clear and objective standards that narrow the class of defendants eligible for the death penalty and by providing a meaningful basis for distinguishing between those cases in which the death penalty is imposed and those in which it is not. The third tier in the pyramid meets the individualization prerequisite by requiring the sentencer to consider any relevant mitigating information so as to enable the sentencer to make the reasoned moral judgment that death is the appropriate punishment in a particular case. See *Walton* v. *Arizona*, supra, 497 U.S. 647–49; *Boyde* v. *California*, supra, 494 U.S. 373–78; *Blystone* v. *Pennsylvania*, supra, 494 U.S. 305; *Zant* v. *Stephens*, supra, 462 U.S. 879; *Eddings* v. *Oklahoma*, supra, 455 U.S. 110–12; *Lockett* v. *Ohio*, supra, 438 U.S. 601–605; *Gregg* v. *Georgia*, [428 U.S. 153, 189, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976)]. Notably, because our statute does not permit the weighing of aggravating and mitigating factors but permits the death sentence to be imposed only if no

mitigating circumstances are found; General Statutes § 53a-46a (e) and (f); it is more stringent than the Pennsylvania sentencing statute that was found constitutional in *Blystone* v. *Pennsylvania,* supra, 299. Furthermore, because our statute mandates this court's review of the relevant factual findings and scrutiny of the record to assure that the death penalty was not the product of passion, prejudice or any other arbitrary factor; General Statutes § 53a-46b (b) (1); it satisfies the constitutional requirement of meaningful appellate review. *Gregg* v. *Georgia,* supra, 198, 207." (Internal quotation marks omitted.) *State* v. *Ross,* supra, 230 Conn. 238–39.

Thus, contrary to the defendant's contention, under our statute, once the sentencer has found an aggravating factor proven beyond a reasonable doubt, there is no requirement that it go further and make an additional determination that the presence of that factor justifies the imposition of the death penalty. In effect, the legislature has stated that as a matter of fundamental policy, the presence of such a factor requires the imposition of that penalty unless a mitigating factor is found. "If the sentencer fails to find the existence of a mitigating factor, after having found the existence of an aggravating factor, the court must sentence the defendant to death." Id., 237–38; see also id., 241 ("the death sentence is mandatorily imposed only after the capital sentencer has determined unanimously that at least one aggravating factor exists and no mitigating factors exist, and has come to this unanimous determination by engaging in a full, individualized consideration as to whether death is the appropriate penalty for each defendant").

The requirement that the sentencer make a reasoned moral and individualized determination regarding whether the death penalty should be imposed in a given case is satisfied by the statutory role played by the mitigating factors. "The United States Supreme Court

has stated that the capital sentencer must make a reasoned moral and individualized determination based on the defendant's background, character and crime that death is the appropriate punishment. *Penry* v. *Lynaugh*, supra, 492 U.S. 319; *Caldwell* v. *Mississippi*, supra, 472 U.S. 330–32; see also *Saffle* v. *Parks*, supra, 494 U.S. 492–93; *California* v. *Brown*, supra, 479 U.S. 541, 543. Our death penalty statutes fulfill this requirement." *State* v. *Ross*, supra, 230 Conn. 240.

"Under § 53a-46a (b), the capital sentencer is either a jury or the court. The sentencer determines whether the defendant, who has been convicted of a capital felony, should receive the punishment of death by making findings regarding the existence of any aggravating or mitigating factors. General Statutes § 53a-46a (e). The requirement that the sentencer's determination be made by setting forth its findings regarding aggravating and mitigating factors merely guides the sentencer's discretion to achieve a more focused and rational response. *Boyde* v. *California*, supra, 494 U.S. 377; *Blystone* v. *Pennsylvania*, supra, 494 U.S. 304–305.

*"The sentencer makes the required moral and individualized determination, under our statute, because it must consider a nonexclusive list of mitigating factors as well as a catchall category consisting of any other mitigating factor concerning the defendant's character, background and history, or the nature and circumstances of the crime.* General Statutes § 53a-46a (b); and see [General Statutes] § 53a-46a (f). The catchall category of mitigating factors includes those factors which, in fairness and mercy, may be considered as tending either to extenuate or reduce the degree of [the defendant's] culpability or blame for the offense or to otherwise constitute a basis for a sentence less than death. General Statutes § 53a-46a (d). *The ability to consider an unrestricted set of mitigating factors satisfies federal constitutional requirements for a*

*moral and individualized decision. Blystone* v. *Pennsylvania,* supra, 494 U.S. 305.

"Furthermore, it is evident that the capital sentencer, either a jury or the court, in making its determination regarding the existence of aggravating and mitigating factors during the separate sentencing hearing is aware that its task [is] the serious one of determining whether a specific human being should die at the hands of the State. *Caldwell* v. *Mississippi,* supra, 472 U.S. 329. Finally, the death sentence is mandatorily imposed only after the capital sentencer has determined unanimously that at least one aggravating factor exists and no mitigating factors exist, *and has come to this unanimous determination by engaging in a full, individualized consideration as to whether death is the appropriate penalty for each defendant. Blystone* v. *Pennsylvania,* supra, 494 U.S. 303–305." (Emphasis added; internal quotation marks omitted.) *State* v. *Ross,* supra, 230 Conn. 240–41.

We also reject the defendant's concomitant claim, without the additional requirement that he perceives, that our statute "is unconstitutional under the authority of cases such as *Penry* v. *Lynaugh,* [supra, 492 U.S. 326–28], because our capital sentencers would not have the mechanism or vehicle to express the determination that death was not the appropriate sentence in all cases." First, this claim is foreclosed by *Ross,* in which, after fully analyzing the statute, including a citation to *Penry* v. *Lynaugh,* supra, 319, we stated: "We conclude, therefore, that our capital sentencing statutes, on their face, give the capital sentencer, either a jury or the court, the proper amount of guided discretion to make the appropriate determination regarding the individual defendant with regard to the defendant's specific crime. Because the statutes are not impermissibly mandatory,

they comply with the eighth and the fourteenth amendments to the United States constitution." *State* v. *Ross*, supra, 230 Conn. 241.

Second, there is nothing in *Penry* that requires a different conclusion. In that case, the court reversed the death penalty because, although the defendant was permitted to introduce certain mitigating evidence, namely, his mental retardation and history of childhood abuse, under the limiting instructions by the trial court, the jury was not permitted to give effect to that evidence "in determining whether death was the appropriate punishment." *Penry* v. *Lynaugh*, supra, 492 U.S. 323. In the present case, there was no such limitation, and the panel took all of the mitigating evidence into account in rendering its special verdict.

V

The Purported Failure to Consider the
Cumulative Impact of Mitigation

The defendant next claims that the panel's verdict is flawed because it "fails to show that the panel separately considered the cumulative effect of all of the mitigating information presented." Specifically, the defendant asserts that, by stating that it did "not find the defendant has proven by a fair preponderance of the evidence *any factor* that can be considered as mitigating"; (emphasis added); the panel indicated that it had not considered the cumulative effect of the mitigating evidence. We disagree.

Among the defendant's listed factors were, as we previously have indicated, the catchall category, namely, "any . . . mitigating factor suggested by the evidence concerning the background, character or history of the defendant or the nature and circumstances of the offense . . . ." In addition, the fourteenth and fifteenth listed factors were the inappropriateness of

the death penalty "[b]ased upon all the mitigating evidence," and mercy. In arguing for these two very general but specifically listed factors, the defendant contended that "even if you don't find any of the factors on the list to be mitigating in nature in and of themselves, the totality of the evidence presented concerning [the defendant's] background, his character and his history or the circumstances of the crime can also be the basis for finding a mitigating factor."

In rendering its verdict, the panel stated: "We have considered all of the defendant's list of proposed mitigating factors submitted on August 5, 1991, and all evidence that was presented to us in mitigation." The panel also stated: "Considering all of the facts and circumstances of this case, we do not find the defendant has proven by a fair preponderance of the evidence any factor that can be considered as mitigating."

Under these circumstances, the record reasonably supports the conclusion that the panel considered, not only each specific mitigating factor individually, but the cumulative effect of all of the mitigating evidence. Indeed, at no time did the defendant claim otherwise in the trial court. Thus, that the panel undertook such a cumulative consideration was clear to those who heard the verdict, and it is clear to us on review of it.

W
The Purported Vagueness of § 53a-46a

The defendant next contends that § 53a-46a, the statute governing sentencing in capital felony cases, is unconstitutionally vague. Specifically, the defendant maintains that the provision in subsection (d) of § 53a-46a directing the capital sentencer to consider "all the facts and circumstances of the case" in determining the existence of mitigation authorizes the capital sentencer to reject evidence regarding mitigation on irrelevant

and improper grounds. In the defendant's view, constitutional vagueness principles require that the phrase "all the facts and circumstances of the case" contained in § 53a-46a (d) be given a limiting construction or be stricken from the statute. We reject this claim.

We begin our analysis by reiterating that, in this context, constitutional vagueness analysis involves the application of the eighth amendment, and that it does not involve the due process fair notice principle. The purpose of the eighth amendment vagueness doctrine is to channel the capital sentencing decision sufficiently so as to ensure that the decision is not made arbitrarily and capriciously. Put another way, the eighth amendment vagueness doctrine requires that a death penalty statute adequately inform the capital sentencer regarding what it must find in order to impose the death penalty. See *Breton I*, supra, 212 Conn. 264. Moreover, eighth amendment vagueness analysis applies only to the eligibility phase and not to the selection phase of the sentencing hearing of a capital felony trial. The due process vagueness principle, however, requires fair warning as to whether conduct constitutes a crime, and clarity of the prohibited conduct sufficient to prevent arbitrary enforcement. It therefore is not relevant at the sentencing phase of a capital trial. See part V J of this opinion.

In *Buchanan* v. *Angelone*, 522 U.S. 269, 275–77, 118 S. Ct. 757, 139 L. Ed. 2d 702 (1998), the United States Supreme Court stated: "[O]ur cases have distinguished between two different aspects of the capital sentencing process, the eligibility phase and the selection phase. *Tuilaepa* v. *California*, 512 U.S. 967, 971 [114 S. Ct. 2630, 129 L. Ed. 2d 750] (1994). In the eligibility phase, the [sentencer] narrows the class of defendants eligible for the death penalty, often through consideration of aggravating circumstances. [Id.] In the selection phase, the [sentencer] determines whether to impose a death

sentence on an eligible defendant. [Id., 972]. . . . It is in regard to the eligibility phase that we have stressed the need for channeling and limiting the [sentencer's] discretion to ensure that the death penalty is a proportionate punishment and therefore not arbitrary or capricious in its imposition. In contrast, in the selection phase, we have emphasized the need for a broad inquiry into all relevant mitigating evidence to allow an individualized determination. *Tuilaepa* [v. *California*, supra, 971–73]; *Romano* v. *Oklahoma*, 512 U.S. 1, 6–7 [114 S. Ct. 2004, 129 L. Ed. 2d 1] (1994); *McCleskey* v. *Kemp*, 481 U.S. 279, 304–306 [107 S. Ct. 1756, 95 L. Ed. 2d 262] (1987); [*Zant* v. *Stephens*, supra, 462 U.S. 878–79].

"In the selection phase, our cases have established that the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence. *Penry* v. *Lynaugh*, [supra, 492 U.S. 317–18]; *Eddings* v. *Oklahoma*, [supra, 455 U.S. 113–14]; *Lockett* v. *Ohio*, [supra, 438 U.S. 604]. However, the state may shape and structure the [capital sentencer's] consideration of mitigation so long as it does not preclude the [sentencer] from giving effect to any relevant mitigating evidence. *Johnson* v. *Texas*, 509 U.S. 350, 362 [113 S. Ct. 2658, 125 L. Ed. 2d 290] (1993); *Penry* [v. *Lynaugh*, supra, 326]; *Franklin* v. *Lynaugh*, 487 U.S. 164, 181 [108 S. Ct. 2320, 101 L. Ed. 2d 155] (1988). Our consistent concern has been that restrictions on the . . . sentencing determination not preclude the [sentencer] from being able to give effect to mitigating evidence. . . . [O]ur decisions suggest that [*at the selection phase*], *complete . . . discretion is constitutionally permissible. See Tuilaepa* [v. *California*, supra, 512 U.S. 978–79] (noting that at the selection phase, the state is not confined to submitting specific propositional questions to the [capital sentencer] and may indeed allow [it] unbridled discretion); [*Zant* v. *Stephens*, supra, 462 U.S. 875] (rejecting the argument

that a scheme permitting the [capital sentencer] to exercise ' "unbridled discretion" ' in determining whether to impose the death penalty after it has found the defendant eligible is unconstitutional, and noting that accepting that argument would require the Court to overrule *Gregg* [v. *Georgia*, supra, 428 U.S. 153])." (Citations omitted; emphasis added.) See also *State* v. *Ross*, supra, 230 Conn. 232 ("[a] statutory requirement that, before death may be imposed, the sentencer must find at least one statutorily mandated aggravating circumstance is a constitutionally permissible response to the need to avoid standardless sentencing discretion"). Consequently, the defendant's vagueness challenge to § 53a-46a (d), which pertains only to the selection phase and not to the eligibility phase of a capital sentencing hearing, is without merit.

It is equally well settled that the federal constitution permits a capital sentencer to "consider the circumstances of the crime in deciding whether to impose the death penalty." *Tuilaepa* v. *California*, supra, 512 U.S. 976; see also *Monge* v. *California*, 524 U.S. 721, 731–32, 118 S. Ct. 2246, 141 L. Ed. 2d 615 (1998); *Woodson* v. *North Carolina*, 428 U.S. 280, 304, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976). Further, although § 53a-46a is not a balancing statute; see *State* v. *Ross*, supra, 230 Conn. 239; the federal constitution permits a state to adopt a death penalty scheme that requires the capital sentencer to balance aggravating factors against mitigating factors at the sentencing hearing. See *Tuilaepa* v. *California*, supra, 979; *Clemons* v. *Mississippi*, supra, 494 U.S. 745; *Blystone* v. *Pennsylvania*, supra, 494 U.S. 305; *McCleskey* v. *Kemp*, supra, 481 U.S. 313–15 n.37. Obviously, in order to balance aggravating factors against mitigating factors, a capital sentencer first must be permitted to consider evidence regarding aggravation. Thus, the federal constitution necessarily permits a capital sentencer to consider evidence relating to aggravation at the selection phase of a sentencing hearing.

Consequently, the defendant's argument that § 53a-46a (d) violates the constitution by permitting a capital sentencer to consider evidence regarding the circumstances of the crime and aggravation is without merit.[101]

Furthermore, the defendant's claim that § 53a-46a (d) unconstitutionally authorizes a capital sentencer to reject a factor that has been proposed as a mitigant on improper grounds, such as the respective races of the defendant and the victim, is unpersuasive. Section 53a-46a (d) simply directs the sentencer to make its determination as to whether a proven factor is mitigating in nature in light of all of the evidence that has been presented in the case; it cannot reasonably be construed to authorize a capital sentencer to base its determination on nonevidentiary factors. The defendant, moreover, has presented absolutely no evidence that in the present case, the panel based its determination that the defendant had not proven the existence of a mitigating factor on any improper ground.

X

The Purported Improper Failure to Find Mitigation

The defendant next claims that the panel arbitrarily and erroneously failed to find mitigation. Specifically, the defendant maintains that, as a matter of law, the

[101] Impliedly raising a statutory rather than a constitutional claim, the defendant also argues that, because § 53a-46a is not a balancing statute, it precludes a capital sentencer from considering evidence regarding aggravation at the selection phase of the penalty hearing. As we indicate more fully in part V X of this opinion, we can discern nothing inconsistent between the statutory provision that directs a capital sentencer *to consider* all of the facts and circumstances of the case in determining whether a particular factor is in fact mitigating in nature; see General Statutes (Rev. to 1989) § 53a-46a (d); and the statutory requirement that, once a particular factor has been found to be mitigating in nature, the capital sentencer may not *balance* that mitigating factor against the proven aggravants, but instead must impose a sentence of life without possibility of release. See General Statutes (Rev. to 1989) § 53a-46a (f) and (g). "A [sentencer] that is entrusted with the awesome responsibility for deciding whether the death penalty should be imposed *cannot be asked to find facts in a vacuum.*" (Emphasis added.) *State* v. *Ross*, supra, 230 Conn. 284; see part V X of this opinion.

evidence established the existence of two statutory mitigating factors as well as the existence of several nonstatutory mitigating factors. We reject this claim.

As to statutory mitigating factors, the defendant claims to have proven that: (1) at the time of the offense, his mental capacity was significantly impaired; and (2) at the time of the offense, his ability to conform his conduct to the requirements of the law was significantly impaired. See General Statutes (Rev. to 1989) § 53a-46a (g). The defendant also claims that, as a matter of law, his evidence in mitigation established that he should be spared the death penalty for one or more of the following nonstatutory reasons: (3) he committed the offense under the influence of an emotional disturbance; (4) he suffers from a mental disorder, namely, mixed personality disorder; (5) he is the father of a four year old son; (6) he served his country as a member of the United States Army; (7) he has a history of steady and reliable employment; (8) he graduated from high school and was a contributing member of his class; (9) he has been affected adversely by problems of racial identity; (10) he has a family that cares about him and that will provide him emotional support while incarcerated; (11) he has many positive qualities that are recognized by others; (12) he confessed to the crime; (13) he has adjusted well to incarceration and would be adaptable to life imprisonment; (14) based upon all the mitigating evidence, life imprisonment without the possibility of release is the appropriate sentence in this case; and (15) mercy.

Before turning to the merits of the defendant's claim, we address the standard of review applicable to a capital sentencer's findings regarding the existence of mitigation. The state maintains that we may not properly review the panel's findings regarding the claimed nonstatutory factors. We previously have concluded, however, that § 53a-46b (a) "authorizes us to determine

whether the [panel] correctly denied [a capital] defendant's motion for a judgment 'acquitting' the defendant of the death penalty on the ground that the evidence presented in mitigation required the [sentencer] to find the existence of a mitigating factor." *Breton II*, supra, 235 Conn. 227. Furthermore, "[a]lthough our review of the evidence in mitigation of the death penalty is a heightened one . . . we will not substitute our judgment or opinions for that of a reasonable [capital sentencer]. *State* v. *Mejia*, 233 Conn. 215, 224, 658 A.2d 571 (1995); *State* v. *Hart*, 198 Conn. 424, 427, 503 A.2d 588 (1986). Instead, we must determine whether the defendant's proof of a mitigating factor was so clear and so compelling that the [capital sentencer], in the exercise of reasoned judgment, could not have rejected it." *Breton II*, supra, 229.

In its special verdict, the panel concluded that the defendant had not proven the underlying factual bases of the first four claimed factors. Specifically, the panel concluded that the defendant had failed to prove by a preponderance of the evidence that: (1) the defendant's mental capacity had been substantially impaired at the time of the offense; (2) the defendant's ability to conform his conduct to the requirements of the law had been substantially impaired at the time of the offense; (3) the defendant had been under the influence of a mental disturbance at the time of the offense; or (4) the defendant had suffered or suffers from a mental disorder. With respect to the eleven remaining claimed factors, all of which were nonstatutory factors, the panel found in effect that the defendant had failed to prove that any such factor was mitigating in nature.

1

Claimed Mitigating Factors Regarding the
Defendant's Psychological State

The defendant maintains that the panel improperly concluded that he had failed to prove the existence of the first four claimed mitigating factors, all of which related to his psychological state. To establish these four factors, the defendant relied primarily on testimony provided by two expert witnesses. Anne Phillips, a clinical psychologist retained by the defendant, conducted five interviews with the defendant over the course of approximately eight hours and administered a battery of psychological tests. She also reviewed the defendant's arrest, military and school records, as well as statements that the defendant's family and friends had provided to investigators retained by him. Phillips testified that the defendant had a full scale I.Q. of seventy-seven, placing him in the borderline range of intellectual ability. She diagnosed the defendant as suffering from a severe mixed personality disorder with paranoid and schizoid features, a malady that she acknowledged, however, is not specified in the Diagnostic and Statistical Manual of Mental Disorders III (DSM III). Phillips opined that the defendant's mental capacity and his ability to conform his conduct to the requirements of the law were significantly impaired at the time of the offense. She further testified that, in her opinion, the defendant suffered from an emotional disturbance at the time of the offense.

The defendant's second expert witness, Jeffrey Gardere, a clinical psychologist, conducted two two hour interviews with the defendant. Based primarily on those interviews as well as on the results of the psychological tests that Phillips had administered to the defendant, Gardere testified that the defendant suffered from a mixed personality disorder with paranoid and borderline features, a diagnosis Gardere acknowledged is not specified in the DSM III. Gardere also opined that the defendant suffered from poor racial identification

attributable to the fact that the defendant, an African-American, had been raised in a predominately white environment.

To rebut the existence of these four claimed factors relating to the defendant's psychological status, the state relied primarily on its cross-examination of the defendant's expert witnesses. On cross-examination, Phillips testified that she was unaware that I.Q. testing previously had indicated that the defendant's I.Q. was ninety-three, which placed him in the average range of intelligence. Phillips acknowledged that she could not rule out the possibility that in his responses to the psychological tests, the defendant had feigned psychological problems. Phillips also acknowledged that she had altered the content of one of the standardized tests that she had administered to the defendant, and that her interpretation of the results of that test was completely subjective. Gardere testified on cross-examination that he was not aware that Phillips had altered the content of one of the standardized tests administered to the defendant.

Although the state did not offer any independent evidence to rebut the existence of these four claimed factors relating to the defendant's psychological status, that alone is not a reason to overturn the panel's findings regarding those claimed factors. "As we have recently stated in this very context, 'the state can weaken the force of the defendant's presentation by cross-examination and by pointing to inconsistencies in the evidence.' *State* v. *Ross*, supra, 230 Conn. 265–66. Furthermore, the general rule that a [finder of fact] is free either to accept or reject, in whole or in part, the evidence presented by the defendant's witnesses; see, e.g., *State* v. *Medina*, [228 Conn. 281, 310, 636 A.2d 351 (1994)]; *State* v. *Steiger*, 218 Conn. 349, 590 A.2d 408 (1991); *State* v. *Perez*, 182 Conn. 603, 438 A.2d 1149 (1981); has particular applicability where, as here, the state has

vigorously contested the force of that testimony by cross-examination." *Breton II*, supra, 235 Conn. 234. "[T]he credibility of the defendant's expert and lay witnesses, and the weight to be given to their testimony regarding the existence of mitigating factors, [moreover] is a matter committed to the sound judgment and common sense of the trier of fact." Id.

In the present case, the testimony elicited by the state on cross-examination of the defendant's expert witnesses raised questions as to the reliability of the psychological testing on which the experts had based their opinions regarding the defendant's psychological status. Moreover, the defendant's evidence concerning the existence of the first four claimed factors regarding his psychological status was not "so clear and so compelling that the [panel], in the exercise of reasoned judgment, could not have rejected it." Id., 229. Thus, the defendant's evidence left room for the panel reasonably to find that he had failed to satisfy his burden of persuasion regarding the existence of those factors.

2

Claimed Nonstatutory Mitigating Factors

The defendant also maintains that the panel reasonably could not have rejected the remaining claimed nonstatutory factors. Specifically, the defendant argues that the evidence conclusively established that he: (1) was affected adversely by problems of racial identity; (2) served his country as a member of the United States Army; (3) is the father of a four year old son; (4) confessed to the crime; (5) has a history of steady and reliable employment; (6) graduated from high school and was a contributing member of his class; (7) has a family that cares about him and that will provide him emotional support while incarcerated; (8) has many positive qualities that are recognized by others; and (9) has adjusted well to incarceration and is adaptable to

life imprisonment. The defendant further maintains that the establishment of the existence of any one of these claimed nonstatutory factors compelled a finding that he had proven the existence of mitigation.

We do not dispute that the evidence established the underlying factual bases of all but the first of the nine claimed nonstatutory factors on which the defendant now relies.[102] We do not agree, however, that the evidence established the factual basis of the first claimed nonstatutory factor, namely, that the defendant was affected adversely by problems of racial identity. To support that claimed factor, the defendant relies primarily upon Phillips' testimony that the defendant felt unaccepted by the black race and unaccepted by the white race, and upon Gardere's testimony that the defendant suffered from poor racial identification attributable to having been raised in a predominately white environment. There was also testimony, however, that the defendant had been a contributing member of his high school class, that he had a good sense of humor, that he had been popular in high school, that he had been happy in high school, and that he had not experienced racial problems in high school. Thus, there was evidence that expressly undercut the testimony provided by Phillips and Gardere regarding the defendant's alleged racial identity problems. The evidence regarding those problems was not "so clear and so compelling that the [panel], in the exercise of reasoned judgment, could not have rejected it." *Breton II*, supra, 235 Conn. 235.

Moreover, even if we were to assume, without deciding, that the evidence somehow established not only the factual bases of the eight remaining nonstatutory factors on which the defendant now relies, but also the

---

[102] Indeed, the evidence regarding those eight factors essentially was undisputed.

factual basis of his claim that he was affected adversely by problems of racial identity, that still would not compel a conclusion that the defendant, as a matter of law, proved the existence of mitigation. "Under our death penalty statute, the defendant must convince the [capital sentencer] not only of the facts underlying an alleged nonstatutory mitigating factor, *but also that the factor 'is mitigating in nature,* considering all the facts and circumstances of the case,' such that 'in fairness and mercy, [it] may be considered as tending either to extenuate or reduce the degree of his culpability or blame for the offense or to otherwise constitute a basis for a sentence less than death.' General Statutes § 53a-46a (d)." (Emphasis added.) *Breton II,* supra, 235 Conn. 229.

With respect to the defendant's claim that he served in the army, there was also evidence that, while in the army, he had been charged with sexually assaulting a woman with a knife and had been dishonorably discharged as a result of that assault. Regarding the defendant's claim that he has a four year old son, there was also evidence that the defendant resented the responsibilities involved in caring for his son, and that the defendant had left his wife and his son in Germany and had returned to live in the United States to get away from them. With respect to the defendant's claim that he confessed to the crime, there was evidence that while incarcerated during the trial, he had written to a former high school classmate, John Gallagher. In that letter, the defendant told Gallagher that his confession was false and that the police had planted evidence in his apartment. He requested that Gallagher commit perjury before the panel by testifying falsely to give him an alibi for the crime. The defendant also stated that, if he were acquitted, he would be "rich," intimating that Gallagher might share in his riches if he complied with the defendant's request to commit perjury. Thus, there was evidence that affirmatively undermined the defendant's

reliance on his service in the army, his fatherhood and his confession as bases for a finding of mitigation.

Furthermore, § 53a-46a (d) explicitly authorizes the capital sentencer to determine whether, *in light of the facts and circumstances of the case,* a proven nonstatutory factor operates to "extenuate or reduce the degree of [the defendant's] culpability or blame for the offense or to otherwise constitute a basis for a sentence less than death." Our review of the record has persuaded us that, in light of the calculated and brutal kidnapping, sexual assault and murder of the victim in the present case, the panel reasonably could have concluded that none of the defendant's claimed nonstatutory factors, either alone or in combination with other claimed factors, operated to reduce his culpability or otherwise provide a basis for a sentence less than death.

The defendant contends nonetheless that if anything positive—no matter how slight—was established about him, § 53a-46a required the panel to find the existence of mitigation. In the defendant's view, permitting a capital sentencer to determine whether proof of something positive about a defendant constitutes mitigation under "all the facts and circumstances of the case" improperly allows the sentencer to balance aggravation against mitigation. See *State* v. *Ross,* supra, 230 Conn. 239 (§ 53a-46a does not permit sentencer to balance aggravants against mitigants). Thus, the defendant argues that, unless his interpretation of the statutory scheme is adopted—namely, that proof of the underlying factual basis of any claimed nonstatutory factor requires a concomitant finding of proof of a mitigating factor—the statute becomes in effect a weighing or balancing statute, which *Ross* plainly holds it is not. We disagree.

First, the defendant's argument would effectively read out of § 53a-46a (d) the requirement that the sentencer determine "whether that factor is mitigating in

nature . . . ." We ordinarily do not read statutes so as to render parts of them superfluous or meaningless. *United Illuminating Co.* v. *New Haven*, supra, 240 Conn. 439. Thus, § 53a-46a (d) contemplates that a capital sentencer may reject a proven proposed mitigant on the ground that, under all of the facts and circumstances of the case, the factor does not "extenuate or reduce the degree of [the defendant's] culpability or blame for the offense or to otherwise constitute a basis for a sentence less than death."

Second, we can discern nothing inconsistent between the statutory provision, on the one hand, that directs a capital sentencer to consider the facts and circumstances of the case in determining whether a particular factor is in fact mitigating in nature; see General Statutes (Rev. to 1989) § 53a-46a (d); and the statutory requirement, on the other hand, that, once a particular factor has been found to be mitigating in nature, the capital sentencer may not balance that mitigating factor against the proven aggravants, but instead must impose a sentence of life without possibility of release. See General Statutes (Rev. to 1989) § 53a-46a (f) and (g). "A [sentencer] that is entrusted with the awesome responsibility for deciding whether the death penalty should be imposed cannot be asked to find facts in a vacuum." *State* v. *Ross*, supra, 230 Conn. 284. Thus, the sentencer, in determining whether a proposed, factually proven mitigating factor is actually mitigating in nature, in light of all the facts and circumstances of the case, must make a value judgment about that factor in light of those facts and circumstances. That is not the same, however, as *balancing* a factor proven to be mitigating against the aggravating factor or factors that have been proven.

In sum, § 53a-46a does not require a capital sentencer to give mitigating force to any particular proven factor solely because that factor establishes "something good"

about the defendant. Instead, the statute leaves the decision as to whether a proven factor is mitigating in nature to the sentencer's reasoned moral judgment.

## Y

### The Imposition of Two Separate Death Sentences

The defendant next claims that the panel improperly imposed two separate sentences of death. In the defendant's view, the panel made only one finding of aggravation, and that finding is not capable of supporting both death sentences. This claim is wholly without merit.

The defendant was convicted of capital felony in violation of § 53a-54b (5) (murder in course of kidnapping) and § 53a-54b (7) (murder in course of sexual assault). In its special verdict, the court stated in relevant part: "The state has proven beyond a reasonable doubt that the murder of [the victim] was committed in an especially cruel manner." Because both of the defendant's capital felony convictions were for the murder of the victim—a murder committed in an especially cruel manner—the court properly imposed the death penalty for both convictions.

## Z

### Certain Constitutional Challenges

The defendant next raises seven constitutional challenges to the death penalty statute. He claims that the capital sentencing scheme is unconstitutional because it: (1) places upon the defendant the burden of proving the existence of mitigation by a preponderance of the evidence; (2) embodies a presumption that death is the appropriate penalty; (3) permits the capital sentencer to make a standardless and unreviewable determination regarding the existence of mitigation; (4) is per se violative of the state constitution; (5) fails to provide for a capital sentencer empowered to determine whether

the proven aggravating factors justify the imposition of the death penalty in an individual case; (6) fails to provide for a capital sentencer empowered to make a reasoned moral decision that death is the appropriate penalty in a particular case; and (7) requires a unanimous finding regarding the existence of mitigation.

We considered and rejected the first six of the defendant's claims in *Breton II*, supra, 235 Conn. 217–18, and we considered and rejected his seventh claim in *State* v. *Ross*, supra, 230 Conn. 243. We decline the defendant's invitation to overrule our decisions in *Breton II* and *Ross*, and, instead, we reaffirm both.[103]

## AA

### The Purported Arbitrary Factors Pursuant to § 53a-46b (b) (1) and (2)

As his final claim challenging the death penalty in this case, the defendant contends that three separate groups of claims render the death penalty invalid. We previously have considered fully and rejected all three

---

[103] Although we reaffirm the constitutionality of the death penalty, we acknowledge the sincerity of the contrary views of the dissenters on that question. We deplore, however, the fact that in expressing his views Justice Berdon has, once again; see, e.g., *State* v. *Hodge*, 248 Conn. 207, 273, 726 A.2d 531 (1999); seen fit to violate one of the most fundamental norms of collegial decision-making, namely, the confidentiality of the internal communications, whether oral or written, among members of this court. See also J. Biskupic & E. Witt, The Supreme Court at Work (2d Ed. 1997) p. 77 ("Conferences are conducted in complete secrecy. No secretaries, clerks, stenographers, or messengers are allowed into the room."); id., p. 85 ("Among the [United States Supreme] Court's most important traditions is secrecy, which applies not only to formal deliberations but also to disclosure of personal disagreements and animosities among the justices. . . . The justices believe they have good reason to maintain the veil of secrecy that surrounds their conference deliberations and their personal relations with other members of the Court. Widespread disclosure of what goes on in conference could reduce public esteem for the Court and its rulings."). The majority in this case; Chief Justice Callahan, and Justices Borden, Peters and O'Connell; is authorized to represent that dissenting Justices Norcott and Katz join in this footnote.

groups of claims under different labels. We therefore decline to reconsider them.

## 1

### The Sufficiency of the Evidence of Aggravation

The defendant claims that there was insufficient evidence to support "the theory of aggravation advanced by the state at the penalty phase," and that the panel's finding of aggravation was "insufficient to support the death sentence(s) imposed because the . . . panel failed to find that the capital offense(s) involved were aggravated." Therefore, the defendant argues, the sentences must be reversed pursuant to § 53a-46b (b) (2). We already have rejected these claims on their merits. They gain no merit in their reassertion despite the invocation of § 53a-46b (b) (2).

## 2

### Certain Guilt Phase Challenges

The defendant next reasserts no less than forty of his previous claims, including certain claims that bear only on the guilt phase and are not relevant to the penalty phase. It would serve no useful purpose to recite those particular claims. Indeed, the defendant does no more than refer to them by label and number. On the basis of these claims, the defendant contends that the sentences may not be affirmed pursuant to § 53a-46b (b) (1). We already have rejected all these claims.

## 3

### Request for Evidentiary Hearing

The defendant claims next that § 53a-46b (b) (1) requires us to set aside his death sentence, or, in the alternative, to remand the case for a further evidentiary hearing. In this third part of his claim, the defendant requests that we remand the case to the trial court for

an evidentiary hearing, pursuant to § 53a-46b (b) (1), regarding what he claims to be preliminary statistical support for the contention that in this state "the *race* of the *victim* and the *race* of *capital defendants* impermissibly influence the decision of whether a particular defendant will be sentenced to death or not." (Emphasis in original.) In effect, by this claim the defendant seeks to raise, in a different way, the claim that he made and we rejected in an earlier proceeding during the course of this appeal. See *State* v. *Cobb*, 234 Conn. 735, 761–63, 663 A.2d 948 (1995) (*Cobb I*).[104]

In *Cobb I*, we rejected the contention that the defendant's statistical claim properly could be raised as part of proportionality review under § 53a-46b (b) (3). We held that such a claim properly was cognizable under § 53a-46b (b) (1), but must have been based on a full evidentiary hearing made at trial in the trial court. Id., 761–62. We also stated that, although this defendant had not made such a trial record, he would be permitted to do so "by way of a postappeal habeas corpus petition, if the ultimate disposition of his direct appeal renders his claim still viable." Id., 762–63. In part VI B of this opinion, we reject the defendant's claim, made as part of his proportionality review challenges, that we overrule *Cobb I*, and we therefore reaffirm *Cobb I*. That reaffirmance necessarily includes our prior holding that this defendant, having failed to raise this statistical claim in the trial court, may nonetheless do so by way of a habeas corpus petition.

We see no basis to disturb that holding. The defendant remains free to present this statistical claim by way of such a petition.[105]

---

[104] In one of the defendant's proportionality review claims, he requests that we overrule *Cobb I* and now remand the case for the same procedure that he seeks in this claim. We discuss that claim in more detail and reject that proportionality claim in part VI B of this opinion.

[105] We note, however, two further aspects of this claim. First, as the defendant concedes, this claim was brought in *Cobb I* by motion of the defendant's separate proportionality counsel "*because the defendant's other appellate*

## VI

### PROPORTIONALITY REVIEW[106]

We next undertake the appellate function of determining whether "the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant." General Statutes (Rev. to 1989) § 53a-46b (b) (3). The defendant makes three claims: (1) we should overrule our decisions in *State* v. *Webb*, supra, 238 Conn. 389, and *Cobb I*, supra, 234 Conn. 735, because the method of comparative proportionality review that we adopted in *Webb* is ineffective under our statutory scheme;[107] (2) we should conclude, applying the method adopted in *Webb*, that the defendant's sentence is disproportionate based on the evidence of mitigation produced during the penalty phase hearing; and (3) we should conclude that the

*counsel do not intend to raise such a claim under § 53a-46b (b) (1)."* (Emphasis added.) *Cobb I*, supra, 234 Conn. 740. Needless to say, that "other appellate counsel" is the same counsel who now brings this claim, nearly four years later. Second, this appeal was filed in October, 1991. The defendant's brief was not filed in this court until February, 1997, more than six years later. Under these circumstances, it ill behooves the defendant's counsel to request a remand for an evidentiary hearing (1) on a claim that he represented nearly four years earlier he did not intend to bring, and (2) in an appeal the disposition of which has been delayed for nearly eight years largely because of his delay in filing his brief. We see no valid reason to delay the disposition of this appeal further. The state, the victim's family and the defendant are entitled to a disposition of this appeal now.

[106] The defendant is represented by two separate sets of attorneys in this appeal. The appellate unit of the chief public defender represents him on all issues except those related to proportionality review. The same separate counsel that represented the defendant in *Cobb I*, represent the defendant on the proportionality review aspects of this appeal.

[107] The defendant asks us to reconsider our prior holding that his capital conviction does not warrant special scrutiny merely because he is an African-American convicted of a capital felony involving the death of a white woman. We decline to do so. We note that, rather than betokening racial unfairness, the verdict in this case represents a finding of guilt for a defendant who claimed, by way of mitigation, that, as a result of his psychological problem with racial identity, he sought out white women as his victims.

defendant's sentence is disproportionate because the panel's finding of an aggravating factor was tainted by improper speculation. We reject each of these claims. In addition, applying the method of proportionality review established by § 53a-46b (b) (3), we conclude that the sentence of death imposed on the defendant was not "excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant." Accordingly, we affirm the sentence.

## A

### The State's Claim of Lack of Proportionality Review Jurisdiction

We first consider the claim of the state that this court no longer has subject matter jurisdiction to undertake proportionality review because of the passage of Public Acts 1995, No. 95-16, § 3 (b). That provision, which repealed subdivision (3) of § 53a-46b (b), eliminated proportionality review from our appellate capital felony jurisprudence. The state claims that this provision is procedural and, consequently, applies to all pending cases, including the present case. We are not persuaded.

In a prior proceeding in the present case involving the question of the scope of § 53a-46b (b) (3), we recognized that "[t]he legislature [had] recently eliminated proportionality review altogether on a prospective basis. Public Acts 1995, No. 95-16, § 3 (b)." *Cobb I*, supra, 234 Conn. 737–38 n.2. We reiterated: "Although the legislature recently repealed the proportionality review requirement . . . such review is still mandatory for all capital felony cases pending at the time that the repealing statute became effective." Id., 746 n.10. We then decided whether proportionality review under § 53a-46b (b) (3) included an evaluation of a claim that, statistically, "race has an impermissible effect on capital sentencing decisions in Connecticut . . . ." Id., 738.

Thereafter, in *State* v. *Webb*, supra, 238 Conn. 389, we adhered to that view. "Although the legislature recently repealed the proportionality review requirement; see Public Acts 1995, No. 95-16, § 3 (b); the requirement applies to the defendant's case, because 'such review is still mandatory for all capital felony cases pending at the time that the repealing statute became effective.' [*Cobb I*], supra, 234 Conn. 746 n.10." *State* v. *Webb*, supra, 491 n.71. On the basis of that premise, we considered and rejected all of that defendant's claims that his death sentence was "excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant." (Internal quotation marks omitted.) Id., 492.

We reaffirm these holdings that proportionality review applies to all capital felony cases pending at the time of the effective date of the repealing statute. We therefore conclude that we are required to undertake proportionality review in the present case. Consequently, we return to the defendant's specific proportionality claims.

B

The Comparative Method of Proportionality Review

In *Cobb I*, which came before this court after the judgment of conviction and imposition of the death penalty in the present case, this defendant moved to have us expand the universe of cases, defined for purposes of proportionality review to include all cases prosecuted in this state since 1973,[108] in which a capital felony *could have been charged* and which resulted in

---

[108] In 1973, the legislature reenacted a revised version of our death penalty statute to comply with *Furman* v. *Georgia*, supra, 408 U.S. 310 ("the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed" [Stewart, J., concurring]).

a homicide conviction, irrespective of whether there had been a conviction of capital felony and irrespective of whether a death penalty hearing had been held. *Cobb I*, supra, 234 Conn. 738. He argued that this broad universe of cases was necessary in order for him to establish[109] that, under § 53a-46b (b) (3), the proportionality review provision, "the death penalty scheme has been disproportionately applied to black defendants or to defendants whose victims were white." Id. We disagreed and concluded: "In light of the language of the statute, its legislative history, and the historical and jurisprudential context in which it was enacted . . . the legislature did not intend proportionality review to encompass a comparison with all homicide cases prosecuted since 1973 in which a capital felony could have been charged." Id., 747.

Thereafter, in *Webb*, which was the first capital felony conviction to come before us in which the imposition of the death sentence by the trial court had been upheld on appeal, we were required to determine, not only what proportionality review does *not* mean, but what it *does* mean. In *State* v. *Webb*, supra, 238 Conn. 513, we held "that our statute contemplates the precedent seeking method of comparative proportionality review,"[110] which requires this court to "[compare] the case before it to other cases in which defendants were convicted of the same or similar crimes, by examining the facts of the crimes, the defendants, and the aggravating and mitigating factors involved." Id., 511–12. More specifically, "proportionality review requires a comparison of the decision to impose a death sentence, made

---

[109] The defendant intended to undertake a statistical analysis to support his claim.

[110] In doing so, we specifically rejected the notion that the statute contemplated what is known as "the frequency method" of proportionality review; *State* v. *Webb*, supra, 238 Conn. 512; a method adopted by only one state, New Jersey, among the then "twenty-seven states that engage[d] in proportionality review . . . ." Id.

by the fact finder in the case before us on the basis of the presence or absence of aggravating and mitigating factors, with decisions to impose sentences of death or life imprisonment, made by the fact finders in the other relevant cases on the basis of the presence or absence of aggravating and mitigating factors. That process requires us to determine whether, as compared to those cases, this case is an outlier." Id., 516–17.

The defendant claims that we should overrule our decision in *Webb* because, he contends, the precedent seeking method of comparative proportionality review articulated therein is "ineffective" when applied to the death penalty statutory scheme governing this case. He contends that this method "was not devised for—and cannot work in—the mandatory, nonweighing capital sentencing scheme" established by our legislation.[111]

More specifically, the defendant argues that the precedent seeking method of proportionality review was derived from the approach used in states in which the sentencer weighs aggravants and mitigants, and then determines the sentence based upon whether the aggravants outweigh the mitigants. Under such a sentencing

---

[111] In 1995, the legislature amended the statute to permit the jury or court to weigh any aggravating factors against any mitigating factors, and to sentence accordingly. See Public Acts 1995, No. 95-19.

General Statutes § 53a-46a (f) now provides: "If the jury or, if there is no jury, the court finds that (1) none of the factors set forth in subsection (h) exist, (2) one or more of the aggravating factors set forth in subsection (i) exist and (3) (A) no mitigating factor exists or (B) one or more mitigating factors exist but are outweighed by one or more aggravating factors set forth in subsection (i), the court shall sentence the defendant to death."

General Statutes § 53a-46a (g) now provides: "If the jury or, if there is no jury, the court finds that (1) any of the factors set forth in subsection (h) exist, or (2) none of the aggravating factors set forth in subsection (i) exists, or (3) one or more of the aggravating factors set forth in subsection (i) exist and one or more mitigating factors exist, but the one or more aggravating factors set forth in subsection (i) do not outweigh the one or more mitigating factors, the court shall impose a sentence of life imprisonment without the possibility of release."

scheme, he contends, proportionality review is effective because it "allows an appellate court to assess whether the same (or similar) combination of factors presented in a particular case under review has, in the past, resulted in a death sentence—i.e., is proportional." Under our sentencing scheme, however, where a death sentence is required if there is an aggravant and no mitigant, and a life sentence is required if there is no aggravant or there is a mitigant, the defendant asserts, a death sentence under review will never be held to be disproportional. In his view, "a death sentence being reviewed on proportionality appeal based on the aggravants and mitigants found by the capital sentencer *will necessarily be distinguishable from every capital felony prosecution that resulted in a sentence less than death*. The only cases 'comparable' to a defendant sentenced to death will be other defendants sentenced to death based on the finding of at least one aggravating factor and no mitigant." (Emphasis in original.) Thus, the defendant contends, proportionality review "will always result in affirmance of the death sentence."

Accordingly, the defendant contends further, "the Connecticut legislature intended proportionality review as a means to control against arbitrary or 'freakish' results in cases of capital sentencing, *particularly arbitrary results based on racial prejudice*." (Emphasis added.) Thus, the defendant asserts, "proportionality review . . . was intended not only as a measure of the comparative blameworthiness of different defendants but also to serve as a procedural safeguard to ensure that prejudice or other impermissible considerations did not taint the decision between life and death." In this regard, however, the defendant does not claim, and points to no evidence in this record suggesting, that race or any other form of prejudice *in fact* played any part in this panel's sentencing decision. Instead, citing to Justice Brennan's dissent in *McCleskey* v. *Kemp,*

supra, 481 U.S. 332,[112] the defendant claims that there is a *danger* of prejudice "where the defendant is accused of a sex crime involving an African-American male and a white woman." Despite the defendant's implicit request that we overrule both *Webb* and *Cobb I*, we reaffirm both decisions.

First, in both *Cobb I* and *Webb*, we undertook an exhaustive statutory analysis that involved a full inquiry into the language, purpose, jurisprudential background and legislative history of the proportionality review statute. That analysis led us to hold that: (1) proportionality review does *not* contemplate the kind of detailed, statistical analysis that the defendant asserted then and reasserts now as essential for such review; *Cobb I*, supra, 234 Conn. 741; and (2) such review *does* contemplate the precedent seeking method of comparative proportionality review. *State* v. *Webb*, supra, 238 Conn. 513. We were persuaded then, and we continue to be persuaded, that these analyses were correct, and we therefore decline to abandon them. Indeed, it would be a curious form of jurisprudence to conclude, as the defendant would have us do, that because the statutory policy may be difficult to execute, as a matter of statutory interpretation we must substitute, for a construction that the language and history of the statute compel, a construction that the same language and history preclude.

Second, we are not persuaded by the defendant's contention that such review is ineffective and cannot work under our capital penalty scheme. Unlike the defendant, we see no essential difference between the

---

[112] In *McCleskey*, which we discussed at some length in *Cobb I*, the United States Supreme Court rejected the contention that "a complex statistical study that indicates a risk that racial considerations enter into capital sentencing determinations proves that . . . [a] capital sentence is unconstitutional under the Eighth or Fourteenth Amendment." *McCleskey* v. *Kemp*, supra, 481 U.S. 282–83.

effectiveness of proportionality review pursuant to a statute that requires the weighing of aggravants and mitigants, on the one hand, and a statute that does not, on the other hand. Under a weighing statute, the reviewing court will not necessarily know how much weight the sentencer gave to any aggravating factor or mitigating factor in arriving at its sentence. In other words, the reviewing appellate court may have no greater insight into how and why the sentencer arrived at the sentence—whether death or life imprisonment—than under our statute. Nonetheless, the reviewing court undertaking proportionality review pursuant to a weighing statute must compare the case under consideration to all similar cases, taking into account all of the facts and circumstances of all the cases, including the proposed aggravating and mitigating circumstances, and determine in its best judgment whether the sentence of death under review is an outlier. Thus, we do not view the reviewing court operating pursuant to a weighing statute, as being in any better position than we are in reaching such a difficult and sensitive decision.

Furthermore, we are not convinced that, as the defendant maintains, our proportionality review could never result in a determination that a particular death sentence is disproportionate. This is only the second case in which we have been called upon to engage in proportionality review. Although there may be a certain surface logic to the defendant's argument,[113] as judges we

---

[113] Indeed, at least one jurist has noted the tension between the statutory concept of comparative proportionality review and the constitutional requirement of individualized sentencing in capital cases. See *State* v. *White*, 168 Ariz. 500, 523, 815 P.2d 869 (1991) (Corcoran, J., concurring), cert. denied, 502 U.S. 1105, 112 S. Ct. 1199, 117 L. Ed. 2d 439 (1992). In very general terms, proportionality review looks for similarities between the death sentence on review and other cases in which life imprisonment was imposed, which might indicate that the sentence on review is disproportionate; whereas the requirement of individualized sentencing ultimately guarantees that similarities to other cases may be disregarded by the sentencer.

have long understood that, as then Judge, later Justice, Oliver Wendell Holmes articulated in his famous aphorism, "The life of the law has not been logic: it has been experience." O. Holmes, The Common Law (1881) p. 1. Neither our brief experience, nor that of other jurisdictions that require proportionality review, persuades us that the undertaking is not worth the effort required.

Indeed, it may be that, as the state contends, when the sentencer, either as a sentencing panel or as a jury under appropriate instructions from the court, properly follows the carefully crafted sentencing scheme and appropriately considers the evidence regarding aggravating and mitigating factors, it is highly unlikely that the sentence will ever constitute an outlier. Nonetheless, simply because any particular sentence of death is affirmed does not mean that proportionality review does not work. Such review is not designed to guarantee an outcome. It is designed, instead, to guarantee a process, namely, a careful comparative review by this court resulting in a difficult and sensitive judgment regarding whether the sentence under consideration is disproportionate or excessive, within the meaning of the statute.

The defendant's argument is essentially an argument, as a matter of policy, against the notion of proportionality review that the legislature enacted. When we as judges perceive that a legislative policy that has been duly enacted may be difficult to administer, however, we are obligated to make it work as best we can within the limits of its language and purpose. Our function is not to scrap it on the pretense that it means something that it plainly does not.

## C

### The Purported Speculative Basis of the Aggravant

We next address the defendant's claim that, under the established method of proportionality review, "it is

reasonably probable that the . . . panel found aggravation in this case based on an erroneous determination that, after pushing [the victim] from the top of the dam, [the defendant] purportedly discovered that she had survived the fall, returned to the scene, and killed [her] by asphyxiation. To the extent that such an erroneous finding about the circumstances of [the defendant's] crime . . . contributed to the . . . panel's verdict in this case, that finding renders the verdict unreliable and mandates reversal of the death sentence as disproportionate." We decline to consider this claim.

We agree with the state that this claim, which we already have discussed fully and rejected on its merits under the defendant's claims regarding the penalty phase, is not properly part of proportionality review. The question of whether there was sufficient evidence to support a sentencer's finding that an aggravant was proven, although properly raisable under subdivision (2) of § 53a-46b (b), is simply not part of the calculus of proportionality review under subdivision (3) of § 53a-46b (b). See footnote 13 of this opinion; see also *State* v. *Webb*, supra, 238 Conn. 527–28. We, therefore, decline to revisit this claim as part of that review.

## D

### Proportionality Review Pursuant to § 53a-46b (b) (3)

We now undertake the task of determining whether, under the principles established in *Webb* and reaffirmed here, the defendant's death sentence is "excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant." General Statutes (Rev. to 1989) § 53a-46b (b) (3). "We reiterate that our function in undertaking this task is to assure that upon consideration of both the crime and the defendant the aggravating and mitigating circumstances present in one capital case will lead to a result similar to

that reached under similar circumstances in another capital case, thus identifying the aberrant sentence and avoiding its ultimate imposition." (Internal quotation marks omitted.) *State* v. *Webb*, supra, 238 Conn. 538–39. The search, however, is not for a case involving a rough equivalence of moral blameworthiness; the search is; rather, "for a gross disparity between the case on review and other cases within the selected pool of similar cases." Id., 501–502. "Thus, proportionality review requires a comparison of the decision to impose a death sentence, made by the fact finder in the case before us on the basis of the presence or absence of aggravating and mitigating factors, with decisions to impose sentences of death or life imprisonment, made by the fact finders in the other relevant cases on the basis of the presence or absence of aggravating and mitigating factors. That process requires us to determine whether, as compared to those cases, this case is an outlier." Id., 516–17. We conclude that the defendant's case is not and, accordingly, we affirm his sentence.

The state and the defendant agree that the appropriate pool of similar cases consists of: (1) *State* v. *King*, supra, 249 Conn. 645; (2) *State* v. *Webb*, supra, 238 Conn. 389; (3) *State* v. *Lapointe*, 237 Conn. 694, 678 A.2d 942, cert. denied, 519 U.S. 994, 117 S. Ct. 484, 136 L. Ed. 2d 378 (1996); (4) *State* v. *Ross*, supra, 230 Conn. 183;[114] (5) *State* v. *Usry*, 205 Conn. 298, 533 A.2d 212 (1987); and (6) *State* v. *Hafford*, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. CR 91-0084381 (August 9, 1996).[115] Each of these cases involves either a kidnap-murder, a sexual assault-murder, or both. See *State* v. *Webb*, supra, 539–40.

---

[114] Similar to *State* v. *Webb*, supra, 238 Conn. 539 n.93, we treat *Ross* as four cases because, although Ross was convicted of six capital felonies, those convictions involved four victims.

[115] The appeal in *Hafford* was taken to this court in February, 1997, and is still pending.

In the present case, the panel found an aggravating factor, namely, that the defendant had committed the offenses of kidnap-murder and sexual assault-murder in an especially cruel and heinous manner. These findings were based on evidence demonstrating that, on a freezing and moonless night, after abducting the victim and forcing her to drive to the secluded area adjoining the pond, the defendant forcibly sexually assaulted her, both anally and vaginally. He then bound and gagged her with reinforced wrapping tape of high tensile strength, carried her over to the wall of the dam, and threw her off to the concrete apron and icy water of the pond twenty-three feet below, inflicting numerous bodily injuries on her. Despite his intent to kill her, however, she survived the fall. The defendant then watched her from the top of the dam, as she engaged in a desperate struggle to save her life by removing the bonds from her hands by scraping them against a metal wire mesh that she had located in the icy water, injuring herself further in the process, and by removing the tape from her ankles. Then, as she crawled back up on the rocky shore, the defendant made his way down to her, forced her back into the water, and strangled or drowned her, or both. The evidence and the panel's verdict, therefore, demonstrate a forcible abduction, followed by two forcible sexual assaults of the highest degree, followed by a particularly brutal murder, all of which inflicted extreme terror and pain on the victim. As discussed previously, the panel rejected all fifteen of the mitigating factors offered by the defendant. See part V O of this opinion.

We first compare the present case to *Hafford*, because the defendant claims that the similarities between this case and *Hafford*, in which a life sentence was imposed, require a reversal of his sentence of death. The defendant argues specifically that "[s]ince a voluntary confession was articulated as a mitigant in *Hafford*,

that same consideration must also . . . be deemed a mitigant in this case . . . ." We disagree.

In *Hafford*, as described by the defendant in his brief, "the defendant was convicted of the capital felony of murder committed in the course of a sexual assault in the first degree in violation of § 53a-54b (7). The murder and rape occurred during the course of a robbery in the early morning hours [in] a Windsor Locks gas station where the victim . . . was the manager. After raping the victim, the defendant then killed her in an attack that lasted at least five minutes. The defendant used five different weapons and inflicted more than sixty wounds on [the victim] during the attack. [The] [d]efendant stabbed her repeatedly, hit her repeatedly in the head with a shovel, and hit her with an ice chopper."

The defendant in *Hafford* offered twenty-eight mitigating factors. The panel hearing the case, after finding the presence of the aggravating factor of commission of the offense in an especially cruel manner, also found the presence of three nonstatutory mitigating factors: (1) the defendant's mental capacity was impaired, "but not so impaired as to constitute a statutory mitigating factor"; (2) the defendant's ability to conform his conduct to the requirements of the law was impaired, "but not so impaired as to constitute a statutory mitigating factor"; and (3) the defendant "gave both oral and written statements to the police shortly after his arrest, fully admitting his guilt. He was remorseful, cooperative and regretful. The court [found] that these factors, when considered in combination with the other mitigating factors found, in fairness and in mercy, [constituted] a mitigating factor." Accordingly, the panel imposed a sentence of life imprisonment without the possibility of release.

Contrary to the defendant's argument, the death sentence in this case is not disproportionate to the sentence

of life imprisonment in *Hafford*. First, in *Hafford*, the panel combined the defendant's confessions, remorse and cooperation, with the other two nonstatutory mitigating factors that it had found, and on the basis of that combination determined that his confession, cooperation and remorse constituted a mitigating factor. In the present case, however, no such other mitigating factors were found. In fact, the two specific mental state nonstatutory mitigating factors that the panel found proven in *Hafford* expressly were found not proven in the present case.

Second, even focusing solely on the cooperation and confession, there are stark differences between *Hafford* and this case. It is true that in this case, prior to his confession, the defendant demonstrated an extraordinary degree of cooperation with the police and orally confessed partly out of a desire to relieve his conscience. That cooperation, however, was not fully truthful. He had lied to the police, for example, about how he came into possession of the victim's shopping bag and receipts. Furthermore, in his confession, the defendant did not fully admit his guilt. His statement to the effect that, after throwing the victim off the top of the dam, he never went down to her and killed her there, but merely looked at her later from the shoulder of Interstate 84 to satisfy himself that she was dead, is plainly at odds with the overwhelming circumstantial evidence that she survived the fall and that he then made his way down to her and strangled her, drowned her, or both. Finally, any suggestion of mitigation arising from his confession and purported remorse completely was undermined by the defendant's conduct with respect to the confession during the trial. He told Gallagher, his former classmate, that the police had planted evidence in his apartment, and that if he were acquitted he would be rich, intimating that Gallagher might share in his riches if Gallagher would comply with his request

to commit perjury before the panel by supplying a false alibi for him. *Hafford* does not, therefore, demonstrate that the defendant's sentence was disproportionate.

We now turn to a description of the remaining five cases in the pool of similar cases. In *State* v. *King*, supra, 249 Conn. 652–53, the defendant broke into a neighbor's home in the middle of the night, where the fifteen year old female victim was baby-sitting for her two and one-half year old sister. The defendant sexually assaulted, beat, strangled and stabbed the victim, causing her extreme physical pain and terror. The victim was found after 4 a.m., lying face down on the bed, bound with duct tape on her mouth, still alive but unresponsive and bleeding from various wounds. Id., 654. She died several hours later while undergoing surgery for the wounds that the defendant had inflicted on her. Id.

The state claimed that the crime was committed in an especially heinous, cruel and depraved manner. The defendant claimed fourteen mitigating factors, including the two statutory mitigating factors of significant impairment of his mental capacity and significant impairment of his ability to conform his conduct to the requirements of the law. His twelve claimed nonstatutory mitigants were: (1) a lesser degree of impairment of mental capacity; (2) a lesser degree of impairment of his ability to conform his conduct to the requirements of the law; (3) his age of twenty years at the time of the offense; (4) his mother's abandonment, emotional neglect and failure to protect him from emotional, sexual and physical abuse adversely affected his childhood development; (5) his moral, psychological, social and educational development was impaired by his early childhood environment; (6) his ability to pursue education and develop friendships was impaired by numerous changes in residence and schools while growing up; (7) at age eight and one-half years, he left his home with

his mother's acquiescence to live with another person, in order to escape abuse and neglect at home; (8) his family wants to maintain personal relationships with him and will support him during incarceration; (9) he has done positive things in his life; (10) life imprisonment is the appropriate sentence for him; (11) the catchall factor;[116] and (12) any or all of the first thirteen factors, in fairness or in mercy, provides a reason for a sentence of less than death.

The jury returned a special verdict finding that the state had proven the aggravating factor alleged, and that the defendant had proven the existence of a mitigating factor, which the jury did not identify. Accordingly, the defendant was sentenced to life imprisonment without the possibility of release. Id., 650–51.

In *Webb*, the defendant, after kidnapping the victim at gunpoint, drove her nearly four miles to a public golf course, where he forcibly attempted to assault her sexually. When she broke free, he shot her twice in the back and, after she had crawled thirty-three yards away, coughing blood and in excruciating pain, he stood in front of the conscious and prostate victim. He then shot her in the chest, in the ear, and point blank in the face, with bullets specially enhanced for potency to do damage. *State* v. *Webb*, supra, 238 Conn. 540–41.

The state claimed two aggravating factors: (1) the offense had been committed during the commission of a sexual assault in the first degree, an offense of which the defendant previously had been convicted; and (2) the offense was committed in an especially cruel and

---

[116] As indicated in the appendix to the state's brief in the present case, the defendant in *King* claimed specifically " '[t]hat there exists a mitigating factor concerning [the defendant's] character, background or history that has not been specifically mentioned in this list that a juror or jurors consider in fairness or mercy as a basis for sentencing [the defendant] to life imprisonment without possibility of release rather than sentencing him to death . . . .' "

heinous manner. Id., 540. The defendant claimed the following ten mitigating factors: (1) significant impairment of mental capacity; (2) a lesser degree of mental capacity; (3) an emotionally deprived childhood; (4) untreated early mental or emotional disturbance; (5) the defendant had surrendered to the police after learning that he was sought as a suspect; (6) he had maintained positive relationships with various persons; (7) a lingering doubt regarding his guilt; (8) fairness, mercy and humanity; (9) a disparity between the defendant's chronological age and his emotional development; and (10) " '[a]ny other mitigating factors concerning [the defendant's] character or background, or the nature and circumstances of the case suggested by the evidence.' " Id., 541. The jury found both of the aggravating factors proven and none of the mitigating factors proven and, accordingly, the death sentence was imposed. Id., 542–43.

In *State* v. *Lapointe*, supra, 237 Conn. 712, the defendant sexually assaulted his wife's grandmother in her apartment and, when she threatened to tell his wife what he had done, he stabbed her repeatedly in the stomach and back, and attempted to strangle her. He then set fire to her apartment, and she died of smoke inhalation.

The defendant in *Lapointe* claimed the following fifteen mitigating factors: (1) significant impairment of his mental capacity; (2) a lesser degree of impairment of mental capacity; (3) the defendant suffered from a congenital cranial deformity, resulting in hydrocephalus and leaving him with permanent brain damage; (4) a difficult childhood and adolescence that adversely affected his emotional and social development; (5) premature and inappropriate termination of his formal education; (6) a steady and reliable work history; (7) he was married, was a loving father, and provided for his family; (8) he had appropriate concern for the secular

and religious education of his son; (9) his belief in God and participation in his religion; (10) his volunteer service to the community; (11) he had adjusted well to prison life; (12) he had no prior criminal history, with one minor exception; (13) mercy; (14) any other factor concerning his character, background or history, or the nature or circumstances of the crime; and (15) a life sentence would be the appropriate sentence. See *State v. Webb*, supra, 238 Conn. 543–44. The jury found that the state had proven an aggravating factor, namely, that the defendant had committed the offense so as to create a grave risk of death to one other than the victim, and that an unidentified mitigating factor had been proven. *State v. Lapointe*, supra, 237 Conn. 695. Accordingly, a sentence of life imprisonment without the possibility of release was imposed. Id., 695–96.

In *State v. Ross*, supra, 230 Conn. 191–93, the defendant sexually assaulted and strangled four young female victims to death. The defendant had a prior violent sex offense conviction, and in his confession he stated that he had killed the victims in order to avoid detection. With respect to his victim, Wendy B., the defendant accosted her on a rural road, forced her into the woods, sexually assaulted her, and then manually strangled her to death while sitting on her back. This took several minutes to accomplish, during which the victim was conscious and the defendant had to relieve his cramping hands. The murder of his victim, Robyn S., was accomplished in a similar manner. With respect to his other two victims, April B. and Leslie S., the defendant picked them up while they were hitchhiking on a rural road. After he had taken April B. outside of the car and sexually assaulted her, he strangled her in a manner similar to his other victims. He next returned to the car to kill Leslie S. The defendant then deposited their bodies in a culvert, which he later visited in order to see their

decomposing bodies and to take pleasure in reliving the killings. See *State* v. *Webb*, supra, 238 Conn. 545–46.

The state claimed that the crimes were committed in an especially cruel, heinous or depraved manner. *State* v. *Ross*, supra, 230 Conn. 259. The defendant in *Ross* presented evidence of the following eleven mitigating factors: (1) significant impairment of his mental capacity; (2) significant impairment of his ability to conform his conduct to the requirements of the law; (3) cooperation with the police; (4) a good adjustment to prison life; (5) emotional disturbance; (6) care and concern for others; (7) positive relationships with others; (8) a deprived childhood; (9) he is the product of a pathological family unit; (10) mercy; and (11) any other mitigating factors concerning his character, background and history suggested by the evidence. See *State* v. *Webb*, supra, 238 Conn. 544–47. The jury found the aggravating factor proven and none of the mitigating factors proven and, accordingly, a sentence of death was imposed. *State* v. *Ross*, supra, 265.[117]

In *State* v. *Usry*, supra, 205 Conn. 310, the defendant, who had just reached the age of eighteen, broke into the victim's apartment, sexually assaulted her and then killed her with repeated blows to the head and face with a brick. The victim survived for approximately twenty minutes after first having been disabled by a blow to her head.

The state claimed that the offense had been committed in an especially cruel, heinous or depraved manner. The defendant in *Usry* claimed the following nine mitigants: (1) significant impairment of mental capacity; (2) emotional disturbance; (3) his youthful age; (4) a

[117] This court subsequently reversed the sentence of death because of an improper evidentiary ruling, and we remanded the case for a new penalty hearing. *State* v. *Ross*, supra, 230 Conn. 273.

disparity between his chronological age and his emotional development; (5) an emotionally deprived early childhood; (6) a pathological family unit; (7) parental neglect, resulting in a lack of help for his psychological problems; (8) he suffered from a mental disease or defect, namely, paranoid personality disorder, schizoid personality disorder; and (9) the catch-all mitigant. The jury found the aggravant proven, but could not reach unanimous agreement on whether a mitigant was proven—five voting in favor of and seven voting against a mitigant having been proven. The trial court imposed a sentence of life imprisonment without the possibility of release. See *State* v. *Webb*, supra, 238 Conn. 547–48.

With respect to the five cases in which the death penalty was imposed, *Webb* and the four *Ross* cases, the fact finders found that the offenses had been committed in an especially cruel, heinous or depraved manner. In *Webb*, an additional aggravant also was proven. In the present case, the panel similarly found that the offense had been committed in an especially cruel manner. Furthermore, in *Webb* and *Ross*, the fact finders rejected the defendants' claims of mitigation. Most of those rejected claims parallel many of the claims of mitigation presented by the defendant in the present case. In all six such cases, therefore—the other five cases and this case—the fact finders consistently rejected most of the claims of mitigation of the nature presented by this defendant.

Other than *Hafford*, which we already have discussed, there were three cases in which the death penalty was not imposed, namely, *King, Lapointe* and *Usry*. In *King*, there was a finding that the offense was committed in an especially cruel, heinous or depraved manner. In *Lapointe*, there was no finding of especially heinous and depraved conduct, the jury was hung on whether there was especially cruel conduct, and there

was a finding of the aggravant that the defendant knowingly created a grave risk of death to one other than the victim. In *Usry*, the jury found that the offense was committed in an especially heinous, cruel or depraved manner.

Regarding the mitigants in these three cases, in *King*, there was a finding that at least one of the fourteen claimed mitigants had been proven. Similarly, in *Lapointe*, the jury found proven at least one of the defendant's fifteen mitigating factors, several of which had no counterpart in the mitigants claimed in the present case. Those were: (1) permanent brain damage; (2) parental concern for the secular and religious education of his son; and (3) religious beliefs and participation in his religion. In *Usry*, the jury was hung, seven to five, against the finding of a mitigant. Moreover, there was at least one mitigant that had no counterpart in the present case, namely, that the defendant was only weeks beyond the statutory mitigant age of eighteen.

Our statement in *Webb* is an apt summary of the process of proportionality review that we have undertaken in the present case. "On the basis of this analysis, of our scrupulous examination of all of the material presented to us regarding the imposition of the death penalty in the present case, and of our careful review of all of the material presented to us regarding the imposition of the sentences in the other [nine] similar cases, we conclude that the death sentence in this case is not 'excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.' General Statutes § 53a-46b (b) (3). There is nothing freakish, arbitrary, wanton or aberrational about the sentence in this case. There is no pattern or trend evident in similar cases with respect to which this sentence is inconsistent. This case is not an outlier.

The various sentencers' evaluations of similar aggravants and claimed mitigants in the other similar cases is reasonably consistent with the [panel's] evaluation of the aggravants and claimed mitigants in this case. The death sentence in this case is reasonably consistent with the sentences of death imposed in the five similar cases in which that sentence was imposed, considering the aggravants found and the mitigants claimed. The death sentence in this case is reasonably consistent with the sentences of life imprisonment in the [four] similar cases in which that sentence was imposed, considering the aggravants found and the mitigants claimed; there is nothing freakish, aberrational or arbitrary in [the panel] having imposed the death penalty in this case and [the sentencers] having declined to do so in the other [four] cases. The sentence in this case is reasonably consistent with the sentences imposed in the pool of similar cases. The sentence of death in this case, therefore, must be affirmed." *State* v. *Webb*, supra, 238 Conn. 550–51.

The judgment is affirmed.

In this opinion CALLAHAN, C. J., and O'CONNELL, J., concurred, and PETERS, J., concurred in parts I through V and in the result in part VI.

PETERS, J., concurring. I agree with parts I through V of the majority opinion. With respect to part VI, which considers the issues raised by the defendant with respect to proportionality review, I agree with the outcome reached by the majority but not with the road taken to get there.

The majority opinion conscientiously and meticulously undertakes to perform proportionality review in the manner that this court previously has authorized. I am persuaded that our legislature did not contemplate anything other than this manner of proportionality

review. I am now equally persuaded that this manner of proportionality review is unworkable.

I regret that the flaws inherent in proportionality review were not visible to me at an earlier time. Only as I have read the briefs of the parties struggling to resolve the issues raised by proportionality review have I come to see proportionality review as an exercise in futility.

If we are to undertake proportionality review, our prior cases have defined the relevant universe of capital crimes cases appropriately. In light, however, of the legislature's abolition of proportionality review, that universe will never contain more than a small sample of cases. There will never be a statistical basis for determining that a death penalty decision should be overturned, even though the crime has been committed as charged, and the penalty determination is appropriate on its merits. I do not believe that a nonstatistical intuitive appraisal of comparative death-worthiness is any more likely to succeed. In short, to my mind, the search for an outlier is the pursuit of a chimera.

This appraisal leads me now to agree with the state that we should hold that the legislative abolition of proportionality review applies to cases then pending as well as to cases arising subsequent to its enactment. I would not recommend this course if I thought that a defendant facing the death penalty would receive even a scintilla of protection from proportionality review. Because I am persuaded that no such protection is to be found in such a review, I would discontinue its pursuit.

Accordingly, I respectfully concur in the judgment with respect to part VI.

BERDON, J., dissenting.[1] To put it mildly, the defendant, Sedrick Cobb, is not a very nice person. But our

[1] Although, of course, I do not join in the endorsement of Justices Norcott and Katz of footnote 103 of the majority opinion, I do join in the substantive reasoning of their respective dissents. As I read Justice Norcott's dissent,

laws are designed to protect every citizen in an even-handed manner. They protect not only the rights of the innocent, but also the rights of those individuals who are not so nice. That is a bedrock principle of our democracy. As Justice Frankfurter stated almost fifty years ago, "[i]t is a fair summary of history to say that the safeguards of liberty have frequently been forged in controversies involving not very nice people." *United States* v. *Rabinowitz*, 339 U.S. 56, 69, 70 S. Ct. 430, 94 L. Ed. 653 (1950) (Frankfurter, J., dissenting).

I continue to believe that the death penalty does not comport with contemporary standards of decency and morality and that its imposition violates our state constitution because it constitutes cruel and unusual punishment. *State* v. *Webb*, 238 Conn. 389, 555, 680 A.2d 147 (1996) (*Berdon, J.*, with whom *Norcott* and *Katz, Js.*, joined, dissenting); *State* v. *Breton*, 235 Conn. 206, 260, 663 A.2d 1026 (1995) (*Berdon, J.*, dissenting); *State* v. *Ross*, 230 Conn. 183, 286, 646 A.2d 1318 (1994) (*Berdon, J.*, dissenting), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995). Although in those prior opinions I have explicated broadly the unconstitutionality of the death penalty, in this dissent I focus on the arbitrariness of its application and the fact that, in practice, the imposition of the death penalty raises serious issues of whether it is driven by racism. I shall also

he now believes that the death penalty is unconstitutional without qualification and under all circumstances. This is a substantial change from his position in *State* v. *Webb*, 238 Conn. 389, 566, 680 A.2d 147 (1996), which prevented me from joining his dissent in that case. In his dissent in *Webb*, Justice Norcott wrote: "I do not believe that the penalty of death for certain crimes is necessarily forbidden by the state constitution . . . ." Id.

I also agree with Justice Katz' resolution of the *Stoddard* issue; see *State* v. *Stoddard*, 206 Conn. 157, 173, 537 A.2d 446 (1988)—that is, waiver of the right to counsel is invalid when the police fail to inform a suspect of the efforts by counsel to consult with him, thereby requiring a per se rule of exclusion of the suspect's confession.

point out that the majority of this court has failed to perform its legislatively mandated duties.[2]

## I

The arbitrariness of the imposition of the death penalty that I discuss in this section of my dissent is a different type than that which I discussed in my dissent in *State* v. *Ross*, supra, 230 Conn. 305–10. It is the arbitrariness of the law upon which the state predicates its conviction that I concern myself with today. This arbitrariness is demonstrated by comparing this court's decision in *Ross* with our more recent decision in *State* v. *Malave*, 250 Conn. 722, 687 A.2d 489 (1999).

In *Ross*, a death penalty case, the majority of this court upheld the trial court's missing witness jury instruction (sometimes referred to as *Secondino* rule)— that is, the jury may draw an adverse inference because of the failure of the defendant "to produce a witness who is within his power to produce and who would naturally have been produced by him . . . ." *Secondino* v. *New Haven Gas Co.*, 147 Conn. 672, 675, 165 A.2d 598 (1960).

The challenged missing witness instruction in *Ross* was particularly important to the state in order to obtain the defendant's conviction. The court's instruction included references to two psychiatrists who had examined the defendant in regard to his sanity but who did not testify at trial. *State* v. *Ross*, supra, 230 Conn. 209. This insanity defense was the defendant's only substantive defense with respect to his criminal liability for the multiple sexual assaults, kidnappings and murders with which he had been charged. Id., 192. The missing witness instruction undermined the testimony of a psychiatrist and a psychologist who the defendant did produce

---

[2] In this dissent I have discussed a limited number of the issues reached by the majority. I want to make it clear that it should not be implied that I agree with those issues that I have not addressed.

and who testified that he lacked the requisite mental capacity under General Statutes § 53a-13. See id., 215–17. In effect, their testimony was that at the times that he committed the crimes, the defendant "lacked substantial capacity as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law." General Statutes § 53a-13 (a). Indeed, in *Ross*, the majority justified the missing witness instruction as being essential for "the truth finding function of the jury." *State* v. *Ross*, supra, 214–15. The court stated: "[T]he *Secondino* charge serves important evidentiary interests. In contradistinction to an invocation of [the attorney-client] privilege, the *Secondino* inference derives from the maxim that all evidence is to be weighed according to the proof which it was in the power of one side to have produced, and in the power of the other side to have contradicted. . . . Permitting consideration of all relevant evidence that bears a reasonable assurance of reliability advances the truth finding function of the jury." (Citation omitted.) Id., 214.[3]

Five years later, in *State* v. *Malave*, supra, 250 Conn. 738, an en banc court unanimously held "that the time has come to abandon the missing witness rule," and ordered trial courts not to instruct jurors that they may draw an adverse inference for the failure of a party to call a witness under *Secondino*. In *Malave*, the court recognized that the "application of the *Secondino* rule in criminal cases gives rise to constitutional issues not present in civil cases. Indeed, some courts have concluded that a missing witness instruction unconstitutionally diminishes the state's burden of proving the defendant's guilt beyond a reasonable doubt by suggesting to the jury that the defendant has some obligation to produce evidence. See, e.g., *State* v. *Brewer*,

---

[3] I strenuously dissented on the issue of the missing witness instruction in *State* v. *Ross*, supra, 230 Conn. 324–34 (*Berdon, J.*, dissenting).

[505 A.2d 774, 777 (Me. 1985)] ("To allow the missing-witness inference in a criminal case is particularly inappropriate since it distorts the allocation of the burden of proving the defendant's guilt. The defendant is not obligated to present evidence on his own behalf. The inference may have the effect of requiring the defendant to produce evidence to rebut the inference. If he fails to do so, the missing-witness inference allows the state to create "evidence" from the defendant's failure to produce evidence. Such a result is impermissible.'); *Russell* v. *Commonwealth*, [216 Va. 833, 837, 223 S.E.2d 877 (1976)] ('[Missing witness instructions] . . . run head on into the presumption of innocence to which every accused is entitled and upon which juries are universally instructed. . . . To tell a jury that the failure of the defense to call a material witness raises an adverse presumption against the accused is to weaken, if not neutralize, the presumption of innocence which, if given its full strength, might be sufficient to tip the scales in favor of acquittal.')." *State* v. *Malave*, supra, 737–38.

Just three years ago, in my dissent in *State* v. *Taylor*, 239 Conn. 481, 512–13, 687 A.2d 489 (1996), cert. denied, 521 U.S. 1121, 117 S. Ct. 2515, 138 L. Ed. 2d 1017 (1997), I pointed out that the missing witness instruction is unconstitutional, stating: "[I]t is well established that '[a]n instruction that dilutes the state's burden, or places a burden on the defendant to prove his innocence, is unconstitutional. *Sandstrom* v. *Montana*, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979).' *State* v. *Reddick*, 197 Conn. 115, 131–32, 496 A.2d 466 (1985), cert. denied, 474 U.S. 1067, 106 S. Ct. 822, 88 L. Ed. 2d 795 (1986). In my view, the *Secondino* rule unconstitutionally diminishes the state's burden of proving the defendant's guilt beyond a reasonable doubt. It is incomprehensible to me that, although the defendant bears no burden and need not present evidence or call witnesses, it is

permissible for the trial judge to instruct the jury, or for the state to comment, that the jury may draw an unfavorable inference on the defendant's failure to produce a witness."[4]

---

[4] "Other jurisdictions have come to the conclusion that it is constitutionally impermissible in criminal cases to draw an adverse inference from a defendant's failure to call a witness. See *State* v. *Brewer*, [supra, 505 A.2d 777] ('To allow the missing-witness inference in a criminal case is particularly inappropriate since it distorts the allocation of the burden of proving the defendant's guilt. The defendant is not obligated to present evidence on his own behalf. The inference may have the effect of requiring the defendant to produce evidence to rebut the inference. If he fails to do so, the missing-witness inference allows the state to create "evidence" from the defendant's failure to produce evidence. Such a result is impermissible.'); *State* v. *Caron*, 300 Minn. 123, 127, 218 N.W.2d 197 (1974) (per curiam) ('such comment might suggest to the jury that [the] defendant has some duty to produce witnesses or that he bears some burden of proof'); *Ross* v. *State*, 106 Nev. 924, 927, 803 P.2d 1104 (1990) ('[Missing witness argument] can be viewed as impermissibly shifting the burden of proof to the defense. . . . Such shifting is improper because it suggests to the jury that it was the defendant's burden to produce proof by explaining the absence of witnesses or evidence.' [Citation omitted; internal quotation marks omitted.]); *State* v. *Leyba*, 89 N.M. 28, 29, 546 P.2d 876 (1976) (concluding that prosecutor's remarks with respect to missing witness inference 'suggest that a defendant has some duty to produce witnesses or has some burden of proof'); *State* v. *Jefferson*, 116 R.I. 124, 139–40, 353 A.2d 190 (1976) ('[w]e now believe that the Minnesota court's concern about the jury's possible mistaken belief that a defendant has a duty to prove his innocence is well taken'); *State* v. *Posey*, 269 S.C. 500, 503, 238 S.E.2d 176 (1977) ('An accused has the right to rely entirely upon [the] presumption of innocence and the weakness in the State's case against him. He would clearly be deprived of that right if an adverse inference is permitted to be indulged against him because of its exercise.'); *Russell* v. *Commonwealth*, [supra, 216 Va. 837] ('[Missing witness instructions] would run head on into the presumption of innocence to which every accused is entitled and upon which juries are universally instructed. The burden is upon the prosecution to prove its case against the accused. The defense need not prove anything; it may rely upon the presumption of innocence. To tell a jury that the failure of the defense to call a material witness raises an adverse presumption against the accused is to weaken, if not neutralize, the presumption of innocence which, if given its full strength, might be sufficient to tip the scales in favor of acquittal.'); see also *Commonwealth* v. *Schatvet*, 23 Mass. App. 130, 135, 499 N.E.2d 1208 (1986) ('[c]ircumspection . . . is especially called for where the inference would run against a defendant in a criminal prosecution, for the inference may come uncomfortably close to invading constitutional rights'). Indeed, the Fifth Circuit Court of

Although this court in *Malave* found the improper missing witness instruction to the jury to be "harmless error" by fancily sidestepping the constitutional issues, one can only speculate as to whether a jury would have acquitted him if the instruction had not been given. "The trial court essentially instructed the jury that it could infer that the testimony of another witness— whom the defendant did not call—would have cast doubt upon the defendant's alibi. The harm that inheres in this instruction is self-evident. The trial court authorized the jury to discredit the testimony of the defendant's alibi witnesses, based on nothing more substantial than the fact that another witness had failed to testify. In short, the trial court encouraged the jury to reject the defendant's alibi. If this kind of encouragement from the court is 'harmless,' then I must not understand the meaning of that word." *State* v. *Malave*, supra, 250 Conn. 746 (*Berdon, J.*, concurring and dissenting).

Although the missing witness instruction finally was abandoned in *Malave*, the change in the predicate law upon which the conviction of the defendant in *Ross*, who now faces a new death penalty hearing, rested has undermined the reliability of his conviction, which may very well lead to a sentence of death.[5] This kind of injustice is unconscionable and should be intolerable in the context of the death penalty.

Appeals pointed out that 'we do not approve of comments reflecting on the lack of evidence presented by a defendant in a criminal case . . . . Such a course of action by the prosecutor is a parlous one at best, of necessity sailing close to implying that the defendant is obligated to produce evidence of his innocence.' *United States* v. *Iredia*, 866 F.2d 114, 118 (5th Cir.), cert. denied, 492 U.S. 921, 109 S. Ct. 3250, 106 L. Ed. 2d 596 (1989)." *State* v. *Taylor*, supra, 239 Conn. 513–15 (*Berdon, J.*, dissenting).

[5] The judgment imposing the death penalty in *Ross* was reversed and the matter remanded to the trial court for a new hearing on the penalty phase. The court let stand the defendant's conviction for capital felony. *State* v. *Ross*, supra, 230 Conn. 286. Accordingly, the decision in *Malave* with respect to the missing witness instruction cannot benefit the defendant in *Ross* on direct appeal.

The majority in this case concedes, "as judges we have long understood that, as . . . Justice . . . Oliver Wendell Holmes articulated in his famous aphorism, '[t]he life of the law has not been logic: it has been experience.' " The majority seems to view the "constitutional" imposition of death as a matter of trial and error. When death is the consequence there is no margin for error. Even Justice Rehnquist acknowledged: "One of the principal reasons why death is different is because it is irreversible; an executed defendant cannot be brought back to life. This aspect of the difference between death and other penalties would undoubtedly support statutory provisions for especially careful review of the fairness of the trial, the accuracy of the factfinding process, and the fairness of the sentencing procedure where the death penalty is imposed. . . . The second aspect of the death penalty which makes it 'different' from other penalties is the fact that it is indeed an ultimate penalty which ends a human life rather than simply requiring that a living human being be confined for a given period of time in a penal institution." *Woodson* v. *North Carolina*, 428 U.S. 280, 323, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976) (Rehnquist, J., dissenting). "An executed person has indeed lost the right to have rights." (Internal quotation marks omitted.) *Spaziano* v. *Florida*, 468 U.S. 447, 469 n.3, 104 S. Ct. 3154, 82 L. Ed. 2d 340 (1984). Because the law evolves continuously as a result of changes in the personnel of the court or as a result of justices who revise their positions,[6] such as in *Malave*, the imposition of

---

[6] Perhaps the most prominent example of a judge's change of heart is that of Justice Blackmun who, in dissenting from the United States Supreme Court's denial of certiorari, wrote: "From this day forward, I no longer shall tinker with the machinery of death. For more than 20 years, I have endeavored—indeed, I have struggled—along with a majority of this Court, to develop procedural and substantive rules that would lend more than the mere appearance of fairness to the death penalty endeavor. Rather than continue to coddle the Court's delusion that the desired level of fairness has been achieved and the need for regulation eviscerated, I feel morally and intellectually obligated simply to concede that the death penalty experi-

the death penalty has no place in a civilized democratic society. It embodies an arbitrariness that cannot be tolerated when the state determines who should live and who should die.

## II

There is a second type of arbitrariness which is inherent in the imposition of the death penalty. Justice Blackmun, in his "I no longer shall tinker with the machinery of death" dissent to the denial of certiorari in *Callins* v. *Collins*, 510 U.S. 1141, 1145, 114 S. Ct. 1127, 127 L. Ed. 2d 435 (1994),[7] cogently wrote: "The arbitrariness inherent in the sentencer's discretion to afford mercy is exacerbated by the problem of race. Even under the most sophisticated death penalty statutes, race continues to play a major role in determining who shall live and who shall die. Perhaps it should not be surprising that the biases and prejudices that infect society generally would influence the determination of who is sentenced to death, even within the narrower pool of death-eligible defendants selected according to objective standards. No matter how narrowly the pool of death-eligible defendants is drawn according to objective standards, [the] promise [of *Furman* v. *Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972)] still will go unfulfilled so long as the sentencer is free to exercise unbridled discretion within the smaller group and thereby to discriminate. ' "[T]he power to be lenient [also] is the power to discriminate." ' *McCleskey* v. *Kemp*, [481 U.S. 279, 312, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987)], quoting K. Davis, Discretionary Justice 170 (1973)." *Callins* v. *Collins*, supra, 1153 (Blackmun, J., dissenting).

The perception of the "virus of racism" which infects the imposition of the death penalty has not only been

---

ment has failed." *Callins* v. *Collins*, 510 U.S. 1141, 1145, 114 S. Ct. 1127, 127 L. Ed. 2d 435 (1994).

[7] See footnote 6 of this dissent.

demonstrated to exist in other jurisdictions, such as Georgia,[8] but also in the state of Connecticut. In the present case, the defendant is an African-American and the victim was white. In *State* v. *Cobb*, 234 Conn. 735, 663 A.2d 948 (1995) (*Cobb I*), I pointed to the following disturbing statistics not from the South but with respect to the application of the death penalty in Connecticut. "First, the data indicates that of all the defendants who have been charged with capital felony, African-American defendants have been convicted twice as often— and, therefore, have been subjected to the death penalty twice as often—as defendants who are not African-American. In other words, if a defendant who is not African-American is charged with capital felony, there is a 200 percent greater chance that the jury will return a verdict of not guilty on that charge, and therefore not subject him to the death penalty, than if the defendant is African-American.

---

[8] Justice Brennan, in his dissent in *McCleskey* v. *Kemp*, supra, 481 U.S. 321, pointed out the following: "At some point in this case, Warren McCleskey doubtless asked his lawyer whether a jury was likely to sentence him to die. A candid reply to his question would have been disturbing. First, counsel would have to tell McCleskey that few of the details of the crime or of McCleskey's past criminal conduct were more important than the fact that his victim was white. . . . Furthermore, counsel would feel bound to tell McCleskey that defendants charged with killing white victims in Georgia are 4.3 times as likely to be sentenced to death as defendants charged with killing blacks. . . . In addition, frankness would compel the disclosure that it was more likely than not that the race of McCleskey's victim would determine whether he received a death sentence: 6 of every 11 defendants convicted of killing a white person would not have received the death penalty if their victims had been black . . . while, among defendants with aggravating and mitigating factors comparable to McCleskey's, 20 of every 34 would not have been sentenced to die if their victims had been black. . . . Finally, the assessment would not be complete without the information that cases involving black defendants and white victims are more likely to result in a death sentence than cases featuring any other racial combination of defendant and victim. . . . The story could be told in a variety of ways, but McCleskey could not fail to grasp its essential narrative line: there was a significant chance that race would play a prominent role in determining if he lived or died."

"Second, the data indicates that the death penalty is more likely to be imposed if the victim of the crime was white or otherwise not African-American. The defendant points to several specific instances:

"(1) Those defendants who murder African-Americans are substantially less likely to be charged with capital felony and, consequently, substantially less likely to be subject to the death penalty, than those defendants who murder persons who are not African-Americans.

"(2) None of the defendants now on death row was sentenced to death for the murder of an African-American, although 40 percent of those persons murdered in this state since 1976 have been African-American.

"(3) Of the twenty-eight cases in which a person was convicted of capital felony, only four, or 14 percent, have involved a victim who was African-American. As indicated previously, however, 40 percent of murder victims since 1976 have been African-American.

"(4) Of the eighteen cases that have proceeded to the 'death penalty phase' hearing, only one, or 5.5 percent, involved a victim who was African-American.

"(5) If the victim was an African-American, those defendants who are accused of kidnapping and murder—two of the specific crimes of which the defendant in this case was convicted—will not be charged with capital felony, and therefore will not be subject to the death penalty.

"(6) Similarly, if the victim was an African-American, those defendants who are accused of sexual assault and murder—also two of the specific crimes of which the defendant in this case was convicted—will very rarely be charged with capital felony, and therefore will very rarely be subject to the death penalty.

"The significance of the capital felony data brought forward by the defendant may be summarized as follows. If the defendant is an African-American, he is more likely to receive the death penalty than if he were white. If the victim is white, a defendant also is more likely to receive the death penalty. If the defendant is an African-American and the victim is white, the defendant is highly more likely to receive the death penalty." *Cobb I*, supra, 234 Conn. 766–68 (*Berdon, J.*, with whom, *Norcott* and *Katz, Js.*, joined, dissenting).

Indeed, when this case is compared to *State* v. *Hafford*,[9] Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. CR91-0084381 (August 9, 1996), which by no means is an isolated example, the perception of racism becomes evident. In *Hafford*, a three judge panel found that the white defendant was guilty of the capital felony of murder that occurred in the course of a sexual assault and during the course of a robbery. They also found that the murder was committed in an especially cruel manner in that the defendant intentionally inflicted extreme pain and torture on his victim above and beyond that which would necessarily accompany the underlying killing. More specifically, the defendant in *Hafford* used five different weapons and inflicted more than sixty wounds on the victim during the attack, stabbing her repeatedly in the head with a shovel and striking her body with an ice chopper. Nevertheless, the three judge panel noted the confession the defendant had given to the police, in which he expressed remorse, and determined that that constituted a nonstatutory mitigating factor that resulted in his life being spared and his being sentenced to life imprisonment.

[9] Although the Supreme Court appeal in *Hafford* is still pending, the issues raised in the appellate briefs do not address any impropriety in the death penalty phase and the trial court's judgment on that issue will stand.

In the present case, the defendant also confessed and was remorseful *before* he was convicted.[10] The murder

[10] Two psychologists as well as prison mental health professionals who worked with the defendant prior to trial, testified that he continued to be remorseful about his crime beyond December of 1989. For example, during a psychological evaluation, the defendant expressed concern about the pain that his actions had inflicted on both the victim's family, as well as on his own, and was tearful and very depressed. According to the testing psychologist, the defendant has forced himself, during his incarceration, to confront his crimes and has expressed a desire to obtain help to understand his actions. According to a department of correction psychiatric treatment worker, the defendant in fact obtained treatment, attending a group workshop on anger and aggression in which he *was an active participant and in* which he expressed the desire to learn more about himself and the reasons that caused him to commit his crimes.

In addition, during a hearing on the defendant's motion to suppress his confession, Detective Neil O'Leary of the Waterbury police department testified in response to questioning by defense counsel as follows:

"A. I asked him if he wanted a lawyer. He said, no. And I asked, Ricky [the defendant], do you understand your rights? You got the card [reciting the *Miranda* warnings]. The card was still on the table. You understand your rights? You have the right to remain silent. Do you want a lawyer? I asked him about three times. He said no, I want to get this off my chest. He started to cry. . . . I asked him at least twice if he wanted a lawyer. He said, no. I said, do you understand your rights? I read him the rights off of the card. I said, you have the right to remain silent. He said, I understand my rights. I said, do you want to talk to us? With that, he starts to cry. He said, I want to get this off my chest.

"Q. He said, I want to get this off my chest. He started to cry?

"A. Yes, sir.

"Q. Did you tell him why you were there?

"A. We told him we wanted to talk to him about [the victim].

"Q. He again started to cry and said, I want to get this off my chest?

"A. Yes. That's correct.

"Q. Then what happened?

"A. Then I told him to start from the beginning and tell us what happened.

"Q. Did he do that?

"A. Yes, he did.

"Q. Was this in a narrative type form with [the defendant] or was it question and answers? What were the mechanics of it?

"A. A little bit of both. I said, start from the beginning. He started to talk. Every once in a while I would ask him, you know, I would ask him a question or I would ask him to clarify something if I didn't understand what he was saying. You know, he would go back and forth. I was taking notes as we were going. . . .

in *Hafford* was committed in a manner that was just as cruel as that committed in this case and both defendants voluntarily confessed and expressed remorse. The only difference I can detect is the race of the defendant— in *Hafford*, the white defendant's life was spared and in this case the African-American defendant has been sentenced to death.

The three judge panel in the present case refused to credit the defendant's confession, cooperation and remorsefulness merely because his attorney moved to suppress his confession. Thus, according to the majority, the defendant must be put to death because the defendant exercised his constitutional right to challenge a potentially coerced confession through a pretrial motion to suppress.

During the argument on the defendant's motion to dismiss the penalty hearing, defense counsel argued that the three judge panel should find that it was a mitigating factor that the defendant had assisted the police in the investigation of the crime and had confessed to the crime, whereupon one of the judges interrupted, stating, "[b]ut then [the defendant] sought to suppress his confessions and the searches, right? . . . You claim that [the defendant] cooperated with the police, [yet] [t]here were extensive suppression hearings." The majority contends that because this colloquy occurred at the hearing on the motion to dismiss the

---

"Q. How long did that conversation last?

"A. Twenty minutes to half an hour.

* * *

"Q. Now, after [the defendant] gave you this oral statement, what happened next?

"A. I asked him if he would give us a formal police statement.

"Q. What do you mean by a formal police statement?

"A. A regular handwritten formal police statement on a police department statement form, voluntary form.

"Q. What was his answer in response to that?

"A. He said he would."

penalty hearing as opposed to during the actual penalty hearing itself—although heard by a panel of the exact same judges—"this record does not support [the defendant's] assertion that in imposing the death penalty, the panel considered and held against him, in connection with his proposed mitigant of his confession, the fact that he had moved to suppress the confession." According to the majority, "[t]he colloquy engaged in by one of the three panel members with the defendant's counsel, during argument on the defendant's motion prior to the penalty hearing, is an inadequate basis for such an assertion." This reasoning by the majority, in and of itself, will foster the perception that the death penalty is driven by racism.[11]

The defendant's confession in conjunction with his mental illness and borderline intelligence are also mitigating factors. Our own case law tells us this.[12] Under these facts, the sentence of death imposed on a mentally ill man whose intelligence tested in the seventh percentile nationwide evidences a statutory structure not only laden with arbitrariness and bias, but also bereft of compassion and mercy.

### III

The legislature has mandated a special type of review by this court when a defendant has been sentenced

---

[11] Furthermore, the trial judge's colloquy with defense counsel raises another serious issue. It unquestionably indicates that the panel did, indeed, punish the defendant for exercising his constitutional rights in clear violation of the mandates of *Simmons* v. *United States*, 390 U.S. 377, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968). In *Simmons*, the United States Supreme Court held that the accused's exercise of his right to suppress evidence, which he alleged was illegally seized, could not be used to punish the accused by then using the accused's motion testimony against him at trial on the issue of guilt. Id., 389–94. The Supreme Court held that to let the prosecution use, as substantive evidence of guilt, the accused's testimony in support of his motion to suppress would create an undeniable tension between two constitutional rights and that it was "intolerable that one constitutional right should have to be surrendered in order to assert another." Id., 394.

[12] See footnote 9 of this dissent.

to death. It requires that the Supreme Court before affirming a sentence of death must determine that the sentence was not the "product of passion, prejudice or any other arbitrary factor . . . ." General Statutes § 53a-46b (b) (1). The majority refuses to make this determination because "we rejected [that claim] in an earlier proceeding during the course of this appeal." See *Cobb I*, supra, 234 Conn. 761–63. Merely to pass this statutory obligation off by stating that the defendant can raise it before a habeas court ignores the plain language of § 53a-46b (b) (1). Furthermore, it was not the intent of the legislature to place on the defendant the same baggage a petitioner must carry before a habeas court on this issue—e.g., the burden of proof.[13]

One week before oral argument in this case, I urged the justices of this court at conference to grant my motion to remand this case to the trial court in order to determine whether the sentence of death was the result of passion, prejudice or any other arbitrary factor. This motion was flatly rejected. In a memorandum to my colleagues in support of the motion, I wrote: "When a capital defendant marshals a compelling argument that the death penalty as it is administered in our state is incurably racist, we should stop dead in our tracks until we have given the argument our most serious attention. The public in general, the African-American community in particular, and any person with an ounce of either compassion or common sense would be appalled if we were to do anything else. It is, quite literally, a matter of life and death.

"In *Cobb I*, supra, 234 Conn. 763, the prevailing justices appeared to agree with this proposition, writing

---

[13] It would appear that, based upon the plain language of § 53a-46b (b) (1), the state would be required to prove that the sentence was not the product of passion, prejudice or any other arbitrary factor. If the legislature intended to place the burden on the defendant, it knew very well how to provide for it. See, e.g., General Statutes § 53a-46a (c) ("[t]he burden of establishing any mitigating factor shall be on the defendant").

that 'the nature of the defendant's claim of systemic racial bias, and the seriousness and finality of the death penalty, counsel against raising any undue procedural barriers to review of such a claim.' More importantly, the prevailing justices expressly stated that the defendant 'could have . . . claim[ed] that the statistical analysis he seeks to establish demonstrates that his death sentence was the product of "prejudice or any other arbitrary factor" ' pursuant to § 53a-46b (b) (1). Id., 761–62. Because I agree with these two statements, I will make a motion at this morning's conference to remand the case to the trial court for an evidentiary hearing to determine the merits of the defendant's argument."

I went on to state in my memorandum the following: "Furthermore, if the death penalty in our state is driven by racism—and all preliminary statistics indicate that it is—then we should face this issue head on. We should not sit back and let a federal court on habeas chide us for ignoring the defendant's claim. That would be an embarrassment and a disgrace. More importantly, we would have failed to have done justice for the defendant, and for every other defendant who might receive the ultimate punishment based upon the invidious factor of race.

"As I stated in *Cobb I*, the defendant's argument, 'having been raised, will continue to cast a dark cloud over the courts and the integrity of our judicial system. We must put it to rest.' *Cobb I*, supra, 234 Conn. 783 (*Berdon, J.*, with whom *Norcott* and *Katz, Js.*, joined, dissenting). We cannot do so unless we remand to the trial court for an evidentiary hearing."

I can feel the frustration of Justice Marshall when the majority of the United States Supreme Court, in *Sawyer* v. *Smith*, 497 U.S. 227, 259–60, 110 S. Ct. 2822, 111 L. Ed. 2d 193 (1990), refused to stay the imposition of the death penalty in order to allow the defendant to

pursue a writ of habeas corpus on the basis of his claim that the jury that convicted him "was deliberately misled about the significance of its verdict," when he wrote in his dissent: "The court's refusal to allow a federal habeas court to correct this error is yet another indication that the Court is less concerned with safeguarding constitutional rights than with speeding defendants, deserving or not, to the executioner."

The majority, in rejecting my motion at conference, succeeded to expedite the executioner's hand. The rush to snuff out the life of the defendant will only deepen African-Americans' perception of racism in this court, in the judicial system and in society. The 237 pages that it takes the majority to confirm the defendant's sentence of death will not wash the stain of blood that results from the majority's decision today.

## IV

Notwithstanding the arbitrariness and the perception of racism inherent in the imposition of the death penalty, I also continue to oppose it because it is cruel and unusual punishment under our state constitution. Justice Brennan, in his dissent in *Gregg* v. *Georgia*, 428 U.S. 153, 230–31, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976), eloquently summarized similar feelings, stating: "Death for whatever crime and under all circumstances is truly an awesome punishment. The calculated killing of a human being by the State involves, by its very nature, a denial of the executed person's humanity. . . . Death is not only an unusually severe punishment, unusual in its pain, in its finality, and in its enormity, but it serves no penal purpose more effectively than a less severe punishment; therefore the principle inherent in the [cruel and unusual punishments clause of the eighth amendment to the United States constitution (clause)] that prohibits pointless infliction of excessive punishment when less severe punishment can adequately

achieve the same purposes invalidates the punishment. . . .

"The fatal constitutional infirmity in the punishment of death is that it treats members of the human race as nonhumans, as objects to be toyed with and discarded. [It is] thus inconsistent with the fundamental premise of the [c]lause that even the vilest criminal remains a human being possessed of common human dignity. . . . As such it is a penalty that subjects the individual to a fate forbidden by the principle of civilized treatment guaranteed by the [clause]. I therefore would hold, on that ground alone, that death is today a cruel and unusual punishment prohibited by the [c]lause. Justice of this kind is obviously no less shocking than the crime itself, and the new official murder, far from offering redress for the offense committed against society, adds instead a second defilement to the first." (Citations omitted; internal quotation marks omitted.)

V

In footnote 103 of the majority opinion, all six of my colleagues who took part in deciding this case accuse me of violating the principles of confidentiality of the conference. I answer this accusation in this part of my dissent rather than bury it in a footnote because it raises profound moral and legal issues that transcend this case. Moreover, the gravity of this case, in which the majority's opinion carries the day by just one vote and will allow the state to kill the defendant, compels me to focus on this matter. Let us first, however, address my alleged transgressions. Prior to oral argument before this court, as I indicated in part III of this dissent, I made a motion at conference to remand this case to the trial court for a determination of whether the penalty of death was imposed as a result of "passion, prejudice or any other arbitrary factor" in accordance with the

legislative mandate of § 53a-46b.[14] According to my colleagues, the disclosure in this dissent of the fact that I made such a motion violates the principles of confidentiality and undermines the integrity of the judicial process. I have three responses.

First, I find their argument to be, for want of a better description, nonsensical. We continually consider motions, both those from parties and sua sponte motions of our own.[15] We discuss and vote on them at conference, and, of course, we notify the parties of our decision. At times, as we did in this case, we have published our decision and our reasoning. *Cobb I*, supra, 234 Conn. 735. It is incredible to believe that my colleagues would advocate that the making of such a motion, together with a written memorandum explaining my reasoning to support the motion, would in some manner fall within the confidentiality of the conference. I would concede that the arguments and discussions of my colleagues at conference are confidential and I am unable to and do not disclose that dialogue. We, however, are not a private club. We are a constitutionally created court of this state whose "powers and jurisdiction . . . [are] defined by law,"[16] not by consensus of the sitting justices.

Second, even if the motion and the decision were confidential, as a justice of this court, I would be compelled legally and morally to disclose that information. The defendant has a constitutional right to know about this court's failure to follow the mandated review that

---

[14] Prior to the conference, I circulated a memorandum that stated that I would make such a motion and the reasons to support such a motion. See part III of this dissent. The memorandum was distributed to all the justices' clerks and secretaries.

[15] See, e.g., *Doyle v. Metropolitan Property & Casualty Ins. Co.*, Supreme Court, Docket No. SC 15939 (court granted its own motion to consider case en banc without further briefing or argument).

[16] Conn. Const., amend. XX, § 1.

the legislature set forth in § 53a-46b. I find it difficult to follow my colleagues' reasoning that I have breached the principles of confidentiality. Therefore, I will play their reasoning out in an extremely outrageous but more simplistic scenario in order to demonstrate the fallacies of their argument. I do so in the context of the vote in this case, that is, four justices voted in favor of upholding the death penalty and three found it unconstitutional. My colleagues would have one believe that an individual justice would be bound by the conference's confidentiality even under the following hypothetical scenario: one of the four justices that voted in favor of the majority's decision admitted at conference that he or she had voted to uphold the penalty of death for no other reason than a dislike for the defendant's attorney. It simply is outrageous to believe that under those circumstances any justice would be bound by principles of confidentiality. Although the subject of the motion I disclosed and my supporting memorandum is not as heinous a breach of trust as, for example, a vote that had been motivated by racial animus, or by discontentment with one's choice of attorney, the failure to perform a legislatively mandated procedure to guard against the imposition of the penalty of death based upon "passion, prejudice or any other arbitrary factor" as required by § 53a-46b (b) (1), is a serious breach of the duty imposed on us by the legislature. The fact that I raised the issue at conference in this case and sought such a review must be made public.

Third, I must remind my colleagues that the decision it renders today is not about dollars and cents, nor is it about the loss of liberty. The decision today is about the loss of the life of a human being. The defendant is entitled to the information that I have disclosed so that he may have it for whatever use may be made of it before state and federal habeas corpus courts.

Accordingly, I dissent.

NORCOTT, J., with whom BERDON and KATZ, Js., join, dissenting. As a preliminary matter, I must reinforce my serious belief that capital punishment per se is wrong. "I have always believed that the death penalty has no place in a civilized society where, ironically the state, on the one hand, cherishes and reveres the value of life, and then pursuant to the guise of justice, on the other hand, takes it away by virtue of the death penalty. In my view, when the state engages in the exercise of ending life under the justification of punishment, it is treading on ground that is reserved for a different, higher authority." *State* v. *Webb*, 238 Conn. 389, 567, 680 A.2d 147 (1996) (*Norcott, J.*, dissenting).

In this present dissent, I want to expound upon my earlier position. Not only do I believe that Connecticut's death penalty scheme violates the state constitution's prohibition against cruel and unusual punishment, but also I am persuaded that our statutory scheme for the imposition of the death penalty cannot withstand constitutional scrutiny because it allows for arbitrariness and racial discrimination in the determination of who shall live or die at the hands of the state. Id., 566–67; see also *Callins* v. *Collins*, 510 U.S. 1141, 1145, 114 S. Ct. 1127, 127 L. Ed. 2d 435 (1994) (Blackmun, J., dissenting).

Notwithstanding the fact that this court has held that the penalty of death for certain crimes does not violate the state constitution, I still agree with Justice Blackmun that only if certain procedural safeguards exist to ensure that death sentences are fairly imposed can one uphold the death penalty, notwithstanding one's own deep moral values and reservations, because there is a heightened need for fairness in the administration of death, given that the death penalty is unique both in its finality and in the quality of the punishment it inflicts. I do not believe that we should rest comfortably with the assurance that such protections presently exist.

In the past, the United States Supreme Court has invalidated death penalty statutes where there was an absence of objective guidance for the sentencer; see *Furman* v. *Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972); or a lack of sufficient discretion for the sentencer to afford mercy. See *Woodson* v. *North Carolina*, 428 U.S. 280, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976). To endure federal constitutional scrutiny, state death penalty statutes must meet two requirements: (1) a reasonable consistency and objective standards to guide the sentencer and avoid caprice or prejudice; *Furman* v. *Georgia*, supra, 238; and (2) individual fairness that affords the sentencer sufficient discretion to grant mercy and consider all relevant mitigating factors; *Lockett* v. *Ohio*, 438 U.S. 586, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978). Unfortunately, balance between the two cannot be achieved. As Justice Blackmun stated in *Collins* v. *Collins*, supra, 510 U.S. 1149, "[a] step towards consistency is a step away from fairness." The objective standards needed to ensure a consistent application of the death penalty cannot be reconciled with the subjectivity of the final determination by the sentencer once he is afforded a certain degree of discretion to include such factors as mercy and compassion. "[T]he decision whether a human being should live or die is so inherently subjective—rife with all of life's understandings, experiences, prejudices, and passions—that it inevitably defies the rationality and consistency required by the Constitution." Id., 1153 (Blackmun, J., dissenting).

The way legislatures traditionally have tried to achieve these principles of rationality and consistency has been through the creation of sensible and objective guidelines for determining who should live and who should die, and by using carefully chosen adjectives for the aggravating factors: adjectives that in application have been too broad or too vague. Chief Justice Burger in his dissenting opinion in *Furman* also emphasized

that applying standards such as "extreme cruelty," necessarily embodies a moral judgment. *Furman* v. *Georgia,* supra, 408 U.S. 382. Likewise, there is a potential for arbitrariness and confusion in the application of clauses such as "especially cruel," "heinous" or "depraved." "Even the [United States] Supreme Court, which has been remarkably hospitable to the death penalty since revisiting the issue in 1976, has recognized several times that, for a person of ordinary sensibilities *every* first-degree murder may be perceived as 'heinous,' 'cruel' or 'depraved.' What these terms connote is that some murders are worse than others. In theory, this aggravating circumstance is intended to insure against arbitrariness, discrimination and caprice; in practice, it does exactly the reverse, tending to feed directly into various levels of jurors' revulsion, with life or death hanging in the balance." (Emphasis in original.) E. Margolis, *"State* v. *Ross*: New Life for Connecticut's Death Penalty?," 68 Conn. B.J. 262, 279 (1994). To me, it is axiomatic that every intentional killing of a human being is cruel and heinous.

Furthermore, it is possible that because of the lack of precision of the linguistics "on application of written 'narrowing' factors, the selection process will remain somewhat arbitrary because all language can be manipulated by talented lawyers. For example, 'especially heinous,' even if defined as involving 'serious physical abuse,' can be made by skillful employment of language to apply, or not, to virtually any intentional killing. Similarly, creative writing can make almost any murder seem committed 'for pecuniary gain.' " R. Little, "The Federal Death Penalty: History and Some Thoughts About The Department of Justice's Role," 26 Fordham Urb. L.J. 347, 490 (1999).

I

Further, I am convinced that the arbitrariness inherent in the sentencer's discretion is intensified by the

issue of race. Indications from the available evidence suggest that the death penalty has been imposed in a racially discriminatory manner and has been geared toward minorities and the poor. In his dissent in *McCleskey* v. *Kemp*, 481 U.S. 279, 323 n.1, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987), Justice Brennan, while discussing the irrationality of a system that features a significant probability that sentencing decisions are influenced by impermissible considerations, stated: "Once we can identify a pattern of arbitrary sentencing outcomes, we can say that a defendant runs a risk of being sentenced arbitrarily." Further, Justice Brennan acknowledged the opinion of Justices Stewart, Powell and Stevens, in *Gregg* v. *Georgia*, 428 U.S. 153, 195 n.46, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976), wherein they concluded that "a constitutional violation is established if a plaintiff demonstrates 'a *pattern* of arbitrary and capricious sentencing.'" (Emphasis in original.) *McCleskey* v. *Kemp*, supra, 323.

Social statistical studies reveal that the factor of the defendant's and the victim's respective race influences the outcome of death penalty sentences. A statistical study conducted by Professor David C. Baldus (Baldus study), which was presented and regrettably rejected by the majority of the Supreme Court in *McCleskey*, demonstrated that, of the more than 200 variables potentially relevant to a sentencing decision, the race of the victim is a powerful explanation for variation in death sentence rates. This study found the victim's race to be as powerful a factor as nonracial aggravating factors such as the defendant's prior murder conviction or the defendant's role as the principal planner of the homicide. This highly reliable study showed that blacks who kill whites are sentenced to death at nearly twenty-two times the rate of blacks who kill blacks, and more than seven times the rate of whites who kill blacks. This study also indicated that prosecutors seek the death

penalty for 70 percent of black defendants with white victims, while only for 15 percent of black defendants with black victims, and only for 19 percent of white defendants with black victims. See D. Baldus, C. Pulaski & G. Woodworth, "Comparative Review of Death Sentences: An Empirical Study of the Georgia Experience," 74 J. Crim. L. & Criminology 661, 674 n.56 (1983). Another study, which was conducted by the Death Penalty Information Center in Washington, found that blacks are four times more likely to receive the death penalty than whites. See R. Dieter, "The Death Penalty in Black and White: Who Lives, Who Dies, Who Decides," Death Penalty Information Center (June, 1998) p. 5.[1] This study revealed how the race of the defendant was found to be a more accurate predictor of capital punishment than the severity of the crime or the defendant's criminal background. This is shocking in a society that believes in an open system of justice.

Even so, the Supreme Court "[m]ajority concluded that the Baldus study was insufficient to support an inference that any of the decisionmakers in [*McCleskey*] acted with discriminatory purpose." (Internal quotation marks omitted.) M. Holland, "*McCleskey* v. *Kemp*: Racism and the Death Penalty," 20 Conn. L. Rev. 1029, 1049 (1988). This is the same Supreme Court that just twenty years earlier, in *Rose* v. *Mitchell*, 443 U.S. 545, 558–59, 99 S. Ct. 2993, 61 L. Ed. 2d 739 (1979), had acknowledged: "[W]e . . . cannot deny that, 114 years after the close of the War Between the States and nearly 100 years after *Strauder* [v. *West Virginia*, 100 U.S. 303, 25 L. Ed. 664 (1879)], racial and other forms of discrimination still remain a fact of life, in the administration of justice as in our society as a whole. Perhaps today, that discrimination takes a form more subtle than before.

---

[1] See also B. Rossesner, "We All Suffer When We Employ Death Penalty," Hartford Courant, June 14, 1998, p. B3.

But it is not less real or pernicious." Therefore, I reaffirm my belief that presently, and in the foreseeable future, race is the prevalent unresolved and divisive issue in this country. As I previously have stated, the specter of racial discrimination touches every facet of our lives, and the statutory scheme for the imposition of the death penalty does not escape its pervasive evil.

## II

Similarly, poverty plays an important role in determining the likelihood of a defendant obtaining a death penalty conviction due to the inadequacy of counsel. Even after the Supreme Court's decision in *Powell* v. *Alabama*, 287 U.S. 45, 71, 53 S. Ct. 55, 77 L. Ed. 158 (1932), in which that court determined that any person facing the death penalty who cannot afford an attorney is entitled to have one appointed for him by the court, the reality is that a large part of the death row population is made up of people who are distinguished by neither their records, nor the circumstances of their crimes, but by their abject poverty, debilitating mental impairments, minimal intelligence, and the poor legal representation they received.[2] "A poor person facing the death penalty may be assigned an attorney who has little or no experience in the defense of capital or even serious criminal cases, one reluctant or unwilling to defend him, one with little or no empathy or understanding of the accused or his particular plight, one with little or no knowledge of criminal or capital punishment law, or one with no understanding of the need to document and present mitigating circumstances." S. Bright,

[2] I acknowledge that this concern for poverty is not presently applicable to Connecticut, given that our state provides a very high quality of legal representation to death penalty defendants through our public defender system, including special public defenders. My concern is that the present admirable level of legal representation is not, like many matters dependent on funding and hiring, infinite. The life of a criminal defendant should neither depend upon nor be subject to such variables.

"Counsel for the Poor: The Death Sentence Not for the Worst Crime but for the Worst Lawyer," 103 Yale L.J. 1835, 1845–46 (1994). Although in Connecticut the concern about the possibility of arbitrariness due to poverty is at this moment not a specific concern, we must acknowledge that aspects such as the funding for public defenders, the salaries these lawyers receive, their heavy caseload, and the amount of resources necessary for investigation and expert testimony, are subject to forces that vary and, therefore, are not completely reliable.

## III

Finally, the real fear presented by these cases is one of actual innocence. In a system that is so inherently flawed with arbitrariness and lack of fairness, it is almost inevitable that at least some innocent people will die in the process. As Justice Blackmun stated in *Herrera* v. *Collins*, 506 U.S. 390, 446, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993): "Just as an execution without adequate safeguards is unacceptable, so too is an execution where the condemned prisoner can prove he is innocent. The execution of a person who can show he is innocent comes perilously close to simple murder."

Moreover, results from the General Social Survey[3] show that the principal reason why citizens of the United States oppose the death penalty is the danger of killing innocent people. S. Gross "Update: American Public Opinion on the Death Penalty—It's Getting Personal," 83 Cornell L. Rev. 1448, 1462 (1998). This concern arises from the few known, and the many unknown, cases of death row inmates who have been set free after having been found innocent. For every seven executions nationwide, since the death penalty was reinstated in 1976, one death row inmate has been

---

[3] The General Social Survey is an annual opinion poll of American adults conducted by the National Research Center at the University of Chicago.

set free. Currently, seventy-nine people have walked off death row nationally.[4] These revelations are quite alarming. Consequently, I must agree that "the inevitability of factual, legal and moral error gives us a system that we know must wrongly kill some defendants, a system that fails to deliver the fair, consistent, and reliable sentences of death required by the constitution." *Callins* v. *Collins*, supra, 510 U.S. 1145–46.

Further, the imposition of capital punishment does not smoothly coincide with the more liberal tradition and providing of due process protections for our citizens that characterize the state of Connecticut. As one member of this court has aptly noted, "in more recent years the Connecticut courts have interpreted the state constitution to afford greater protection of individual rights than the federal constitution in several important areas including search and seizure, educational funding, substantive due process . . . ." R. Berdon, "An Analytical Framework for Raising State Constitutional Claims in Connecticut," 14 Quinnipiac L. Rev. 191, 196 (1994). Currently, thirty-eight states do authorize the death penalty. The remaining twelve states, which do not have the death penalty, lie outside the historically defined southern or border states. Since *Gregg* v. *Georgia*, supra, 428 U.S. 153, reauthorized the death penalty in 1976, only twenty-two states have fully reinstated the executions. As of the date of this opinion, nine of these states have performed no executions since at least 1972, and the state of Connecticut is included among them.[5]

In this state, no execution has occurred since 1960, while six[6] men currently reside on death row. I propose that we remain on a higher plane, and further suggest that if this state has not yet begun executions for over

[4] M. Brant, "Last Chance Class," Newsweek, May 31, 1999, p. 32.

[5] R. Little, supra, 26 Fordham Urb. L.J. 347.

[6] This data is provided by the Connecticut department of correction as of July 20, 1999.

thirty years, it should not begin now, when people—particularly those in our legal community—simply do not have faith in it anymore. The deficiencies that were denounced in *Furman* have not been cured, despite newly reconstructed death penalty statutes nationwide. As Justice Blackmun stated, "the death penalty experiment has failed." *Callins* v. *Collins*, supra, 510 U.S. 1145.

One final indication of this failure can be gleaned from the American Bar Association's call for a moratorium on the death penalty in the United States, which was made on February 3, 1997. Even a traditionally conservative organization such as the American Bar Association, which is made up of lawyers who understand the system, has recognized that the system as it is cannot work fairly, and that there is a risk that innocent people might be executed.[7] Not surprisingly, Connecticut's own bar association has become the second state bar association in the nation, behind Pennsylvania, to demand this moratorium on the death penalty, until and unless the American justice system rids itself of the harmful influences of money and race.

I believe that the time is now appropriate for this court not only to reexamine closely the social statistical studies that the Supreme Court of the United States has rejected in the past, which point out overwhelming

---

[7] The American Bar Association's goal is to attempt, once again after the obvious failure of the majority of the states' legislatures, to create guidelines for the carrying out of the death penalty in the United States. Its policies are concerned with providing competent legal counsel at all stages: during conviction, sentencing and appeals; preserving due process in the adjudication of constitutional claims in postconviction proceedings and in federal habeas corpus proceedings; eliminating discrimination in death sentences on the basis of race of the victim or the defendant; and preventing executions of mentally retarded persons or those who are under eighteen when they committed their offenses. J. Podgers, "Time Out for Executions," 83 A.B.A. J. 26 (1997).

While I applaud the noble motivations of the American Bar Association, I feel that the imposition of moratoriums falls short of the ultimate proper resolution of the matter—the complete abolition of the death penalty.

statistical evidence of the corrosive racism and classism inherent in the death penalty scheme along with the rampant inconsistencies in the standards it applies, but also to open the court to any similar evidence proffered by counsel in the future. In the aftermath, it well may be that even those previously unpersuaded by arguments that the death penalty is unconstitutional will reflect differently.

Certainly, with the alternative of life imprisonment without the possibility of parole as a penalty, the continuation of the death penalty simply makes no sense as we approach a hopefully more enlightened new millennium.

I respectfully dissent.

KATZ, J., with whom BERDON, J., joins, dissenting. The majority assumes, without deciding, that, under the facts of this case, there was a violation of this court's decision in *State* v. *Stoddard*, 206 Conn. 157, 158, 537 A.2d 446 (1988), which held that the due process clause of the Connecticut constitution requires the police "to inform a suspect whom they are holding for custodial interrogation of timely efforts by counsel to render pertinent legal assistance." The majority determines that the scope of review over this issue is plenary, and that it is the obligation of the court to consider the totality of the circumstances as disclosed by the record as a whole and to determine whether the pertinent information not communicated to the defendant would have altered the defendant's decision to speak with the police when he did. Determining, in accordance with *Stoddard*, that the degree of persuasion is by a preponderance of the evidence, the majority concludes that the state has met its burden of proving that knowledge of the efforts of counsel would not have altered the defendant's decision. Because I believe that the totality of the circumstances test and the preponderance of the

evidence standard are no longer appropriate in a case such as this, I disagree with the majority on this issue.

In my opinion, actions by police officers or sheriffs to frustrate the efforts of counsel seeking to consult with a suspect prior to or during custodial interrogation should be deemed a per se violation of the suspect's privilege against self-incrimination and the ancillary right to counsel. Therefore, such actions should operate to invalidate any incriminating statements made after counsel has made efforts to consult with the suspect, and after those with custody of the suspect—or those to whom such knowledge fairly can be imputed—become aware of those efforts. Accordingly, I would reverse the defendant's judgment of conviction and order a new trial at which the state would not have the benefit of the defendant's statements of December 27, 1989.

Whether a waiver of presence of counsel can, under certain circumstances, be shown invalid if the police fail to inform a suspect of the efforts by counsel to consult with that suspect was the principle issue in *State* v. *Stoddard*, supra, 206 Conn 163. Therein, in attempting to ascertain the independent meaning of the due process clause of article first, § 8, of the Connecticut constitution, the court first recounted the state's long history of recognizing the significance of the right to counsel, even before that right attained federal constitutional importance. Id., 164–65. The court further recognized that this history specifically illuminates the right to counsel that attaches after the initiation of adversarial judicial proceedings and informs the due process concerns raised by police interference with counsel's access to a custodial suspect. Id., 166. On the basis of this "historical record and our due process tradition, we conclude[d] that a suspect must be informed promptly of timely efforts by counsel to render pertinent legal assistance. Armed with that information, the suspect must be permitted to choose whether

he wishes to speak with counsel, in which event interrogation must cease, or whether he will [forgo] assistance of counsel, in which event counsel need not be afforded access to the suspect. The police may not preclude the suspect from exercising the choice to which he is constitutionally entitled by responding in less than forthright fashion to the efforts by counsel to contact the suspect. The police, because they are responsible for the suspect's isolation, have a duty to act reasonably, diligently and promptly to provide counsel with accurate information and to apprise the suspect of the efforts by counsel. . . . [T]his duty requires . . . that the police act as a neutral conduit for the pertinent and timely requests by counsel to meet with a custodial suspect." Id., 166–67.

The court in *Stoddard* refused to "conclude that a decision to [forgo] the abstract offer contained in *Miranda* [v. *Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)] embodies an implied rejection of a specific opportunity to confer with a known lawyer." *State* v. *Stoddard*, supra, 206 Conn. 168. The court was "unwilling . . . to dismiss counsel's effort to communicate as constitutionally insignificant to the capacity of the suspect to make a knowing and intelligent choice whether he or she will invoke the right to counsel. *Miranda* warnings refer only to an abstract right to counsel. That a suspect validly waives the presence of counsel only means that for the moment the suspect is foregoing the exercise of that conceptual privilege. *Weber* v. *State*, 457 A.2d 674, 685 (Del. 1983). Faced with a concrete offer of assistance, however, a suspect may well decide to reclaim his or her continuing right to legal assistance. To pass up an abstract offer to call some unknown lawyer is very different from refusing to talk with an identified attorney actually available to provide at least initial assistance and advice, whatever might be arranged in the long run. A suspect indifferent

to the first offer may well react quite differently to the second. *State* v. *Haynes*, 288 Or. 59, 72, 602 P.2d 272 (1979), cert. denied, 446 U.S. 945, 100 S. Ct. 2175, 64 L. Ed. 2d 802 (1980)." (Internal quotation marks omitted.) *State* v. *Stoddard*, supra, 168. Accordingly, police may not fail to apprise the defendant of a specific communication from his attorney bearing directly on the right to counsel.[1] Id., 169.

In the present case, Assistant Public Defender Michael Isko informed Sheriff Michael Connelly that the defendant already was represented by the public defender's office in Derby, that the public defender would be representing the defendant in connection with an incident in Naugatuck, and that Isko wanted to speak with the defendant *before* the police did so as to advise him of his rights and to let him know that he would be represented by the public defender. Isko repeated his concerns to Lieutenant Philip Calo, again emphasizing the importance of his having the opportunity to speak with the defendant before he made any statement to the police.

Despite Isko's requests, the defendant was taken to the lockup area, which is controlled by the sheriff's department, and placed in the bail commissioner's

---

[1] Our holding in *Stoddard* was contrary to that of the United States Supreme Court in *Moran* v. *Burbine*, 475 U.S. 412, 422, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986), in which the court held that efforts by counsel to contact a suspect in police custody have no bearing on the validity of that suspect's waiver of rights guaranteed by *Miranda* v. *Arizona*, supra, 384 U.S. 436. In *Stoddard*, we held that "a waiver of rights may or may not, depending upon the totality of the circumstances, be vitiated by the failure of the police to fulfill their responsibility to inform the suspect." *State* v. *Stoddard*, supra, 206 Conn. 163. "While the United States Supreme Court . . . refused to impose a similar duty upon the police under the federal constitution, it nonetheless recognized that '[n]othing we say today disables the States from adopting different requirements for the conduct of its employees and officials as a matter of state law.' *Moran* v. *Burbine*, supra, 428." *State* v. *Stoddard*, supra, 164.

office with Detective Neil O'Leary and Lieutenant Patrick Deeley of the Waterbury police department. Because Assistant Public Defender Barbara Sorrentino was anxious to speak with the defendant as soon as possible, she walked to the geographical area courthouse from her office on Grand Street in Waterbury, located Isko, and together they attempted to learn whether the defendant had arrived at the courthouse. They first needed permission from the sheriff at the front entrance of the courthouse to gain entry into the lockup area. That sheriff telephoned the lockup and approximately five minutes later unlocked the door to allow them entry. Once inside, they found Calo and Connelly, who told them that the defendant had not yet arrived. When Calo and Connelly glanced toward a door located in the rear of the lockup area, Sorrentino asked if the defendant was in that room. When Connelly replied that he was but that he was busy, Sorrentino and Isko attempted to enter but were blocked temporarily by Connelly. After approximately one minute, they moved past Connelly and entered the bail commissioner's office. By the time Isko and Sorrentino finally made their way into the office, shortly after 9 a.m., the interview was well under way.

At Sorrentino's request, O'Leary and Deeley left the room. Before exiting, they indicated to the defendant that, if he cared to speak with them further, they would be waiting for him outside the door. The officers moved away from the door only after the defendant had been placed in a cell without speaking to them further.

In the present case, the majority *assumes* that: "(1) the custody of the defendant by the sheriff's department was a sufficient surrogate for police custody; (2) the fact that the defendant was in custody for purposes of requiring the *Miranda* warnings was sufficient to trigger the application of *Stoddard*; and (3) the public

defenders had sufficient authority to contact the defendant so as to trigger the duty established by *Stoddard*." Accordingly, the majority next considers under what circumstances statements obtained in violation of this duty must be suppressed.

The resolution of this question hinges on well known principles governing the waiver of constitutional rights. Although the right to have counsel present during interrogation can be waived by the suspect, such "[a] valid waiver is defined, in accordance with the well known test of *Johnson* v. *Zerbst*, 304 U.S. 458, 464, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938), as the intentional relinquishment or abandonment of a known right." *State* v. *Barrett*, 205 Conn. 437, 450, 534 A.2d 219 (1987). An effective waiver "presupposes full knowledge of the right or privilege allegedly waived . . . ." *State* v. *Ramos*, 201 Conn. 598, 603, 519 A.2d 9 (1986). Additionally, the waiver must be "accomplished with sufficient awareness of the relevant circumstances and likely consequences." *State* v. *Reed*, 174 Conn. 287, 293, 386 A.2d 243 (1978).

In *State* v. *Stoddard*, supra, 206 Conn. 173–74, the court examined the question of "how to interpolate into the calculus of waiver the failure of the police to inform a suspect of inquiries by counsel," recognizing the two views of this issue taken by courts in other jurisdictions: a per se rule of exclusion in order to enforce the duty to inform; and a more open-ended examination of the totality of the circumstances. The court noted that "[i]n the majority of reported cases, the rule has been that a lack of knowledge always fatally undermines the suspect's continuing right to claim the presence of counsel. The principal reason for adhering to a per se rule of exclusion is ably stated by the Supreme Court of Oregon: 'When the opportunity to consult counsel is in fact frustrated, there is no room for speculation what [the] defendant might or might not have chosen to do after

he had that opportunity.' *State* v. *Haynes*, supra, [288 Or. 75] . . . ." (Citations omitted.) *State* v. *Stoddard*, supra, 174.

Nevertheless, we rejected the majority rule, deciding instead to ask "whether the information not conveyed by the police would likely have changed the defendant's appraisal and understanding of the circumstances." Id., 175. We noted that "[o]f particular, but not exclusive, relevance are such facts and circumstances as the relationship of the suspect to the attorney, the nature of counsel's request, the extent to which the police had reasonable notice of counsel's request and the conduct of the suspect."[2] Id.

*Stoddard* presented us with our first opportunity to consider whether a suspect's lack of knowledge undermines his or her right to claim the presence of counsel. At that time, in diverging from the United States Supreme Court's decision in *Moran* v. *Burbine*, 475 U.S. 412, 422, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986), this court determined that a waiver of rights may or may not, depending upon the totality of the circumstances,

[2] In *State* v. *Stoddard*, supra, 206 Conn. 176, the court concluded that "[t]he record . . . taken as a whole, reveal[ed] at least a reasonable likelihood that the defendant would have invoked his right to counsel had the police fulfilled their duty to inform." In that case, "two days after the discovery of the victim's body, the defendant, having heard that the police wanted to question him regarding the death, called a Bridgeport police detective." Id., 160. After telling the detective that he would not come to the station, he nevertheless told the police his whereabouts on the night in question. Approximately one week later, the defendant gave a written statement to the police following a stationhouse interview in which he was given *Miranda* warnings. In that statement, he denied killing the victim. Id. The defendant's next encounter with the police came about when he was arrested outside his home. "Before leaving for the police station, the defendant spoke briefly with his girlfriend through the partly opened front door of his home." Id. Accordingly, the court held that the state had not met its burden of proving by a preponderance of the evidence that the defendant would have changed his appraisal and understanding of the circumstances had he known of the efforts by counsel to communicate with him. Id., 176–77.

be vitiated by the failure of those charged with the suspect's custody to inform him of counsel's attempts to speak with him. *State* v. *Stoddard*, supra, 206 Conn. 163. Since that time, however, more states have joined the majority view in adopting a per se rule of exclusion in similar circumstances. I believe the time has come for us to do the same.

As noted previously, a majority of state courts hold that the failure to inform a suspect of an attorney's attempts to consult with him, prior to or during custodial interrogation, "*always* . . . undermines the suspect's continuing right to claim the presence of counsel." (Emphasis added.) Id., 174; see also *Bryan* v. *State*, 571 A.2d 170, 176 (Del. 1990) (waiver cannot be valid when police do not inform suspect that attorney seeks to render legal advice); *People* v. *McCauley*, 163 Ill. 2d 414, 444, 645 N.E.2d 923 (1994) (police conduct denying attorney access to defendant and failing to inform him of attorney's efforts to consult with him violated state due process rights); *State* v. *Matthews*, 408 So. 2d 1274, 1278 (La. 1982) (failure to inform defendant of attorney's attempts to consult with him violated state constitutional and statutory right to remain silent and right to counsel); *Elfadl* v. *State*, 61 Md. App. 132, 142–43, 485 A.2d 275, cert. denied, 303 Md. 42, 491 A.2d 1197 (1985), cert. denied, 475 U.S. 1081, 106 S. Ct. 1457, 89 L. Ed. 2d 715 (1986) (effective waiver of counsel in the abstract terminates once specific attorney appears on behalf of accused; accused must be informed of availability of counsel and rewaiver of right to counsel must be obtained before interrogation may proceed); *Commonwealth* v. *Sherman*, 389 Mass. 287, 294–95, 450 N.E.2d 566 (1983) (failure of police to inform defendant that counsel appointed to represent him on unrelated charge sought to be present at interrogation on subsequent charge violated right to counsel); *People* v. *Bender*, 452 Mich. 594, 614, 551 N.W.2d 71 (1996) (defendants' waivers of right to remain silent and right to

counsel were not knowing and intelligent because police did not inform them of attorneys' attempts to contact them); *State* v. *Reed*, 133 N.J. 237, 269, 627 A.2d 630 (1993) (failure of police to give suspect information that retained attorney sought to consult with him rendered subsequent waiver of privilege against self-incrimination invalid per se); *People* v. *Garofolo*, 46 N.Y.2d 592, 599, 389 N.E.2d 123, 415 N.Y.S.2d 810 (1979) (once police are aware that attorney has undertaken to represent suspect in custody, suspect cannot waive assistance of counsel outside counsel's presence); *State* v. *Stephens*, 300 N.C. 321, 327–28, 266 S.E.2d 588 (1980) (invalidating waiver of right to counsel and right to be free from compelled self-incrimination where police deceived defendant and his attorney by failing to inform them that interrogation had begun); *State* v. *Haynes*, supra, 288 Or. 70 (suspect could not knowingly waive right to counsel when not informed that attorney had been retained on his behalf and sought to consult with him); *Commonwealth* v. *Hilliard*, 471 Pa. 318, 322, 370 A.2d 322 (1977) (failure to request counsel could not constitute valid waiver due to police refusal to inform defendant that attorney sought to render legal assistance); *State* v. *Jones*, 19 Wash. App. 850, 854, 578 P.2d 71 (1978) ("when counsel is retained or appointed and expressly objects to custodial interrogation of defendant, these facts must be communicated to defendant before his waiver will be held to have been knowingly and intelligently made"); *State* v. *Hickman*, 175 W. Va. 709, 716, 338 S.E.2d 188 (1985) (defendant held for custodial interrogation must be advised that counsel has been retained or appointed to represent him where police have that knowledge).[3]

---

[3] Additionally, one state court followed the majority view until its holding was superseded by constitutional amendment. See *People* v. *Houston*, 42 Cal. 3d 595, 610, 724 P.2d 1166, 230 Cal. Rptr. 141 (1986), superseded by *People* v. *Johnson*, 3 Cal. 4th 1183, 1222–23, 842 P.2d 1, 14 Cal. Rptr. 2d 702 (1992), cert. denied, 510 U.S. 836, 114 S. Ct. 114, 126 L. Ed. 2d 80 (1993).

In some states, a dispositive factor can be whether the suspect or someone known to the suspect had retained counsel on the suspect's behalf, or

whether an attorney, unknown to the suspect, had appeared at the police station seeking to consult with him. For example, courts in both Colorado and Florida exclude statements made after an attorney has been denied access to a suspect when the attorney has been retained by the suspect's family; see, e.g., *People* v. *Harris*, 703 P.2d 667, 672–73, (Colo. App. 1985); *Haliburton* v. *State*, 514 So. 2d 1088, 1089–90 (Fla. 1987); but admit statements when an attorney unknown to the suspect and not retained by those known to him seeks to consult with him. See, e.g., *People* v. *Page*, 907 P.2d 624, 633 (Colo. App. 1995); *Harvey* v. *State*, 529 So. 2d 1083, 1085 (Fla. 1988), cert. denied, 489 U.S. 1040, 109 S. Ct. 1175, 103 L. Ed. 2d 237 (1989).

We note that there are other states, however, that, like Connecticut, apply a totality of the circumstances test in circumstances such as this. See, e.g., *Yates* v. *State*, 467 So. 2d 884, 885–86 (Miss. 1984); *State* v. *Beck*, 687 S.W.2d 155, 158–59 (Mo. 1985), cert. denied, 476 U.S. 1140, 106 S. Ct. 2245, 90 L. Ed. 2d 692 (1986); *State* v. *Reese*, 319 N.C. 110, 127–32, 353 S.E.2d 352 (1987), overruled in part on other grounds, *State* v. *Barnes*, 345 N.C. 184, 233, 481 S.E.2d 44 (1997); *State* v. *Luck*, 15 Ohio St. 3d 150, 154–58, 472 N.E.2d 1097 (1984), cert. denied, 470 U.S. 1084, 105 S. Ct. 1845, 85 L. Ed. 2d 144 (1985); *Roeder* v. *State*, 768 S.W.2d 745, 753–55 (Tex. Crim. App. 1988).

We note also that a minority of state court decisions harmonize with *Moran* v. *Burbine*, supra, 475 U.S. 412; see footnote 1 of this dissent; in deviation from both the majority view of our sister states and the view of the majority of this court. See, e.g., *Callahan* v. *State*, 557 So. 2d 1292, 1303 (Ala. Crim. App.) (suspect's rights not violated by failure of police to inform him of presence of attorney contacted by suspect's father), aff'd, *Ex parte Callahan*, 557 So. 2d 1311 (Ala. 1989), cert. denied, 498 U.S. 881, 111 S. Ct. 216, 112 L. Ed. 2d 176 (1990); *Mitchell* v. *State*, 306 Ark. 464, 468, 816 S.W.2d 566 (1991) (because defendant did not know of counsel's efforts to see him when he waived rights, failure by police to inform him of attorney's efforts did not invalidate waiver); *Blanks* v. *State*, 254 Ga. 420, 422 and n.3, 330 S.E.2d 575 (1985), cert. denied, 475 U.S. 1090, 106 S. Ct. 1479, 89 L. Ed. 2d 733 (1986) (fifth amendment rights not violated when police failed to inform suspect that attorney retained by suspect's father sought to consult with him); *Lodowski* v. *State*, 307 Md. 233, 242, 513 A.2d 299 (1986) (based on *Moran*, court admitted into evidence on remand defendant's statement previously excluded); *Tilley* v. *State*, 963 P.2d 607, 614 (Okla Crim. App. 1998) (expressly adopting Supreme Court's rationale in *Moran*); *State* v. *Drayton*, 293 S.C. 417, 426–27, 361 S.E.2d 329 (1987), cert. denied, 484 U.S. 1079, 108 S. Ct. 1060, 98 L. Ed. 2d 1021 (1988) (where defendant informed of rights prior to waiver, failure of police to inform him that public defender sought to contact him did not invalidate waiver); *State* v. *Stephenson*, 878 S.W.2d 530, 547 (Tenn. Crim. App. 1994) (state privilege against self-incrimination does not require police to inform defendant that attorney contacted by his family was present and sought to consult with him); *State* v. *Earls*, 116 Wash. 2d 364, 380–81, 805 P.2d 211 (1991) (court declined to invalidate waiver based on unretained attorney's telephone call to police station in which attorney left message for defendant to call); *State* v. *Hanson*, 136

Underlying the reasoning of these decisions, either explicitly or implicitly, is the following principle: "[T]he atmosphere of custodial interrogation is inherently coercive and protecting the right against self-incrimination [and the ancillary right to counsel] entails counteracting that coercion." *State* v. *Reed*, supra, 133 N.J. 255. I agree with the words of the Supreme Court of New Jersey when it stated: "Although we cannot conclude with confidence that a suspect's knowledge that an attorney is ready, able, and willing to represent him or her will enhance the suspect's knowledge of the right to counsel, that knowledge will surely play an important role in dissipat[ing] the compulsion inherent in custodial interrogation and, in so doing, guard against abridgement of the suspect's right against self-incrimination." (Internal quotation marks omitted.) Id., 257.

In *State* v. *Stoddard*, supra, 206 Conn. 166, this court discussed the special judicial solicitude the right to counsel receives in Connecticut. We recognized the "unique ability of counsel to protect the rights of a client undergoing, or confronting the imminent possibility of, interrogation." (Internal quotation marks omitted.) Id., citing *State* v. *Barrett*, supra, 205 Conn. 448. The court noted that "[t]his recognition is in service of the traditional belief that an accused may be convicted only if exacting measures have been taken to assure that the accused has been treated with the most scrupulous fairness by law enforcement officials. . . . Because counsel is uniquely prepared to assist a suspect in making an intelligent and knowing decision whether to speak or stand mute, we have concluded that questioning of a suspect must cease once a clear request

Wis. 2d 195, 219, 401 N.W.2d 771 (1987) (right to counsel not violated by police failing to inform defendant that attorney arranged for him by parents sought to see him); *Wheeler* v. *State*, 705 P.2d 861, 864 (Wyo. 1985) (waiver upheld where defendant expressly stated that he did not want attorney; court based decision on nonexistence of independent right of *attorney* to have access to client).

for counsel has been made. . . . The decision in
*Miranda* v. *Arizona*, supra, [384 U.S. 444], itself the
benchmark in this area of law, required fully effective
means of ensuring a suspect's continuous right of
access to counsel." (Citations omitted; internal quota-
tion marks omitted.) *State* v. *Stoddard*, supra, 166.

As the United States Supreme Court has observed:
"The rule in *Miranda* . . . was based on this Court's
perception that the lawyer occupies a critical position
in our legal system because of his unique ability to
protect the Fifth Amendment rights of a client undergo-
ing custodial interrogation. . . . [T]he lawyer is the
one person to whom society as a whole looks as the
protector of the legal rights of [a] person in his dealings
with the police and the courts." (Citations omitted.)
*Fare* v. *Michael C.*, 442 U.S. 707, 719, 99 S. Ct. 2560, 61
L. Ed. 2d 197 (1979). It also has been stated that "the
duty to inform a person held in custody of a specific
opportunity to confer with a known lawyer is closely
connected, both in logic and in experience, to the full
effectuation of the privilege against self-incrimination.
. . . [T]he right to counsel has been recognized as
inextricably intertwined with the right against self-
incrimination. . . . That right to counsel gives full
force, life and substance, to the right against self-incrim-
ination and is essential to the effectuation of that right."
(Citation omitted; internal quotation marks omitted.)
*State* v. *Reed*, supra, 133 N.J. 266.

In evaluating the totality of the circumstances test,
courts impose a two part inquiry. "First, the waiver must
have been voluntary—it must have been 'the product of
a free and deliberate choice rather than intimidation,
coercion, or deception.' *Moran* [v. *Burbine*, supra, 475
U.S. 421]. Second, the waiver must have been made
upon 'a full awareness of both the nature of the right
being abandoned and the consequences of the decision
to abandon it.' Id. However, a purported waiver can

never satisfy a totality of the circumstances analysis when police do not even inform a suspect that his attorney seeks to render legal advice. *Weber* [v. *State*, supra, 457 A.2d 686]." *Bryan* v. *State*, supra, 571 A.2d 176.

I do not believe that a totality of the circumstances test or a preponderance of the evidence standard comports with the spirit either of our own case law—which demonstrates special solicitude for the rights guaranteed by *Miranda*, *Stoddard* notwithstanding—or of *Miranda* itself. Despite the rule set forth in *Stoddard* governing police action, Calo and Connelly, *deliberately and in bad faith,*[4] attempted to thwart the efforts by Isko and Sorrentino to render timely legal assistance to the defendant, with the obvious goal of delaying the attorneys in the hope that the defendant would incriminate himself before they could render legal advice. These actions are hardly an example of " 'the most scrupulous fairness' " with which this court has directed law enforcement officials to treat those accused of crimes before the accused can be convicted. *State* v. *Stoddard*, supra, 206 Conn. 166.

Moreover, with the totality of the circumstances test and the preponderance of the evidence standard we set forth in *Stoddard* guiding its decision, the majority determines that the information withheld from the defendant as a result of the actions of Calo and Connelly would not have altered the defendant's decision to speak with the police. In light of the blatant disregard of our edicts in *Stoddard*, and the fact that the majority's decision today does nothing to discourage such disregard in the future, it is evident to me that the totality

---

[4] The term "bad faith" connotes a deliberate act done with intent to deprive the defense of information. *State* v. *Santangelo*, 205 Conn. 578, 587, 534 A.2d 1175 (1987); see also *United States* v. *Bryant*, 439 F.2d 642, 644 (D.C. Cir. 1971) (recognizing that "intentional non-preservation" and "bad faith" are not synonymous). I note that in *Stoddard*, unlike in the present case, "there was no proof that the police deliberately misled counsel . . . ." *State* v. *Stoddard*, supra, 206 Conn. 172.

of the circumstances test and its corresponding preponderance of the evidence standard should be abolished, and a per se rule of exclusion should be adopted in their place. The fact that the test and the standard set forth in *Stoddard* were inadequate, both to deter the police conduct at issue in the present case and to compel the majority of this court to conclude that the conduct of Calo and Connelly rendered the defendant's statements inadmissible, compels me now to conclude that a per se rule is warranted. To require less "would encourage the police to do everything possible, short of a due process violation, to prevent an attorney from contacting his client before or during interrogation. Once the suspect signed the waiver form, police could interrogate the suspect in isolation, without the assistance of his own lawyer, even if that lawyer is making an actual effort to consult with the suspect. To encourage this type of police behavior would undermine the safeguards we have established to protect the rights to remain silent and to counsel. If these rights are to mean anything, surely we must be adamant in our protection of them." *People* v. *Bender*, supra, 452 Mich. 615–16.

"[P]olice deception of a suspect through omission of information regarding attorney communications greatly exacerbates the inherent problems of incommunicado interrogation and requires a clear principle to safeguard the presumption against the waiver of constitutional rights." *Moran* v. *Burbine*, supra, 475 U.S. 452, (Stevens, J., dissenting). I believe that "[t]he right to counsel becomes meaningless if a suspect cannot communicate with his attorney or can only speak with him after the suspect has given a statement. Thus, the inherently coercive nature of incommunicado interrogation requires a per se rule that can be implemented with ease and practicality to protect a suspect's rights to remain silent and to counsel." *People* v. *Bender*, supra, 452 Mich. 617.

In my opinion, therefore, the per se rule, in addition to comporting with the spirit of our state constitution and with our long tradition of protecting the constitutional rights of our citizens, would carry with it two practical benefits. First, it would reduce the level of coercion inherent in custodial interrogation, thereby enhancing the reliability of confessions obtained. See *State* v. *Reed,* supra, 133 N.J. 260. Second, it would "diminish the likelihood of unreasonable police conduct in those situations where police, knowing that an attorney has been retained for the suspect and is asking for contact with his or her client, are desperate to acquire a confession before the suspect speaks with the attorney." Id.

I acknowledge that the per se rule could be considered a burden to the administration of law enforcement in that it could lead to law enforcement officers obtaining fewer confessions from suspects as more suspects assert their rights to remain silent and to counsel.[5] I am struck, however, by the force of the words of the United States Supreme Court: "[N]o system of criminal justice can, or should, survive if it comes to depend for its continued effectiveness on the citizens' abdication through unawareness of their constitutional rights. No system worth preserving should have to fear that if an accused is permitted to consult with a lawyer, he will become aware of, and exercise, these rights. If the exercise of constitutional rights will thwart the effectiveness of a system of law enforcement, then there is something very wrong with that system." *Escobedo* v. *Illinois,* 378 U.S. 478, 490, 84 S. Ct. 1758, 12 L. Ed. 2d 977 (1964).

I respectfully dissent.

---

[5] I believe, however, that such concerns are overrated. The rule imposed in *Stoddard* applies only to *concrete* offers of assistance from a suspect's attorney *bearing directly* on the right to counsel. *State* v. *Stoddard,* supra, 206 Conn. 169.